Department of Justice
Environment & Natural Resources Division
801 B Street, Suite 504
Anchorage, Alaska  99501-3657
(907) 271-5452
FAX (907) 271-5827
Email: bruce.landon@usdoj.gov

Attorney for Federal Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ORGANIZED VILLAGE OF KAKE, SOUTHEAST ALASKA CONSERVATION COUNCIL, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, THE WILDERNESS SOCIETY, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>                 Plaintiff,<br><br>v.<br><br>UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; MARK REY, in his official capacity as Under Secretary of Agriculture; DENNIS E. BSCHOR, in his official capacity as Alaska Regional Forester; and FORREST COLE, in his official capacity as Forest Supervisor for Tongass National Forest,<br><br>                 Defendant. | Case No. J04-0029-CV (JKS) |

OPPOSITION BRIEF OF FEDERAL DEFENDANTS (COUNTS V AND IX)

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 1 -

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 3 -

1.  Projections of Market Demand on the Tongass . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 3 -

2.  The Threemile Timber Harvest Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 5 -

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 9 -

I.  REVIEW OF AGENCY ACTION IS GOVERNED BY THE DEFERENTIAL STANDARDS
    OF THE ADMINISTRATIVE PROCEDURES ACT . . . . . . . . . . . . . . . . . . . . . . . . . . - 9 -

II.  THE AGENCY'S USE OF THE BROOKS AND HAYNES PROJECTIONS AND MORSE
    METHODOLOGY AS PART OF ITS ANALYSIS WAS APPROPRIATE . . . . . . - 11 -

    A.  The Use of the Brooks and Haynes Projections Was Neither Inaccurate Nor
        Misleading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 11 -

    B.  The Fact that Actual Harvest in Recent Years Has Been Significantly Lower than the
        Projected Demand and that Some Offered Sales Have Received No Bids Does not
        Render Use of the Demand Projections Improper . . . . . . . . . . . . . . . . . . . . . - 12 -

    C.  Plaintiffs Erroneously Deduce that Because Timber Prices Have Declined There is a
        Lack of Demand for Economic Timber . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 15 -

    D.  Current Conditions Do Not Differ So Significantly From Brooks' and Haynes'
        Assumptions As to Render Continued Consideration of those Projections
        Arbitrary and Capricious . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 16 -

III.  THE FOREST SERVICE DETERMINATION THAT SIGNIFICANT RESTRICTIONS ON
    SUBSISTENCE WERE NECESSARY WAS APPROPRIATE . . . . . . . . . . . . . . . . - 18 -

    A.  Section 810 of ANILCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 18 -

    B.  In Order to Prevail, Plaintiffs Must Show that All the Bases of the Agency's Necessity
        Determination Were Arbitrary and Capricious . . . . . . . . . . . . . . . . . . . . . . . . - 19 -

    C.  The Necessity Finding Is Supported by Indisputable Facts . . . . . . . . . . . . . . . . . - 19 -

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 22 -

TABLE OF AUTHORITIES

FEDERAL CASES

Alaska Pulp Corp., Inc. v. United States, 48 Fed. Cl. 655 (2001) . . . . . . . . . . . . . . . . . . - 4 -, -6 -

Animal Defense Council v. Hodel, 840 F.2d 1432 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . - 11 -

Coker v. Skidmore, 941 F.2d 1306 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 1 -

Friends of Endangered Species v. Jantzen, 760 F.2d 976 (9th Cir. 1985) . . . . . . . . . . . . . - 10 -

Greenpeace Action v. Franklin, 14 F.3d 1324 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . - 10 -

Hookah Indian Ass'n v. Morrison, 170 F.3d 1223 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . - 18 -

Inland Empire Public Lands Council v. United States Forest Service, 88 F.3d 754 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 10 -

Johnson v. Davis, 698 F.2d 1088 (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . - 11 -, -13 -

Mt. Graham Red Squirrel v. Espy, 986 F.2d 1568 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . -109 -

Natural Resources Defense Council v. U.S. Forest Service, (NRDC I), 421 F.3d 797 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 1 -, - 14 -

Oregon Natural Resources Council v. Lowe, 109 F.3d 521 (9th Cir. 1997) . . . . . . . . . - 1 -, - 3 -

O'Keefe's Inc. v. U.S. Consumer Product Safety Com'n, 92 F.3d 940 (9th Cir. 1996) . . . . - 10 -

Price Road Neighborhood Ass'n, Inc. v. United States Dept. of Transportation, 113 F.3d 1505 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 10 -

Resources Ltd. v. Robertson, 35 F.3d 1300 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . - 9 -

Roosevelt Campobello International Park Comm. v. United States Environmental Protection Agency, 684 F.2d 1041 (1st Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 19 -, -21 -

Seattle Audubon Society v. Moseley, 80 F.3d 1401 (9th Cir. 1996) . . . . . . . . . . . . . . . . . - 10 -

Sierra Club v. U.S. Army Corps of Engineers, 701 F.2d 1011 (2nd Cir. 1983) . . . . . . . . . . - 1 -

South Louisiana Environmental Council, Inc. v. Sand, 629 F.2d 1005 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 10 -

Washington State Farm Bureau v. Marshall, 625 F.2d 296 (9th Cir. 1980) . . . . . . . . . . . . - 10 -


FEDERAL STATUTES

16 U.S.C. § 3120(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 8 -, - 9 -, - 18 -

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 9 -

- ii -

Administrative Procedures Act, 5 U.S.C. § 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 9 -

Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. § 3120 . . . - 6 -, -8 -, - 18 -

National Environmental Policy Act, (NEPA), 42 U.S.C. § 4331 . . . . . . . . . . . . . . . . . . . . - 10 -

Section 339 of the Interior and Related Agencies Act of 2004, Pub. L. 108-108, 117 Stat. 1241 (November 10, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 14 -, -17 -

FEDERAL REGULATIONS

Roadless Area Conservation Rule, 36 CFR Part 294 . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 13 -

INTRODUCTION

Before the Court is plaintiffs' motion for summary judgment on Counts V and IX of the First Amended Complaint. Both counts involve a challenge to consideration of certain projections of timber market demand in relation to the Threemile Timber Harvest project. The projections at issue are the projections made by David Brooks and Richard Haynes of the Pacific Northwest Research Center (PNW) of the Forest Service in September 1997. Those projections are cited in the final environmental impact statement (FEIS) for the Threemile project and are also used as one of the inputs in a methodology developed by Kathleen Morse for estimating annual demand for Tongass timber. Plaintiffs object to both uses.

