

| United States Department of Agriculture | Forest Service | Alaska Region | P.O. Box 21628 Juneau, AK 99802-1628 |
|---|---|---|---|

**File Code:** 1570
**Date:** OCT 7 2004

Mr. Buck Lindekugel
Southeast Alaska Conservation Council
419 6th Street, Suite 200
Juneau, AK 99801

Dear Mr. Lindekugel:

Pursuant to 36 CFR 215.17, I have reviewed the administrative appeal record for the Threemile Timber Sale Final Environmental Impact Statement and Record of Decision (ROD). The Tongass Forest Supervisor signed the ROD. I have also considered the Appeal Reviewing Officer's (ARO) recommendation (enclosed) regarding the disposition of your appeal (Appeal No. 04-10-00-0012). The ARO recommended that the Forest Supervisor's decision be affirmed.

## DECISION

I concur with the ARO's recommendation and I affirm the Forest Supervisor's decision. Your requested relief is denied.

In regard to the road system identified for the Threemile project, based on my review of the EIS, ROD, and project record I find that the roads and road management associated with the Selected Alternative constitute the minimum road system needed for safe and efficient travel and for the administration, utilization, and protection of National Forest System lands.

My decision incorporates, by reference, the entire administrative record, which includes the appeal and project planning records, and constitutes the final administrative decision of the Department of Agriculture [36 CFR 215.18(c)]. The ROD may be implemented 15 days following the date of this decision [36 CFR 215.10(b)].

Sincerely,

*Steven A Brink*

STEVEN A. BRINK
Appeal Deciding Officer

Enclosure

DEF.
EXHIBIT 4
Page 1 of 45



Caring for the Land and Serving People          Printed on Recycled Paper

678

Copy provided to:

Co-Appellants: Organized Village of Kake

Interested Parties: Greenpeace
The Wilderness Society

Forest Service: Tongass Forest Supervisor
Petersburg District Ranger
Tongass Appeal Coordinator

EXHIBIT 4
Page 2 of 45



| United States Department of Agriculture | Forest Service | Alaska Region | P.O. Box 21628 Juneau, AK 99802-1628 |
|---|---|---|---|

File Code: 1570

Date: OCT 6 2004

Subject: Threemile Record of Decision and Final Environmental Impact Statement

To: Appeal Deciding Officer

This is my recommendation, as Appeal Reviewing Officer, on the action you should take, as Appeal Deciding Officer, on the pending appeals of the Threemile timber sale project. The following appeals were filed under 36 CFR 215:

#04-10-00-0010, filed by the Sierra Club, the Sitka Conservation Society, and the Natural Resources Defense Council;
#04-10-00-0011, filed by the Cascadia Wildlands Project; and
#04-10-00-0012, filed by the Southeast Alaska Conservation Council.

The decision being appealed is the decision by the Tongass Forest Supervisor to authorize the sale of timber and the construction of roads on Kuiu Island in southeast Alaska, approximately 20 miles southwest of Kake, Alaska.

The decision includes the harvest of approximately 665 acres (about 19.5 million board feet (MMBF) of saw log and utility volume) and the construction of about 4.2 miles of new classified road, 4.2 miles of temporary road, and a land-to-barge type log transfer facility (LTF) at Threemile Arm.

## Background

A Notice of Intent (NOI) to prepare an EIS for the Threemile project was published in the Federal Register in March 1999, with a Revised NOI published in June 1999. The Draft EIS was released for public comment in January 2001. On April 23, 2004, the Tongass Forest Supervisor signed the Record of Decision (ROD) for the project. The Sierra Club, Sitka Conservation Society, and Natural Resources Defense Council; Cascadia Wildlands Project; and the Southeast Alaska Conservation Council (SEACC) (on behalf of SEACC and the Organized Village of Kake) appealed the ROD. Greenpeace, SEACC, and the Wilderness Society submitted interested party comments.

My review of these appeals was conducted pursuant to 36 CFR 215.15. The appeal and project records have been carefully reviewed in my consideration of the objections raised by the appellants and their requested relief. I have also considered the interested party comments. The Petersburg Ranger District prepared the enclosed indices of the documentation supporting the decision, which are keyed to specific issues raised by the appellants. My recommendation hereby incorporates the entire administrative record for the project.



EXHIBIT 4
Page 3 of 45



Caring for the Land and Serving People          Printed on Recycled Paper

The appellants list many interrelated issues in their appeals of the Threemile timber sale project. Although I may not have listed each specific issue, I have considered all of the issues raised in the appeals and believe that they are adequately addressed in the following discussions.

