Forest Plan) includes a 15-page description of efforts conducted in compliance with this direction. The most pertinent portions of that description follow.

> A brief summary of the habitats used by the 13 wildlife MIS, population status and trends, and the general management trends on the Tongass National Forest (Tongass) that influence habitat capability for these species [is provided below].... In addition, determinations of 1) the relationships that existed between changes in habitat capability and MIS population changes and... 2)...if the habitat and population information is consistent with expectations in [the] Forest Plan is also addressed. Various techniques were used to infer trends in habitat capability by assessing changes in important habitats. Each species summary was examined to determine its value of that species as an MIS. This evaluation was based on the quality and quantity of existing data available for that species, the magnitude of the management issues associated with the species, and the cost and feasibility of gathering additional data. For many species we acknowledge that linking population changes to management activities id difficult to implement (Landres et al. 1988, Mladenoff et al. 1997), that our analyses could likely only detect dramatic changes in populations, and that we were unable to definitively determine whether changes in the population was due to human caused habitat change.

* * *

> Of the 5.5 million acres of productive old growth on the Tongass National Forest in 1954, about 1.3 million acres are tentatively suitable forested lands (Tongass ROD, 1997 p. 7). Of these acres, about ½ million acres are available for timber harvest over the 100-year timber rotation. Assuming maximum levels of allowable timber harvest ([an average of] 267 million board feet/year), this equates to an annual harvest of about 8,250 acres. About 16,472 acres have been harvested on the Tongass during the 5-year period (1998 through 2002) since implementation of [the] Forest Plan. This amount of harvest equates to 3294 acres annually, less than half the maximum rate allowed in the Forest Plan. The majority of this harvest occurred in [Game Management Units] 2 and 3, particularly in [three specific] ecological subsections. The number of acres harvested in the last 5 years equates to a very small percentage, generally < 1% of the forest in these subsections (Nowacki et al. 2001). Therefore, reduction of old growth habitat to date has been less than projected in the Forest Plan Final Environmental Impact Statement (USDA FS 1997).

[decision document #20, pp. 2-161 and 2-162, 2-164 and 2-165]. The monitoring report demonstrates that population and habitat data have been collected and evaluated, and that trends have been identified to the degree possible, as has the relationship between changes in habitats and changes in populations. These results have been reported in summary in a monitoring report covering the fifth year after adoption of the Forest Plan. A report specifically written to address MIS is in progress and is expected to be available soon. Accordingly, I believe that the requirements of the NFMA regulations and the Forest Plan with respect to MIS monitoring have been met.

Appellants also assert that the Threemile FEIS illegally ignores potential effects on the brown creeper and hairy woodpecker. I disagree. Appellants quote sentences out of the Wildlife Specialist Report to support this assertion. More complete excerpts are as follows:

EXHIBIT 4
Page 16 of 45

> **Hairy woodpecker (*Picoides villosus*)**
>
> The hairy woodpecker is an uncommon, permanent resident in Southeast Alaska.... Work is being conducted elsewhere on the Tongass National Forest to determine the status of this species as a Management Indicator Species (MIS). The hairy woodpecker will not be discussed in depth in this document because of the difficulty in monitoring this species, their low densities, cryptic behavior, seasonal movements and large year-to-year fluctuations in their populations.
>
> **Brown creeper (*Certhia familiaris*)**
>
> Its preferred habitat is composed of mature forests (>30,000 Mbf) consisting of western hemlock/Sitka spruce stands.... As with the hairy woodpecker, work is being conducted elsewhere on the Tongass National Forest to determine the status of this species as a Management Indicator Species (MIS). The brown creeper will not be discussed in depth in this document because of the difficulty in monitoring these species, their low densities, cryptic behavior, seasonal movements and large year-to-year fluctuations in their populations.

[project document #183, p. 10]. The FEIS also discusses MIS for the Threemile project, and how they were chosen:

> The Forest Plan identified thirteen Management Indicator Species for the Tongass National Forest. Some of these species do not occur within the Threemile Project Area. Species not affected by the proposed activities will have their habitat needs protected by standards and guidelines, or can be represented by other Management Indicator Species. Table 3-38 displays the Management Indicator Species used for the Threemile Project Area analysis.

[FEIS, p. 3-164]. The species selected include the Sitka black-tailed deer, selected because it is an important subsistence species; marten, because it needs low-elevation, high volume old-growth; black bear, due to a concern for the sustainability of the high sport hunting harvest; and wolf, because it is a predator tied to a prey base.

There is no requirement for Forest Plan MIS to be evaluated by every project analysis. Moreover, as discussed above, the Forest Plan monitoring for MIS is being conducted as required. Consequently, I believe the project's treatment of brown creeper and hairy woodpecker is appropriate. For the same reasons, the appellants' assertion that the Threemile FEIS does not demonstrate that the brown creeper and hairy woodpecker cannot be monitored is moot—they are being monitored, but as part of the Forest Plan monitoring program instead of in conjunction with the planning of the Threemile project.

