inventoried roadless areas – Camden, Rocky Pass, and East Kuiu. The TLMP SEIS considered the wilderness potential of these areas:

### Camden

The roadless area is natural appearing, but the western side of Port Camden is influenced by developments on adjacent lands. The natural integrity and apparent naturalness of the area is high. The natural integrity of the portion east of Port Camden is outstanding and the apparent naturalness is very high when rated separately. The western area has moderate natural integrity and apparent naturalness when rated separately. The opportunity for solitude is very high and the opportunity for primitive recreation is outstanding in the roadless area. None of the roadless area landscape is considered distinctive for the character type from a scenery standpoint. The area has good cultural, historic, and recreational values. There are no other ecologic, geologic, or scientific features of significance in the area.

### Rocky Pass

The area is natural appearing. The natural integrity is very high and the apparent naturalness is outstanding. The opportunity for solitude is very high and the opportunity for primitive recreation is outstanding. Approximately 9 percent of the landscape is considered distinctive for the character type from a scenery standpoint. The area has very high cultural, historic, and recreational values. The area is prized for its geologic diversity, and is a prime area for rock hounds to visit.

### East Kuiu

The area is mostly unmodified. The natural integrity is outstanding and the apparent naturalness is very high. The opportunity for solitude is very high and the opportunity for primitive recreation is outstanding. Approximately 10 percent of the landscape is considered distinctive for the character type from a scenery standpoint. The area has important cultural and historic values.

[TLMP SEIS, Appendix C, pp. C1-394, C1-406, and C1-431]. As stated in the Threemile EIS, the 1997 TLMP allocated approximately 80 percent of the Camden Inventoried Roadless Area to the timber production and modified landscape LUDs; approximately 7 percent of the Rocky Pass Inventoried Roadless Area to the timber production, modified landscape, and scenic viewshed LUDs; and approximately 64 percent of the East Kuiu Inventoried Roadless Area to the timber production and modified landscape LUDs [Threemile EIS, pp. 3-35 to 3-37]. The remaining acres were allocated to LUDs that generally do not allow timber harvest and road construction [Id.].

The Threemile EIS identified the potential effects of the project on the Inventoried Roadless Areas as a significant issue, and discusses the affected environment and the potential effects of the project on the Roadless Areas on pages 3-34 to 3-48. Among other topics, it describes the proximity to wilderness and other inventoried roadless areas; the proximity to non-National Forest System lands that could be developed; the amount of human disturbance; and the biological, historical, recreational, and research values of the Roadless Areas [pp. 3-38 to 3-46]. The EIS and ROD indicate that the areas that contain the highest roadless area values for resources other than timber management will be retained in the Selected Alternative. For the Camden Inventoried Roadless Area, these include the isthmus between Port Camden, the Bay of

EXHIBIT 4
Page 31 of 45

Pillars, and Threemile Arm; the waterfowl hunting area at the head of Port Camden Bay; and the fossil site located on the eastern shore of Port Camden [EIS, p. 3-47; ROD, p. R-9]. For the Rocky Pass Inventoried Roadless Area, these include Rocky Pass; land otter habitat; and sport fishing streams [ROD, p. R-9]. The Selected Alternative avoids any timber harvest and road construction in the East Kuiu Inventoried Roadless Area, so its roadless area values and wilderness characteristics will remain unaffected by the Threemile project decision.

The EIS indicates that 39,345 acres of the Camden Inventoried Roadless Area will remain roadless after the timber harvest proposed under the Selected Alternative, and that 78,111 acres of the Rocky Pass Inventoried Roadless Area will remain roadless. The Selected Alternative includes the harvest of 292 acres and the construction of 4.76 miles of road within the Camden Inventoried Roadless Area, and the harvest of 329 acres and the construction of 3.02 miles of road within the Rocky Pass Inventoried Roadless Area. All of the timber harvest and road construction is along the edge of the roadless area boundaries, adjacent to the existing road system, and all of the roads will be closed after harvest operations are completed [ROD, p. R-6; EIS, p. 3-48]. Considering both the road construction and the timber harvest included in the Selected Alternative, less than 3 percent (1,050 acres) of the Camden Inventoried Roadless Area (40,395 total acres) will be affected, and less than 2 percent (992 acres) of the Rocky Pass Inventoried Roadless Area (79,103 total acres) will be affected [EIS, p. 3-48]. Based on the analysis in the EIS and project record, the Forest Supervisor concluded that the activities associated with the Selected Alternative will not significantly affect the wilderness character of these Roadless Areas or their eligibility for inclusion in the National Wilderness Preservation System [ROD, pp. R-6, R-9].

