Steve Silver
Amy Gurton Mead
Robertson, Monagle & Eastaugh
801 W. 10th Street, Suite 300
Juneau, Alaska 99801
(907) 586-3340 (telephone)
(907) 586-6818 (facsimile)

ssilver628@aol.com
agmead@romea.com

Attorneys for
Alaska Forest Association,
Intervenor Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

ORGANIZED VILLAGE OF KAKE )
  et al.,                  )
                           )
          Plaintiffs,      )
                           )   Case No. J04-029 CV (JKS)
     v.                    )
                           )
UNITED STATES FOREST SERVICE, )
  et al.,                  )
                           )
          Defendants.      )
_____)

**OPPOSITION BRIEF OF INTERVENOR DEFENDANT
ALASKA FOREST ASSOCIATION
(COUNTS V AND IX)**

**TABLE OF CONTENTS**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.    PLAINTIFFS FAIL TO UNDERSTAND WHAT
          COMPRISES "DEMAND". . . . . . . . . . . . . . . . 2

    II.   PLAINTIFFS SIGNIFICANTLY UNDERESTIMATE
          CURRENT DEMAND. . . . . . . . . . . . . . . . . . 9

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . 11

ROBERTSON, MONAGLE & EASTAUGH, P.C.
GOLDBELT PLACE, SUITE 300
801 WEST 10TH STREET
JUNEAU, ALASKA 99801
PHONE: (907) 586-3340

**INTRODUCTION**

Count V of the plaintiffs' complaint asserts that the Forest Service relied upon and presented misleading and incomplete information concerning market demand in the Threemile FEIS. Count IX bootstraps upon that argument, asserting that since the market demand analysis the Forest Service relied upon in the FEIS was invalid, the agency's further reliance upon it with respect to the agency's ANILCA analysis was arbitrary.

The Threemile FEIS utilized a market demand projection authored by David Brooks and Richard Haynes in 1997. The plaintiffs contend that the Brooks and Haynes forecast is flawed because it overestimates demand, as evidenced in large part by the fact that the actual volume of timber cut has been significantly lower.

The parties are in agreement that the FEIS and ROD correctly identified a need to provide enough timber to meet annual market demand. The parties disagree, however, about what the market demand is. The plaintiffs' assumption that actual volume cut accurately reflects demand is misguided. Demand is not just a function of the harvest level.

Primarily, it is a function of both economic timber supply[1] and mill capacity, which, at the present, are substantially under-utilized.

The floor for demand in Alaska is the minimum amount needed to sustain an integrated manufacturing industry – meaning, an industry comprised of a mix of processing facilities that can utilize all of the species, qualities and sizes of timber grown in Southeast Alaska.[2] The generally accepted <u>minimum</u> annual amount in 1997 to sustain the industry was 300 mmbf.[3]

> For a forest industry to exist in Southeast Alaska, it must be of large enough scale to sustain all the various direct and indirect components of the industry, including logging and road building contractors, tug and barge lines, financial services, etc. A guaranteed supply of timber, of sufficient scale to justify the

---

[1] An economic timber sale is one that an operator of average efficiency can profitably purchase, harvest, and process at prevailing market price. Congress requires that the USFS use the residual value appraisal process in determining whether a sale is economic (in which the stumpage value of the timber is the amount left when you subtract the cost of harvesting and processing the timber, including a profit allowance, from the value of the products that are produced.)
> No timber sale in Region 10 shall be advertised
> if the indicated rate is deficit when appraised
> using a residual value approach that assigns
> domestic Alaska values for western red cedar.
Section 318 of Public Law 108-108, the FY 2004 Department of Interior and Related Agencies Appropriations Act.
[2] See Graham Dec. at para. 11.
[3] Int. Def. Exh. 4, Robert Flynn & Associates, *Meeting "Market Demand" for Timber on the Tongass National Forest*, December 8, 1997, p. 3 at para. 6. The annual operating capacity of the 18 most active sawmills in Southeast Alaska is closer to 378.85 mmbf. See Int. Def. Exh. 2, Graham Dec. at para. 5.

