Case 1:04-cv-00029-JKS    Document 59-5    Filed 03/09/2006    Page 1 of 11



United States
Department of
Agriculture

Forest Service

Tongass
National Forest

R10-MB-329

August 1996





# King George Timber Sale

## Final Environmental Impact Statement

## Stikine Area

**Exhibit 3, page 1 of 11**

# Record of Decision

## Introduction

This Record of Decision documents my decision to select an alternative from the King George Timber Sale Final Environmental Impact Statement (FEIS) project area on Etolin Island. This decision includes specific harvest unit, road and log transfer site locations and methods of harvest and construction.

The purpose and need of this project is to make available for harvest approximately 15-25 million board feet of timber to (1) carry out the direction in the Tongass Land Management Plan, 2) contribute to providing a sustained volume of wood to meet local and national demands, and 3) provide local and regional employment opportunities. A comparison of the existing and desired conditions in the project area (see Appendix A, FEIS) suggests that approximately 900 to 1,300 acres could be harvested with a variety of silvicultural methods. These silvicultural methods will be designed to maintain stand structure and ecological functions over time while still yielding timber. These methods will leave low, medium and high densities of trees within stands following harvest. Harvesting between 900 to 1300 acres of forest using these methods could yield between 15-25 MMBF of timber. A variety of resources and values will be maintained through the application of ecosystem management principles in the design of the project.

## Decision

It is my decision to select Alternative 5 as described in the FEIS. Several changes were made in this Alternative between the Draft and Final EIS based on public comment. The changes mainly address concerns that the Environmental Protection Agency and State of Alaska had concerning road management and risk of sedimentation in King George Creek. Other changes also addressed the values of the Honeymoon Volume Class 7 stand (brought up by local residents, environmental groups, the State of Alaska, and US Fish and Wildlife Service) and impacts to the scenic quality from Zimovia Highway on Wrangell Island (brought up by local residents). Although the number of sales that can be offered from this EIS is an administrative decision, I wanted to acknowledge and be responsive to the concerns of local residents and the State of Alaska to offer more small sales for potential value-added milling operations. Alternative 5 was modified as follows and the environmental effects are fully disclosed in the FEIS:

- We will harvest **Units 3, 4 and 30** and part of Unit 5 on the Zimovia Face with helicopter partial cuts. The road will be constructed only to Unit 5 thus eliminating

# Record of Decision

the need for the entire segment of road across Zimovia Face. This will address many of the scenic quality concerns of Zimovia Highway residents.

- I am administratively deferring harvest of **Units 6, 10, 15, 20, 23 and 24** as future small sales. This will make about 124 acres and approximately 4 MMBF available to small operators over the next five years.

- The harvest prescriptions for **Units 10-12** were modified. These units were combined into one large unit below the Honeymoon Road and will be logged with a combination of individual tree or group selection and patch cuts. The intent of this prescription is to manage this stand for high quality wood fiber (large trees with clear wood produced by pruning and thinning) sought by operators interested in producing high-value wood products. This prescription also helps maintain the values of the lower portion of the Volume Class 7 Honeymoon Stand by helping perpetuate the patches of large spruce, hemlock and cedar trees in this managed portion of the stand. Harvest in other portions of this stand are deferred. Fragmentation of this stand is minimized by harvesting the portion of the stand below the road and using uneven-aged harvest methods.

- **Road Segment 5** was dropped and **Unit 18** will be harvested entirely by helicopter. This will allow us to minimize soil disturbance and maintain smaller diameter trees within the harvest unit. Islands of trees will also be retained where they are windfirm and there is low risk that they will affect sedimentation of streams in the event they blow over. This changes were made to reduce the risk of sedimentation into King George Creek.

- **Road Segment 4** has two hydrological sites requiring major stream crossing structures. A gate will be placed on the first structure to restrict public motorized access during the intermittent life of the project and after harvest operations are complete in the King George watershed. This will address the need to maintain the wildlife security values of King George Creek while allowing periodic road maintenance access.

