

United States
Department of
Agriculture

**Forest Service**

Tongass
National Forest

R10 - MB-332

October 1996



# Upper Carroll Timber Sale

Final Environmental Impact Statement

**Record of Decision**



# Upper Carroll Timber Sale
# Final Environmental Impact Statement

# Record of Decision

United States Department of Agriculture
Forest Service—Alaska Region
Ketchikan Area, Tongass National Forest

| | |
|---|---|
| Lead Agency: | USDA Forest Service<br>Tongass National Forest<br>Ketchikan Administrative Area |
| Responsible Official: | Forest Supervisor<br>Ketchikan Administrative Area<br>Tongass National Forest<br>Federal Building<br>Ketchikan, AK  99901 |
| For Further Information Contact: | Bill Nightingale, Project Manager<br>Ketchikan Administrative Area<br>Tongass National Forest<br>Ketchikan Ranger District<br>3031 Tongass Avenue<br>Ketchikan, AK  99901<br>(907) 225-2148 |

The USDA Forest Service proposes to harvest up to approximately 70 million board feet (MMBF) of timber in the Upper Carroll Project Area, Ketchikan Ranger District, Ketchikan Administrative Area, Tongass National Forest. Timber volume would be offered to the Ketchikan Pulp Company (KPC) under the KPC Long-term Timber Sale Contract (A10fs-1041) and/or the Ketchikan Area independent timber sale program. The actions analyzed in this EIS are designed to implement direction contained in the Tongass Land Management Plan (TLMP, 1979a, as amended) and the Tongass Timber Reform Act. The EIS describes 6 alternatives which provide different combinations of resource outputs and spatial locations of harvest units. The alternatives include: 1) No Action, proposing no new harvest from the Project Area at this time; 2) configure harvest units to provide the maximum amount of timber within Forest Plan Standards and Guidelines; 3) configure harvest units to emphasize timber sale economics, fisheries, wildlife, and subsistence values; 5) emphasize helicopter yarding in Neets Bay while allowing harvest at the Forest Plan implementation level in most other zones; 6) avoid harvest in Neets Bay and in potential goat winter range, minimize impacts to the west side of Carroll Creek through the use of helicopter logging; and 7) emphasize helicopter logging, visuals, and subsistence values.

# Table of Contents

Background .................................................................. 1
Decision ..................................................................... 2
Reasons For Decision ......................................................... 6
How Issues Are Addressed ..................................................... 7
    Issue 1   Timber Harvest Economics and Supply ................................ 7
    Issue 2   Fish Habitat and Water Quality .................................... 8
    Issue 3   Recreation and Scenic Quality ..................................... 11
    Issue 4   Wildlife Habitat .................................................. 12
    Issue 5   Subsistence Use ................................................... 15
    Issue 6   Transportation/Utility Corridor ................................... 18
    Issue 7   Social and Economic Effects ....................................... 19
    Issue 8   Marine Environment ................................................ 20
Public Involvement ........................................................... 22
Coordination With Other Agencies ............................................. 22
Alternatives Eliminated From Detailed Consideration .......................... 23
    Alternative A   Single Resource or Issue ..................................... 23
    Alternative B   Transportation/Utility Corridor between Ketchikan and the Project Area ... 23
    Alternative C   Avoid Previously Mapped Old-growth Retention Areas ........... 23
    Alternative D   Neets Bay/Orchard Lake Alternative ........................... 24
    Alternative E   Helicopter Logging Alternative ............................... 24
    Alternative F   "Fishermen's Alternative" .................................... 24
    Alternative G ............................................................ 25
Alternatives Considered for Detailed Study ................................... 25
    Alternative 1 (No Action) ................................................ 25
    Alternative 2 ............................................................ 25
    Alternative 3 ............................................................ 26
    Alternative 5 ............................................................ 27
    Alternative 6 ............................................................ 27
    Alternative 7 ............................................................ 28
    Environmentally Preferred Alternative .................................... 31
    Administrative Record .................................................... 31
Mitigation ................................................................... 31
    Water Quality, Fish Habitat, Wetlands .................................... 31
    Anadromous Fish Habitat .................................................. 32
    Beach Fringe and Estuaries ............................................... 32
    Temperature Sensitive Streams ............................................ 32
    Cavity and Snag-dependent Wildlife ....................................... 32
    Goshawks ................................................................. 33
    Marbled Murrelets ........................................................ 33
    Trumpeter Swans .......................................................... 34
    Bald Eagle Nests ......................................................... 34
    Whale Habitats ........................................................... 34
    Marine Mammals ........................................................... 34
    Waterfowl ................................................................ 35
    Heron and Raptor Nest Protection ......................................... 35
    Alexander Archipelago Wolf ............................................... 35
    Mountain Goat ............................................................ 35
    Subsistence .............................................................. 35
    Scenic Quality ........................................................... 35
    Cultural Resources ....................................................... 36
    Sensitive Plants ......................................................... 36
    Fisheries ................................................................ 36