The Brooks and Haynes projections were also at issue before the Ninth Circuit in *Natural Resources Defense Council v. U.S. Forest Service, (NRDC I)*, 421 F.3d 797 (9th Cir. 2005). The dispute in Counts V and Count IX is, however, totally different from the issue that was before the Ninth Circuit. The Ninth Circuit held that the revised Tongass Land Management Plan (TLMP) was defective because the TLMP Record of Decision (ROD) and FEIS *misinterpreted* the Brooks and Haynes projections – nearly doubling those projections.

In Counts V and IX of this action, plaintiffs concede that the agency *correctly* interpreted the Brooks and Haynes projections in the site-specific FEIS and ROD for the Threemile project. They nonetheless argue that it was improper for the Forest Service to use those projections because, according to plaintiffs, the projections were hopelessly outdated and demonstrably inaccurate. Plaintiffs' argument is largely premised on the erroneous assumption that if actual harvest is less than the demand projected by Brooks and Haynes for a number of years, the demand projections are outdated and inaccurate. Plaintiffs are wrong.

Although the projections were approximately 7 years old when the agency issued the ROD for the Threemile project, mere passage of time rarely warrants an order to update the information to be considered by the agency. *Coker v. Skidmore,* 941 F.2d 1306, 1310 (5th Cir. 1991); *Sierra Club v. U.S. Army Corps of Engineers,* 701 F.2d 1011, 1036 (2nd Cir. 1983). Indeed, in *Oregon Natural Resources Council v. Lowe,* 109 F.3d 521, 527 (9th Cir. 1997) the Ninth Circuit upheld the use of studies at least as old as the Brooks and Haynes projections.

- 1 -

In this case, it was not arbitrary and capricious for the agency to use the Brooks and Haynes projections because the structure of the timber industry on the Tongass in 2004 was not significantly different than Brooks and Haynes assumed in 1997.

Plaintiffs make much of the fact that actual harvest on the Tongass during 2001 through 2003 was lower than Brooks' and Haynes' had projected for those years. But conversely, actual harvest exceeded Brooks' and Haynes' "high scenario" of projected demand in 1998-2000. FEIS at App. A-8 [1]/, Def. Exh. 1 at 27. Moreover, Brooks and Haynes themselves warned against equating timber demand with actual harvest. It is hardly surprising that actual harvest has been less than projected demand in recent years when one considers the formidable obstacles that Forest Service has faced in recent years in making available to industry timber that responds to the specific economic needs of the industry.

In any event, in deciding how much timber to offer for sale in any given year, the agency uses the sophisticated Morse methodology. That methodology has the advantage of being self-correcting in that when actual harvest falls below demand projections, offerings for future years are reduced. The methodology also adjusts for changes in mill capacity due to openings and permanent closures of facilities.

The agency's continued use of the Brooks and Haynes projections despite a small number of years in which actual harvest was less than projected is especially prudent because the effect of underestimating timber demand is much more serious than overestimating demand. When the agency underestimates timber demand, mills can close for lack of adequate timber supply. Under current conditions is it unlikely that a closed mill will be replaced by a new facility. Conversely, if the agency prepares more timber than is demanded, the excess timber will not be sold and no environmental impacts will occur.

In sum, timber demand on the Tongass has always been volatile, and can differ significantly

---

[1]/    Citations to "FEIS" or "ROD" refer to the site-specific documents prepared for the Threemile Project. "TLMP FEIS" refers to the FEIS prepared for the 1997 revision of TLMP. "Wilderness SEIS" refers to the supplemental impact statement prepared in 2003 for the TLMP revision pursuant to this Court's decision in *Sierra Club v. Rey,* J00-0009 CV (JKS) (D. Alaska).

from actual harvest in any given year or series of years. It was well within the agency's discretion to use the 1997 Brooks and Haynes projections and the Morse methodology in the Threemile project. Moreover, the subsistence finding at issue in Count IX is supported by indisputable facts independent of the Brooks and Haynes projections. Accordingly, Counts V and IX must be dismissed.

BACKGROUND

1. **Projections of Market Demand on the Tongass**

For planning purposes, the Forest Service estimates what the long-term timber demand will be, given cycles in the market. FEIS at App. A-7, Def. Exh. 1 at 26. Such demand projections provide guidance to the Forest Service to request budgets, to make decisions about workforce and facilities, and to indicate the need to begin new environmental analyses for future program offerings. *Id.* They also provide a basis for expectations regarding future harvest, and thus provide an important source of information for establishing the schedule of probable future sale offerings. *Id.*

The Forest Service has consistently recognized that demand projections involve significant uncertainty. *Id.* ("Areas of uncertainty include the prospect of continuing changes in markets, in conditions faced by competitors, and the speed and magnitude of investment in manufacturing in Alaska."). Indeed, Brooks and Haynes characterized the future for demand for Tongass timber as having a "high degree of uncertainty." Brooks and Haynes 1997, Plnts' Exh. 4 at 6. Morse advised that "the timber industry in Southeast Alaska is in the midst of a complete structural change and the data required to build a formal economic model of demand are limited." Morse, Plnts' Exh. 7 at 2. In addition, "it is a well established economic principle that in highly concentrated markets – such as the Southeast Alaska stumpage market – prices and quantities are indeterminate in terms of formal supply and demand curves." *Id.* Accordingly, the weight that the Forest Service gives to the planning-cycle demand projections will vary depending on a number of factors, such as how recently they were done and how well they appear to have accounted for recent, site-specific events in the timber market. FEIS at App. A-7 to A-8, Def. Exh. 1 at 26-27. Seeking to meet market demand under these conditions requires a great deal of professional judgment. Morse, Plnts' Exh. 7 at 2.

In connection with the revision of TLMP, the Forest Service sought professional assistance

- 3 -

in assessing the planning cycle timber demand from the PNW.  FEIS at App. A-7, Def. Exh. 1 at 26.
Brooks and Haynes made their first projections in 1990, close to the beginning of the revision
process.  Brooks and Haynes 1997, Plnts' Exh. 4 at 5.  Thereafter, the Forest Service requested two
updates in response to significant changes in the timber industry in the Tongass.  The first update
in 1993 was in response to the closure of the Alaska Pulp Corp. pulp mill; and the widespread
injunction in the "spotted owl cases" in the Pacific Northwest.  Brooks and Haynes 1994, Def, Exh.
2 at 3-7.