**Appeal No. 04-10-00-0010 - Sierra Club, Sitka Conservation Society, and the Natural Resources Defense Council:**

**Issue 1. Whether the ROD for the Threemile project is consistent with the National Forest Management Act (NFMA) and the Tongass Land Management Plan (TLMP, or Forest Plan).**

Appellants assert that the Threemile project is inconsistent with the standards and guidelines of the Forest Plan, and therefore violates NFMA. Specifically, appellants assert that the Threemile project cannot rely on the guidance in the "Powell memos" (April and August 1998 Tongass Plan Implementation Team (TPIT) Policy Papers) as this guidance contradicts Forest Plan heron and raptor survey requirements. Appellants further assert that the Threemile project violates Forest Plan standards and guidelines with respect to wolves, stating that there is no documentation in the project record indicating that surveys for dens were completed; that the Threemile ROD and Final Environmental Impact Statement (FEIS) fail to disclose that wolves are likely denning in the project area; that if any dens do exist they have not been protected as required by the Forest Plan; and that the record does not demonstrate the interagency analysis/communication required by the Forest Plan with respect to potential effects on wolves. Appellants also assert that the Threemile project violates Forest Plan standards and guidelines for the marbled murrelet, as murrelet nest habitat cannot be protected if the Forest Service has not surveyed for nests in the project area. Finally, appellants assert that the goshawk surveys required by the Forest Plan are not in the Threemile project record; thus, there is no way to determine if the surveys were conducted at the appropriate time of year, using appropriate survey methods and qualified personnel.

**Discussion**

The Forest Plan's standards and guidelines include direction for Wildlife Habitat Planning. Subsection X A 1. provides direction to "[c]onduct project level inventories to identify heron rookeries and raptor nesting habitat using the most recent inventory protocols" [TLMP p. 4-116]. The Tongass Forest Plan Implementation Clarification Papers [decision document 31] provide the "most recent inventory protocols." This direction was later extended indefinitely by the Forest Supervisor's letter to the Tongass Leadership Team dated February 24, 1999 [Appellants' Exhibit 1, p. 7].

*Herons*

I find no basis for the appellants' assertion that this direction means that "[h]eron surveys are eliminated altogether," or that these protocols are inconsistent with the Forest Plan. Rather, the Tongass Forest Plan Implementation Clarification Papers merely describe the necessary protocols for implementing the standards and guidelines and other provisions of the Plan.

Appellants cite particular heron sightings noted in the project record. Two of these sightings were in the vicinity of Alvin Bay, outside of the project area and approximately 10 miles from

EXHIBIT 4
Page 4 of 45

> Rich reminded me that Lilly Peacock, a graduate student working on black bears on Kuiu for ADF&G, watched wolves fishing. She observed that the wolves were better at fishing that the black bears and spent much less time successfully fishing than black bears.
>
> The Threemile Area is no exception; Ed Crain (the retired Area Biologist for the Alaska Department of Fish and Game located in Petersburg) and I walked one of the roads in the Threemile Study Area that had an inordinate amount of wolf sign on it. This was during the spring and we theorized that it had to do with a possible denning site in the area.
>
> Rich does not see any reason for concern regarding the wolf population on Kuiu Island for the near future.

[decision document #34, p. 3]. The same document includes an exchange of e-mail messages between the Forest Service biologist and Mr. Lowell, in which the Forest Service biologist asked his State counterpart to "[m]ake sure it [the summary of their conversation] is accurate and let me know if you agree with this," to which Mr. Lowell replied "Jim and I made a few changes. Thanks for running this by me" [Id., pp. 1 and 2].

The Threemile ROD also summarizes several contacts with other agencies, including:

> Personnel from Alaska Division of Governmental Coordination (now the Alaska Department of Natural Resources, Office of Project Management and Permitting), Alaska Department of Fish and Game, Alaska Department of Environmental Conservation, and the U.S. Fish and Wildlife Service visited the project area during the environmental analysis [ROD, pp 10-11].

In summary, I believe the Threemile FEIS, ROD, and project record indicates that the Forest Plan requirements for interagency communication have been met, and that no wolf mortality concerns have been identified for the project area.

*Marbled Murrelets*

Appellants also assert that "[t]he [Threemile] ROD violates TLMP by not protecting marbled murrelets," arguing that "[b]ecause the Forest Plan provides specific direction to protect such areas, it is implicit that to do so one must first survey for nests." The Forest Plan does not require surveys of a project area to identify such nests.

The biologist's field notes included in the project record contain several references to marbled murrelet surveys conducted during project planning:

> Bob and I talked... while we sat looking for marbled murrelets flying into the bay that evening. We did not see any murrelets.