Appellants further assert that the Threemile project cannot rely on the Forest Plan's monitoring strategy to ensure wildlife viability because that strategy has not been implemented. I disagree. As described above in the discussion of Issue 4 regarding wildlife viability, this requirement applies only to forest plans, (not to project level decisions), and the District Court's decision in *Natural Resources Defense Council v. U.S. Forest Service* upheld the validity of the Forest Plan's conservation strategy in meeting viability requirements. In addition, as described above

EXHIBIT 4
Page 17 of 45

in this section, the Forest Plan monitoring strategy has been implemented. Thus, this assertion is without foundation.

**Issue 8. Whether the unit cards in the Threemile ROD and FEIS provide adequate information to insure that wildlife populations are protected.**

Appellants assert that the unit cards do not provide any specific information regarding the type, size, and spacing of live trees that will be left to protect cavity nesters, red squirrels, marten, and other wildlife species as intended by the Forest Plan.

**Discussion**

Each unit card [FEIS Appendix B] describes the stand treatment to be applied to the specific stand. Where treatment is "Partial Cut by Diameter Limit," reserve trees are specified. Stand size, shape, and relative placement are displayed in a map for each unit. Silvicultural treatments are further described in the Silvicultural Resources Report [decision document #56, pp. 21-22]. The Forest Plan standards and guidelines provide an overall conservation strategy for wildlife and generally address landscape-level treatments, not (with one exception) stand-specific prescriptions. The exception, a stand-specific prescription for marten, describes canopy and snag retention in high value marten habitat, standards that do not apply in this project area.

The Wildlife Specialist Report [decision document #38] and FEIS [pp. 3-169 through 3-180] analyze and describe the potential effects of the alternatives (including the Selected Alternative) on a variety of wildlife species, including deer, black bear, red squirrel, amphibians, marten, and wolf. In my opinion, the unit cards, in concert with the effects determinations in the Wildlife Specialist Report and FEIS, provide adequate information to ensure that wildlife populations are protected.

**Issue 9. Whether the Threemile FEIS adequately considers and discloses the potential effects of the project on resident and non-resident species of birds.**

Appellants assert that the Threemile FEIS does not adequately consider and disclose the potential effects of the project on indigenous populations of birds, including MIS species. Appellants further assert that the Forest Service failed to coordinate with ADF&G on issues affecting wildlife, particularly birds, and that comments from ADF&G suggest that the Forest Service has neglected to consider MIS and other bird species in planning the Threemile project.

**Discussion**

The Threemile FEIS and supporting documents consider the potential effects of proposed management actions on a wide variety of bird species. The FEIS [pp. 3-141 and 142] addresses potential effects on the northern goshawk, osprey, Peale's peregrine falcon, and trumpeter swans. In addition to the bird species addressed in the FEIS, the Biological Evaluation for this project also addresses the potential effects on Kittlitz's murrelet [decision document #33, pp. 6, 11, 16, 19, and 23] and marbled murrelet [pp. 8, 9, 13, 17, and 21]. The report "Neo-tropical Birds of Concern on the Tongass National Forest" [decision document #57] discusses 36 additional bird species and summarizes the anticipated effects of management activities on these species and their habitats.

EXHIBIT 4
Page 18 of 45

Four MIS (deer, marten, black bear, and wolf) were selected for detailed analysis in the Threemile FEIS [p. 3-164]. Project planners are not obligated to select bird species as MIS. Marten were selected due to the species dependence on low-elevation, high volume old-growth [FEIS, p. 3-164], and in my opinion adequately represent effects on this habitat type.

The project record contains multiple references to wildlife coordination with ADF&G, including consultation on adjusting and enlarging the small old-growth reserve in Value Comparison Unit 419 [ROD, Appendix 1], joint field visits to the project area [decision document #37], telephone conversations regarding wildlife populations [decision document #34], and more formal correspondence [FEIS, Appendix C-59]. Forest Service biologists and their ADF&G counterparts have a long history of working cooperatively on a wide variety of projects and issues, including preparation of this FEIS and the Forest Plan.

I conclude that the project record adequately considers bird species, that selection of MIS was within the discretion of project planners, and that Forest Service and ADF&G staff do now and will continue to coordinate and work cooperatively on a wide variety of wildlife-related projects and issues.

**Issue 10. Whether the economic analysis completed for the Threemile EIS is adequate.**

Appellants assert that the Threemile FEIS fails to include an adequate economic analysis for the project that considers the full range of financial costs and benefits. Asserting that the economic analysis must consider both market and non-market values, appellants state that the Threemile FEIS fails to fully disclose the natural resource benefits associated with unlogged forests or the direct, indirect, and cumulative socio-economic costs of the project. Appellants assert that NFMA includes a specific management objective to maximize net public benefits, and that the Forest Service should have prepared a cost-benefit analysis for the Threemile project that quantitatively estimates the costs and benefits of the project with respect to non-market resources.