In my opinion, the Forest Supervisor adequately considered the potential effects of the Threemile project alternatives on the Inventoried Roadless Areas within the project area. The EIS and ROD indicate that the Selected Alternative will have a minimal overall effect on these Roadless Areas (less than 3 percent of Camden; 2 percent of Rocky Pass; and no affect on East Kuiu), and that the most important roadless area values of the Camden and Rocky Pass Inventoried Roadless Areas will be retained.

EXHIBIT 4
PAGE 32 of 45

**Appeal No. 04-10-00-0011 –Cascadia Wildlands Project:**

**Issue 1. Whether the Threemile EIS includes an adequate range of alternatives.**

Appellants assert that road management alternatives were not properly developed, and that there in no indication that appropriate resource specialists were involved in road management decisions. Appellants also assert that the EIS failed to consider alternatives with additional road closures, in violation of NEPA, Forest Service regulations at 36 CFR 212.5(b), and Forest Plan transportation standards and guidelines. Appellants further assert that the EIS should have considered additional road maintenance as part of the alternatives considered for the project.

**Discussion**

Road development and access were identified as a significant issue, including the extent to which the project should build new roads, upgrade existing roads, close roads, maintain roads, and allow the use of roads. In addition to these five decision components, three units of measure were identified, including miles of new road constructed, miles of existing road placed in storage after completion of the project, and road density [FEIS, p. 1-18]. Table 2-7 [Id., p. 2-27] shows the range of outputs from the six alternatives considered in detail, including 0 to 4.2 miles of new and temporary roads, 0 to 11.4 miles of roads to be placed in storage after harvest, and 9.1 to 20.5 miles of road to remain open after harvest (with the highest amount representing the existing condition).

Chapter 2 of the FEIS [p. 2-5] explains how a range of management strategies was used to respond to the issue and how roads to be closed were identified. In Alternatives 1, 2 and 3, harvest unit locations were placed to facilitate closure of existing roads [pp. 2-7 – 2-9] which reduces maintenance costs, and Alternative 1 would not construct any new roads. Alternative 4 was designed to be the most economical with the minimum roads needed [p. 2-10], Alternative 5 is no action and would not close any roads or remove any culverts or bridges, and Alternative 6 (the preferred alternative in the Draft EIS and, with some modifications, the Selected Alternative in the ROD) was designed to incorporate conventional logging systems and the associated roads needed.

Chapter 3 [p. 3-6] refers to the forest-scale and Kuiu Island road analyses, showing the tiered, science-based system of analysis. Each alternative's effects related to roads are described and compared, and cumulative effects are discussed on pp. 3-17 and 3-18. Page 3-28 discloses that closing roads will result in long-term cost savings because road maintenance will be eliminated for closed roads, and that a range of 0 to 11.4 miles of existing roads could be closed in the various alternatives considered in detail.

FEIS Appendix B [pp. B-79 to B-105] describes the road management objectives and how handbook direction is implemented (FSH 7709.55). It defines and describes in some detail several criteria used, including: general design, maintenance, operation, and site-specific design. Beginning on page B-81, the results of the field inventories are described. Each road is mapped and a road card contains the specific management direction, including specific mitigation measures. This information is summarized in Appendix 2 of the ROD and made specific for the Selected Alternative.

EXHIBIT 4
Page 33   45

The ROD [p. R-4] explains that the 4.2 miles of new roads and 8.3 miles of existing roads will be placed in the minimum maintenance level 1 to reduce costs. The Kuiu Island Road Analysis, under "What's Next," discloses the limited road maintenance funding and deferred maintenance situation on Kuiu Island [decision document #24, pp. 22-23]. The cover page of this document lists the team that prepared it. The FEIS [pp. 4-16 to 4-18] describes the experience of the entire project interdisciplinary team. Between these two sources, it is evident that the Road Analysis was prepared by an analysis team led by a Civil Engineer with 20 years of experience, and included a Soils Scientist with 36 years of experience, a Recreation Biologist with 21 years of experience, and so on. All relevant specialists were included. In addition, the project record includes documentation that all relevant specialists were involved in the decisions on closing particular roads on Kuiu Island, and the reasons for these decisions [decision document 21].

These documents were available in the project record. By proposing to close existing roads in all action alternatives, the Threemile project team was attempting to reduce the maintenance backlog and meet the minimum road system identified for the island.

Appellants assert that 8 surface erosion problems identified in the Kuiu Island Roads analysis are not addressed. These sites appear to be similar (although not exactly the same) to the fish passage barriers identified on the map in Appendix B [p. B-89], with detailed information regarding information collected to date. Page B-95 describes development of an erosion control plan. The ROD further specifies that all soil exposed during maintenance shall be seeded [ROD Appendix 2, p. 2-51].

Based on my review of the FEIS, ROD, and project record, I believe that a range of reasonable alternatives was developed in response to the significant issue concerning roads and their effects, including the amount of roads to be closed and the level of road maintenance. The direction in the Forest Plan and FSH was followed. All appropriate specialists were involved. While appellants would like to see more roads closed and no roads built, the decision maker and public had a full range of alternatives with which to consider the effects and evaluate the trade-offs of more or fewer roads.