2

> investments needed to make Southeast Alaska's industry competitive in the global markets, is absolutely essential to maintaining a sustainable forest industry in this region. In addition, timber offerings must have minimum bid rates that permit the purchasers to operate economically (i.e., at a reasonable profit), to allow for further value-added capital investments. The Governor's Southeast Alaska Timber Task Force estimated that the <u>minimum</u> volume needed to sustain a viable industry is 300 MMBF, a volume which should easily be accepted in the market if economic timber sales are available.

(Int. Def. Exh. 4, p. 6. Emphasis in the original.)

As it currently stands, there is not enough economic timber available to the mills. Economic Timber supply must be reliable and sufficient in order for the industry to remain operational.

**ARGUMENT**

**I.   PLAINTIFFS FAIL TO UNDERSTAND WHAT COMPRISES "DEMAND"**

The Plaintiffs are mistaken in their belief that the actual volume cut is an accurate reflection of demand. According to the Plaintiffs, the Forest Service should have assumed that current demand is approximately 45 mmbf, and thus much lower than the estimates projected by Brooks & Haynes, as that was the average amount of volume cut in FY 2001 - 2004. What the plaintiffs fail to understand is that volume cut is in no way a clear indicator of demand. It is supply, not demand, that is the limiting factor ("[T]imber supply, not demand, is the limiting factor in consumption of

3

timber from the Tongass National Forest." Flynn Report, Int. Def. Exh. 4, at p. 7.)

In their opposition brief, the Federal Defendants recognize that

> An operator can be expected to desire (demand) to process sufficient timber to keep its mill operating at a reasonable level in relation to the capacity of the operator's mill. Indeed, an operator cannot run a sawmill indefinitely at low level of capacity without risking bankruptcy.

(Opposition Brief of Federal Defendants at pp. 12 - 13.) "Sufficient timber" is not, as the plaintiffs suggest, 45 mmbf. Receiving only 45 mmbf per year would mean more than simply a "risk" of bankruptcy, it would be a death knell to the industry.

In order to remain viable, the mills need to maintain a three-year pipeline supply of timber under contract. (Graham Dec. at para. 3.) Having a three year supply equal to operating capacity provides the mills with the flexibility necessary to effectively deal with market changes and the

trying operational logistics of logging in Southeast Alaska.[4] (Graham Dec. at fn. 2.) Without the even flow of timber needed to maintain stable mill operations, timber sales quickly fail to be economically viable. (Graham Dec. at para. 4.)

At the time the 2004 ROD was signed, the timber industry was already experiencing a supply shortage. That situation has never been remedied, rather, it has increasingly grown worse. According to the 2003 Draft Timber Supply and Demand Report, in FY 2003, there were 392 mmbf under contract.[5] (Def. Exh. 7 at pp. 26 - 27.) Currently, there is less than 72 mmbf available under contract. (Declaration of Owen Graham at para. 3.) The annual operating capacity of the 18 most active sawmills in Southeast Alaska is 378.85 mmbf. (Graham Dec. at para. 5.) The availability of only 72 mmbf is woefully

---

[4] According to Owen Graham, Executive Director of the Alaska Forest Association, these variable conditions can include: the fact that most fish stream crossings must be constructed in a narrow "timing window"; the typical road construction requirements of about one mile of road for every one or two million board feet of timber accessed; the slow rate of construction in most of the mountainous areas (about a mile of road per month); and the logistical difficulties of operating remote construction camps. These conditions result in the need to plan for at least two construction seasons to build the roads for a typical timber sale, and another year or two is typically needed to harvest the timber once the roads are constructed. (Graham Dec. at fn. 2.)

[5] Some of the available timber was not cut due to it not being economic to do so at that time. That fact, however, does not alter the amount of volume that was under contract, an amount the mills could rely upon.

5

inadequate and will not allow the mills to remain economically viable.

For example, Pacific Log and Lumber has an annual capacity of approximately 33.6.  Thus, to remain operating at a reasonable level and avoid the risk of bankruptcy, the mill needs a three year supply of about 101 mmbf.  It currently has 7 mmbf under contract. (Graham Dec. at para. 3(a).) Silver Bay Logging has an annual capacity of 65 mmbf, and needs a three year supply of 195 mmbf.  It currently has no federal timber under contract.  (Graham Dec. at para. 3(b).) Viking Lumber Company is in similarly dire straits, with an annual need of 80 mmbf, a three year need 240 mmbf, and only 45 mmbf under contract.  (Graham Dec. at para. 3(c).)