- **Road Segment 7** will be a specified road leading as far as Unit 21. The portion of the road into **Unit 22 (Segment 22)** was dropped (under all 'action' alternatives), along with the associated upper stream crossing. After harvest we will block access, remove culverts and restore the natural drainage pattern. This road segment has one major stream crossing at the beginning of the segment which will be removed. Unit 22 will be harvested entirely with helicopter which will minimize ground disturbance and allow us to maintain smaller diameter trees distributed within the unit. Islands of windfirm trees will also be maintained which will not endanger sedimentation of King George Creek in the event they blow over.

- **Road Segment 8** will have all drainage structures removed (log bridges and culverts) beyond and including the first major stream crossing and hydrological site located between Units 25 and 26. The natural drainage pattern will be restored in the closed road segment.

- **Road segments beyond the gate** in Segment 4 (just beyond Unit 17), which do not have their drainage structures removed, will be maintained and be capable of intermittent administrative vehicle access. Safe-guard measures (overflow dips) will also be implemented at stream crossings to help minimize effects on water quality should a minor structure fail after the intermittent life of the project. All major

**Exhibit 3, page 3 of 11**

stream crossings at hydrological sites beyond the gate with the exception of the bridge across King George Creek will be removed after harvest.

The selected alternative (Alternative 5) as described in the FEIS has the following key features:

- **Road Construction-** Approximately 10.8 miles of road would be constructed beyond a low angle ramp LTF just north of Honeymoon Creek.
- **Road Management-** During and following the intermittent life of the project, approximately 4 miles of road will remain open and allow motorized use by the public. We will allow motorized public access of the Honeymoon Creek watershed but restrict motorized access in the King George Creek watershed to mitigate effects of the sale on wildlife habitat security. Almost 3 miles of road will be closed by removing stream crossing structures or culverts and restoring natural drainage patterns. On the remaining portion of road only occasional administrative access will be allowed for small sales, monitoring, habitat improvement projects and maintenance of the road and drainage structures. Safe-guard measures will be implemented in concert with regular maintenance to further reduce sedimentation risk (see Road Cards in Appendix B, FEIS).
- **Timber Harvest-** Harvest would occur on 1,393 acres using a variety of silvicultural prescriptions that leave various amount of green trees within harvest units. Approximately 75% of the harvest prescriptions will leave 30% or more green tree retention and will not be clearcut (see Unit Cards in Appendix B, FEIS).
- **Volume-** Harvest will yield approximately 26.8 Million Board Feet (MMBF) of timber.
- **Old Growth Habitat Areas-** Large areas of operable commercial forest land will be retained in an old-growth condition for the life of the project. These areas include habitat along streams, beach and estuary fringes and large blocks of old growth forest. The streamside buffers required by the Tongass Timber Reform Act are permanent designations. There are 2,079 acres designated to be retained in contiguous block of old-growth for the life of the project (see Designated Old Growth Retention (page 2-13, FEIS). This area encompasses some of the most valuable wildlife habitat and travel corridors in the project area near the King George Creek estuary and along Red Mountain face. In addition, more than 80% of the Suitable Forest Lands (those lands that have productive forest with greater than Volume Class 4 minus stream buffers and extreme hazard soil areas) will be left in an old growth condition after harvest.

# Public and Other Agency Involvement

Public involvement occurred early and throughout the planning process through a variety of scoping letters, open houses and meetings or phone conversations with other agencies and interested groups and individuals.
- In June, 1995 a Notice of Intent to prepare an EIS was published in the Federal Register.
- Public comments on the Draft Environmental Impact Statement were received from April 26 to June 10, 1996.

The Final EIS identifies the agencies that were informed and/or involved in the planning process (see Chapter 5, FEIS). Several agencies have been involved in review of the EIS and the need to acquire necessary permits. These agencies are described on page 1-6 of the FEIS.