| | |
|---|---|
| Soils | 36 |
| Log Transfer Facilities | 36 |
| Regeneration | 36 |
| Caves/Karst | 36 |
| Monitoring and Enforcement | 37 |
| Findings Required By Law | 37 |
| National Forest Management Act | 37 |
| Tongass Land Management Plan and Alaska Regional Guide | 37 |
| Clearcutting as the Optimal Method of Harvesting | 38 |
| Clearcuts Over 100 Acres in Size | 38 |
| Tongass Timber Reform Act | 39 |
| Proportionality—Original Method | 39 |
| Proportionality | 39 |
| Litigation Settlement | 40 |
| Transition Proportionality Analysis Method | 40 |
| Endangered Species Act | 40 |
| Bald Eagle Protection Act | 41 |
| Clean Water Act | 41 |
| National Historic Preservation Act | 42 |
| Federal Cave Resource Protection Act of 1988 | 42 |
| ANILCA Section 810 | 42 |
| Subsistence Evaluation and Findings | 42 |
| Subsistence Determinations | 42 |
| Necessary, Consistent with Sound Management of Public Land | 43 |
| Amount of Land Necessary to Accomplish the Purpose of the Proposed Action | 43 |
| Reasonable Steps to Minimize Adverse Impacts Upon Subsistence Uses and Resources | 44 |
| Executive Orders | 45 |
| Executive Order 11988 | 46 |
| Executive Order 11990 | 46 |
| Executive Order 12962 | 46 |
| Coastal Zone Management Act | 46 |
| Federal and State Permits | 46 |
| Implementation Process | 47 |
| Process for Change During Implementation | 47 |
| Right To Appeal | 47 |
| Contact Person | 48 |
| | 49 |

Appendices
1 ROD Unit List
2 ROD Unit Cards
3 ROD Road Cards

# List of Tables

| | | |
|---|---|---:|
| Table ROD-1 | ROD Unit Crosswalk Table | 5 |
| Table ROD-2 | Cumulative Watershed Effects, Percentage of Watershed Harvested and Roaded in Third Order or Larger Watersheds | 9 |
| Table ROD-3 | Stream Crossings to be Constructed | 10 |
| Table ROD-4 | Acres of High Hazard Soils Harvested by Alternative | 10 |
| Table ROD-5 | Potential Changes in Habitat Capability within the Project Area for MIS in 1997 | 13 |
| Table ROD-6 | Effect of Timber Harvest on Forest Fragmentation in Acres | 14 |
| Table ROD-7 | Percent of 1954 Deer Habitat Capability for WAAs 406 and 510 | 17 |
| Table ROD-8 | Potential Transportation/Utility Corridor Access Miles | 19 |
| Table ROD-9 | Log Transfer Facilities Required, by Alternative and System | 21 |
| Table ROD-10 | Marine Benthic Habitat Affected by Alternative | 21 |
| Table ROD-11 | Summary Comparison of Alternatives | 29 |
| Table ROD-12 | Proportion of Volume Classes 6 and 7 Proposed for Harvest by Management Area as Described by Proportionality Analysis Method FSH 2409.18-93-3 | 40 |
| Table ROD-13 | Proportion of Volume Classes 6 and 7 Proposed for Harvest by Management Area as Described by Transition Proportionality Analysis Method | 41 |

# Record of Decision

## Background

The purpose and need for this project is to implement direction contained in the Tongass Land Management Plan (TLMP 1979a, as amended), to help provide a sustained level of timber supply to meet annual and TLMP planning cycle market demand, and to provide local employment in the woods products industry, consistent with providing for the multiple use and sustained yield of all renewable forest resources. Another objective would be to provide timber volume that will contribute to a three-year current timber supply under the KPC Long-term Timber Sale Contract (No. A10fs-1042; Sections B0.61 and B0.62) and/or the Ketchikan Area Independent Timber Sale Program. The alternatives and actions considered are possible approaches to meeting this purpose and need. The EIS study process was designed to help insure that, in meeting this purpose and need, the Forest Service makes the most informed decision possible for this Project Area specifically, and for the Tongass National Forest generally. The Upper Carroll Project is expected to provide up to approximately 70 MMBF of timber, given the guidance of the Forest Plan.

The Project Area is partially within the KPC Contract Primary Sale Area; the remainder is within the Contract Contingency Area. Under TLMP, 100 percent of the Project Area has been given Land Use Designation (LUD) IV. The TLMP schedules timber sale preparation for all management areas in the Project Area. A comparison of the desired future condition for the Project Area, as reflected in the TLMP direction, with the existing condition shows the need to convert suitable stands of old growth to managed productive stands capable of long-term timber production.