The second update, in 1997, was in response to the closure of the other pulp mill in Southeast
Alaska and changes in the Japanese lumber market.  Brooks and Haynes 1997, Plnts' Exh. 4 at 2.
Beginning in the 1950's the Southeast timber industry was dominated by two long-term timber
contracts that supplied two large pulp mills. TLMP FEIS at 3-258 to 3-260, Def. Exh. 3 at 2-4.  The
long-term contracts were important in two respects.  First, they contained  a required minimum
harvest level to be maintained throughout the fifty years of the contract.  *Alaska Pulp Corp., Inc. v.
United States,* 48 Fed. Cl. 655, 666 (2001).  Second, the pulp mills provided a market for logs of
insufficient quality to be used for saw lumber.  TLMP FEIS at App. M-2, Def. Exh. 3 at 6.

In 1993, the Alaska Pulp Corporation (APC) pulp mill in Sitka closed and the Forest Service
terminated the APC long-term contract in 1994.  Brooks and Haynes 1997 at 1, Plnts' Exh. 4 at 5;
TLMP FEIS at 3-258, Def. Exh. 3 at 2.  In 1996, Ketchikan Pulp Co. (KPC) closed the remaining
pulp mill, and in 1997 the Forest Service asked PNW to update its projections to take into account
this second major change in the structure of the industry.  Brooks and Haynes 1997, Plnts' Exh. 4
at 2.[2]/

Timber harvest has always been extremely volatile on the Tongass, as shown by the graphs
in Plnts' Exh. 22.  Accordingly, the Forest Service uses a special method for estimating how much
timber to offer for sale in any given year.  The annual market demand is analogous to assessing
industry performance in the short-term.  FEIS at 3-21, Def. Exh. 1 at 9.  In the short-run, a firm will

---

[2]/     The Forest Service has asked for a third update of the projections which will be used in the
revision of TLMP ordered by the Ninth Circuit in *NRDC I.*

make use of its existing equipment to maximize profits or minimize losses. *Id.* The general approach is to consider the timber requirements of the region's sawmills at different levels of operation and under different assumptions. *Id.* The volume of timber likely to be purchased is equal to the volume needed to make up any inventory shortfall in addition to the volume likely to be harvested in the coming year. *Id.* The Forest Service uses the methodology set forth in Morse, *Responding to the Market Demand for Tongass Timber* (Morse) to assess short term demand. *Id.*

The inventory control procedure outlined in Morse has the advantage of being self-correcting. It is used to help implement the goal of providing to industry an inventory of timber equal to two to three years of expected harvest. Morse, Plnts' Exh 7 at 35; FEIS at App. A-10, Def. Exh. 1 at 29. If harvest in any given year is lower than that predicted, the projected offering for the following year decreases. *See* Morse, Plnts' Exh. 7 at 32- 34, 41. Further, the Morse methodology adjusts for changes in installed mill capacity as new facilities open or existing facilities close permanently. Morse, Plnts' Exh. 7 at 17.

While Morse's methodology is self-correcting, Morse recognized uncertainties and warned in her report that it is more dangerous to underestimate than to overestimate timber demand:

> [I]n terms of short-term economic consequences, over-supplying the market is less damaging than under-supplying it. If more timber is offered than purchased in a given year, the unsold volume is still available for re-offer in future years. The unsold volume would have no environmental effects because it would not be harvested. However, a shortfall in the supply of timber available for harvest in a given year can be financially devastating to the industry.

Morse Plnts' Exh. 7 at 33, She also noted that "[d]uring low points in the market cycle, timber sale purchases tend to increase before markets recover." Morse, Plnts' Exh. 4 at 30. Morse also advised the agency to consider the likelihood of delays from administrative appeals and litigation when planning its timber program. Morse, Plnts' Exh. 7 at 33. The dangers of failing to meet timber demand are further increased by the fact that under current conditions, if a mill on the Tongass closes permanently, it is unlikely to be replaced by other processing capacity. Wilderness SEIS at 3-274, Def. Exh. 6 at 11.

## 2. The Threemile Timber Harvest Project

The Threemile Timber Harvest Project at issue in this case involves the harvest of an

- 5 -

estimated 19.5 million board feet (MMBF) of timber from approximately 665 acres.  ROD at 4, Plnts' Exh. 21 at 6.  The analysis area for the Threemile project encompasses approximately 21,660 acres on Kuiu Island in the Tongass National Forest.  FEIS at S-1, Def. Exh. 1 at 2.  The project will entail 4.2 miles of new classified roads and 4.2 miles of temporary road.  ROD at 4, Plnts' Exh. 21 at 6.  There will be no new fish stream crossings.  ROD at 7, Plnts' Exh. 21 at 9.

Kuiu Island has no settlements and no regular ferry service.  FEIS at 1-3 and Map at 1-5, Def Exh. 1 at 4-5.  The project area surrounds Threemile Arm, an embayment on the east side of Kuiu Island, south of Rocky Pass, between Kuiu and Kupreanof Islands.  *See* ROD at 25, Plnts' Exh. 21 at 26; Map at FEIS 1-5, Def. Exh. 1 at 5.

Timber harvest has occurred within the Threemile project area since 1924, continuing until 1993.  FEIS at 1-3, Def. Exh. 1 at 3.  A map showing the existing harvest units and roads appears in the ROD at 25, Plnts' Exh. 21 at 26.  In contrast to earlier harvests, the units included in the Threemile project are located in the interior of the project area, separated from the more heavily used coastal areas.  *Id.*

In the FEIS, the agency considered in detail five action alternatives and the no-action alternative.  *See,* Plnts' Exh. 21.  The agency considered, but excluded from detailed consideration, an alternative that would have harvested along the existing roads and completely outside of inventoried roadless areas.  The agency explained its decision not to consider that alternative in detail:

> Due to previous harvest in the Threemile Project Area, further timber harvest along the road system at this time does not meet Forest Plan standards and guidelines for visual quality.
>
> Timber sale planning on Kuiu Island must consider the cost of mobilization of equipment to a remote setting.  Since these costs are high, in order to be economically feasible, timber sales must be large enough to recover the cost of mobilization.  This would not be possible with an alternative that harvested only along the road system.

FEIS at 2-35, Def. Exh. 1 at 7.