* * *

> Completed a marbled murrelet survey from the boat this a.m. No birds noted.

* * *

EXHIBIT 4
Page 5 of 45

the nearest harvest unit or road construction approved as part of the Threemile ROD. The field notes for one of those sightings state that the wildlife biologist "[v]isited Unit 416-14 looking for a reported heron nest. I was unable to locate it even though I found the area and looked in every tree" ["Goshawk Calling on Kuiu Island," decision document #32, p. 27]. In a third reported sighting, also near Alvin Bay and outside the project area, the same document states "I recommend we drop unit 44, part of 45 and move the road location downhill to protect the heron rookery (this is the first heron rookery located in Southeast Alaska as far as I know)" [Id., p. 17]. None of these units are included in the Selected Alternative approved by the Forest Supervisor. The same document notes a heron sighting near Hiller Cove on September 28, 1994 [Id., p. 36]. The biologist was traveling along the beach conducting a general wildlife survey when the single bird was noted. Because this date is well outside the nesting period, and outside the time period for survey under the protocol (April through July), no follow-up survey for heron nesting was required. As stated in the FEIS, "[i]f any great blue heron rookeries ... are identified in the future they will be protected according to the Forest Plan standards and guidelines" [FEIS, p. 2-29]. I believe that the forest has followed appropriate survey protocols for herons.

*Raptors*

Appellants further assert that "[t]he FEIS and Planning Record also show no indication that surveys for any raptors except the Queen Charlotte goshawk were performed." This is incorrect, as the FEIS describes efforts made to identify and protect raptor nests:

> Since 1992, Forest Service personnel have conducted valley watches, scanning the project area for raptors. Some sightings were reported but no nests were found in the project area. Monitoring will continue during project implementation. If nests are found, the applicable Forest Plan standards and guidelines will be applied. Implementation of the Forest Plan standards and guidelines is expected to prevent any adverse effects on raptors.

[FEIS, p. 3-179]. The FEIS goes on to state:

> The only proposed action near the shoreline is the construction of the [Log Transfer Facility] LTF in Threemile Arm. We have conducted bald eagle surveys in the vicinity of the proposed LTF. All proposed construction is well beyond the 330-foot buffer for all nests, active or inactive, in the area.

[FEIS, p. C-15]. Accordingly, I believe the FEIS and ROD demonstrate compliance with the applicable standards and guidelines of the Forest Plan with regard to raptor survey requirements.

*Wolves*

Appellants assert that the Forest Plan contains an implicit requirement to survey for wolf dens, and that no such surveys were conducted; thus, the project fails to comply with the Forest Plan. Appellants quote several statements in the project record, including a statement in the biologist's field notes that "Ed Crane joined us for a field day. Everett and I took him around the road system and showed him what we had planned. He agreed with me that there was probably a wolf den in the area of 2 mile on road 6461" [decision document #32, pp. 59-60]. The pertinent Forest Plan requirement is to "[m]aintain a 1,200-foot forested buffer, where available, around .



EXHIBIT 4
Page 6 of 45

*known* active wolf dens" [Forest Plan, p. 4-117, emphasis added]. There is no requirement in the Forest Plan to conduct a survey to locate all wolf dens in the project area.

Appellants also assert that "[t]he Threemile ROD fails to disclose that wolves are likely denning within the project area and clearly should such dens [exist] they have not been protected as required by TLMP." From the portions of the project record quoted by appellants, it is clear that information about the likely existence of a den was available to the Forest Supervisor when he signed the ROD, and to the public in the project record. In addition, the project map [FEIS, Figure 2-7] indicates that the nearest timber harvest unit is approximately 2,500 feet from the area noted in the record as the likely location of a den, whereas (as previously stated) the Forest Plan requirement is to maintain a 1,200-foot forested buffer, where available, around known active wolf dens. In my opinion, the Selected Alternative adequately protects wolf-denning habitat. If an active wolf den is identified during additional field work or project implementation, Forest Plan standards and guidelines will be applied.

Appellants also assert that "neither the planning record [n]or the FEIS makes any mention that interagency analysis/communication regarding impacts to wolves from this project occurred as required by TLMP." The requirement cited by appellants is included in the Forest Plan's Standards and guidelines for Wildlife:

> Implement a Forest-wide program, in cooperation with the Alaska Department of Fish and Game and U.S. Fish and Wildlife Service, to assist in maintaining long-term sustainable wolf populations. Where wolf mortality concerns have been identified, develop and implement a Wolf Habitat Management Program.