**Discussion**

Appellants assert that the economic analysis conducted for the Threemile EIS is inadequate because it does not examine a full range of costs and benefits of the project, including both market values and non-market values and costs. Appellants suggest that NEPA, the Multiple-Use Sustained Yield Act (MUSYA), the Resource Planning Act, and NFMA require analysis of non-market goods and services when evaluating management alternatives. I disagree. There is nothing in NEPA, other statutes related to project-level planning, or Forest Service regulation or policy on project planning that requires the agency to quantify, in monetary terms, all of the costs and benefits associated with non-market impacts. In fact, under most planning and project conditions, all costs and benefits cannot be monetarily valued.

This view, that neither NEPA, MUSYA, NFMA, nor NFMA's planning regulations require a quantification of non-market values in monetary terms, was recently upheld in a decision dated September 14, 2004 by the United States District Court for the Western District of Washington [*Forest Conservation Council, et al., v. United States Forest Service,* No. C02-1293C]. In that decision, the Court held that "under the MUSYA, NFMA, and NEPA, [the United States Forest

EXHIBIT 4
Page 19 of 45

Service] enjoys broad discretion as to the manner in which it conducts the required economic analysis under the Planning Regulations" [Id., p. 24]. The Court further held that:

> [E]ven if USFS had assigned monetary value to the non-timber resources and had found that value to exceed the projected value of the harvested timber, USFS might not have changed its decision to authorize the particular volume of the timber sales due to competing purposes of the sales such as improving the forests' quality, "securing favorable conditions of water flows, and ... furnish[ing] a continuous supply of timber for the use and necessities of citizens of the United States." 16 U.S.C. § 475. In fact, according to the MUSYA's express mandate, those purposes are superior to administering the national forests for such uses as outdoor recreation advocated by Plaintiffs. *See* 16 U.S.C. § 528.

[Id., pp. 24-25]. While the Forest Service is not required to quantify the non-market benefits and costs associated with every timber sale, it is required to "insure that unquantified environmental amenities and values [are] given appropriate consideration in decisionmaking along with economic and technical considerations" [42 USC 4332(2)(B)]. The Threemile FEIS analyzed the potential effects of the project on "unquantified environmental amentities and values," such as deer hunting and subsistence, recreation, the Camden, Rocky Pass, and East Kuiu Inventoried Roadless Areas, other wildlife, fish habitat and water quality, wetlands, and heritage resources [FEIS, Chapter 3].

Accordingly, I believe that the economic analysis contained in the Threemile FEIS and ROD meets all applicable legal requirements.

**Issue 11. Whether the clearcutting prescriptions included in the Selected Alternative are consistent with NFMA.**

Appellants assert that the clearcutting prescriptions included in the Selected Alternative, which are directly related to maximizing dollar returns or timber output, violate NFMA.

**Discussion**

Section 6(g)(3)(F)(i) of NFMA requires that the Forest Service:

> [I]nsure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an even-aged stand of timber will be used as a cutting method on National Forest System lands where -- for clearcutting, it is determined to be the optimum method, and for other such cuts it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan.

In addition, the Chief's directive of June 4, 1992 on ecosystem management limits clearcutting to areas where it is essential to meet Forest Plan objectives and involves one or more of the following circumstances:

1. To establish, enhance or maintain habitat for Endangered, Threatened, or Sensitive species.
2. To enhance wildlife habitat or water yields, or to provide for recreation, scenic vistas, utility lines, road corridors, facility sites, reservoirs, or similar development.

EXHIBIT 4
Page 20 of 45

3. To rehabilitate lands adversely impacted by events such as fires, windstorms or insect or disease infestations
4. To preclude or minimize the occurrence of potentially adverse impacts from insect or disease infestations, windthrow, logging damage or other factors affecting forest health.
5. To provide for the establishment and growth of desired trees or other vegetative species that are shade intolerant.
6. To rehabilitate poorly stocked stands due to past management practices or natural events.
7. To meet research needs.

In part, many of appellants' concerns with respect to clearcutting relate to forest planning issues that are outside the scope of a project-level EIS. The Under Secretary of Agriculture's decision on the appeals of the 1997 TLMP ROD and FEIS affirmed the Regional Forester's decision with respect to the clearcutting issues raised, stating "[t]he 1997 Forest Plan is consistent with NFMA with regard to silvicultural methods analyzed and selected.... The FEIS adequately addressed the cumulative effects of clearcutting ... on the various resources for the Tongass National Forest." [April 13, 1999 decision, p. 22]. Appendix G of the TLMP EIS describes the silvicultural systems available; provides a comparison of the systems and the anticipated results of each, along with key site and stand conditions found on the Tongass National Forest; and then identifies the most appropriate systems for given combinations of these factors. As stated in Appendix G, certified silviculturists usually make the site-specific project level selection of silvicultural systems, which are then evaluated through the NEPA process [TLMP EIS, Appendix G, p. G-1].