My review of the FEIS, ROD, and project record also leads me to conclude that the project meets the intent of 36 CFR 215.5. The analysis described above is sufficient to support a finding that the Selected Alternative incorporates the minimum road system needed for safe and efficient travel and for administration, utilization, and protection of National Forest System lands, as required by that regulation. However, the specific finding required is not included in the project documentation. I recommend, therefore, that you include such a finding in your appeal decision, based on the analysis contained in the record.

**Issue 2. Whether the Threemile EIS and project record accurately discloses the cumulative road miles and maximum road density.**

Appellants assert that the EIS includes misleading information about the amount of roads in the project area after project implementation, and that the EIS and project record fail to disclose the cumulative road miles and road density.

EXHIBIT 4
Page 34 of 45

**Discussion**

The FEIS states that "[t]he *open* road density within the project area would be reduced from 0.55 to 0.36 mile per square mile" under Alternative 6 [p. 3-14, emphasis added]. It also explains that Alternative 6 will place 8.3 miles of the existing 20.5 miles of open permanent roads into storage; that all 4.2 miles of new permanent roads constructed will be put into storage; and that all 4.2 miles of temporary roads will be decommissioned with drainage structures removed [Id., pp. 3-13 and 3-14].

The primary reason open roads are counted--and not roads that have been closed, put into storage, or decommissioned--is that the concern over road density stems from issues raised about additional mortality of wildlife species such as bear, deer, and wolves that can result from increasing access for hunters and trappers through road construction. These concerns were raised during the development of the Forest Plan, and led to the development of standards and guidelines such as those discussed under Issue 1 of the Sierra Club et al. appeal that seek to limit the density of open roads in areas where wolf mortality concerns exist and where road access has been identified as a significant factor in such mortality. There is no reason to be concerned about the density of roads in the Threemile Project area that do not provide additional access to the area.

In addition, closing roads removes the sediment-producing effects of vehicular travel. Putting roads into storage—or decommissioning them—further reduces potential adverse effects on watershed conditions by removing or bypassing culverts, thereby returning the drainage patterns to natural conditions. This too supports the analysis of road density that counts only open roads in the computation.

In my opinion, this analysis is not misleading. In view of the analysis described in the discussion of Issue 1 above, the effects of roads of all types are adequately disclosed in the FEIS.

**Issue 3. Whether the Threemile EIS adequately considers road maintenance concerns.**

Appellants assert that the EIS fails to consider the road maintenance backlog facing the Forest Service, both forest-wide and on Kuiu Island and within the Threemile project area. Appellants also assert that the EIS fails to disclose a large number of maintenance problems related to stream crossing structures and erosion, and includes incomplete and misleading information relating to fish passage barriers in the project area. Appellants further assert that the EIS fails to adequately consider the potential effects of the road maintenance concerns that are disclosed. Finally, appellants assert that the EIS ignores funding shortfalls for road maintenance needs, and fails to consider the potential effects of the project on the maintenance backlog and its direct and cumulative effects on the environment.

**Discussion**

As discussed above under issues 1 and 2 of this appeal, the FEIS identified road maintenance as part of the road development and access management issue. Harvest units were located under Alternatives 1-3 so as to facilitate closing roads, which reduces maintenance needs. All alternatives included road reconstruction to repair or replace drainage structures and reconstruct fill slopes in several locations [FEIS, p. 3-9]. All new permanent roads constructed under the

EXHIBIT 4
Page 35 of 45

Selected Alternative will be put into storage, and all temporary roads will be decommissioned. Miles of open road under the Selected Alternative will be reduced from 20.5 to 12.2, and nine culverts will be removed from fish streams [FEIS, p. 2-27]. Road maintenance concerns were clearly considered. All of the components of the Selected Alternative described above serve to reduce maintenance needs; for example, putting roads into storage moves them to Maintenance Level 1, the lowest level [ROD, pp. R-4, R-7, R-8].

The Kuiu Island Roads Analysis included in the project record adds additional information on the effects of closing or storing roads on future maintenance needs, stating that "[a]nnual road maintenance funds are not expected to be sufficient to keep all of the forest roads on the island fully maintained *if kept open*" [decision document #24, p. 16, emphasis added]. This analysis also shows that average annual maintenance costs for Maintenance Level 1 is estimated to be $169 per mile, compared to $806 and $1,138 per mile for Maintenance Levels 2 and 3, respectively [decision #document 24, p. 28]. By moving over 8 miles of open road into storage, the Selected Alternative will reduce overall funding required for future road maintenance needs, even with the construction of new roads (all of which will be in Maintenance Level 1 following completion of timber harvest). The net effect of the project, therefore, is to reduce the existing road maintenance backlog, not add to it.