The mills are simply not getting the timber they need to remain economically sound.  It is not lack of demand or lack of sales - it is lack of economic timber supply.  The industry harvested approximately 50 mmbf each of the last five years, not due to lack of lumber sales[6], but due to the cumulative effects of a continuing scarcity of economic timber under contract. (Graham Dec. at para. 9.)

Plaintiffs argue that the demand has steadily declined over the years, evidenced by the fact that only an average of 45 mmbf per year has been harvested.  In reality, there has

---

[6] See paragraph 12 of Owen Graham's declaration, where he describes the state of the market for Alaskan lumber.

6

been no decline. The Forest Service's web site indicates that of 1,476 mmbf sold between 1994 and 2005, 1,366 mmbf was harvested.[7] Additionally, approximately 180 mmbf were mutually terminated when it became clear those sales were not economically sound.[8] When the 180 mmbf of mutually terminated sales are taken into account, it is apparent that the industry reduced (harvested more than was sold) its pipeline of economic volume under contract; which is why the volume under contract declined. Each of these sales was purchased by the operator based on a desire to meet economic market demand. If these sales would have been economic, they would have been harvested. Instead, even though these sales were terminated, the purchase coupled with mill capacity makes clear that the demand far exceeds the 45 mmbf demand argued by Plaintiffs.

Since 2000, the industry has purchased 432 mmbf and harvested 376 mmbf. The difference in purchases versus actual harvest is not due to a decline in the mills' capacity or in actual demand, but is due to a shortage of economic timber made worse by the litigation surrounding the sales,

---

[7] http://www.fs.fed.us/r10/ro/policy-reports/documents/1994-2005_offer_cut_sold.doc

[8] A sale will fail to be economic when the costs of building access roads and harvesting the timber for the sale exceeds the value of the timber to the mill. If the cost is too high, and there is no residual value available for stumpage or profit, the sale fails to be affordable. See Graham Dec. at para. 4.

7

such as the Orion North (NRDC I) and Yakutat (Case No. J05-0009 CV) appeals.

Besides relying upon the average of the actual annual harvest, Plaintiffs cite to additional "evidence" in support of their theory that the timber market has steadily declined. For example, Plaintiffs argue that the decline in the market led to Gateway Forest Products and Silver Bay Logging, Inc. to file for bankruptcy protection in 2000. (Opening brief at p. 7) That argument is a red herring. Gateway filed for bankruptcy without logging any significant amount of the timber sales it purchased.[9] Accordingly, the fact Gateway went bankrupt had nothing to do with the state of the market – the market was irrelevant. As for Silver Bay, it curtailed its logging operations at Cube Cove and Afognak Island shortly before filing bankruptcy. The loss of positive cash flow from those two operations created a temporary cash crisis. When its logging contract with KPC ended in 1999, the company had to rely solely on profits from federal timber sales. Those sales were not adequate to keep their entire operation functioning, and, as a result, they were forced to file bankruptcy. In the reorganization, Silver Bay paid off all of

---

[9] According to the Forest Service's website, Gateway purchased a total of 115,780 mmbf in 1999 and 2000. and harvested a scant 5626 mmbf. http://www.fs.fed.us/r10/ro/policy-reports/for_mgmt/vol_under_contract/vol_under_contract_fy2001.pdf

8

its creditors. They have been operating ever since, although they speak of annual losses due to poor timber sale economics and a shortage of timber sales.

The plaintiffs simply fail to appreciate the vicious cycle that is created when a sufficient amount of economic timber is not offered. The low harvest over the last five years is directly attributable to the cumulative effects of a continuing scarcity of economic timber under contract. (Graham Dec. at para. 9) Between 1990 and 2000, timber sales totaled 3357 mmbf. The industry purchased 84% of that, and harvested 95% of the timber purchased. During the same time period, the amount of timber under contract declined from 2300 mmbf in 1990 to the 71 mmbf it is today.[10] (Graham Dec. at para. 10.) Accordingly, the amount harvested has drastically fallen - from 2673 mmbf between 1999 - 2000 to approximately 46 mmbf in 2004. The industry's most pressing concern is viable economic timber supply. Without it, the industry cannot continue. (See Graham Dec. at paras. 11 and 12.)