**Exhibit 3, page 4 of 11**

### Record of Decision

Through these above contacts, four key issues emerged which became the central focus of the analysis and alternatives:
- Scenic and Recreation Resources
- Timber Sale Economics and Road Management
- Freshwater Systems and Estuaries
- Wildlife Habitat Conservation

The effects on several other issues were evaluated early in the planning process and were considered minor issues because they were easily addressed by all alternatives or were less important to the public in this particular project area. For brevity of the document, effects on these resources are summarized at the end of Chapter 3. These environmental considerations included:
- Subsistence
- Cultural and Archeological Resources
- Soil and Vegetative Productivity
- Sensitive Plants
- Irreversible and Irretrievable Commitments of Resources and Unavoidable Effects
- Wild and Scenic Rivers

# Reasons for the Decision

In making my decision, I first examined each alternative's responsiveness to the key environmental issues identified in the FEIS. All alternatives were compatible with desired conditions we wanted to maintain in the project area and provide key corridors to other areas on Etolin Island (see Appendix A).

Alternative 5 addresses key public issues in the following ways:

The design of Alternative 5 is responsive to **Scenic Resource** concerns by harvesting less than 10% of the key viewsheds with predominantly partial cut methods. Modifications in the selected alternative between the Draft and Final EIS minimized visual concerns expressed by Zimovia Highway residents. Harvest will be noticed but appear like natural openings to the casual observer. The log transfer site is as small and unobtrusive as possible and the sort yard is located away from the beach and viewers. These harvest conditions also help retain the potential economic value of the area for tourism.

**Wildlife habitat conservation** objectives may be met by harvest prescriptions that maintain 50% or greater of the basal area within harvest units. Other harvest prescriptions that maintain less green trees will help provide greater stand diversity within managed stands important to some species. In addition, this alternative would harvest only 1/3 of the available and manageable acres for timber harvest (with all buffers and reserve areas subtracted) and only 20% of the suitable lands (lands with greater than volume Class 4 timber with all stream buffers and extreme soil hazard areas subtracted). A large old-growth reserve area encompasses some of the most valuable wildlife habitat in the project area in the King George watershed. Closure of the road to motorized public use will help mitigate effects of human use and make the reserve area more effective in providing for wildlife habitat security. Fragmentation of the "Honeymoon stand" is minimized as much as possible without completely deferring harvest.

The health and productivity of **freshwater systems and estuaries** is maintained by buffers and the extensive use of other than clearcut harvest methods. Aerial yarding by helicopter also will minimize soil disturbance on the majority of acres harvested. Several

# Record of Decision

modification were made between the Draft and Final EIS to further minimize risk of sediment delivery to King George Creek. Road maintenance objectives strike an effective balance between providing access for cost efficient maintenance while restricting motorized public use in the King George watershed in response to wildlife habitat security concerns. Alternative 5 avoids wetland impacts where practicable. Site specific measures described in Appendix B help maintain wetland soil, water and vegetation functions. The location of the road on the north side of Honeymoon Creek helps accomplish this as well as reduce potential cumulative impacts of future roading to access timber on both sides of the creek.

Several of you, in commenting to the DEIS, stated that you were disappointed in the selection of Alternative 5 as the preferred alternative because it harvests the most timber. There is an inherent assumption that selecting an alternative in the 'mid- or low range' of timber harvest volumes is the only way to be responsiveness to environmental issues. This assumption is made, while at the same time, expecting a larger range of alternatives. I do not agree with these assumptions in this case for the reasons I have outlined above. Differences in alternatives will always be 'relative.' The expectations associated with reaching 'compromises' or a 'balance' will therefore always appear to be met by selecting the 'middle' alternative.

In this project, I examined the responsiveness of all alternatives to the key issues and made my decision in light of the project location while keeping the regional timber supply situation in mind. I selected the alternative with the most timber harvest because I feel it more accurately depicts our intent to manage the project area over time for a combination of small and large sales. In offering this timber for sale, the Forest Service does not control who buys it. However, the project area's location next to Wrangell, immediately across from the Pat's Creek LTF, makes the project area perfectly situated to supply a combination of large and small sales over time for potential processors in Wrangell. Some of these sales may supply value-added wood processing operations.