Section 101 of the Tongass Timber Reform Act of 1990 (TTRA) directs the USDA Forest Service "... to the extent consistent with providing for the multiple use and sustained yield of all renewable forest resources, seek to provide a supply of timber from the Tongass National Forest which (1) meets the annual market demand for timber from such forest and (2) meets the market demand from such forest for each planning cycle." Section 101 of the TTRA specifies that Forest Service efforts to seek to meet market demand are subject to appropriations, National Forest Management Act (NFMA) requirements, and other applicable laws. Providing a timber supply from the Tongass for sustained local wood products industry employment and related economic and social benefits is an objective of the TLMP; the Alaska National Interest Land Conservation Act (ANILCA), as amended by the TTRA; and the KPC Long-term Contract.

There is demonstrated mill capacity in the region to process the logs, if supply of timber is available. There is also a projected need for the timber volume being considered from this Project Area (see Appendix A) for the Forest Service to come closer to meeting an objective of providing a three-year supply of timber under contract to the existing dependent industry, as a means of providing for stability in relation to fluctuating market demand (Morse, 1995). There is a substantial component of the economy of Southeast Alaska that is dependent on a viable timber industry. Based on these factors, the need for the project is clearly indicated.

Public scoping, data collection and analysis, and document production began with issuance of the Notice of Intent published in the Federal Register on August 28, 1994. This Record of Decision (ROD) and the Final Environmental Impact Statement (FEIS) disclose the environmental effects of the alternatives considered and document the decision for authorization of activities within the Project Area.

In developing the FEIS and this ROD, it is recognized that less than complete knowledge exists about many relationships and conditions of wildlife, fish, forests, jobs, and communities. The ecology, inventory, and management of a large forest area is a complex and developing science. The biology of wildlife species prompts questions about population dynamics and habitat relationships. The interaction of resource supply, the economy, and communities is the subject matter of an inexact science.

The data and level of analysis used in the FEIS were commensurate with the importance of the possible impacts (40 CFR 1502.15). When encountering a gap in information, the interdisciplinary team (IDT) took one of two approaches: (1) they collected the missing information or conducted the analysis necessary to identify important relationships; or (2) they concluded that, although the missing information would have added precision to estimates or better specified a relationship, the basic data and central relationships are sufficiently well established in the respective sciences that the new information would be very unlikely to reverse or nullify understood relationships. Thus, any information missing from the FEIS was determined to be not essential for a reasoned choice among the alternatives.

## Decision

This Record of Decision documents my decision to make timber volume available from the Upper Carroll Project Area to meet the KPC Long-term Timber Sale Contract and/or the Ketchikan Area Independent Timber Sale Program requirements. My decision encompasses the following:

- the volume to make available under the contract in this Project Area in multiple "timber offerings";
- the location and design of timber harvest units;
- the location and design of road systems;
- the location and design of the log transfer facility;
- necessary standards and guidelines, mitigation measures, and enhancement opportunities for resources other than timber;
- whether there may be a significant restriction on subsistence use and if so, related findings and measures to minimize impacts on subsistence users;
- road management objectives to include closures for resource protection.

It is my decision to select Alternative 3 for implementation in the Upper Carroll Project Area (see the description of Alternative 3 in Chapter 2 of the FEIS). This decision is responsive to issues raised during scoping, data gathered and analyzed, public responses to the Draft Environmental Impact Statement (DEIS), and testimony received at the subsistence hearings.

Specifically, I select Alternative 3 without modification and authorize the required actions to implement this decision. Furthermore:

1. The Selected Alternative will harvest about 1,074 acres of commercial forest land (CFL) to meet the requirements of the KPC Long-term Timber Sale Contract and the Independent Timber Sale Program. This specified harvest will provide approximately 33 MMBF of sawlog and utility volume along with 1 MMBF of right-of-way (ROW) volume, for a total of 34 MMBF. ROD Appendix 1 lists each unit approved for harvest. Design features of the harvest units are described in detail on the Unit Design Cards in Appendix 2 of the ROD. Appendix B of the FEIS displays the harvest units greater than 100 acres and the reasons for exceeding this size. Silvicultural prescriptions will be developed for each unit prior to harvesting.

2. The Selected Alternative includes partial cut harvest, rather than clearcut harvest, for 15 acres. This is consistent with Forest Service Chief's policy to reduce the amount of clearcutting. Appendix H of the FEIS displays a list of harvest units by alternative for which partial cut harvest is prescribed. The partial cut harvest prescriptions for these units are intended to promote regeneration (especially red and yellow cedar), provide for stand structural diversity, maintain riparian habitat, maintain scenic quality, and leave young, vigorously growing trees. The impacts to residual trees will be minimized. The Unit Design Cards in ROD Appendix 2 of the FEIS provide specific direction for field layout to accomplish these objectives.