As part of its analysis, the Forest Service considered the impacts (direct, indirect and cumulative) of the project on subsistence and wildlife.  Pursuant to section 810 of the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. § 3120, the agency determined that

- 6 -

there was no significant possibility of a significant restriction on subsistence for any species other than Sitka black-tail deer. ROD at 16, Plnts' Exh. 21 at 18. The agency likewise found no possibility of a significant restriction on deer from *the project itself.*

However, the agency found a possibility of a significant restriction for deer *from all alternatives, including the no-action alternative*, when the cumulative effects of past, present and reasonably foreseeable actions are taken into account. ROD at 17, Plnts' Exh. 21 at 19. This finding of a significant restriction on subsistence is premised on projections of rapid population increases in nearby areas in the Tongass during the twenty-first century. The FEIS used the formula found in the Tongass Land Management Plan for projecting population increases. FEIS at 3-127, Def. Exh. 1 at 14. That formula in turn is taken from the document "Strategic Management Plan for Deer, ADF&G 1991." *Id.* at 3-128, Def. Exh. 1 at 15. For the decades 1954 to 2010, TLMP assumed an 18 percent increase per decade in human population. From 2010 to 2100, TLMP assumed 15 percent increases in human population. *Id.* Based on those predictions, the FEIS predicted that demand for deer would exceed deer habitat capability by 2040 even if the no-action alternative were chosen. *Id.*

The estimated growth in the hunter population does not reflect actual conditions. In the last decade, for example, instead of increasing by 18%, the population of Kake increased by 1.4 percent, Petersburg increased by 0.5 percent, Port Protection increased by 1.5 percent, Point Baker decreased by 10.2 percent and Wrangell decreased by 6.9 percent. *Id.* at 3-128, Def. Exh. 1 at 15. In addition, the subsistence analysis calculated deer habitat capability assuming that all harvest would be by clear-cut, when in fact, project alternatives call for both clearcut and partial timber harvest. *Id.* In sum, the finding of a restriction on subsistence from cumulative effects represents a very conservative worst case scenario.

Relatively few deer are taken from Kuiu Island. Historically, the project area had a four to five month deer-hunting season. *Id.* at 3-127, Def. Exh. 1 at 14. However, in 1972, the deer population crashed dramatically and the island was closed to all deer hunting from 1973 to 1991. *Id.* This was due to several factors, including a deep persistent snow pack that did not retreat until late June 1973, and deer populations that were above their carrying capacity as a result of artificially low wolf populations. *Id.* The low wolf population was due to a wolf eradication program that

- 7 -

included a bounty on wolves until 1968, and a hunting and trapping program thereafter. *Id.* at 3-177, Def. Exh. 1 at 17.   Since 1992, all of Kuiu Island has been open for deer hunting, but recovery of the deer population has been slow because of high black bear populations and an increasing wolf population due to the ending of the wolf eradication program. *Id.* at 3-127, Def. Exh. 1 at 14.  Of the number of deer taken in Game Management Unit 3 (Deer, Etolin, Kadin, Kasheverof, Kuiu, Kupreanof, Mitkof, Woronkofski, Wrangell, and Zarembo Islands) in the 1998-1999 season, only 2.6 percent came from Kuiu. *Id.* No hunters from Kake reported harvesting deer from Kuiu during the 2000-2001 or 1998-1999 seasons. *Id.*  The lowest recorded deer harvest on Kuiu Island was in the 1997-98 season, when 50 hunters spent 148 days to harvest 13 deer. *Id.*

Most of the deer harvest on Kuiu Island occurs along beaches (where timber harvest cannot occur under TLMP,  FEIS 3-57, Def. Exh. 1 at 10) and along the existing road system, rather than in the interior part of the island where the harvest units of the Threemile project are located.  Def. FEIS at 3-125, Def. Exh. 1 at 12.

After preparing the FEIS and holding subsistence hearings in Kake, the Forest Service issued its Record of Decision in which it made the determinations regarding subsistence required by Section 810 of ANILCA, 16 U.S.C § 3120.  In light of its determination that there may be a significant possibility of a significant restriction on subsistence use of deer under all alternatives, including the no-action alternative, due to cumulative effects of full Forest Plan implementation and projected increases in human demand, the Forest Service determined that "(A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions." 16 U.S.C. § 3120(a)(3).  Specifically, the agency determined:

> As described in Appendix A of the FEIS, the Selected Alternative is necessary as a component of the timber management program designed to implement the Forest Plan and to meet TTRA [Tongass Timber Reform Act] direction.  There is currently a market demand for timber, a limited timber supply from other sources, and an under-utilized mill capacity in the region.  The volume from the Selected Alternative is a component of the 10-year timber sale schedule, which attempts to provide timber to industry in an even-flow over the planning cycle.  The Selected Alternative can

- 8 -

> help meet the Forest Plan and TTRA objectives, while also providing reasonable protection measures for forest resources, especially for subsistence.  It is consistent with the Forest Plan, laws, regulations, policies, pubic needs, and the capabilities of the land.

ROD at 17, Plnts' Exh. 21 at 19.

> The agency also found that:

> Most of the Tongass National Forest is used by one or more rural communities for subsistence deer hunting purposes.  It is not possible to lessen timber harvest in one area and concentrate it in another locale without impacting one or more rural communities' important subsistence use areas.  In addition, harvestable populations of subsistence wildlife species could not be maintained in a natural distribution across the forest if harvest were concentrated in specific areas.  A well-distributed population of species is required by the National Forest Management Act and is one of the objectives of the Forest Plan.

ROD at 17-18, Plnts Exh. 21 at 19-20.

Plaintiffs filed administrative appeals of the Threemile ROD, arguing *inter alia* that the FEIS and ANILCA finding were defective because the Brooks and Haynes projections were allegedly inaccurate.  The agency affirmed.  The agency found that plaintiffs' attacks on the agency's use of the *correct interpretation* of the Brooks and Haynes projections in the site-specific Threemile FEIS were virtually identical to those raised by plaintiffs in *NRDC I* and rejected by this Court.  Threemile Administrative Appeal Decision at 23, Def. Exh. 4 at 25.   In affirming the subsistence "necessity" finding, the agency specifically affirmed the Forest Supervisor's findings that there is a current demand for timber,  limited alternative supply and under-utilized mill capacity.  *Id.*  Def. Exh. 4 at 40.

Plaintiffs subsequently sought review in this Court.

ARGUMENT

I.  REVIEW OF AGENCY ACTION IS GOVERNED BY THE DEFERENTIAL STANDARDS OF THE ADMINISTRATIVE PROCEDURES ACT

This action seeks review of agency action, and is accordingly governed by the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*  The courts will set aside agency action that is arbitrary and capricious, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A); *Resources Ltd. v. Robertson,* 35 F.3d 1300, 1304 (9th Cir. 1993).

Under the arbitrary and capricious standard, a reviewing court may not substitute its

judgment for that of the agency. *O'Keefe's Inc. v. U.S. Consumer Product Safety Com'n*, 92 F.3d 940, 942 (9th Cir. 1996). The arbitrary and capricious standard is deferential, and the courts will affirm an agency's action if a reasonable basis existed for its decision. *Washington State Farm Bureau v. Marshall*, 625 F.2d 296, 302 (9th Cir. 1980). The courts are particularly deferential where the agency decision "implicates substantial agency expertise." *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993); *Inland Empire Public Lands Council v. United States Forest Service,* 88 F.3d 754, 760 (9th Cir. 1996). The agency may rely on reasonable assumptions in its analysis. *Id.* at 761; *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1335-36 (9th Cir. 1992). A determination based on the current state of scientific knowledge will be upheld. *Seattle Audubon Society v. Moseley,* 80 F.3d 1401, 1404 (9th Cir. 1996).