[Forest Plan, p. 4-116]. The Biological Evaluation included in the planning record includes a reference to a personal conversation with "Crain, Ed. ADF&G [Alaska Department of Fish and Game] Area Habitat Biologist, Petersburg, AK [decision document #33, p. 26]. This is the same person who accompanied the Forest Service employees on the field trip described in the field notes quoted in the appeal. The project record also includes another summary of a conversation between the Federal and State biologists:

> On 12/7/2001, I had a conversation with Rich Lowell, Area Biologist for the Alaska Department of Fish and Game located in Petersburg, Alaska. We talked about the status of the wolf population on Kuiu Island.
>
> Rich agreed with me that the population of wolves on Kuiu Island was stable, and probably increasing. Rich seemed to think that the population of wolves on Kuiu was higher than anywhere else in the area, but he is not sure why. It could be because the black bear population is large and is probably tied to the high beaver population on Kuiu. The deer population, which is normally the wolf's primary prey species, is still rebounding from the die-off in the early 1970's.
>
> Rich agrees with me that the harvest of wolves on Kuiu Island is more opportunistic and probably occurs when hunters are after black bears. There may be an increase in harvest when the Rowan Bay logging camp is in operation, but this camp is currently closed.

EXHIBIT 4
Page 7 of 45

> [C]onducted marbled murrelet survey from the boat tied in Serenity Cove. 3 crows and 2 geese seen, no Mamu [marbled murrelets].

* * *

> Alvin Bay Mamu Survey. Started at 0300 and watched until 0500. Saw one Mamu fly into the bay but did not see it go inland.

* * *

> 0330 started a marbled murrelet survey...watched for evidence of murrelet nesting...but did not see any activity.

[decision document #32, pp. 18, 19, 23, 28, 54]. I believe the project record demonstrates that a considerable effort was made to survey for marbled murrelets, and that no murrelets were seen flying into the sale area. If a murrelet nest or nests are found during later field work or during project implementation, they will be protected as required by the Forest Plan.

*Goshawks*

Appellants further assert that "[t]he planning record is missing documents regarding the Queen Charlotte goshawk," and that none of the required surveys are included in the project record "as required." I disagree. The planning record is replete with references to these surveys, summarized as follows:

> During the 1994-1995 field season, we spent 6 to 8 10-day trips to Kuiu Island each year and walked over 300 miles. I had the goshawk caller on every occasion. I did not record the calling unless we had a response. This process also occurred during the 1996 to 1999 field seasons.

> Following the demise of the Long-Term Sale, we designed the Threemile Timber Sale using the existing unit pool from the Long-Term units. All these efforts were conducted under the 1992 protocols and we met those by calling [for goshawks] for two consectutive years. Again, in 1998 and 1999 we went back to the Threemile Sale Area and conducted more goshawk calling stations up river valleys and along all the road corridors. We followed and met the modified 1998 protocols. We did not get any response to the calling so I did not fill out any forms and we went ahead with the sale planning.

> The goshawk crew called for goshawks in all drainages of the Threemile Sale area again in 2001 without finding any goshawks.

> During the current season (2004), the Integrated Resource Inventory crew (IRI) called for goshawks in the Threemile Sale Area following the current Regional protocols. The results are located in the annual report on goshawks, which is just being completed. No responses were recorded.

> We will continue to monitor the sale area during implementation and any subsequent location of goshawks will necessitate the implementation of prescribed protective measures

EXHIBIT 4
Page 8 of 45

> found in the Forest Plan. The Petersburg Ranger District has implemented these
> prescriptions before.
>
> * * *
>
> We have followed the Regional protocols for calling goshawks since the 1993 season. We
> have attempted to locate goshawks all over Kuiu Island from the north to the southern end
> of the island. While we have located goshawks on the northern, western, and central
> portions of Kuiu Island, we have not located any on the eastern or southern portions of the
> island. [The Threemile Arm Timber Sale Area is on the eastern portion of the island.] We
> continue to look and will follow all Forest Plan standard and guidelines if nesting pairs are
> located.

[decision document #32, pp. 1-2]. Other documents in the record describe specific goshawk survey activities and results for 2001 and 2004 in the Threemile project area, and in each case, no goshawks were detected [decision documents #39 and 40].

I believe that the project record contains sufficient information indicating that all applicable Forest Plan requirements related to goshawks have been followed.