For the Threemile project area, clearcutting (an even-aged management method) was selected for use on 351 acres to preclude or minimize the occurrence of potentially adverse impacts from windthrow. It will be applied where windthrow potential is moderate to high. Clearcutting will also be used to minimize mistletoe infestations, logging damage or other factors affecting forest health. In the Threemile project, the clearcut prescription is applied primarily to existing even-aged and multiple cohort stands of windthrow origin. Specific information and rationale for use of this prescription is shown on the unit cards attached to the ROD, in the project planning record, in Chapter 3 of the FEIS, and the rationale is summarized in the ROD and in the silvicultural prescriptions. Where used, this prescription has been deemed optimal related to site-specific considerations as described above [ROD, p. 14].

In my opinion, the Forest Supervisor's conclusion that clearcutting is the optimal method of harvest is reasonable and supported by the documentation of the site-specific stand characteristics for the harvest units and the analysis in the project record.

**Issue 12. Whether the public investment and financial efficiency analyses conducted for the Threemile FEIS are adequate.**

Appellants assert that the Threemile ROD and FEIS fail to disclose the public investment costs that have been or will be necessary to prepare, offer, and administer the Threemile timber sale, and that the Forest Service failed to respond to comments requesting that this information be included in the FEIS. Appellants also assert that information regarding the costs the Forest Service will incur, compared to the expected revenue of the sale, indicates that the Forest Service will lose $754,823 by selecting Alternative 6, and that this is not disclosed in the Threemile FEIS, in violation of NEPA. Appellants also assert that the project costs identified in the

EXHIBIT 4
Page 21 of 45

Threemile project record are outdated and dramatically understate actual Forest Service expenses. Finally, appellants assert that the expected bid price stated in the Threemile FEIS is inaccurate, that the Forest Service is offering sales below fair market value.

**Discussion**

Appellants' assertion that the Threemile FEIS and ROD violate NEPA because they do not disclose public investment costs is incorrect for two reasons. First, NEPA requires disclosure of effects on the human environment, not of the administrative costs of managing the Threemile Arm project area. The task for the agency is to weigh the economic and other benefits of the Threemile project against its *environmental* costs. The Forest Service is not required to consider, as part of the NEPA process, the administrative costs of preparing EISs, sale layout, and sale administration.

Second, even though NEPA does not require it, the administrative costs of implementing timber harvest activities on the Tongass National Forest have been disclosed. The Threemile FEIS tiers to the 2003 TLMP Supplemental EIS for Roadless Area Evaluation for Wilderness Recommendations (SEIS): "[t]he SEIS provides updated inventory information and this project also tiers to SEIS instead of providing duplicate information [Threemile FEIS, p. 1-7]. The SEIS displays the administrative costs of timber harvest "[b]ased on per [thousand board feet] MBF planning and support charges: $41 for NEPA preparation; $23 for sale preparation; $9 for sale administration; and $28 for engineering support" [SEIS, p. 3-299]. In addition, as the appeal points out, the project record includes a comparison of estimated project revenues and costs [project document #343].

Appellants' assertion that the FEIS includes no response to their comment on this point is also incorrect. A lengthy quotation from appellants' comment letter on the Draft EIS is included in the appeal. That quote omits the conclusion of the paragraph from the DEIS comment letter:

> A more detailed financial analysis should be presented *of road closure* (emphasis added). Does harvest truly facilitate closure of roads, does it pay for it and are the costs discussed above reflected in the analysis[?] Would the Apricot Creek Harvest pay for closure of roads along all of south side?

[FEIS Appendix C, p. C-53]. The Selected Alternative excluded all harvest units on the south side of Threemile Arm, including the Apricot Creek area [ROD, p. R-25]. In addition, the FEIS includes a response to the specific request described above: "[t]he costs of closing roads are included in the financial analysis of each alternative" [FEIS Appendix C, p. C-58].

Appellants also assert that the FEIS includes no financial efficiency analysis as required by Forest Service Handbook (FSH) 2409.18; that the analysis contained in the project record shows the project will lose over $750,000; and that "the failure to disclose that fact in the FEIS violates NEPA."

FSH 2409.18 provides extensive guidance on how to conduct financial analysis of a proposed timber harvest project during NEPA analysis:



> Complete a financial analysis of each timber sale project alternative at Gate 2 [during NEPA analysis].
>
> * * *
>
> The information is used to select the most efficient alternative that achieves the desired objectives and improves the financial position of the timber sale program.
>
> * * *
>
> The analysis basically compares estimated Forest Service direct expeditures with estimated financial revenues.