Appellants further assert that the FEIS does not adequately disclose problems with stream crossing structures and fish passage. I disagree. The FEIS describes the ongoing Road Condition Survey program, concerns identified through that program, steps included in the project to deal with those concerns, and that further evaluation of potential concerns outside of the project area is needed [FEIS, pp. 3-16 and 3-17]. In addition, the FEIS states that "no new proposed roads will cross fish bearing streams" and that road closures in the Selected Alternative will result in fish passage being restored on two Class I stream crossings and seven Class II stream crossings [FEIS, pp. 3-13 and 3-14].

Based on my review of the FEIS, ROD, and project record, it is my opinion that the Threemile project will improve existing conditions relative to road maintenance and fish passage in the project area. No additional analysis is needed to support the Forest Supervisor's decision.

**Issue 4. Whether the EIS contains adequate information on the conditions of the roads within the Threemile project area.**

Appellants assert that the Threemile EIS depends on road condition surveys that are incomplete and/or outdated, and that the analysis of the potential effects of the project is therefore inaccurate.

**Discussion**

As discussed under previous issues for this appeal, the FEIS describes the Road Condition Survey program. The project record includes the survey data and dates they were collected [decision document #27]. The Kuiu Island Road Analysis shows that temporary roads were surveyed in 2001 [decision document #24, pp. 19-20]. One road in the project area was surveyed this year [decision document #25]. The ROD states that "[a]ll of the accessible classified roads on [Kuiu] island were driven in 2001" [ROD Appendix 2, p. 38].

EXHIBIT 4
Page 36 of 45

Based on the foregoing information, I believe the road condition surveys contained in the Threemile project record and referred to in the FEIS and ROD provide adequate information to support the Forest Supervisor's decision in the ROD.

**Issue 5. Whether the Threemile EIS adequately considers the potential effects of road management on the watersheds within the project area.**

Appellants assert that the FEIS fails to consider the effects on fisheries and watershed, both from the existing roads within the project area and from the action alternatives considered in the FEIS. Appellants also assert that the FEIS fails to disclose the actual effects of fish passage barriers, and that the misleading analysis of road density has also corrupted the watershed analyses completed for the project area. Appellants further assert that the FEIS fails to disclose the potential effects of road management on non-fish bearing streams, and that the ROD, FEIS, and project record fail to address the 525 non-fish bearing stream crossings that are likely to have maintenance issues relevant to watershed, wildlife, fisheries, economic, and silvicultural concerns, as well as likely effects on downstream watersheds resulting from increased sediment and blowouts.

**Discussion**

Many of these assertions are similar to those already discussed in previous issues contained in this appeal. I incorporate those discussions here. Fish passage concerns will be reduced by the Threemile project. Road density issues were correctly interpreted and displayed. Road maintenance problems will be reduced. In addition, regarding watershed effects, the FEIS states that:

> Drainage structures in streams along the closed road segments would be removed. Cross drain culverts may be bypassed with trenches dug along the side of the culverts. This would permit culverts to be re-used if the road is needed in the future. Two Class I streams [i.e., streams containing anadromous fish] and seven Class II streams [those with resident fish] would be returned to natural conditions after drainage structures are removed along stored roads. On roads that remain open within the project area and along the access route to Rowan Bay, drainage structures that may act as barriers to fish passage would be replaced to provide fish passage.

* * *

> Alternative 6...will put into storage 8.3 miles of existing road and remove 6 culverts on fish streams restoring natural drainage to 2 Class I streams and 7 Class II streams.

[FEIS, pp. 3-14, 3-92]. Extensive additional analysis of the potential effects of the road aspects included the Selected Alternative is presented in the FEIS [pp. 3-6 to 3-18], along with the potential effects on watersheds and fisheries [pp. 3-74 to 3-92].

Based on my review of the project record and the discussion of all of the above issues of this appeal, I conclude that the analysis of the potential effects of the proposed road activities on watersheds and fisheries contained in the Threemile FEIS, ROD, and project record meets all applicable requirements.

EXHIBIT 4
Page 37 of 45

**Issue 6.** Whether the Threemile EIS adequately discloses the potential effects of the project on wolves.

Appellants assert that the EIS fails to adequately consider the potential effects of the project on wolves, as the analysis relies entirely on the deer model and misleading road density information. Appellants also assert that the EIS fails to disclose relevant information about the presence of wolves in the project area, and fails to disclose the fact that outfitter-guides use the project area for wolf hunting and that the project is likely to increase wolf hunting and trapping in the area by providing increased access to areas currently used by wolves. Appellants further assert that the Threemile project violates TLMP standards and guidelines for the protection of wolves, including those relating to road density, integrating wolf habitat management program recommendations in the development of road management objectives, and protecting known active wolf dens.