## II.   PLAINTIFFS SIGNIFICANTLY UNDERESTIMATE CURRENT DEMAND

Plaintiffs argue that current demand can be derived from averaging the actual volume cut in recent years. Using

---

[10] This decline is completely unrelated to market price. Graham Dec. at para. 10. See also, Int. Def. Exh. 3, Irland Report at the report's p. 1.)

9

that scenario, they estimate annual demand to be 45 mmbf, and reason that since that number is significantly lower than the Brooks & Haynes estimates, the Brooks & Haynes estimates must be wrong. (Opening Brief, pp. 6 - 7.) Even if plaintiffs are correct in their calculation, 45 mmbf cannot sustain the timber industry. The mills simply need more timber to remain operational. Failing to provide the necessary economic timber will mean the downfall of the industry.

> [T]he inadequate volume of timber sold from the Tongass, the lack of consideration for economic operation of timber sales, and the uncertainty of supply, are some of the most important impediments to sustaining a viable forest products industry in Southeast Alaska.

(Flynn Report, Int. Def. Exh. 4 at page 2, para. 1.)

The annual operating capacity of the 18 most active mills in Southeast Alaska is 378.85 mmbf.[11] The three largest mills alone, operating at a one-shift level[12], have a 89.3 mmbf per year capacity - which is more than twice what the

---

[11] Graham Dec. at para. 5.
[12] These three mills are each operating at a single-shift level because they cannot afford to operate a two-shift level due to the unavailability of economic timber. Graham Dec. at para. 6.

10

Plaintiffs' contend the current "demand" is.[13] (Graham Dec. at para. 6.)

## CONCLUSION

The Plaintiffs' briefing illustrates that the Plaintiffs fail to understand what "demand" actually encompasses. The Brooks and Haynes forecast underestimated the demand, not overestimated it. The actual volume of timber cut in recent years is a clear indication that there is not enough timber currently available to sustain the industry. It is not an indication of faulty reasoning by Brooks & Haynes.

The Southeast Alaska timber industry has been in a slow downward spiral for years as a direct result of an inadequate supply of economic timber. The plaintiffs have asked the Court to enjoin yet another sale, which would result in the amount of timber under contract to be further decimated. The industry cannot withstand this trend. (See Letter to Steve Brink, Deputy Regional Forester, dated September 23, 2002,

---

[13] Those numbers, however, are not the end of the story. To derive the economic volume requires increasing the capacity by 25%, due to the fact that 20% of the timber in Southeast is pulp-quality logs, for which there is no longer a local processing facility, and 5% of the logs are Yellow Cedar, which are exported without processing. (Graham Dec. at para. 8.) The final estimate must also take into account the fact that approximately only one-third of the timber under contract can be harvested in a year. Therefore, for the three largest mills with a combined capacity of 89.3 mmbf/year, the actual amount of economic timber under contract necessary to sustain their operations is closer to 368 mmbf. (Graham Dec. at para. 8.)

11

from Owen Graham, Int. Def. Exh. 5.) The mills desperately need economic timber in order to survive.

RESPECTFULLY SUBMITTED this 10th day of February.

        s/Amy Gurton Mead
        STEVE SILVER
        AMY GURTON MEAD
        Robertson, Monagle & Eastaugh
        801 W 10th St., Ste. 300
        Juneau, AK 99801
        (907) 586-3340 (telephone)
        (907) 586-6818 (facsimile)

        ssilver628@aol.com
        agmead@romea.com

        Of Attorneys for Alaska Forest Association, Intervenor Defendant

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9 day of February 2006, a copy of the foregoing document was served electronically on the following attorneys of record:

Bruce Landon
Thomas Waldo
Nathaniel Lawrence
Kevin Saxby

Laurie Gyles-Chesnut

12