The economic conditions of Southeast Alaska can not support only small value-added processing operations. Larger sales must be offered in areas with greater dependency on more expensive helicopter operations and to develop road systems which smaller operators can then use. These are the conditions and economic opportunities in the King George planning area. Given the economic situation in Wrangell, I felt that selecting an alternative that would harvest the most volume in the next five years and satisfy both larger and smaller independent sale buyers while meeting other resource desired conditions is the best balance. Even if the buyer is not based in Wrangell, a sale from a project area this close to Wrangell will provide jobs and economic benefits to the community.

The Regional timber supply situation was also a factor in my decision. Timber market assessments confirm that there is underutilized mill capacity in the region and a strong market for wood products. This sale will be offered to meet a regional commitment of independent sale volume. Alternative 5 best meets economic needs while incorporating extensive measures to meet scenery, habitat conservation and freshwater system objectives.

**Exhibit 3, page 6 of 11**

**Record of Decision**

## Alternatives

A total of six alternatives were considered in the FEIS including the 'No Action' Alternative. An alternative to harvest approximately 30 MMBF was dropped early in the planning process after a landscape level analysis (see Appendix A) showed that desired resource conditions could not be met by harvesting that amount of volume. The six alternatives were:

**Alternative 1-** Harvested timber entirely by helicopter within a mile from saltwater. This alternative was primarily responsive to freshwater system and habitat conservation issues. The alternative harvests 14.1 MMBF on 888 acres.

**Alternative 2-** Minimized fragmentation by harvesting at the head of each drainage. Most of the harvest occurs in the 'interior' portion of the planning area. This alternative was primarily responsive to scenery, freshwater systems and habitat conservation issues. This alternative also investigated the option of putting the road on the south side of Honeymoon Creek to minimize impacts on the high volume, south-facing stands along Honeymoon Creek. The alternative harvests 19.5 MMBF on about 968 acres.

**Alternative 3-** Concentrated harvest in Honeymoon and Upper King George Creek but did not harvest along Zimovia Face or lower King George Creek land units, mainly in response to scenery and freshwater system issues. The alternative harvests 16.7 MMBF from about 894 acres.

**Alternative 4-** Concentrated harvest in only the Honeymoon Creek watershed, mainly in response to habitat conservation and freshwater system issues. The alternative harvests 16.2 MMBF from about 943 acres.

**Alternative 5-** Was identified as the Proposed Action and Preferred Alternative in the DEIS. It proposes the most harvest by harvesting across the planning area while being responsive to the desired conditions for all four key issues. This alternative is the Forest Supervisor's selected alternative.

## Environmentally Preferred Alternative

The 'No Action' Alternative would cause the least environmental disturbance and is therefore the environmentally preferred alternative of all the alternatives studied in detail. Of the 'action' alternatives, Alternative 1 is the environmentally preferred action alternative. This alternative would involve no road construction and minimize impacts to wildlife habitat and streams.

## Mitigation

Mitigation includes measures taken to avoid, reduce or minimize the adverse effects of actions. These measures are described in Chapter 2 of the FEIS and the Road and Unit Cards in Appendix B. These measures are adopted as part of this decision and will be implemented as part of the selected alternative.

**Exhibit 3, page 7 of 11**

# Monitoring

Monitoring requirements are specified in Appendix C in the FEIS. These implementation and effectiveness monitoring items are adopted as part of this decision and will be implemented. Each monitoring item describes what the item is, where, when and how it will occur. The monitoring item will be implemented even if available funding may affect the intensity of the monitoring effort.

# Findings Required by Law

This decision is consistent with the **Alaska Regional Guide and the Tongass Land Management Plan** of 1979 (as amended in 1985/86) The areas of undisturbed old-growth wildlife habitat maintained in this alternative meet or exceed the standards for retention established in the Forest Plan. Although not required, the activities authorized in this decision are as consistent as practicable with the proposed standards and guidelines of the Revised Supplement to the Draft EIS for the Tongass Land Management Plan. Options to implement the Revised Forest Plan alternatives were maintained where practicable while still meeting current Forest Plan management direction and schedule of activities.