3. The Selected Alternative includes reconstruction of 3.7 miles of existing road, and construction of 21.1 miles of new road in order to access the specified timber harvest units. ROD Appendix 3 of the FEIS contains the Road Cards with direction for the location of each road. The Road Cards list road segments and road management objectives for future management of the transportation system.

4. The existing Log Transfer Facility (LTF) located at Upper Carroll Inlet will be reconstructed and used to transfer logs to the water after timber harvest. It is my decision to select the preferred method of log transfer for this LTF as the low-angle ramp method. This method consists of a shot-rock ramp sloped at 10 to 15 percent grade with wood or steel rails on the ramp surface. Log bundles are walked down the ramp into the water by use of a rubber-tired log loader. This decision is based on analysis found in the Marine Environment, Log Transfer Sites, and Related Facilities Section of Chapter 3 which documents that the low-angle ramp method for the LTF located at Upper Carroll has the least affect on marine habitat as well as being the most cost efficient. This LTF includes a permanent floating dock facility for administrative use, public access, and safety. The LTF located at Shelter Cove, which is currently being used to transfer logs to the water as part of the Shelter Cove Project, will be used for the six Upper Carroll harvest units that are associated with the Shelter Cove road system.

5. This Record of Decision identifies mitigation measures authorized to reduce or eliminate adverse environmental effects of the timber harvest and road construction activities specified in the Selected Alternative. Chapter 2 of the FEIS specifies the implementation and effectiveness monitoring that will be conducted to determine if the resource management objectives have been met.

6. Appendix I of the FEIS includes descriptions of the enhancement opportunities for the Selected Alternative which are feasible following implementation of this action. These opportunities will be included in Sale Area Improvement (SAI) plan(s) developed in conjunction with the timber sale contract documents for each offering.

7. I have identified certain lands which contain important wildlife habitat which will remain in their current condition for the duration of this project. These lands are depicted on the ROD map and labeled Old-growth Retention. Subsequent projects and the National Environmental Policy Act of 1969 (NEPA) analysis may specify changes in the locations of these areas; however, sufficient acreage will exist in an old-growth condition at all times to meet the requirements for Old-growth Retention (TLMP, 1979 as amended) and Standards and Guidelines of the March 1996 Revised Supplement Draft TLMP EIS (RSDEIS).

8. I have determined that there may be a significant possibility of a significant restriction of subsistence use of deer in the Project Area in the future. The effects of the Selected Alternative on the subsistence use of deer are minimal. However, increased demand and cumulative effects of future actions may at some point result in a significant restriction of subsistence use of deer and some furbearers (wolf and marten) in the Project Area. This restriction exists regardless of which alternative is implemented, including the No Action

Alternative. As a result, I have determined that: (1) these actions are necessary, consistent with sound management of public lands, (2) the Selected Alternative involves the minimum amount of public land necessary to accomplish its purpose, and (3) reasonable measures to minimize impacts on subsistence uses and resources have been adopted to the extent practicable while still meeting the purpose and need for this project.

9. Class 1 anadromous streams will receive a minimum 300-foot no-cut buffer and where practical locate roads, tail holds, and guy-circles outside this stream buffer.

10. I have assigned ROD harvest unit numbers which reflect how the units will be tracked through layout, harvest, and post sale monitoring. Several of the unit configurations considered in the various alternatives adjoin each other and will be marked, traversed, harvested, and monitored as an individual unit. ROD Table-1 provides a crosswalk between the ROD harvest unit number and the FEIS harvest unit number for the Selected Alternative.

    I have included a complete set of Harvest Unit Cards for the Selected Alternative in ROD Appendix 2. A ROD unit schematic map consisting of an orthophoto image and a topographic map image of the unit and roads has been included with the ROD Harvest Unit Cards. The unit schematic map is intended to facilitate (1) accurate layout, and (2) be utilized to document final layout.

    I have included a complete set of Road Cards for the Selected Alternative in ROD Appendix 3. The road management and access objectives for the Selected Alternative are also included.

Table ROD-1
**ROD Unit Crosswalk Table**

| ROD Unit Number | FEIS Unit Number |
|---|---|
| C01 | 127 |
| C02 | 125 |
| C03 | 111 |
| C04 | 119 |
| C05 | 120 |
| C06 | 121 |
| C07 | 35 |
| C07 | 38 |
| C08 | 3 |
| C08 | 27 |
| C08 | 28 |
| C09 | 40 |
| C09 | 41 |
| C11 | 47 |
| C11 | 49 |
| C12 | 19 |
| C13 | 20 |
| C14 | 21 |
| C15 | 22 |
| C16 | 51 |
| C17 | 55 |
| C17 | 138 |
| C18 | 8 |
| C19 | 57 |
| C19 | 58 |
| C19 | 59 |
| C20 | 68 |
| C21 | 9 |
| C22 | 61 |
| C23 | 16 |
| C24 | 64 |
| C24 | 65 |
| C24 | 66 |
| C25 | 67 |
| C26 | 72 |
| C26 | 73 |
| C27 | 130 |
| C28 | 74 |
| C29 | 131 |
| C30 | 132 |

Note: ROD units displayed on ROD Map. The corresponding FEIS unit number is displayed on the alternative maps contained in the Summary and in Chapter 2 of the FEIS.