It is for the agency to determine the experts on whom it will rely. *Price Road Neighborhood Ass'n, Inc. v. United States Dept. of Transportation,* 113 F.3d 1505, 1511 (9th Cir. 1997). The courts will not resolve disagreements between scientists. *Friends of Endangered Species v. Jantzen,* 760 F.2d 976, 986 (9th Cir. 1985). A disagreement among scientists does not make agency action arbitrary or capricious. *Seattle Audubon Society v. Lyons,* 871 F.Supp. at 1321. Nor will the government be held to a "degree of certainty that is ultimately illusory." *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1336 (9th Cir. 1992).

In cases raising challenges under the National Environmental Policy Act, (NEPA), 42 U.S.C. § 4331 *et seq.,* "the selection of data for the determination of economic non-environmental benefits is extremely tangential to the concerns expressed in NEPA." *South Louisiana Environmental Council, Inc. v. Sand*, 629 F.2d 1005, 1014 (5th Cir. 1980). Consequently, "[c]ourt intrusion into agency decisions of this kind must be extremely limited." *Id.* Courts will "evaluate the economic justification only if it has become so flawed that it grossly distorts the environmental considerations." *Id.* Further, "[i]t is not for the courts, under the authority of NEPA, to review every economic calculation which an agency puts into its environmental impact statement." *Id.* at 1015.

The Ninth Circuit has enunciated the following standard for evaluating an EIS:

Where the information in the initial EIS was so incomplete or misleading that the

- 10 -

decisionmaker and the public could not make an informed comparison of the alternatives, revision of an EIS may be necessary to provide a "reasonable, good faith, and objective presentation of the subjects required by NEPA."

*Animal Defense Council v. Hodel,* 840 F.2d 1432 at 1439, quoting *Johnson v. Davis,* 698 F.2d 1088, 1095 (10th Cir. 1983). Thus, a court will only reject an EIS when (a) the economic information is grossly incorrect and (b) is so misleading as to impair the agency's consideration of the environmental impacts of the alternatives, which are at the heart of NEPA.

## II. THE AGENCY'S USE OF THE BROOKS AND HAYNES PROJECTIONS AND MORSE METHODOLOGY AS PART OF ITS ANALYSIS WAS APPROPRIATE

In Count V of their Amended Complaint, and Part I of the Argument in their Opening Brief, plaintiffs argue that the FEIS for the Threemile project is defective because it allegedly relied on outdated and demonstrably inaccurate projections of market demand. As plaintiffs acknowledge, this is a totally separate issue from the issue which the Ninth Circuit decided in *NRDC I.* The Ninth Circuit had before it the question of whether a misinterpretation of the Brooks and Haynes timber demand projections in the Record of Decision for the revised TLMP rendered that decision defective. The issue here is whether use of the *correct* interpretation of the Brooks and Haynes projections in the site-specific FEIS for the Threemile Project rendered that FEIS defective.

Although this question was not before the Ninth Circuit in *NRDC I,* it was before this Court in that case, where plaintiffs made the same claim with regard to other site-specific FEISs in Count V of *NRDC I. See,* Def. Exh. 4 at 25. This Court granted judgment to the Forest Service and the *NRDC I* plaintiffs[3]/ did not pursue Count V on appeal. Plaintiffs' argument is no stronger in this case than it was in *NRDC I,* and must be rejected.

A.  The Use of the Brooks and Haynes Projections Was Neither Inaccurate Nor Misleading

The Threemile FEIS uses the Brooks and Haynes Projections in Appendix A. The information is neither inaccurate nor misleading. The Appendix accurately sets forth Brooks'



[3]/    Of the plaintiffs in this action, only the Organized Village of Kake was not a plaintiff in *NRDC I.*

and Haynes' projections for the low, medium and high scenarios for each year from 1998 to 2007. Def. Exh. 1, Table A-1 at FEIS App. A-8. Next to the projections, the table sets forth the actual harvest figures for each year from 1998 through 2003. *Id.* The Appendix warns with respect to the projections that "[a]reas of uncertainty include the prospect of continuing changes in markets, in conditions faced by competitors, and the speed and magnitude of investment in manufacturing in Alaska." *Id.* at App. A-7. The Appendix informs the reader that "[t]he weight given to the projections will vary depending on a number of factors such as how recently they were done and how well they appear to have accounted for recent, site-specific events in the timber market." *Id.* at App. A-7 to A-8. The EIS, thus, accurately set forth the projections and their limitations, informing the reader of the difference between the projections and actual harvest. There is nothing inaccurate or misleading about any of this information. The agency, thus, fully complied with its obligation under 40 CFR § 1502.24 to insure the professional integrity of the FEIS.

     B. <u>The Fact that Actual Harvest in Recent Years Has Been Significantly Lower than the Projected Demand and that Some Offered Sales Have Received No Bids Does Not Render Use of the Demand Projections Improper</u>

     Plaintiffs' argument that it was misleading to use the Brooks and Haynes projections in the analysis of the Threemile Project is largely based upon the non-sequitur that because actual harvest in 2001 through 2003 were significantly lower than projected, the Brooks and Haynes projections are "demonstrably inaccurate" and should not have been used in the Threemile FEIS.

     Plaintiffs' claim fails because it is improper to equate actual harvest with demand for timber. Indeed, Brooks and Haynes explicitly warned about equating timber demand with actual harvest.

> As with our previous projections, the volume of projected National Forest harvest is neither the volume likely to be harvested nor, necessarily, the volume that ought to be offered for sale. It is the volume of National Forest timber harvest that is consistent with projected consumption of Alaska products. *** we do not intend to imply that 'gaps' will be created by levels of National Forest harvest that differ from our projections.

Plnts' Exh. 4 at 7.