**Issue 2. Whether the Threemile ROD and FEIS adequately disclose the potential effects on marten, and whether the Forest Service can rely on the marten model to predict effects on marten.**

Appellants assert that the Threemile FEIS does not adequately disclose the potential effects of the project on marten. Appellants note that the open road density after project implementation will be .36 miles of road per square mile, which exceeds the .2 miles of road per square mile density at which the marten habitat capability model predicts declines in marten densities. Appellants also assert that the marten habitat capability model relied upon by the Forest Service to predict marten habitat capability is not adequate to assess potential effects, as it fails to account for predator densities, prey density, winter severity, and trapping pressure. Appellants further assert that the Threemile project cannot rely on Forest Plan standards and guidelines for marten as the Plan fails to adequately protect marten viability, and that the Threemile ROD and FEIS fail to include critical new information regarding marten and assumptions made in designing the Forest Plan. Finally, appellants assert that there have been no studies to determine if the Forest Plan marten standards and guidelines are being or can be implemented properly, and that the only monitoring conducted to date has indicated that an insufficient number of trees of the correct diameter were retained and a number of trees had been lost to windthrow.

**Discussion**

Appellants are correct that the FEIS estimates there will be .36 miles of open road per square mile in the Threemile project area following implementation of this project [FEIS, p. 3-14]. The effects of this open road density on marten habitat were considered and included in the model's estimate of marten carrying capacity, which is displayed in Table 3-41 of the FEIS [FEIS, p. 3-172]. The open road density is also described in the subsistence analysis [FEIS, p. 3-131].

EXHIBIT 4
Page 9  45

Appellants assert that the marten model "is not adequate to access impacts to marten as it fails to account for predator densities, prey density, winter severity, and trapping pressure." The marten model relies on <u>habitat</u> characteristics to evaluate relative differences in habitat capability between alternatives. It is not designed to incorporate non-habitat factors such as predator densities, prey density, winter severity, or trapping pressure. It was designed to capture the effects of timber harvest on marten habitat. The four factors mentioned by appellants would be the same in each alternative, and nothing would be gained by adding these parameters as separate components of the model.

In development of the model, however, prey availability was specifically considered when estimating relative values of stand age, beach fringe, and elevation [Habitat Capability Models for Wildlife in Southeast Alaska, 1993, pp. J8 through J9]. This same document discusses road density (with resultant trapping pressure) effects on marten. The Threemile project's Biological Evaluation [decision document #33, pp. 17-18] also discusses trapping pressure and describes a current study to monitor marten mortality, especially vulnerability to trapping.

I believe that the marten model is used appropriately; that supporting documents describe other factors that may contribute to effects of the project on marten; and that such factors were considered in determining the potential effects of the project on marten. In that regard, the only factor for which the Forest Service has responsibility is management of habitat. Factors such as a severe winter, a dramatic decline in the population of marten prey such as voles, a significant increase in trapping success, or any combination of such events, could result in significant pressure on marten populations. Trapping regulations set by ADF&G would play a key role in mitigating the effects of such factors.

Appellants assert that "[t]he FEIS and ROD also erroneously rely upon the TLMP to protect marten viability and fail to include new critical information from the scientific literature regarding this species." I disagree. Appendix N to the Forest Plan FEIS describes the risk assessment panel process used in 1995 to evaluate Forest Plan alternatives and components of the old growth habitat conservation strategy and marten standards and guidelines [TLMP FEIS, Appendix N, pp. 13-15]. This appendix also describes concerns expressed by individual panelists over certain components of the conservation strategy, including distances between Habitat Conservation Areas (HCAs) (now called old growth habitat reserves), the size of small HCAs, and the usefulness of connecting habitat corridors [p. N-13]. A similar panel was convened in 1997 to evaluate additional Forest Plan alternatives. Based on comments provided by panelists, information drawn from past studies on marten, and information on existing habitat conditions on the Tongass National Forest, the standards and guidelines for marten were further strengthened prior to implementation of the Forest Plan, and must be applied to high value habitat in five biogeographic provinces where risks were judged to be higher due primarily to greater past timber harvest activities in these areas. The Threemile FEIS documents that Kuiu Island is not in a high-risk biogeographic province [FEIS, p. 3-170].

The Robertson, et. al. draft reports referenced by the appellants identify a broad array of unanswered questions regarding marten populations, habitat use, and Forest Plan standards and guidelines for marten conservation. The report points out information needs, but does not provide any definitive answers to these questions.

EXHIBIT 4
Page 10 of 45

As appellants note, a monitoring project is being conducted on the Wrangell Ranger District to evaluate the implementation and effectiveness of some of the marten standards and guidelines. In addition, the Alaska Department of Fish and Game (ADF&G) is studying marten abundance and diets in various locations around Southeast Alaska. New information will be thoroughly assessed prior to any changes to approved forest-wide standards and guidelines for marten. In my opinion, the marten model was used appropriately in assessing the potential effects of the Threemile project alternatives on marten.