[FSH 2409.18, pp. 6-7]. There is no requirement in the Handbook to include this information in the NEPA document. In compliance with the Handbook, the Addendum to the Timber Economics Resource Report referred to by appellants demonstrates that, according to the agency's NEPA Economic Analysis Tool (NEAT), Alternative 6 (which became the Selected Alternative) would receive the highest bid value of all action alternatives, and the greatest estimated net revenue of all the alternatives, even though that return would be a loss of approximately $755,000 [project document #343]. The FEIS explained in further detail that these estimates are useful for comparative purposes only:

> The discussion of economics for the Threemile Project Area is based on the use of the Forest Service timber NEPA economic analysis tool to compare the relative value of the alternatives. This comparison can only be used for relative values and not for exact monetary values. Some of the factors that influence the cost of timber harvest are presented.
>
> * * *
>
> The projected harvest volume, costs and expected bid values are estimates and not definitive figures. For this analysis, timber values were taken from the NEAT system. These estimates are useful for comparing the alternatives but actual values will probably differ from final appraisal due to more accurate cruise information... Competitive bidding will determine the actual value.

[FEIS, pp. 3-20, 3-26, 3-27]. Appellants assert that the project costs estimated in the Threemile project record, as well as the similar estimates contained in the SEIS and used in annual budget allocations on the Tongass National Forest, "dramatically understate actual Forest Service expenses." They also assert that several Annual Monitoring and Evaluation Reports of the Tongass National Forest demonstrate that these cost estimates are incorrect.

I disagree with all of these assertions. These same issues are currently being litigated before the United States District Court for the District of Alaska in a case brought by several parties,

EXHIBIT 4
Page 23 of 45

including one of the current appellants, regarding the Woodpecker timber sale project. The Government's opposition brief filed in that case points out that:

> The question of how to calculate public investment in a timber sale is complex and necessarily imprecise.... Moreover, predicting the administrative costs of a particular timber sale is extremely speculative until that sale has been completed. For example, the agency cannot know beforehand whether the project will be litigated, whether a supplemental EIS will be necessary, or whether there will be unusual complications in the administration. Indeed, until the timber is actually cut and measured, it is not possible to know exactly how much timber will be harvested.

* * *

> The Forest Service has used those average budget estimates in other circumstances as well, including the present net value analysis in the 2003 SEIS on the TLMP revision...

* * *

> Contrary to plaintiffs' allegation, ... the agency has *not* recognized that the budget figures are outdated or inaccurate. The 1998 and 1999 Annual Monitoring Reports ... questioned whether the budget estimates were lower than unit costs in that year, but could not determine whether the higher costs were "a one-year occurrence or a trend.... In subsequent reports, the agency concluded that available data did not permit a comparison with the budget figures because of a change in accounting categories.

> Far from recognizing that the figures are incorrect, the Forest Service continues to use those figures for a variety of purposes, including the making of budget requests... This use demonstrates the Forest Service's confidence in the figures, and provides an additional verification of them...

> Rejecting the Forest Service's time-tested figures, plaintiffs take another approach. Rather than taking a long-term view based upon completed contracts for which hard figures are available, plaintiffs look to the report produced yearly by the Forest Service of actual expenditures from budget items that include the administrative costs of the timber sale program. They then divide those expenses by the actual harvest of that year... That approach is misleading for two reasons. First, delays between expenditures and actual harvest due to litigation, plan revision, and similar circumstances in recent years makes a same-year comparison between expenses and harvest inappropriate. Second, the budget line items used in plaintiff's calculations include many Forest Service activities not related to timber sales.

> The timber sale process is a multiple year process, and there is no expectation that expenditures and actual harvest will occur in the same year... Since 1998, there has hardly been a time during which the timber sale program has not been restricted by litigation and other unusual circumstances.

* * *

EXHIBIT 4
Page 24 of 45

> [E]ach of the budget line items used in plaintiffs' calculations includes many Forest Service functions in addition to timber sales... For example, the "road maintenance" line item includes maintenance after completion of the sale when the road is left open for other management purposes. The "planning/inventory/monitoring" line item includes forest plan level monitoring and inventorying unrelated to timber sales.
>
> Under these circumstances, it was certainly reasonable for the agency not to use plaintiff's flawed methodology.

[decision document 60, pp. 16-22].

Finally, appellants assert that the bid prices contained in the project record are inaccurate. As discussed above in this section, the FEIS states that these values are estimates and not definitive figures, which will be determined through the competitive process. In my opinion, this disclosure meets NEPA's requirement to use the best available information, and disclose the limitations of such estimates. For the same reasons, I also disagree with the related assertion by appellants that, because the NEAT model estimates receipts based on past experience, the FEIS does not demonstrate that the agency will meet regulatory requirements to receive fair market value for the timber to be sold. The NEAT model merely estimates revenues to be received years later; the appraisal process conducted after the NEPA process determines fair market value, and market conditions at the time timber is offered for sale determine amounts actually bid.

For the foregoing reasons, I believe the financial efficiency analysis contained in the Threemile project record and FEIS meets all applicable requirements.