**Discussion**

Some of these assertions are similar to those related to wolf surveys, the presence of wolves, and compliance with Forest Plan standards and guidelines for wolf den protection and wolf habitat management that are discussed above under Issue 1 of the appeal filed by the Sierra Club et al. I incorporate that discussion here by reference, which adequately responds to the related assertions in this appeal. Some of the specific assertions made in this appeal, however, warrant further discussion.

I disagree with appellants' assertion that the EIS fails to adequately consider the potential effects of the project on wolves. The FEIS clearly discloses the reasons for wolf decline in Southeast Alaska, and why Kuiu Island wolf populations are stable. A conversation between Forest Service and ADF&G biologists is documented in the project record [decision document #030], in which both agreed that the Kuiu Island population of wolves was probably increasing, and that there was no reason for wolf viability concerns in the Threemile project area. The FEIS also discloses the effects of activities in Wildlife Analysis Area 5018 that will likely cause a reduction in deer populations, and that any reduction in the deer population may have a short-term spatial reduction in wolves in that area. However, because timber harvest is not allowed on 65 percent of Kuiu Island, viability of wolves is not a concern. Moreover, as previously discussed, the FEIS discloses that the density of open roads in the project area following completion of the project will be 0.55 mile per square mile [FEIS, p. 3-177]. This far exceeds the Forest Plan's guidance (which only applies where wolf mortality concerns have been identified, and where road access has been determined to significantly contribute to wolf mortality—neither of which apply to the Threemile Project area) that "[o]pen road densities of 0.7 to 1.0 mile per square mile may be necessary to reduce mortality to sustainable levels" [Forest Plan, p. 4-116].

Forest Plan standards and guidelines clearly state that known active den sites will be checked during spring-time to determine whether they are active, and topographic and spatial buffers protecting dens will be employed during road construction. The project record indicates that no wolf dens were noted during field reconnaissance. The road density standard did not apply to this project since discussions with ADF&G (including a site visit) concluded that wolves were secure. As discussed in Issue 1 of the Sierra Club et al. appeal, the ROD and project record indicate that interagency discussions were held with USFWS and ADF&G.

EXHIBIT 4
Page 38 of 45

I also disagree with appellants' assertions that the FEIS misleads the public in discussing road densities and the potential effect on wolves. The road density assertion is discussed above under Issue 2 of this appeal, and I incorporate that discussion here. In addition, the discussion of Issue 1 of the Sierra Club, et al. appeal deals in part with requirements for an interagency Wolf Habitat Management program in areas where wolf mortality concerns have been identified. I incorporate that discussion here as well. As previously discussed, no wolf mortality concerns have been expressed in the Threemile project area. On the contrary, interagency consultation has revealed agreement that the wolf population is probably increasing. Road access has not been determined to significantly contribute to wolf mortality. Indeed, the FEIS states that "[e]xcessive wolf mortality due to hunting and trapping does not seem to be a problem in the Threemile Project Area" [p. 3-177]. Therefore, the open road density objective of 0.7 mile per square mile does not apply to the Threemile project area. The FEIS also states that "[r]oad densities and hunting access by vehicle would be reduced" [p. 3-17]. For all these reasons, I believe the effects of road management on wolves are properly disclosed in the FEIS.

Based on my review of the Threemile FEIS, ROD, and project record, the Threemile project complies with all applicable direction related to protection of wolves and wolf habitat.

EXHIBIT 4
Page 39 of 45

**Appeal No. 04-10-00-00012 – Southeast Alaska Conservation Council:**

**Issue 1.** Whether the timber volume authorized for harvest in the Threemile ROD is needed to meet annual market demand on the Tongass National Forest and demand over the planning cycle.

Appellants assert that the Forest Service misinterpreted the demand projections prepared by agency economists during the Forest Plan revision process, and that this error was incorrectly used as the basis for the allowable sale quantity (ASQ) established in the 1997 Forest Plan and caused the agency to allocate more land for timber production than was necessary to meet demand projections. Appellants also assert that the agency compounded this error by incorporating these projections as an integral component of the timber sale procedures used to set the annual Tongass timber program offer levels. Appellants further assert that the Forest Service violated NEPA by relying on an incorrectly inflated market demand projection and by failing to disclose and evaluate changes in current timber market conditions. Finally, appellants assert that the Forest Supervisor's conclusion that there is currently a market demand for timber, a limited supply of timber from other sources, and an under-utilized mill capacity in the region is arbitrary as it runs counter to evidence before the agency, and that the agency's estimate of installed mill capacity and utilization rates over-estimates mill consumption by at least 43 percent.