In accordance with the **National Forest Management Act** and the areas designation as a LUD III, clearcutting is not the predominant harvest method proposed on 75% of the harvest acres. The remaining 25% have a stand management objective of timber production accomplished by a single regeneration harvest with green tree retention of about 10%. In these areas, I have determined that the use of clearcutting with individual green tree retention is optimal due to the need to favor regeneration of Sitka spruce, increase natural regeneration and timber production in the central portion of the study area, and lower logging costs by using cable systems. There are no units that create an opening over 100 acres in size.

The selected alternative is not anticipated to have direct, indirect or cumulative effects on any threatened, endangered or sensitive species in the project area. A complete biological assessment is included in the planning record for this project. The U.S. Fish and Wildlife Service and the National Marine Fishery Service have concurred with the conclusion of the Wrangell Ranger District biologist that the actions described are not likely to adversely affect threatened and endangered species. I have determined that this action will not have any adverse impacts on threatened and endangered species and is consistent with the **Endangered Species Act.**

Harvest units were designed and will be located to maintain minimum 100-foot buffers for all Class I streams and Class II streams which flow directly into Class I streams as required in Section 103 of the **Tongass Timber Reform Act.** The actual widths of these buffers will often be greater than the 100 foot minimum.

Management activities within 330 feet of an eagle nest site are restricted by a Memorandum of Understanding (MOU) between the Forest Service and the U.S. Fish and Wildlife Service to facilitate compliance with the **Bald Eagle Protection Act.**

# Record of Decision

The design of harvest units and roads for all alternatives, including the selected alternative, were guided by standards, guidelines and direction contained in the current Tongass Land Management Plan, Alaska Regional Guide, and applicable Forest Service Manuals and handbooks. The unit and road cards (Appendix B) contain specific details on practices prescribed to prevent or reduce non-point sediment sources. Reasonable implementation with site specific application and monitoring of approved Best Management Practices (BMPs) is expected to comply with applicable **State Water Quality Standards and Regulations.** The State of Alaska's comments made during the Alaska Coastal Management Program review, and the Environmental Protection Agency comments, were incorporated into the selected alternative.

Cultural resource surveys of various intensities have been conducted in the project area. The State Historic Preservation Officer has been consulted and the project is consistent with the provisions of **36 CFR part 800.** I have determined that there will be no significant effects on cultural resources.

A subsistence evaluation was conducted for the six alternatives considered in detail in accordance with **ANILCA Section 810.** The full analysis is located in the planning file for this project and summarized in Chapter 3 of the Final EIS. The evaluation of scoping and additional analysis indicate that there is no significant possibility of a significant restriction on subsistence uses for wildlife, fish and shellfish, marine mammals, other foods, and timber resources.

**Executive Order 11988** directs federal agencies to avoid, to the extent possible, the long and short-term adverse impacts associated with the occupancy and modification of floodplains. The numerous streams in the project area make it impossible to avoid all floodplains during timber harvest and road construction. The design of the proposed developments, harvest prescriptions, reliance on helicopter logging and the application of Best Management Practices combine to minimize adverse effects to floodplains.

**Executive Order 11990** requires Federal Agencies to avoid, to the extent possible, the long and short-term adverse impacts associated with the destruction or modification of wetlands. The amount of wetlands in the project area (much of it peatlands) makes it impossible to avoid wetlands entirely. Therefore, soil moisture regimes and vegetation on some wetlands may be altered in some cases. Harvest occurring on wetlands would still be classified as wetlands and function as wetlands in the ecosystem. Roads were designed to avoid wetlands as much as possible (except Alternative 2 which considered a road on the south side of Honeymoon Creek to show the trade-off associated with avoidance of the "Honeymoon Stand"). Less than 5% of the wetlands (all types) within the project area are affected by harvest units or roads in the selected alternative.