# Reasons For Decision

1. In making my decision, I worked to assure consideration of all issues and to take into account the competing interests and values of the public. There were many divergent public, personal, and professional opinions expressed during this project. This decision will probably not completely satisfy any one particular group or individual. However, I considered all views, and I believe the decision I have made is reasonable. The Selected Alternative provides a beneficial mix of resources for the public within the framework of the existing laws, regulations, policies, public needs and desires, and capabilities of the land, while meeting the stated purpose and need for this project.

2. My decision to implement this Selected Alternative is in conformance with the Tongass Land Management Plan (TLMP 1979, as amended), the March 1996 Revised Supplement Draft Tongass Land Management Plan EIS (RSDEIS), and sound National Forest management. I have considered the need to help provide a sustained level of timber supply to meet annual and TLMP planning cycle market demand, and to provide local employment in the wood products industry, consistent with providing for the multiple use and sustained yield of all renewable forest resources. KPC Long-term Contract offerings implemented through this project will help meet KPC Long-term Contract timber supply needs.

3. I have determined that the estimated harvest volume of the Selected Alternative meets the purpose and need defined for the project.

4. I have deferred timber harvest in the majority of the large unfragmented old-growth habitat blocks that are over 1,000 acres in size including a portion of the Naha old-growth habitat block that is designated LUD IV under current TLMP direction. The west side of Carroll Creek which contains a small block of old-growth habitat will also be deferred from timber harvest at this time. This will serve as a small habitat reserve. Recent sightings of goshawks and probable nest locations in this area confirmed my decision to defer this area. These reserves meet the size, spacing, and distance parameters as set forth by the Interagency Viable Population (VPOP) Committee and the TLMP RSDEIS (1996a) Preferred Alternative. They are also consistent with the retention requirements under the current Forest Plan (TLMP 1979a, as amended). These identified old-growth habitat blocks will be retained for the duration of this project. This decision will defer harvest activities in them only for the duration of this project. Any future harvest will be considered through the National Forest Management Act (NFMA) and NEPA process.

5. The Selected Alternative is consistent with the proportional harvest requirement in the Tongass Timber Reform Act (TTRA) using the Timber Type Map (TIMTYP) methodology in the Forest Service Handbook (FSH) and also using the new transition method for calculating proportionality based on volume. The Selected Alternative meets or improves the proportionality which existed at the time of passage of the TTRA for Management Areas K32 and K35.

6. I have ensured that all alternatives including the Selected Alternative meet the visual quality objectives (VQOs) as specified from the priority travel routes and key viewsheds. These priority travel routes and key viewsheds include: (1) Upper Carroll/Shelter Cove; (2) Upper Carroll estuary; and (3) Head of Neets Bay. Actual viewpoints used in the analysis for meeting the VQOs for each viewshed are specified in Chapter 3 of the FEIS.

7. I have designed the Selected Alternative so that only one unit will exceed 100 acres. This unit which exceeds 100 acres is justified on the basis of topography, effects upon wildlife and fish habitat, and logging and transportation systems requirements. This unit was described in Chapter 3 and in Appendix B of the DEIS and FEIS.

8. In the development of the Selected Alternative, I have taken action to implement the policy set by the Chief of the Forest Service on ecosystem management and a reduction in clearcutting. I have specified that 15 acres will be harvested using shelterwood silvicultural treatments to promote regeneration, especially for red and yellow cedar. All timber harvest in the Selected Alternative, except that described in Chapter 3 under the Silviculture section, is prescribed as type 1 and 2 clearcuts. Finally, all units will include ecosystem management principals including green tree retention. This includes the leaving of standing green trees, small islands, and other forms of structural diversity. The specific objectives for each unit are listed in Chapter 3 of the FEIS and in the ROD, Appendix 2, Unit Design Cards.

9. Shelterwood harvest is a relatively new silvicultural system in Southeast Alaska. However, the units for which shelterwood harvest is prescribed were identified and designed to ensure the success of the regeneration. This includes removing a portion of the trees within the unit, while successfully retaining individual trees and/or groups of trees. The specific harvest objectives are described in the ROD Unit Design Cards. Silviculture and logging system specialists will apply this direction in the preparation of the units for harvest. Sale administrators will ensure that the logging operations accomplish the harvest objectives for these units. Implementation of these prescriptions is intended to add to our knowledge of alternate treatments for Southeast Alaska timber types.