     An operator can be expected to desire (demand) to process sufficient timber to keep its

mill operating at a reasonable level in relation to the capacity of the operator's mill.  Indeed, an operator cannot run a sawmill indefinitely at a low level of capacity without risking bankruptcy. Wilderness SEIS at 3-274, Def. Exh. 6 at 11 ("it is unknown whether the 2000 production levels for the region's larger mills, which ranged from 21 percent (Silver Bay) to 28 percent (Pacific Log and Lumber) of estimated installed capacity would be sufficient to allow long-term operations of these facilities.") [4]/

An operator cannot be expected, however, to harvest timber if the cost of harvest significantly exceeds the value of the timber.  In other words, in periods of low timber prices, the type of timber which can contribute to the satisfaction of market demand may change, even though the level of demand itself may not significantly change.  Sawmill operations are driven by the specific demands of the market and require the volume and species that will produce the lumber needed to meet particular market segments.  Def. Exh. 3, Wilderness SEIS at 3-279.  The mix of log grades varies from sale to sale and also from unit to unit within a sale.  *Id.*  Conflating actual harvest with demand would only be appropriate if all volume offered actually responded to the specific needs of the operators.  Not all volume is fungible.

A number of events in recent years have impaired the ability of the agency to respond to those changes in the types of sales needed to satisfy demand, and thus depressed actual harvest. In 2001, the harvest season was truncated by virtue of the first injunction issued by this Court in *Sierra Club v. Rey,* J00-0009 CV (JKS) (D. Alaska).  FEIS at App A-8 n. 2, Def. Exh. 1 at 27. Also in 2001, the promulgation of the Roadless Area Conservation Rule, 36 CFR Part 294, 66 Fed. Reg. 3244 (January 12, 2001), caused the agency to set aside a number of projects in the NEPA process (including the Threemile Project) because of the restrictions on timber harvest in inventoried roadless areas contained in that rule.  FEIS at App. A-4, Def. Exh. 1 at 23.  Since the filing of *NRDC I,* the agency has refrained from attempting to sell timber at issue in that litigation.  The one exception was the Orion North sale, which was promptly bought and would

---

[4]/     To put these percentages into context, Alaska mills averaged 47 percent utilization from 1985-1995 and Pacific Northwest mills averaged 71 percent utilization during the same period. Morse, Plnts' Exh. 7 at 19.

have been harvested but for the Ninth Circuit's injunction. *See, NRDC I,* 421 F.3d at 816 n. 29.

The result of these circumstances is that the agency was, for the most, part forced to reoffer repeatedly sales that did not respond to the needs of potential purchasers. The list of timber sale offerings in recent years shows that the Forest Service attempted to reoffer numerous sales more than once without receiving bids, while other sales were bought by industry. Def. Exh. 5. The fact that some sales do not respond to industry needs, does not mean that demand for economic sales is lacking.

Similarly, the fact that some timber under contract has not been harvested does not necessarily indicate a lack of demand for economic timber. Congress took notice of the reality that much of purchasers' timber inventories, purchased during periods of higher timber prices could no longer be harvested without a loss. It, therefore, authorized the mutual cancellation of uneconomic timber sales in 2003. Section 339 of the Interior and Related Agencies Act of 2004, Pub. L. 108-108, 117 Stat. 1241 (November 10, 2003); see also Draft 2001-2002 Timber Supply and Demand Report, Plnts' Exh.19 at 3.

Brooks and Haynes warned that the lack of reliability of the timber supply was a factor that could cause a disparity between demand and actual harvest. In all of their projections, Brooks and Haynes assumed that the timber supply from the Tongass would be "reliable, predictable and sufficient to meet the requirements of the industry." Brooks and Haynes 1997, Plnts' Exh. 4 at 7 n.1. When the agency's ability to provide a reliable supply of timber responsive to the mills' actual need is impaired, it is not surprising that a gap will develop between projected demand and actual harvest.

The Draft Fiscal Year 2001-2002 Timber Supply and Demand Report (Plnts' Exh. 19), on which plaintiff relies for the proposition that the Brooks and Haynes projections were inaccurate and outdated, actually supports the continued reasonableness of the use of those projections. Specifically, that report identified litigation and changing legal regimes as factors making it more challenging for the Forest Service to respond to industry demand.

> On the supply side, the cost of packaging stumpage for sale and delivering it to the mills has increased owing to changing inventory, to legal and procedural challenges to federal timber sales, and to more stringent constraints on harvest

activity aimed at environmental conservation. The uncertainty surrounding TNF
sale quantities has substantially increased the risks faced by potential purchasers
and investors in local processing capacity.  In this current environment, federal
timber is hard pressed to provide both value for the purchaser of TNF timber and
positive returns to the treasury, and, in recent years, a significant proportion of
TNF timber offered for sale has gone unsold.

Plnts' Exh. 19 at 4.  See also, *id.* at 9 (warning against constructing a timber sale preparation

program on the low actual harvest figures of the early 2000s); *id.* at 11 ("Rather than merely

securing volume, the challenge facing TNF timber purchasers is to make a profit from new sales

and volumes currently under contract.").  The Draft 2001-2002 Report concluded:

> *Short-term fluctuations in market conditions, however, do not always indicate
> long-term structural changes, and the future direction of the region's wood
> products industry is uncertain.*  On the supply side, legal challenges, regulatory
> uncertainty and the crucial question of whether the Forest Service can put together
> profitable sales all point to continuing challenges.  On the demand side shrinking
> markets in Japan and competition from producers in other regions mean that
> traditional sources of profit have largely evaporated.  At the same time, though,
> new market opportunities are currently being explored.  Likewise, some of the
> challenges currently faced by the Forest Service in preparing and administering
> timber sales may be a temporary phenomenon resulting from society's efforts to
> come to a decision regarding the conservation and use of our National Forests.
> Assuming stable demand for the region's wood products, a more stable and
> orderly sale program in the future may alleviate uncertainty on the part of
> investors and improve the health of industry.

*Id.* at 13.

    C.  Plaintiffs Erroneously Deduce that Because Timber Prices Have Declined There is a
Lack of Demand for Economic Timber

In general, prices for lumber and other wood products from the Tongass have been lower

in recent years than they were in 1997.  *See*, Draft 2001-2002 Timber Supply and Demand

Report, Plnts' Exh. 19 at 3.   However, those lower prices do not mean that there is a lack of

demand for economic timber volume. The 2001-2002 Draft 706(a) Report makes this point clear:

> Rather than merely securing volume, the challenge facing TNF timber purchasers
> is being able to make a profit from new sales volume and volumes currently under
> contract.

*Id.* at 11.  Lower timber prices mean that those timber sales remaining economic, such as the

Threemile project, are even more important to the satisfaction of market demand.

- 15 -

D.  Current Conditions Do Not Differ So Significantly From Brooks' and Haynes' Assumptions As to Render Continued Consideration of those Projections Arbitrary and Capricious

Brooks and Haynes made their projections at a time of uncertainty and transition in the timber industry of Southeast Alaska, and therefore, considered a wide range of possible developments.  Most of the current conditions in Southeast Alaska that plaintiffs point to as changes from Brooks' and Haynes' assumptions are, in fact, within the scenarios considered by them.