**Issue 3. Whether the Threemile ROD adequately protects bald eagles.**

Appellants assert that the Threemile project should not tier to protective measures in the Forest Plan that are unproven, and that the Threemile EIS has not adequately considered the site-specific effects of the project on bald eagles and their nests. Appellants further assert that the Forest Service has failed to follow the conservation measures set forth in the Bald Eagle Conservation Interagency Agreement between the Forest Service and the U.S. Fish and Wildlife Service to survey all shoreline areas affected by road construction, timber harvest, camps, or LTF sites, and that the project record does not demonstrate that all nests within the project area, active or inactive, are properly buffered.

**Discussion**

The 2002 Memorandum of Understanding (MOU) between the Forest Service and the U.S. Fish and Wildlife Service describes the responsibilities of both parties and the agreed-upon procedures for conserving Bald Eagles. Forest Service responsibilities include, in general, avoiding encroaching on nest trees with land use activities, maintaining perching and winter roost habitat, avoiding blasting near eagle nests, and avoiding helicopter overflights of active nests.

Most eagle nests are along shorelines. The project's wildlife report [decision document #32, pp. 36 and 58] documents that known eagle nests were checked in Threemile Arm on two different occasions. The Forest Service response to the Department of the Interior's comment letter [FEIS Appendix C, p. C-15] states that bald eagle surveys were conducted in the vicinity of the proposed LTF, which is the only activity for this sale that is near the shoreline. It goes on to state that no active or inactive nests were within the buffer limits stipulated in the MOU. I conclude that appropriate surveys were conducted and that eagle nests are adequately protected as stipulated in the MOU. Any previously-unidentified eagle nests discovered during the course of project implementation will be managed in accordance with the MOU.

**Issue 4. Whether the Forest Plan conservation strategy adequately provides for the viability of wildlife species within the Tongass National Forest.**

Appellants assert that the Forest Plan does not ensure that wildlife viability will be protected, as required by NFMA. Appellants also assert that there has been substantial dispute regarding the adequacy of the Forest Plan conservation strategy, and that the Threemile ROD and FEIS fail to disclose this opposition, in violation of the National Environmental Policy Act (NEPA).

EXHIBIT 4
Page 11 of 45

## Discussion

In large part, appellants are arguing forest planning issues that are outside the scope of a project level EIS. Forest Service regulations at 36 CFR 219.19 require that fish and wildlife habitat be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. These regulations apply to the development, adoption, and revision of forest land and resource management plans as required NFMA. They do not apply to project level decisions.

The Tongass Land Management Plan (TLMP) is the applicable Forest Plan, and the TLMP administrative record demonstrates that the Forest Plan old-growth habitat conservation strategy provides for viable populations of all old-growth associated species. The Under Secretary of Agriculture's decisions on the appeals of the TLMP ROD and FEIS determined that the Regional Forester's decision was consistent with NFMA.

Appellants' assertions relating to the adequacy of the Forest Plan old-growth habitat conservation strategy and the peer reviewers' criticism of that strategy are nearly identical to those raised in *Natural Resources Defense Council v. U.S. Forest Service*, No. J03-0029 (D.Alaska, decided September 24, 2004). In its decision in that case, the District Court concluded that the Forest Service had "acknowledged th[e] uncertainty [regarding the conservation strategy], considered the available scientific evidence, marshaled the evidence in applying it to the Tongass Plan, and proceeded to choose an alternative that would, in the Forest Service's opinion, best provide for the multiple-use goals mandated by Congress" [September 24, 2004 Order at p. 6]. The Court went on to state that the Forest Service "adequately considered the range of alternatives and adequately justified its decisions sufficient to pass muster under both NEPA and NFMA" [Id.].

The Threemile project is appropriately tiered to the comprehensive landscape old-growth habitat reserve strategy designed for TLMP. This strategy was developed to provide a system of reserves that provide for the viability of species, even with the maximum timber harvest allowed under the Tongass Forest Plan for a full 100 years. Projects consistent with the Tongass Forest Plan, such as the Threemile project, have had their cumulative effects evaluated in the Forest Plan EIS and their effects on the viability of species have been considered in the design of the comprehensive landscape old-growth habitat reserve strategy.

Forest Plan monitoring and evaluation and the five-year review of the Forest Plan required by NFMA provide opportunities to evaluate the effectiveness of TLMP standards and guidelines and to recommend amendments as necessary. At this time, there is no reason to question the effectiveness of the standards and guidelines provided in TLMP, nor the adequacy of the overall old-growth habitat reserve strategy.