**Issue 13. Whether the market demand analysis in the Threemile FEIS is adequate.**

Appellants assert that the FEIS relies on outdated market demand information, that the Forest Service has failed to disclose changed market conditions and update the market demand projections, and that the Forest Service failed to respond to comments on this issue.

**Discussion**

Appellants' assertions on this issue relate largely to forest planning issues that are outside the scope of a project level EIS. These assertions related to market demand analysis are nearly identical to those raised in *Natural Resources Defense Council v. U.S. Forest Service*, No. J03-0029 (D.Alaska, decided September 24, 2004). In fact, appellants refer to Plaintiff's briefing in that case "[f]or further explanation of these issues."

In its decision in that case, the District Court concluded that "[i]t is impossible to know for certain what market for forest products will exist during the life of the forest plan. The Forest Service must plan for all eventualities whether likely or not. The Court is satisfied that the Forest Service has done so" [September 24, 2004 Order at p. 6].

The Threemile project is appropriately tiered to the market demand analysis conducted for the Forest Plan. The procedure for meeting market demand and scheduling environmental analysis of timber sales on the Tongass National Forest is explained in detail in a 19-page appendix to the

EXHIBIT 4
Page 25 of 45

Appeal Deciding Officer                                                                         24

Threemile FEIS [Appendix A]. The recent decision from the District Court upheld that process [Id.]. I find no reason to change that outcome through this appeal.

Appellants also assert that the Forest Service failed to respond to their comments on this issue. Appellants submitted a 13-page comment letter on the Draft EIS. That letter included an extensive discussion of economic issues that concluded with a request to include a more detailed financial analysis of road closure [FEIS Appendix C, p. C-53]. The Forest Service responded to that specific request. In my opinion, that response was adequate.

**Issue 14. Whether the Threemile project is consistent with the Clean Water Act (CWA) and NEPA.**

Appellants assert that the timber harvest and road construction activities authorized in the Threemile ROD will violate the State of Alaska's water quality standards for turbidity and sediment, in violation of the CWA. Appellants also assert that the analysis in the Threemile FEIS regarding turbidity is inaccurate and misleading, and that neither the ROD nor FEIS discuss the potential violations of the sediment standard, in violation of NEPA.

**Discussion**

Section 313 of the CWA and Executive Order 12088 require the Forest Service to comply with all Federal, State, and local requirements relating to the control and abatement of water pollution [33 U.S.C. 1323(a)]. Section 319 of the CWA and Executive Order 12372 require that Best Management Practices (BMPs) be consistent with the State's Non-Point Source Pollution Control (NPS) program, and that they be used to mitigate the effects of land disturbing activities. The Memorandum of Agreement between the Alaska Department of Environmental Conservation (DEC) and the Alaska Region of the Forest Service recognizes that the Forest Service's BMPs are consistent with the State's NPS program.

Appellants assert that the Threemile project will violate Alaska's Water Quality Standards (WQS) found at 11 AAC 70.020. Specifically, appellants assert that implementation of the Selected Alternative will result in violations of the turbidity standard found at 18 AAC 70.020(b)(12) and the sediment standard found at 18 AAC 70.020(b)(9); thus, the project violates the CWA and the FEIS violates NEPA. As I understand it, this assertion is based on the fact that these provisions of the WQS do not specify whether or not the controlling measurements of turbidity and sediments are to be taken 48 hours after an action such as installation of a culvert is taken.

On this question, I believe that provisions of the Alaska Forest Practices Regulations [11 AAC 95] are controlling. Under the Alaska Forest Resources and Practices Act [FRPA, AS 41.17.010], DEC has the authority to approve regulations promulgated under the FRPA. Upon approval, such regulations "establish the non-point source pollution requirements under state law and sec. 319 of the Clean Water Act" for forestry activities [AS 41.17.010(6)].

In keeping with the review process mandated by the Coastal Zone Management Act, the Alaska Coastal Management Program (ACMP) and DEC's NPS program, several State agencies reviewed the Threemile EIS for consistency with the ACMP. As part of that review, DEC reviewed the EIS for consistency with State nonpoint source pollution control requirements.

EXHIBIT 4
Page 26 of 45

Results of that review are contained in a Final Consistency Finding from the Alaska Division of Governmental Coordination (DGC), which states that

> The Alaska Departments of Environmental Conservation, Fish and Game, and Natural Resources have reviewed your proposed activity. Based on that review, the State concurs that this proposed project is consistent with the ACMP to the maximum extent practicable.

[project document #169, p. 2]. No mention is made in DGC's finding of any water quality concerns or any potential violations of the WQS.