**Discussion**

I believe these issues are dealt with adequately in the discussion of Issue 13 of the appeal filed by Sierra Club, et al., above. Additional comments are worthwhile, however, regarding the assertions in this appeal that the agency's estimates of mill capacity and utilization rates are inaccurate. Among the documents in the project record used as a basis for these calculations is a recent publication of the Forest Service's Pacific Northwest Research Station, *Estimating Sawmill Processing Capacity for Tongass Timber* [decision document #25]. This report describes standard procedures for estimating mill capacity. These estimates are regularly updated, based on information gathered directly from producers in Southeast Alaska. Some of the procedures used in developing these estimates differ somewhat from practices employed in reports from other sources, including some of those cited by appellants. It is difficult to identify exactly how appellants' figures for capacity of certain mills were calculated, but it appears that a mixture of estimates from different sources using different methods was used, instead of the standardized methods mentioned above. Regarding utilization rates, the report cited above estimates that mills in Southeast Alaska utilized an average of 17.36 percent of their capacity in 2000, and only 8.75 percent in 2002 [Id., p. 7]. In my opinion, the Forest Supervisor's findings relating to market demand, limited alternative supply, and underutilized mill capacity are not arbitrary.

**Issue 2.** Whether the Threemile EIS adequately considers and discloses the potential effects of the project on subsistence users, and whether the Forest Supervisor's conclusion that the significant restrictions on the subsistence use of deer are "necessary" is supported by the record.

Appellants assert that the Threemile EIS and project record fail to evaluate the effects of chronic low deer populations within the customary and traditional deer hunting areas near Kake, the ability of Kake residents to safely hunt deer, and the cumulative effects of poor and dangerous

EXHIBIT 4
Page 40 of 45

weather conditions and increased fuel prices on the ability of local hunters to obtain deer to feed their families and elders. Appellants further assert that the Forest Supervisor's conclusion that the significant restrictions on the subsistence use of deer are "necessary" is arbitrary because the Forest Supervisor failed to consider accurate timber market demand information and failed to balance the need to supply timber with the need to maintain the cultural, spiritual, and economic values of customary and traditional uses of the natural resources of the project area by residents of Kake and SEACC members.

**Discussion**

Section 810(a)(3) of ANILCA requires that no use or occupancy of lands under Federal jurisdiction can significantly restrict subsistence uses until the Federal agency determines that:

> (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.

The EIS identifies deer as an important subsistence resource for the communities of Kake, Petersburg, Point Baker/Port Protection, and Wrangell, and indicates that Kuiu Island currently provides 2.6 percent of the deer harvested in Game Management Unit 3 [EIS, p. 3-127]. Deer hunting was not identified as a significant issue for the Threemile project, but the EIS indicates that deer habitat was considered when designing the project alternatives:

> The project alternatives call for both clearcut and partial timber harvest prescriptions that are designed to mimic natural disturbance events. Alternatives were developed that selected harvest units in areas with lower deer winter range values to mitigate the impacts on the deer population. Areas designated for non-harvest like stream buffers, beach fringe, and Old-growth Habitat, will help maintain huntable deer populations.

[EIS, p. 3-128]. The potential effects of the Threemile project on subsistence is discussed in Chapter 3 of the EIS [pp. 3-124 to 3-132]. Based on the analysis in the EIS, the Forest Supervisor concluded that the Selected Alternative did not present a significant possibility of a significant restriction on the subsistence use of wildlife (other than deer), salmon, other finfish, shellfish, marine mammals, plant foods, and personal use timber resources. The Forest Supervisor did conclude that there may be a significant possibility of a significant restriction on the subsistence use of deer for all of the alternatives, including the no-action alternative [ROD, p. 17].

The EIS displays potential reductions in the habitat capability of deer in the project area by alternative over 100 years [FEIS, p. 3-170]. The EIS states that the implementation of the Selected Alternative by itself does not present a significant possibility of a significant restriction of the subsistence use of deer. The possibility of such a restriction exists when the Selected Alternative, together with other past, present, and reasonably foreseeable future actions, are considered in a cumulative manner and in relation to the projected demand for deer forest-wide [ROD, p. 17].

EXHIBIT 4
Page 41 of 45

In accordance with Section 810 of ANILCA, the Forest Supervisor determined that the actions involved in the implementation of the Selected Alternative are necessary, consistent with sound management of public lands, and strike the best balance between meeting the needs of the public and protecting forest resources [ROD, p. 17]. Appellants challenge this determination, pointing to their assertions relating to market demand and stating that the restriction of subsistence use is not necessary as the project is not needed to meet market demand.

Appellants' argument is similar to those raised in *Hoonah Indian Association v. Morrison*, 170 F.3rd 1223 (9th Cir. 1999). In *Morrison*, the 9th Circuit held that the word "necessary" does not have the affect of prohibiting timber sales that affect subsistence uses and are not required by law. A significant restriction of subsistence use might not be necessary to achieve compliance with law, yet necessary to conform to "sound management principles" for the "utilization" of public lands. The "utilization" to which "sound management principles" refers to is multiple, and includes outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness. The Threemile project is a timber sale project. The Forest Supervisor was required to consider the potential effects of the project on subsistence, but is not precluded from selecting an alternative that may cause a restriction of subsistence use if he determines that the actions involved are "necessary, consistent with sound management principles for the utilization of the public lands."