The **Coastal Zone Management Act** (CZMA), while specifically excluding Federal lands from the Coastal Zone, requires that a Federal agency's activities be consistent with the enforceable standards of a state's coastal management program to the maximum extent possible. The enforceable standards for timber harvest activities are found in the State Forest Practices Act. The standards and guidelines for timber management in the King George Project Area meet or exceed the standards in the State Forest Practices Act. The Division of Governmental Coordination did a consistency review of our determination for Alternative 5 in the DEIS. I have addressed their recommendations between Draft and Final and incorporated them into Alternative 5 described in the FEIS and this ROD. I have therefore determined that the selected alternative is consistent with the Alaska Coastal Management Program to the maximum extent practicable.

**Exhibit 3, page 9 of 11**

I have determined that this action will not adversely affect prime farmland, range land, rivers eligible for Wild and Scenic River designation, standards associated with the Clean Air Act, Wilderness or civil rights, women, and minorities. The State and Federal permits necessary to implement the authorized activities are listed in Chapter 1 of the FEIS.

# Implementation

Implementation of this decision may occur no sooner than 50 days following publication of the legal notice of the decision in the Petersburg Pilot (expected to be August 8, 1996), published in Petersburg Alaska. Publication of the Notice of Availability of the Final EIS in the Federal Register will be concurrent and is anticipated to be August 9. The first timber sale from this project is planned to be offered in the Fall of 1996.

Implementation of all activities authorized by this Record of Decision will be monitored to ensure that they are carried out as planned and described in the Final EIS. The Appendix of this document contain the Harvest Unit and Road design cards. These cards are an integral part of this decision because they document key implementation measures that ensure resource concerns are addressed.

Proposed changes to the authorized project actions will be subject to the requirements of the National Environmental Policy Act (NEPA), the National Forest Management Act, the Tongass Timber Reform Act, the Coastal Zone Management Act, and other laws concerning such changes. Minor changes are expected during implementation to better meet on-site resource objectives. Minor adjustments to unit boundaries are also likely during final layout for the purpose of improving logging system efficiency. Many of these minor changes will not present sufficient potential impacts to require any specific documentation or other action to comply with applicable laws. Some changes may require further analysis and documentation to comply with Forest Service Handbook 1909.15, sec. 18. If the Forest Supervisor determines that the change is both substantive and relevant to environmental concerns, it will require a supplement to the existing EIS. If the change is not considered substantive enough to be relevant to environmental concerns, the change will be documented in the implementation record. Cards similar to the unit and road cards will be used to document changes between planned and implemented features of the Selected Alternative.

# Right to Appeal

This decision is subject to administrative appeal. Organizations or members of the general public may appeal this decision according to Title 36 Code of Federal Regulations (CFR) 215. The appeal must be filed within 45 days of the date that legal notification of this decision is published in the Petersburg Pilot, the official newspaper of record. The Notice of Appeal must be filed in duplicate with:

Phil Janik, Regional Forester
Forest Service
U.S. Department of Agriculture
P.O. Box 21628
Juneau, AK 99802-1628

# Record of Decision

It is the responsibility of those who appeal a decision to provide the Regional Forester with sufficient written evidence and rationale to show why the decision by the Forest Supervisor should be changed or reversed. This written Notice of Appeal must:

1. State that the document is a Notice of Appeal filed pursuant to 36 CFR Part 215;
2. List the name, address and if possible, the telephone number of appellant;
3. Identify the decision document by title and subject, date of the decision, and name and title of the Responsible Official;
4. Identify the specific change(s) in the decision that the appellant seeks or portion of the decision to which the appellant objects;
5. State how the Responsible Official's decision fails to consider comments previously provided, either before or during the comment period specified in 36 CFR 215.6 and, if applicable, how the appellant believes the decision violates law, regulation or policy.

For Additional information concerning this decision, contact Meg Mitchell, Forest Service Interdisciplinary Team Leader, Wrangell Ranger District, P.O. Box 51, Wrangell, AK 99929, or call (907) 874-2323.

ABIGAIL R. KIMBELL
Forest Supervisor, Stikine Area
Tongass National Forest

July 19, 1996
Date

**Exhibit 3, page 11 of 11**