10. The Selected Alternative will provide the highest economic return to the Federal Government while still meeting the previously mentioned resource objectives. The Selected Alternative provides a net return of $19.06 per thousand board feet as indicated by the mid-market analysis.

11. Some public responses suggested changing all cable units to helicopter yarding. After careful consideration, I have decided to utilize some helicopter yarding to accomplish the goals and objectives of resource protection as well as to help mitigate some watershed, wildlife, and visual resource concerns. Analysis of converting all or combinations of units within most action alternatives to helicopter yarding showed above average helicopter yarding costs that could not be offset by projected stumpage values. These higher costs seriously impacted the economic efficiency of most action alternatives where a large percentage of a particular alternative is scheduled for helicopter yarding. Of the acreage in the Selected Alternative, approximately **three** percent is scheduled to be helicopter logged.

## How Issues Are Addressed

In the following summary, I detail how significant issues are addressed within the Selected Alternative.

**Issue 1**

**Timber Harvest Economics and Supply**
Of the five action alternatives, Alternative 3 produced the highest stumpage rate. The Selected Alternative produces the highest mid-market stumpage rate of +$19.06 per thousand board feet. Actual returns from the harvest will be determined for each timber offering based on current market conditions as determined through the Timber Sale Appraisal and subsequent bids (for independent timber sales).

Of the five action alternatives, Alternative 2 incurred the highest logging costs ($647.29/MBF) and the lowest stumpage value estimate (-$158.40/MBF). Under Alternative 2, a Shelter Cove to Carroll Inlet road tie is analyzed for its economic effects. The estimated cost of the road tie ($6,070,000) was not offset by the value of the timber harvested under the alternative. The mid-market stumpage value estimate went from -$51.95 to -$158.40 per

MBF with the Shelter Cove road tie. Alternative 3 has the lowest estimated logging cost ($458.01/MBF) and the highest estimated stumpage value (+$19.06) of all the action alternatives.

The economic viability of Neets Bay helicopter and cable units is analyzed within Alternatives 2 and 5. Their negative mid-market values of -$51.95 and -$53.64 per MBF respectively, is a result of several factors which include: (1) helicopter yarding factors: above average yarding distances, elevational differences of greater than 2000 feet, support service landing areas (fuel, maintenance, etc.) being located farther than average, and flight path adjustments in Neets Bay to avoid the Southern Southeast Regional Aquaculture Association (SSRAA) facility located nearby including their salmon holding pens; and (2) additional roading cost factors such as above average road building costs to access Neets Bay cable units, Shrimp Bay LTF (road tie), additional miles of road required to access a low amount of difficult and isolated timber volume.

Public concern has been focused on the effects of falldown on community stability and the rate of harvest (ASQ) scheduled in the Forest Plan. The Forest Service has addressed this issue by incorporating updated information into the Forest Plan Revision (TLMP RSDEIS, 1996a) which includes not only the effects of falldown, but land use allocations and revised standards and guidelines. The Ten-Year-Sale-Action Plan included as part of Appendix A of the Upper Carroll FEIS has been updated to reflect these changes for both the Tongass National Forest and the Upper Carroll Project Area. The Upper Carroll project is consistent with the existing Forest Plan (TLMP, 1979 as amended) and the standards and guidelines for the TLMP RSDEIS (1996a) Preferred Alternative.

In addition to the actions listed above, the Upper Carroll Project includes a range of alternatives that would harvest from 19 MMBF (Alternative 7) to 64 MMBF (Alternative 2) of the volume originally scheduled. The remaining alternatives would harvest approximately 33, 34, and 54 MMBF (Alternatives 6, 3, and 5 respectively).

**Highlights of the Selected Alternative (3)** include the following:

- Does the best job of balancing resource protection and timber supply, while still providing an economically viable timber sale.

- Produces the highest mid-market estimated stumpage rate (+$19.06/MBF)

- Produces 34 MMBF of economically viable timber to help support the local forest products industry.

**Issue 2**

### Fish Habitat and Water Quality

There is no measurable effect on water quality or fisheries production by any of the timber harvest or associated activities proposed by any of the action alternatives. All alternatives meet the requirements and intent of the Clean Water Act. Implementation of project specific stream buffers that range up to 500 feet, which meet or exceed the TTRA's requirement to provide a minimum 100-foot buffer on Class I streams and Class II streams flowing directly into Class I streams, would effectively mitigate direct stream channel impacts from proposed timber harvest and road construction. Adherence to Best Management Practices (BMPs) outlined in the Soil and Water Conservation Handbook (USDA FSH 2509.22) during the design of units and roads will minimize the potential direct effects to fish as well.