For example, contrary to plaintiffs' claim, Plnts' Brief at 18, the projections are not based upon an assumption that a new market will necessarily be found for utility logs and other "residues."  *See,* Brooks and Haynes 1997, Plnts' Exh. 4 at 9 ("In none of the scenarios do we explicitly examine the possible emeregence of new industries in Alaska.").  Brooks and Haynes treated the possible establishment of new facilities to process lower grade logs (such as the then-proposed Gateway Veneer Plant in Ketchikan) as speculative (*id.* at 2), and assumed the possibility that lower grade logs would simply be left in the woods when higher grade logs were harvested:

> Our projections, therefore, are based on demand for National Forest timber that would be used in manufacturing sawn wood for both export markets and U.S domestic markets; we also estimated the volume of low-grade saw logs and utility logs that would be harvested and exported *or left as logging residue.*

*Id.*  (Emphasis added).  Thus, the closure of the Gateway Veneer Plant, the provision in recent timber contracts permitting the purchaser the option not to remove lower grade logs, and the absence of a market for those logs are all within the range of  assumptions posited by Brooks and Haynes.  *See also*, *id* ("Our projections take into account the fact that existing mills may not be able to profitably use the low-grade saw logs and utility volume.")

Brooks and Haines assumed that North America would supply between 70 and 76 percent of the Japanese market for softwood lumber.  *Id.* at 9.  By 2000, that share was 61 percent.  A nine percentage change does not represent a structural shift in the market.  To the contrary, Morse advised that "the ten-year harvest projections are not especially sensitive to this variable ."  Morse, Plnts' Exh. 7 at 39.  She recommended that the agency consider revising the Brooks and

- 16 -

Haynes projections "if there is a significant variation ($\pm$ 25 percent) from the stated assumption."
*Id.* Plaintiffs point out that the portion of Tongass timber shipped to domestic markets is higher
than assumed by Brooks and Haynes. This does not suggest a lack of demand for Tongass
timber. As the Wilderness SEIS explained, Alaska has developed new markets in the Lower 48
due to the relatively robust U.S. housing construction market. Wilderness SEIS at 3-253, Def.
Exh. 6 at 5. Tongass producers have found unique market niches in the domestic market for
specialty products (old-growth hemlock lumber and Sitka spruce not available from the Pacific
Northwest). 2003 Draft Timber Supply and Demand Report, Def. Exh. 7 at 3 and 12.

     If anything, the annual reports vividly illustrate the volatility of the timber industry in
recent years and the danger of confusing a snapshot of a small number of years with a long-term
trend. Indicators can swing significantly in a single year. For example the volume under contract
dropped from 295 MMBF in 2002 to 193 MMBF in 2003. *Id.* at 9. The ratio of volume under
contract to actual harvest was 6.7 and 8.7 for 2001 and 2002 respectively, but fell to 3.8 in 2003.
*Id.* The reports make clear that timber sector declines can be blamed on federal timber supply
constraints, slack demand for Southeast Alaskan timber, or both. Draft 2001-2002 Timber
Supply and Demand Report, Plnts' Exh. 19 at 6. While supply and demand are treated separately
in the report, it is important to remember that the interaction of these two forces is what is
important. *Id.* The timber offered in recent years has varied widely. The supply offered dropped
from 115.3 MMBF in 1999 to 56.9 MMBF in 2002, but then rose to 88.8 MMBF in 2003. Draft
2003 Timber Supply and Demand Report, Def. Exh. 7 at 10. Softwood lumber exports from
Alaska were even more erratic, jumping from 3,292 thousand board feet (MBF) in 2001 to 85
MBF in 2002 to 1,023 MBF in 2003. *Id.* 35.

     In sum, timber demand and harvest are volatile, particularly in recent years when the
timber industry has been in a state of transition. Demand cannot be separated from issues
relating to supply and price. In recent years the ability of the Forest Service to respond to
industry demand for economic timber has been severely constrained. What is important is that
the structure of the timber industry is largely consistent with Brooks and Haynes' assumptions.
Consequently, it was neither arbitrary nor capricious for the agency to continue using Brooks'

and Haynes' projections and the Morse methodology while alerting the reader to their limitations.

III.  THE FOREST SERVICE DETERMINATION THAT SIGNIFICANT RESTRICTIONS ON SUBSISTENCE WERE NECESSARY WAS APPROPRIATE

    A.  Section 810 of ANILCA

    Section 810 of ANILCA, 16 U.S.C. § 3120, provides that prior to determining whether to withdraw, reserve, lease or otherwise permit the use, occupancy, or disposition of public lands, the agency must "evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs...."  If the agency determines that the action, either by itself or together with past, present or reasonably foreseeable future actions, presents a significant possibility of a significant restriction on subsistence, the activity may not proceed until the agency gives certain notices, holds hearings and makes the following three determinations:

> (A) such a significant restriction of subsistence is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.

16 U.S.C. § 3120(a)(3).  Plaintiffs do not contest that the agency performed its subsistence evaluation, gave the notice, held the hearings, and made the required determinations.  Their claim is limited to the argument that the agency's determination of "necessity was arbitrary and capricious."

    In *Hoonah Indian Ass'n v. Morrison,* 170 F.3d 1223 (9th Cir. 1999), the Ninth Circuit interpreted the meaning of the "necessity" finding.  The Circuit admonished that the word "necessary" does not stand outside of a context, subject to definition only by a dictionary. *Id.* at 1227. Rather, the subsistence provision of the statute says "necessary, consistent with sound management principles for the utilization of public lands." *Id.*  A significant restriction of subsistence uses might not be necessary to achieve compliance with law, yet necessary to conform to sound management principles for such "utilization." *Id.*  If so, the statutory language would make it "necessary."

    In *Hoonah,* the Circuit upheld the agency's finding that a timber sale was "necessary consistent with sound principles for the management of the public lands" because "a substantial

component of the economy of Southeast Alaska is dependent on a viable timber industry, " and
"there is a clear need" for the sale in order to "come closer to the objective of providing a three-
year supply of timber to the existing dependent industry."  *Id.*  The Circuit rejected the
argument that an activity is not necessary unless it is required by law.  *Id.*

      B.  In Order to Prevail, Plaintiffs Must Show that All the Bases of the Agency's Necessity
Determination Were Arbitrary and Capricious

      Plaintiffs argue that in the Threemile ROD the agency "found that the restriction on
subsistence was made 'necessary' by the Tongass timber sale program, which was designed to
meet two goals: (1) 'to implement the Forest Plan,' and (2) 'to meet TTRA direction.'" Plnts'
Opening Brief at 22.  Plaintiffs then argue that if *either* the Forest Plan or the projection of
market demand under the TTRA was arbitrary or otherwise contrary to law, then the finding
would be correspondingly arbitrary.  To the contrary, for plaintiffs to prevail, they must show that
all the bases of the agency's necessity finding are arbitrary in order for the necessity
determination to be arbitrary and capricious.  ANILCA merely requires that an activity be
"necessary, consistent with sound management principles for the management of the public
lands."  If an activity is necessary for even a single valid purpose, it is still necessary and satisfies
the requirements of the statute.  *See, Roosevelt Campobello International Park Comm. v. United
States Environmental Protection Agency,* 684 F.2d 1041, 1046 (1st Cir. 1982) (even though there
was no longer a general need for additional oil refining capacity, the project remained necessary
because there was still demand for refineries capable of refining high sulfur crude oil).