**Issue 5. Whether the Threemile FEIS adequately considers and discloses the potential effects of the project on deer, and whether the Forest Service can rely on the deer model to predict these effects.**

Appellants assert that the deer model is inadequate to accurately predict the potential effects of a project as it relies on data that does not correlate to forest structure; that the model has not had a thorough, independent peer review, although there is significant doubt regarding its reliability

EXHIBIT 4
PAGE 12 of 45

within the scientific community; that there is substantial dispute over the correct values to use for various coefficients the model relies on; and that changes that may have been made to these coefficients at the project level have not been disclosed. Appellants also assert that the analysis in the Threemile FEIS relies heavily on the deer model despite known faults with the model, and fails to use additional methods to assess the potential effects on deer; that the FEIS incorrectly claims that the deer analysis is conservative because the model predicts the "worst case scenario;" and that the FEIS fails to disclose the uncertainties and opposition relating to the deer model. Appellants further assert the statement in the Threemile FEIS that the partial harvest prescriptions for the project will leave understory plants that provide browse for deer is misleading, as the harvest prescriptions for the Threemile units will remove all or at least half of the large trees within the units, making any understory plants that are retained inaccessible to deer in a heavy-snow winter.

### Discussion

Several of appellants' assertions regarding the accuracy of the model's predictions, debate within the scientific community, and disclosure of coefficients used in the project analysis are related to the NEPA requirements for: 1) use of best available information [40 CFR § 1502.22] and 2) disclosure of methodology and scientific accuracy [40 CFR § 1502.24]. In my opinion, the FEIS complies with these requirements.

The deer model uses the volume-stratum map, in addition to snow-level, elevation, and aspect, to predict winter habitat capability for deer [Forest Plan FEIS, p. 3-366]. ADF&G biologists have funded and conducted studies and published several papers in peer reviewed journals over the past 20 years on how deer interact with their habitat. These studies have shown that timber volume is a good predictor of winter deer range, and ADF&G has argued that low elevation, high volume old-growth timber stands be conserved. This research was considered and used in the development of the deer model and is in the project record [see, for example, Schoen and Kirchoff, 1990, referenced in decision document #49, p. B-60]. Research has also demonstrated that the volume stratum map is a statistically valid method of stratifying the forest for timber volume [decision document #46]. It is reasonable that the deer model used the volume-stratum map, since it was the only statistically valid map available at the time and it utilized ADF&G's research findings on deer habitat selection and timber volume. Nonetheless, during the Threemile analysis, a new map was being researched to better evaluate forest structure. This map is undergoing peer review and has not been tested for its utility for evaluating deer habitat, whereas timber volume has been extensively evaluated. A method that utilizes tree diameters and tree densities may better discriminate forest structure and timber volume. That method is in its final evaluations now and could be evaluated for use in updating the deer model.

Appellants also assert that the reliance of the Threemile FEIS on the deer model was inappropriate, that the characterization in the FEIS of the model's outputs was incorrect, and that the FEIS did not disclose the uncertainty of those outputs. I disagree. Several statements in the Threemile FEIS acknowledge the concern about confidence in the model. In brief: the word "theoretical" was used to indicate uncertainty; the model was evaluated by field surveys; the model represents just one tool in project level analysis; models are best used to make relative comparisons between alternatives rather than actual population predictions. Any changes in the model will be the result of field observations, thorough analysis, and peer review [FEIS, pp. 3-128, 3-166, 3-169, and 3-176].

EXHIBIT 4
Page 13 of 45

Appellants further assert that the FEIS discussion of the effects of partial harvest is misleading. I disagree. The appeal generally does not question the results of the model. Nor have appellants disagreed with the way a specific area on the map published in the EIS was scored. The model gives the highest scores to low elevation high volume old-growth stands and the lowest scores to non-forest and aging clearcuts, a point that did not create controversy. There is an exception, however; the appellants questioned the Forest's judgment about the value of winter range that has had a partial harvest prescription applied. The Forest gave partial cuts the same value as clearcuts, but stated that this was a "worst case" assumption. There is some optimism that some partial harvest prescriptions can conserve forest structure [see Deal and Tappeiner 2001, and Deal 2001, cited in decision document #38, p. 47] and may improve habitat values [see Doerr 1995, cited in decision document #38, p. 47]. Deal and Tappeiner (2001) state that "[s]ilvicultural systems based on partial cutting can provide rapidly growing trees for timber productions while maintaining complex stand structures with mixtures of spruce and hemlock trees similar to old-growth stand" [Id.]. The idea that partial cutting may provide some benefit to deer and other wildlife is not an unsupported supposition. Given that these papers are in the project record, the Forest's approach was reasonable and not arbitrary.