In addition, *Alaska's Nonpoint Source Pollution Control Strategy* (September, 2000), published by DEC (see http://www.state.ak.us/dec/water/wnpspc/pdfs/NPSstrat-appendixFINAL.pdf), states that the Forest Practices Regulations have been approved by DEC:

> In July 1993 the State promulgated revised regulations required by the 1990 revision of the Alaska Forest Resources and Practices Act (FRPA). The changes incorporated recommendations of the statewide Forestry Steering Committee. The revised regulations specify both administrative procedures and environmental standards for timber harvest activities on private, state and other public lands. The Forest Resources and Practices regulations were promulgated by [the Alaska Department of Natural Resources] and approved by DEC. DEC had approval authority of the regulations since provisions of the FRPA and the regulations establish the State's nonpoint source pollution control requirements under state law and Section 319 of the Clean Water Act for forest practices activities.

[Id., Volume 2, p. 7]. The Alaska Forest Practices Regulations provide that the term "degradation of water quality" excludes "changes that are temporary," and further provide that temporary "means 48 hours or less" (11 AAC 95.900(20)) [decision document #69].

The FEIS characterized the effects of the project on water quality, and compliance with State Water Quality Standards, as follows:

> Some short-term sediment increase is expected when new [stream] crossings are constructed. State Water Quality standards require that the duration of turbidity increases be limited to 48 hours during culvert installation. Monitoring has shown that when proper installation techniques are used this standard can be maintained (Monitoring and Evaluation Reports, 1999a and 2000b).

[FEIS, p. 3-87].

Based on the foregoing analysis, I believe the FEIS and project record demonstrate that the Threemile project complies with all applicable State nonpoint source pollution control requirements. Thus, there is no violation of CWA or of NEPA.

EXHIBIT 4
Page 27 of 45

Appeal Deciding Officer 26

**Issue 15. Whether the Threemile ROD and FEIS adequately analyze the potential effects of the project on the inventoried roadless areas within the project area and their potential for future wilderness designation.**

Appellants assert that the rule temporarily exempting the Tongass National Forest from the provisions of the Roadless Area Conservation Rule (Roadless Rule) is unwarranted and illegal, and that the Threemile project will prejudice the final decision on whether to permanently exempt the Tongass, and other forests, from the Rule. Appellants also assert that the Forest Service decision in the Forest Plan to allow entries into roadless areas was illegal, referencing various appeals of the Forest Plan. Appellants also assert that the Forest Service lacks an adequate rationale for entering the roadless areas within the Threemile project area, and that the Forest Service should have considered in detail an alternative that did not involve activities in the roadless areas. Appellants further assert that the Threemile EIS does not adequately disclose the effects the new roads within the roadless areas will have on the maintenance of existing roads and the associated effects of failing to maintain existing roads. Finally, appellants assert that the Threemile ROD and FEIS fail to adequately consider and disclose the potential direct, indirect, and cumulative effects of the project on the future wilderness potential of the roadless areas affected by the project.

**Discussion**

In large part, appellants are arguing forest planning issues that are outside the scope of a project level EIS. As explained in the December 30, 2003 Federal Register notice [68 FR 75136] that announced the Final Rule and Record of Decision to temporarily exempt the Tongass National Forest from the provisions of the Roadless Area Conservation Rule, the unique situation of the Tongass has been recognized throughout the Forest Service's process for examining prohibitions on activities in inventoried roadless areas. The process for developing the Roadless Rule included different options for the Tongass at each stage of the promulgation of the Rule and the environmental analysis process associated with that Rule. At each stage, the option of exempting the Tongass from the Rule's prohibitions was considered in detail. Given the uncertainty about the implementation of the Roadless Rule due to various lawsuits, the U.S. Department of Agriculture decided to adopt the temporary exemption for the Tongass, initiated pursuant to a settlement agreement with the State of Alaska. This allows the Tongass to continue to be managed pursuant to the 1997 Tongass Land Management Plan (TLMP), as readopted by the 2003 Record of Decision for that Plan.

Appellants assert that the Threemile ROD will prejudice the Forest Service's forthcoming decision about whether to reinstate the Roadless Rule on the Tongass or exempt the Forest permanently. I disagree. The Threemile FEIS and ROD and the Advanced Notice of Proposed Rulemaking [ANPR, 68 Federal Register 41864] regarding a permanent exemption for both the Tongass and Chugach National Forests have separate utility. The July 15, 2003 ANPR sought comment on whether both national forests in Alaska should be exempted permanently from the prohibitions of the Roadless Rule. The Threemile ROD has separate utility in providing timber to meet market demand and in preventing socioeconomic dislocation in Southeast Alaska, while protecting forest resources, regardless of whether the agency ultimately decides to exempt both national forests from the prohibitions of the Roadless Rule on a permanent basis. The Forest Supervisor's decision in the Threemile ROD does not prejudice the ultimate decision on the

EXHIBIT 4
Page 28 of 45

ANPR. An action prejudices the ultimate decision on a proposal when it tends to determine subsequent development or limit alternatives. The Threemile ROD does neither.

Appellants assert that the Forest Service lacks an adequate rationale for entering the roadless areas within the Threemile project area, and that the Forest Service should have considered in detail an alternative that did not involve activities in the roadless areas.
Regulations implementing NEPA at 40 CFR 1502.14 state that agencies shall "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."
The Council on Environmental Quality (CEQ) has clarified these regulations, stating that "[w]hat constitutes a reasonable range of alternatives depends on the nature of the proposal and the facts in each case" [CEQ's Forty Most Asked Questions #1(b)].