The Threemile project is a necessary component of the Tongass timber management program designed to implement the Forest Plan and to meet the requirements of the Tongass Timber Reform Act (TTRA) related to seeking to meet the market demand for timber from the Tongass National Forest. The Forest Supervisor considered Forest Plan and TTRA direction, and well as other laws and direction relating to management activities on National Forest System lands, and concluded that the Selected Alternative provides the best mix of resource uses and opportunities to meet these needs [ROD, pp 17, 19]. Moreover, I disagree with appellants' assertions related to market demand, for reasons discussed in Issue 1 of this appeal and Issue 13 of the Sierra Club, et al. appeal above. The market demand aspects of the subsistence issue are dealt with adequately in those sections.

Therefore, the Forest Supervisor's conclusion that the significant restriction of subsistence use is necessary is reasonable and consistent with applicable law and policy direction.

**Issue 3. Whether the economic analysis conducted for the Threemile EIS is adequate.**

Appellants assert that the Threemile EIS fails to compare the economic benefits of the project with the economic costs associated with the adverse environmental effects of the project, particularly the significant possibility of the significant restriction of the subsistence use of deer in the project area. Appellants also assert that the financial efficiency analysis conducted for the Threemile project is inadequate as it fails to include a full discussion or estimate of the public costs of planning and administering the project; provides no information on the practice of pre-roading deficit timber sales; ignores the economic impacts on the commercial Dungeness crab fishery in Threemile Arm; and fails to comply with Forest Service Handbook direction or the EIS's description of the required financial efficiency analysis. Appellants further assert that the Threemile EIS fails to disclose the stumpage values and other data that were used for the NEPA Economic Analysis Tool (NEAT) analysis conducted for the project. Appellants further assert that it is unreasonable for the Forest Service to rely on the economic efficiency analysis conducted for the Forest Plan instead of using updated information available in the 2003

EXHIBIT 4
Page 42 of 45

Supplement to the Forest Plan EIS, and that tiering to either analysis in the Threemile EIS is inappropriate as it fails to examine the site-specific factors relevant to the project, particularly those relating to the economic value of project area lands to local communities for future recreation and tourism opportunities. Finally, appellants assert that the ROD's statement that the project provides positive economic returns is inaccurate and unsupported by the record, as the agency's own analysis indicates that the net revenue for the Selective Alternative is estimated to be negative.

## Discussion

Appellants assert that "the FEIS fails to compare [the project's] supposed economic benefits with the economic costs associated with the expected adverse environmental effects," especially potential subsistence effects. This assertion involves issues very similar to those described above in the discussion of Issue 10 of the appeal filed by Sierra Club, et al., relating to the quantification of non-market values. As discussed in that section, there is no requirement to attempt to quantify non-market values in monetary concerns.

With regard to appellants' assertions related to the potential effects on subsistence uses, see the response to Issue 2 above. In my opinion, that discussion adequately responds to the subsistence-related assertions in this issue.

Appellants also assert that the economic analysis in the FEIS inadequately considers economic effects on the crab fishery in the area of the proposed LTF. In its comment letter on the DEIS, the Department of the Interior recommended that the LTF be changed to a barge design to minimize bark deposition [FEIS Appendix C, p. C-6]. Bark deposition is widely believed to adversely affect habitat values, and such effects would be avoided by employing a barge LTF. The Forest Service complied with this request [FEIS Appendix C, p. C-15]. Moreover, the dive survey conducted for this LTF did not indicate that the area was particularly good habitat; species abundance and diversity was low [project document #328, p. 7]. Accordingly, I find nothing in the project record to suggest that any significant effect on the crab fishery will result from the Threemile project, so it would be speculative and inappropriate to attempt to quantify any economic effects on that fishery.

Appellants' assertions about public investment and financial efficiency analysis are very similar to those raised by Sierra Club et al., and described above in the discussion of Issue 12 of that appeal. I believe that discussion is sufficient to address the issues raised in this appeal regarding public investment, financial efficiency analysis, consistency with FSH direction, disclosure of net revenue effects of the decision, and compliance with NEPA.