The Upper Carroll Project and Watershed Analysis (Appendix F) implement the recommendations applicable to project-level planning presented in the Anadromous Fish Habitat Assessment (AFHA) report of January 1995. Site-specific BMPs were developed and selected to minimize the potential for impact to fish habitat. For example, Class I anadromous streams received a 300-foot no-cut buffer prescription in Carroll Creek. Site-specific BMPs were developed and selected to minimize the potential for impact to fish

habitat. These site-specific BMPs are noted on the individual ROD Unit Design and Road Cards in ROD Appendix 2 and 3.

Fish habitat capability models are used to estimate the effects of timber harvest on the capability of streams to provide habitat for selected species of salmon and trout. Because there are many factors which influence fish populations—including commercial/sport harvest, oceanic conditions, and predation—these computer models provide only relative measures of habitat capability. These models indicate that there is no significant direct change in habitat capabilities.

Every major watershed within the Project Area has experienced prior timber harvest and road construction. Re-entering these drainages may generate a greater potential risk for impacts on water quality, with the risk expected to be greater in those watersheds with the higher cumulative percents of harvest. Table ROD-2 shows the existing direct and indirect effects of timber harvest and road construction by third order or larger watershed during the 15 year period, 1982-1997.

Table ROD-2
**Cumulative Watershed Effects, Percentage of Watershed Harvested and Roaded in Third Order or Larger Watersheds**

| Watershed Number | Watershed Harvested and Roaded 1982-1997 | | | | | |
|---|---|---|---|---|---|---|
| | Alt. 1 | Alt. 2 | Alt. 3 | Alt. 5 | Alt. 6 | Alt. 7 |
| C41B | 0 | 3 | 0 | 1 | 0 | 0 |
| C43A | 0 | 19 | 0 | 19 | 0 | 0 |
| C58A | 0 | 4 | 0 | 0 | 0 | 3 |
| D69B | 0 | 3 | 1 | 2 | 2 | 0 |
| D70C | 0 | 8 | 5 | 6 | 5 | 2 |
| D71A | 0 | 4 | 8 | 11 | 3 | 3 |
| D74A | 0 | 1 | 0 | 0 | 0 | 0 |
| D79A | 10 | 23 | 22 | 18 | 18 | 22 |
| D80B | 0 | 0 | 0 | 0 | 0 | 0 |

SOURCE: Babik, 1996

Another measure of potential risk to fish habitat from timber harvest is the associated new road construction and road reconstruction which cross streamcourses (see Chapter 3-Fisheries). During placement of culverts or bridges, sediment may be introduced into the streams which may have short- or long-term effects on water quality. Alternative 7 proposes the fewest stream crossings, while Alternative 2 proposes the most. This is shown in Table ROD-3.

Table ROD-3
**Stream Crossings to be Constructed**

|  | Alt. 1 | Alt. 2 | Alt. 3 | Alt. 5 | Alt. 6 | Alt. 7 |
|---|---|---|---|---|---|---|
| Class I | 0 | 15 | 11 | 17 | 10 | 8 |
| Class II | 0 | 25 | 11 | 17 | 13 | 1 |
| Class III | 0 | 127 | 72 | 74 | 52 | 3 |
| Total Crossings | 0 | 167 | 94 | 100 | 108 | 12 |

SOURCE: Oien, 1996

Following timber harvest, there is an increased risk of landslides until second growth and the brush layer become firmly established. One way of analyzing this risk is to determine the amount of timber harvest on slopes which have high mass movement index (MMI) soils. This rating does not imply that such a mass-wasting event will occur; rather, it ranks the alternatives on the basis of the potential for a mass-wasting event to occur, which may or may not result in an increase in stream sediment. This increased stream sedimentation may result in some loss or impairment of resident and anadromous fish spawning and rearing habitat. Table ROD-4 displays the proposed harvest on high MMI and very high MMI soils by alternative. Virtually all very high MMI soils have been removed from the timber base. Only those sites that appear to be small inclusions or mistyped have been retained in the unit pool. These sites have been examined by a professional soil scientist as part of unit reconnaissance.

Table ROD-4
**Acres of High Hazard Soils Harvested by Alternative**

|  | Alt. 1 | Alt. 2 | Alt. 3 | Alt. 5 | Alt. 6 | Alt. 7 |
|---|---|---|---|---|---|---|
| High MMI soils | 0 | 520 | 245 | 455 | 231 | 107 |
| Very High MMI soils* | 0 | 0 | 0 | 0 | 0 | 0 |

SOURCE: Babik, 1996

* See Chapter 3-Soils for details of MMI classification

The Carroll Creek and Neets Creek watersheds were evaluated for sediment delivery and depositional potential using a watershed-level analysis (Geier and Loggy, 1995). The watersheds were divided into sub-basins and reaches. Sediment transport and deposition indices were developed based upon watershed morphology, discharge, and potential sediment sources (for a detailed description of this process see FEIS Appendix F, Sediment Transfer and Deposition Analysis Procedure). This sediment transfer index indicates where in a watershed sediment production and deposition is a potential problem for maintenance of aquatic habitat. The quantity of sediment transported and deposited depends upon a number

of factors, including nature of sediment source, stream discharge, and channel morphology. These are factors that resource managers must consider when they undertake activities on areas that are linked to important aquatic habitat.