      C.  The Necessity Finding Is Supported by Indisputable Facts

      In reviewing the agency's 'necessity finding," it is crucial to determine what the agency
actually determined and why.  Plaintiffs' brief seriously misstates the basis of the agency's
necessity finding.  The Forest Service found that:

      The alternatives presented in the FEIS represent different ways of managing the
      resources of the Threemile Project Area in combinations that are intended to meet
      these needs.  Each provides a different mix of resource uses and opportunities,
      and each has some potential to affect subsistence uses.  Given the framework and
      emphasis of the Selected Alternative, the possibility of a restriction is necessary,
      consistent with sound management of public land.

Threemile ROD at R-16 to R-17.  The agency explained:

> As described in Appendix A of the FEIS, the Selected Alternative is necessary as a component of the timber management program designed to implement the Forest Plan and to meet TTRA direction. *There is currently a market demand for timber, a limited timber supply from other sources, and an under-utilized mill capacity in the region.* The volume of the Selected Alternative is a component of the 10-year timber sale schedule, which attempts to provide timber to industry in an even-flow over the planning cycle, providing reasonable protection measures for forest resources.

*Id.* (Emphasis added).

The agency recognized that no alternative, including the no action alternative, would avoid a significant impact on subsistence somewhere in the Tongass. *Id.* The agency concluded that "the actions involved in the implementation of the Selected Alternative are necessary, consistent with sound management of public lands, and strike the best balance between meeting the needs of the public and protecting the forest resources." ROD at 17, Plnts' Exh. 21 at 19.

Plaintiffs telescope this nuanced analysis into a finding that the Threemile project was necessary because, without it, the agency would not offer the amount of timber calculated as market demand using the Morse methodology. Of course, that is not what the agency found. The ROD does not even mention the Morse Methodology or the Brooks and Haynes projections.[5]/ Rather, it makes the indisputable points that there is currently a demand for timber from the Tongass, that there is a limited timber supply from other sources, and that there is an under-utilized mill capacity.

The existence of timber demand for the Threemile project is amply supported by the record. The Alaska Forest Association (AFA) submitted public comments supporting the project and "look[ing] forward to implementation of timber sales that help meet all the goals set forth in the Tongass Land Management Plan (TLMP), including production of sufficient timber to meet the market demand." FEIS at App. C-72, Def. Exh. 1 at 39. AFA emphasized the importance of an even-flow of timber in an economically efficient manner and that "[t]imber sale economics are as critical to a successful timber sale program as is adequate volume offered." *Id. See also,*

---

[5]/    Even if the finding were based upon the Brooks and Haynes projections or the Morse calculations, plaintiffs would not prevail, because, as shown with regard to Count V, use of the projections and methodology was perfectly permissible.

- 20 -

public comments of Ketchikan Gateway Borough, FEIS at App. C-119, Def. Exh. 1 at 44.

In its public comments on the Threemile project, Sealaska Corp. wrote:

The forest products industry is fighting to stay alive because past Forest Service actions have reduced the supply of timber for sale to record low levels.   The industry needs this sale and others to come in order to provide employment while still meeting other amenity needs.

FEIS at App. C-82. Def. Exh. 1 at 42.

Nor is there a dispute about the limited supply of timber from non-Tongass sources.  The Wilderness SEIS documented that harvests within Southeast Alaska are the main source of raw materials for the region's wood products industry. Wilderness SEIS at 3-250, Def. Exh. 6 at 2.  It also documented  that 96% of that harvest comes from the Tongass or Native Corporation lands, but that timber from the Tongass and Native Corporation lands essentially flow into different markets because the Native timber is not subject to a requirement that it be processed in Alaska. *Id.*  Brooks and Haynes had likewise concluded that there is limited non-Tongass timber for Alaska mills.  Brooks and Haynes 1997, Plnts' Exh. 4 at 8.

Finally, and perhaps most importantly, the record confirms the existence of under-utilized mill capacity, which, if it continues, can lead to mill closures.  The 1997 TLMP Revision FEIS reported an average utilization rate of 66 percent during the 1985-1994 period compared to a 23 percent utilization rate in 2000 (68 MMBF). Wilderness SEIS at 3-254, Def. Exh. 6 at 6.  The SEIS also concluded that when mills close due to extended under-utilized capacity, they are unlikely to be replaced by other processing capacity. *Id.*  at 3-274, Def. Exh. 6 at 11.

Thus, the Forest Service was faced with a dilemma.   It could conclude, as plaintiffs would have it do, that actual harvest rather than the Brooks and Haynes projections and the Morse methodology represented timber demand on the Tongass.  Such a conclusion would require the agency to assume that purchasers would continue processing at a very low capacity level even if offered economic timber and thereby commit economic suicide.  In the alternative, the agency could make its best efforts to supply economic timber to the industry that meets market demand.   It was not arbitrary and capricious to choose the latter.

- 21 -

CONCLUSION

For the foregoing reasons, the Court should dismiss Counts V and IX of the amended complaint with prejudice.

RESPECTFULLY SUBMITTED this 20th day of January, 2006, at Anchorage, Alaska.

> s/ Bruce M. Landon
> BRUCE M. LANDON
> Department of Justice
> Environment & Natural Resources Division
> 801 B Street, Suite 504
> Anchorage, Alaska  99501-3657
> Phone: (907) 271-5452
> Facsimile: (907) 271-5827
> bruce.landon@usdoj.gov
> Attorney for Federal Defendants

Certificate of Service

I hereby certify that on the 20th of January, 2006, a copy of the foregoing OPPOSITION BRIEF OF FEDERAL DEFENDANTS (COUNTS V AND IX) was served electronically on:

Thomas S. Waldo
Nathaniel S.W. Lawrence
Steve Silver
Amy Gurton-Mead

/s/ Bruce M. Landon

- 22 -