ADF&G (Person and Kirchhoff) evaluated the deer model and reported their results at the 2000 Annual Meeting of the Alaska Chapter of the Wildlife Society in Juneau. They compared model results with their pellet data set and reported a significant positive relationship (regression) between deer model scores and pellet densities. This is mentioned in the Tongass National Forest Annual Monitoring and Evaluation Report for FY 2000 [decision document #22]. This is where ADF&G suggested that the Forest Service should use 100 deer per square mile in its NEPA effects analyses instead of the 125 deer per square mile multiplier currently used.

Given that the deer model is used to evaluate relative differences between alternatives and not provide absolute numbers, in my opinion, use of the deer model is reasonable. The deer model is the best available means of estimating the effects of project alternatives on deer populations.

**Issue 6. Whether the Threemile FEIS adequately considers the effect of windthrow in its analysis of the project's effects on wildlife.**

Appellants dispute the statements in the Threemile ROD and FEIS that the project is designed to mimic natural wind disturbances, asserting that the size of the harvest units appear to mimic rare, larger-scale "catastrophic" windthrow events rather than the more common, low-intensity wind disturbances. Appellants assert that the Threemile FEIS fails to consider the extent of windthrow present in the beach fringe, project area, and on Kuiu Island as a whole, and the susceptibility of the area to frequent, catastrophic wind events in its analysis of the project's potential effects on deer, marten, bear, and other wildlife.

**Discussion**

I disagree with appellants' assertions. The silvicultural prescriptions for the timber harvest units discuss how harvest in specific units mimics stand replacing disturbance events [decision document #56, Attachment A]; the FEIS discusses the relationship between timber harvest and the natural disturbance ecology of the region [FEIS, pp. 3-58 to 3-72]; and one of the research papers included in the project record, "Windthrown or clearcut – what's the difference?"



EXHIBIT 4
Page 14 of 45

[decision document #51] considers and scientifically compares clearcuts and windthrow. The Wildlife Specialist Report in the project record [decision document #38] discusses environmental consequences of partial cutting on various wildlife species, particularly deer. Within the framework of the overall conservation strategy, Forest Plan standards and guidelines will adequately support the viability of these species. For these reasons, I believe the FEIS and ROD adequately consider the effects of windthrow.

**Issue 7. Whether the Forest Service has met its wildlife monitoring obligations under the Forest Plan, as required by NFMA.**

Appellants assert that the Forest Service has continually failed to implement the Forest Plan wildlife monitoring strategy, and that to date, the Forest Service has not attempted to evaluate population trends for any management indicator species (MIS) on the Tongass National Forest. Appellants also assert that the Threemile project cannot rely on the Forest Plan monitoring strategy to protect species viability when that strategy has not been implemented. Appellants further assert that it is illegal for the Threemile FEIS to not address the site-specific effects of the project on MIS species, particularly the brown creeper and hairy woodpecker, and that the Forest Service has not demonstrated that collecting the monitoring information required to adequately assess the potential effects on these MIS species is not possible.

**Discussion**

I disagree with appellants' assertions that the Tongass has failed to meet its responsibilities to acquire and analyze actual and trend population data for MIS, and that no attempt to evaluate population trends for any wildlife species has been reported. The requirements for MIS monitoring are contained in the 1982 Forest Service Regulations implementing NFMA:

> Population trends of the management indicator species will be monitored and relationships to habitat changes determined. This monitoring will be done in cooperation with State fish and wildlife agencies, to the extent practicable.

In keeping with this direction, the Forest Plan requires monitoring to answer the following question: "[a]re population trends for Management Indicator Species (MIS) and their relationship to habitat changes consistent with expectations?" [Forest Plan, p. 6-14.] The sampling methods to be employed are described as follows:

> Measure habitat changes (see Biodiversity Monitoring, item #2). Use the most recent version of the interagency habitat capability models (other sources may be used if they better reflect habitat change) to estimate change in the relative habitat values for each MIS since the start of plan implementation. Compare population trends for MIS (gathered as described below) with habitat changes. *Evaluate approximately every five years for consistency with plan expectations* [Id., emphasis added].

The Tongass National Forest Annual Monitoring and Evaluation Report for Fiscal Year 2002 (the most recent annual report available, which covers the five-year period after adoption of the

EXHIBIT 4
Page 15 of 45