As stated in the FEIS, the Threemile project alternatives were designed to both meet the purpose and need for the project and to provide a different response to the significant issues identified for the project [FEIS, p. 2-5]. The purpose and need for the Threemile project is stated on page 1-2 of the FEIS:

> The purpose and need for the Threemile ... project is to respond to the goals and objectives identified by the Forest Plan. The Forest Plan goals and objectives applicable to the project area include:
>
> - Manage, from suitable lands made available for timber harvest, the timber resource for production of saw timber and other wood products...
>
> - Seek to provide a timber supply sufficient to meet the annual market demand for the Tongass National Forest and the demand for the planning cycle.
>
> - Provide diverse opportunities for resource uses that contribute to the local and regional economies of Southeast Alaska.
>
> - Support a wide range of natural-resource employment opportunities within Southeast Alaska's communities.

The significant issues identified for the Threemile project are also stated in the FEIS, and the potential effect of the project on those portions of the Inventoried Roadless Areas (IRAs) within the project area is identified as a significant issue. The FEIS indicates that the Forest Plan allocated the portions of the IRAs within the Threemile project area to development land use designations, and that all of the action alternatives will affect at least one of the IRAs by reducing its size slightly [FEIS, p. 2-14]. However, each action alternative provides a different response to the issue, as discussed on page 2-14 of the EIS and outlined in Table 3-17 [p. 3-48]. Alternative 1 was expected to have the least impact, as it proposed no roads within the IRAs and included the least amount of acres to be harvested (252 acres). Alternative 2 included 1.44 miles of road construction and the harvest of 376 acres within IRAs, Alternative 3 included 4.07 miles of road construction and the harvest of 572 acres within IRAs, and Alternative 4 included 7.78 miles of road construction and the harvest of 605 acres within IRAs. All three of these alternatives avoided road construction within the East Kuiu IRA. The FEIS acknowledges that Alternative 6 is expected to have the greatest impact on IRA acreage, with the construction of

EXHIBIT 4
Page 29 of 45

7.78 miles of road and the harvest of 621 acres; however, this alternative avoids all road construction and timber harvest within the East Kuiu IRA [FEIS, p. 2-14]. The ROD indicates that the most public concerns were expressed for the proposed harvest activity in the East Kuiu IRA, particularly the Apricot Creek area [ROD, p. R-9].

The FEIS also discusses the alternatives considered but eliminated from detailed study, and these included an alternative that would have limited harvest to the existing road system and completely outside the IRAs. As discussed in the FEIS, this alternative was eliminated from detailed study for two reasons:

- Due to previous harvest in the Threemile project area, further timber harvest along the road system at this time does not meet Forest Plan standards and guidelines for visual quality.

- Timber sale planning on Kuiu Island must consider the cost of mobilization of equipment to a remote setting. Since these costs are high, in order to be economically feasible timber sales must be large enough to recover the costs of mobilization. This would not be possible with an alternative that harvested only along the road system.

[FEIS, p. 2-35]. The Forest Supervisor acknowledged the alternative that would have avoided harvest and road construction in the IRAs and the reasons for it having been eliminated from detailed study [ROD, p. R-9]. The Forest Supervisor also stated that he believed his decision balances the need to provide industry with a supply of timber while affording a great amount of consideration of and protection to roadless areas. I agree. Given the purpose and need for the Threemile project, the need to provide a timber supply from the Tongass sufficient to meet market demand, sale economics, and Forest Plan visual quality standards and guidelines, the range of alternatives considered in the Threemile EIS constitutes a reasonable range of alternatives, and the Forest Supervisor adequately considered the potential effects of these alternatives on those portions of the IRAs within the project area, as discussed in the paragraphs below.

In compliance with Forest Service regulations, policy, and procedures, the potential wilderness values of roadless areas throughout the Tongass National Forest were thoroughly inventoried and evaluated at the forest planning level, as discussed in the TLMP Supplemental EIS for Roadless Area Evaluation for Wilderness Recommendations [TLMP SEIS, February 2003].

With regards to appellants' assertions regarding whether the Forest Service adequately considered the potential effects of building the new roads within the Roadless Areas on the maintenance of existing roads, see Issues 1 and 3 of the Cascadia Wildlands Project appeal, below, for a complete discussion of these issues. In my opinion, the alternatives considered for the Threemile project constitute a reasonable range of alternatives, and the Threemile EIS and project record demonstrate that the effects of the road construction activities associated with the Selected Alternative have been adequately considered and disclosed.

The roadless area analysis for the Threemile project was based on the 2003 Roadless Inventory conducted for the TLMP SEIS. The Threemile project area includes portions of three

EXHIBIT 4
Page 30 of 45