**Issue 4. Whether the cumulative effects analysis conducted for the Threemile EIS is adequate and consistent with NEPA and ANILCA.**

Appellants assert that the Threemile EIS fails to provide adequate site-specific information about the location of the Kuiu, Bayport, and East Alecks I and II timber sales, all of which enter the Port Camden or East Kuiu Inventoried Roadless Areas (IRAs), and that it fails to adequately evaluate the cumulative effects on the subsistence, commercial, and recreational use of fish and wildlife and the roadless area values of the project area. Appellants further assert that the Bayport and East Alecks I and II sales will result in cumulative effects on the Apricot Creek

EXHIBIT 4
Page 43 of 45

watershed that are not disclosed in the Threemile EIS, and that the EIS fails to consider the cumulative effects of other timber sale projects within the traditional territory of OVK members, particularly the Fanshaw timber sale project.

**Discussion**

The assertions on this issue are similar to those discussed above under Issue 15 of the appeal filed by the Sierra Club, et al. I incorporate that discussion here. Moreover, the assertion regarding analysis of potential effects on subsistence opportunities is adequately dealt with in the discussion of Issue 2 of this appeal. Finally, the assertion related to the adequacy of the analysis of cumulative watershed and fisheries effects contained in the Threemile FEIS is discussed above in the response to Issue 5 of the Cascadia Wildlands Project appeal, and I incorporate that discussion here as well.

Regarding the Kuiu timber harvest and road management project, the Threemile project record contains a scoping letter for the Kuiu project that describes the Value Comparison Units (VCUs) included in the Kuiu project area, and none of them are in either the Port Camden or East Kuiu IRA, as appellants assert [decision document #41, p. 3]. The statement in the FEIS that the Kuiu project will not affect IRAs in the Threemile project area is accurate [FEIS, pp 3-51 and 3-52].

With respect to the Bayport, East Alecks I and East Alecks II projects, there is not yet any proposal for those projects as that term is defined in the Council on Environmental Quality's NEPA regulations, because the agency is not yet actively preparing to make a decision on one or more alternatives nor can the effects by meaningfully evaluated [See 40 CFR 1508.23]. Indeed, there has not been a Notice of Intent to prepare an EIS on any of these projects.

Effects of future projects on IRAs and on resources outside the Threemile project area are appropriately examined during the project-planning process for those projects, in which appellants will have the opportunity to participate.

For the foregoing reasons, I believe the analysis contained in the Threemile FEIS of cumulative effects of the Selected Alternative meets all applicable requirements.

**Issue 5. Whether the temporary roads authorized for the Threemile project qualify for an exemption under Section 404 of the Clean Water Act (CWA).**

Appellants assert that the Forest Service has not demonstrated that the construction of the temporary roads authorized for the Threemile project comply with the Corps of Engineer's regulations for the exemption of temporary roads from the requirements of Section 404 of the CWA as the Forest Service has not committed to removing the fill from these temporary roads as required by Corps' regulations.

**Discussion**

Appellants are correct that construction of temporary roads must comply with BMPs specified in 33 CFR § 323.4(a)(6), and that the last BMP states that "[a]ll temporary fills shall be removed in their entirety and the area restored to its original elevation" [33 CFR § 323.4(a)(6)(xv)]. The decision whether to interpret this BMP to require the removal of the entire prism of any temporary road built on wetlands under the Threemile ROD will be up to the U.S.

EXHIBIT 4
Page 44 : 45

Army Corps of Engineers (Corps). In its comment letter on the Threemile Draft EIS, the Corps made no mention of any concern regarding this provision [FEIS Appendix C, pp. C-79 and C-80]. In addition, the location of temporary roads will be determined by the timber operator who purchases the sale, subject to contract provisions that require compliance with all applicable laws and regulations. Thus, it is not possible to determine for certain at the NEPA stage of the process whether any temporary roads will be constructed on wetlands. The question of whether the Corps will require the operator to remove such temporary fills is, therefore, premature. It is my understanding, however, that in some cases the Corps has determined that the removal of the entire prism of temporary roads from wetlands would do more harm than good, and has not required it. In any case, all temporary roads constructed under the Threemile ROD will be subject to the Corps' interpretation regarding removal of temporary fills.

For these reasons, I believe the assertion made by appellants on this issue are not warranted and require no remedy.

### Recommendation

In my opinion, the analysis in the Threemile FEIS and project record is sufficient to support the Forest Supervisor's decision with respect to all the issues raised in these appeals. Based on my review of the FEIS, the ROD, and the project record, and all the discussions above of each specific appeal issue, I believe the FEIS and ROD meet all applicable requirements of law, regulation, and policy. All of the required findings are included, except for the finding related to the minimum road system that is required by 36 CFR § 212.5(b), as discussed above under Issue 1 of the appeal filed by the Cascadia Wildlands Project.

Because the analysis in the FEIS and project record fully support the minimum road system finding, I believe the appropriate remedy for this technical oversight would be for you to include in your decision language that tracks the exact provisions of this regulation. I will prepare the appropriate language for your consideration.

*Cherie Shelley*

CHERIE SHELLEY
Appeal Reviewing Officer

Enclosures

EXHIBIT 4
Page 45 of 45