Results of this sediment transport and deposition risk assessment for roads and units in the Upper Carroll action alternatives indicate that Alternatives 7, 6 and 3 have a lower overall risk of sediment delivery to streams. Alternative 7 harvests the fewest acres, avoids new road construction, utilizes helicopter logging, and avoids most sensitive areas. Alternative 3 reduces overall risk by minimizing harvest unit location and road construction near stream courses in high risk sub-basins and proposing no activities in Neets Creek watershed, and in the west fork of Carroll Creek. Alternative 6 is generally similar to Alternative 3 except that it makes a helicopter entry into the west fork of Carroll Creek. This is somewhat offset by avoiding several units with high sediment deposition index (SDI) ratings in Sub-basin S04. Alternative 5 presents a higher risk of producing sediment that may affect beneficial uses, mainly by proposing road construction and timber harvest in the west fork of Carroll Creek along with helicopter logging in Neets Creek. Alternative 2 poses the highest risk of sediment delivery from road related sediment. It also proposes a number of timber harvest units and roads in the west fork of Carroll Creek, plus the Neets Creek watershed.

**Highlights of the Selected Alternative (3)** include the following:

- Implements the recommendations applicable to project-level planning presented in the Anadromous Fish Habitat Assessment (AFHA) Report.

- Implements 300-foot buffers along Class I anadromous streams.

- Protects water quality at the Southern Southeast Regional Aquaculture Association (SSRAA) Fish Hatchery by avoiding harvest in Neets Creek (VCU 737).

- Reduces overall risk by minimizing harvest unit location and road construction near stream courses in high risk sub-basins and proposing no harvest activities in the Neets Creek watershed, or in the west fork of Carroll Creek.

- Avoids timber harvest on important riparian areas and fens identified as part of the Watershed Analysis. This helps to protect riparian habitat and regulate streamflow.

**Issue 3**

**Recreation and Scenic Quality**
This issue addresses concerns for outdoor recreation and scenic viewing opportunities offered in and around the Upper Carroll Project Area and the effects timber harvest and transportation system development may have upon these opportunities.

The Selected Alternative locates timber harvest within previously unharvested areas and increases development within the existing developed areas. However, the Project Area contains only a small amount of the total recreation opportunities on the Tongass National Forest, and there are similar recreation opportunities nearby. This shift in recreation opportunities is a minor impact when viewed forest-wide.

All alternatives have similar effects on the distribution of Recreation Opportunity Spectrum (ROS) acres within the Project Area.

The current recreation inventory for the Upper Carroll Project Area contains four existing and three proposed Recreation Places. Five of these Recreation Places will not be directly affected by any of the proposed activities in the alternatives. The Selected Alternative has the second lowest amount of timber harvest activities proposed in these Recreation Places with some timber harvest in two of the four existing Recreation Places.

All alternatives meet the visual quality objectives as specified from the priority travel routes and their viewsheds. These priority travel routes and key viewsheds include: (1) Upper Carroll/Shelter Cove; (2) Upper Carroll estuary; and (3) Head of Neets Bay.

**Highlights of the Selected Alternative (3) include the following:**

- Meets the visual quality objectives as specified from the priority travel routes and their viewsheds.

- Avoids impacts to the Neets Bay viewshed and has a relatively low impact to the Upper Carroll Estuary viewshed.

- The application of 1,000-foot estuary, 500-foot beach, and 300-foot anadromous stream buffers serve to help screen management activities and to protect recreational fisheries use.

**Issue 4**

**Wildlife Habitat**

Table ROD-5 displays the potential reduction in wildlife habitat capabilities, as estimated by habitat capability models, for the key Management Indicator Species (MIS) found in the Upper Carroll Project Area. This table displays the 1954 long-term habitat capability and estimated short-term reduction in habitat capability after potential implementation of the alternatives.

The major effect on wildlife habitats in all action alternatives is the reduction of old-growth forest habitat. Impacts to other habitats were reduced by the interdisciplinary design of units prior to alternative formulation. All action alternatives result in impacts consistent with the implementation of the TLMP (1979a, as amended) and Alternative 3 of the March 1996 Revised Supplement Draft TLMP EIS (RSDEIS), Standards and Guidelines. The Selected Alternative identifies old-growth retention as per TLMP 1979a in a fashion which incorporates the viable population strategy consistent with the VPOP Committee Report and the TLMP RSDEIS (1996a) Preferred Alternative.