| | |
|---|---|
| **Environmentally Preferred Alternative** | There is no single factor that can be used to determine which alternative is environmentally preferred. Maintaining the basic productivity of the land and the quality of lifestyle of the local residents are vitally important.<br><br>Alternative 1, the No-Action/No Further Harvest alternative, would cause the least environmental disturbance and is therefore the environmentally preferred alternative. This is based on the comparison of all the alternatives shown in the Table ROD-11 and as displayed in Chapter 3 of the FEIS.<br><br>All alternatives considered in detail have varying levels of environmental effects depending on what issue is addressed. The Selected Alternative and Alternative 7 would cause the least adverse environmental effects. The Selected Alternative has significantly less effects for most resources due to building less road, deferring harvest in significant old-growth blocks, and crossing fewer large streams. Alternative 7 also has significantly less effects for most resources due to no new road building (reconstruction of existing road only), and having the least impact on areas identified with subsistence use and fisheries concerns. However, Alternative 7 does not defer harvest in units located in the West Fork of Carroll Creek as well as the portion of the Naha which is designated as LUD IV. |
| **Administrative Record** | The Administrative Record for this project includes the Draft EIS, Final EIS, Tongass Land Management Plan (1979a), TLMP RSDEIS (1996a), Alaska Regional Guide, and all material incorporated by reference including the planning record. |

## Mitigation

Mitigation measures are prescribed to avoid, reduce, minimize, or eliminate the adverse affects of actions. These measures were applied in the development of the project alternatives, including the Selected Alternative, and in the design of the harvest units and road corridors. The Mitigation Measures section of Chapter 2 of the FEIS discusses the mitigation measures for all alternatives.

Mitigation measures applicable to the Selected Alternative include those contained in the Standards and Guidelines of the Tongass Land Management Plan (1979a), TLMP RSDEIS (1996a) Preferred Alternative, Alaska Regional Guide, and applicable Forest Service Manuals and Handbooks. The ROD Appendices 2 and 3 include Unit Design and Road Cards which incorporate site-specific mitigation and are adopted as part of this decision. Integrated silvicultural prescriptions will be developed which will further specify mitigation direction for each unit.

All practical measures have been adopted to avoid or minimize adverse environmental effects of the Selected Alternative. Measures have been included to protect, enhance, and restore resources affected by timber harvest and related actions. The Forest Service has the authority, through the timber sale contract and other permit requirements or authorities, to enforce and implement adopted mitigation measures and monitoring necessary to ensure the effectiveness of the mitigation. The following mitigation measures are authorized for application to the Upper Carroll Project Area.

### Water Quality, Fish Habitat, Wetlands

Mitigation to protect water quality, fish habitat, and wetlands includes application of the Best Management Practices (BMPs) stated in the Soil and Water Conservation Handbook (USDA FSH 2509.22). This handbook provides standard operating procedures for all stream classes. In addition, the TTRA mandates a minimum 100-foot buffer on all Class I streams and on Class II streams that flow directly into Class I streams. The width of this buffer strip may be greater than 100 feet for reasons such as topography, riparian soils, a windfirm boundary,

timber stand boundaries, logging system requirements, and varying stream channel locations. In addition, certain Class III streams flow directly into or have been identified as influencing Class I streams. These Class III streams have been buffered to the slope break of the channel or to a windfirm boundary to protect water quality. Split yarding or full suspension was built into the logging and transportation design process, as was partial and full suspension over wetland soils or soils with a higher mass movement potential. Direct in stream impacts are minimized through road construction timing and fish passage requirements on certain Class I and II streams. Refer to FEIS Appendix F (Watershed Report) for the rationale and to ROD Appendices 2 and 3 (Unit Design and Road Cards) for the unit-specific stream buffering, suspension, passage, and timing requirements being applied. Application of BMPs and adherence to the TTRA requirements will protect water quality fish habitat and wetlands as well as riparian habitat important to other species such as deer, bear, and furbearers.

### Anadromous Fish Habitat
Class I anadromous streams will receive a minimum 300-foot no-cut buffer. Where practical, roads, tail holds, and guy-circles will be located outside this stream buffer.

### Beach Fringe and Estuaries
Beach fringe and estuaries will receive 500-foot and 1,000-foot no-cut buffers respectively. When practical, roads, tailholds, and guy-circles will be located outside these buffers.

### Temperature Sensitive Streams
While required buffers will mitigate most temperature sensitivity concerns, there still is concern about providing topographic shading to Class III streams that flow through harvest units. FEIS Unit 16 (ROD Unit No. C23) has characteristics (south aspect, lack of immediate downstream forested stream buffers, historical, and continued harvest activities, etc.) that may contribute to the temperature sensitivity of nearby streams. Following completion of the watershed analysis, buffers were placed on streams as needed to meet water quality objectives including water temperature.

### Cavity and Snag-dependent Wildlife
Provide habitat requirements for cavity and snag-dependent wildlife species by retaining reserve trees within all land use designations as outlined in the TLMP RSDEIS (1996a). To provide for adequate distribution of snags within VCUs which have marginal numbers of snags, the following units will have small 0.1 acre (or larger) snag patches distributed throughout the unit at a rate of 0.1 acre per 10 acres of unit. The location of these snag patches will be determined during layout or sale administration, and will be designed in such a fashion as to not impose undue safety hazards on logging contractors.

Guidelines for placement of snag patches and old-growth islands include:

- Areas where wildlife use is concentrated (determined during reconnaissance).
- Selected areas should be at least 100 feet away from unit boundary (unless the unit boundary is an existing second-growth stand; then the patch or island can be placed along the unit boundary).
- Patches or islands can be placed along split yard sections of harvest units, particularly split yard streams.
- Snag patches or old-growth islands can be incorporated into stream buffers.
- Snag patches or old-growth islands can be placed along boundaries of muskegs.

FEIS Unit 20 (ROD Unit C13) will employ these snag recruitment techniques.

**Goshawks**

Region 10 goshawk management guidelines in effect at the time of unit release will be followed. Goshawk guidelines in the TLMP RSDEIS (1996a) call for maintaining the following conditions:

> Nest Stand—Maintain an area of at least 25 acres around the confirmed nest tree (and probable nest tree if identified) and attempt to include prey handling areas, perches, and roosts. Vegetative structure objectives generally include a multi-layered, closed (over 60 percent) forest canopy, a relatively open understory, with large trees (usually greater than 20 inches DBH) and low ground vegetation. These structural characteristics generally equate to Volume Class 5 and higher in the timber resource inventory.
>
> > Management—No vegetative manipulation or new road construction is permitted. Existing roads may be maintained. Permit no continuous disturbance likely to result in nest abandonment within the surrounding 600 feet from March 15 to August 15. Activity restrictions are removed for active nests that become inactive or unsuccessful.
>
> Nesting Habitat—Maintain an area of not less than 75 acres surrounding the nest stand (total management of 100 acres). Include inactive nest stands, hiding cover and foraging opportunities for young goshawks. Vegetative structure is similar to the nest stand but may include some intermediate canopy (e.g. Volume Class 4).
>
> > Management—No commercial timber harvest is permitted within the nesting habitat. New road construction is permitted (outside the nest stand) if no other reasonable roading alternatives outside the mapped nesting habitat exist.

A recent sighting of a goshawk was made during field reconnaissance of a portion of the West fork of Carroll Creek (this is within the boundary of the old-growth small habitat reserve block). The area has since been revisited in an attempt to establish the location of a potential nesting site. Although a nest was not located, the area will continue to be monitored for goshawk activity. All new nests discovered during field reconnaissance or unit layout will be protected by implementing the above measures or the Region 10 goshawk management guidelines in effect at the time of unit release.

**Marbled Murrelets**

Due to the limited information available on nesting habitat requirements of marbled murrelets, any nests located during field reconnaissance or unit layout will be assessed on a case-by-case basis.

A 600-foot, generally circular, radius of undisturbed forest habitat surrounding identified murrelet nests will be maintained. Disturbance activities within this buffer will be minimized during the nesting season (May 1 to August 15). The Buffer zone will be maintained and the site monitored for nesting activity for not less than two nesting seasons after nest discovery. The buffer protection may be removed if the site remains inactive for two or more consecutive nesting seasons.

**Trumpeter Swans**

Timber harvest units that are within a half mile of Carroll Inlet estuary will allow harvest and road construction activities from April 1 to October 31. During the remainder of the year harvest and road construction may occur if swans are not present. This affects the following ROD units:

| ROD Unit No. | Corresponding FEIS Unit No. |
|---|---|
| C07 | 35 and 38 |
| C08 | 3, 27, and 28 |
| C09 | 40 and 41 |
| C11 | 47 and 49 |

Log transportation (hauling) and LTF operation within a half mile of Carroll Creek estuary would be prohibited during January and December of each year.

**Bald Eagle Nests**

Road construction activities that are within a half mile of bald eagle nests will usually have blasting restricted to the period of September 1 to February 28. If the nest is unoccupied, normal blasting procedures are also permitted from June 1 to August 31, if there is no direct danger to eagles, nests, eagle nest trees, or other eagle habitat elements. Blasting within one-half mile of an active eagle nest is only allowed if: (1) the blasting can be accomplished in accordance with the requirements of the Bald Eagle Protection Act; (2) written coordination with the U.S. Fish and Wildlife Service has occurred; and (3) the results of the interagency coordination is documented.

**Whale Habitats**

The following Forest-wide standards and guidelines have been developed for application on all Forest Service permitted or approved activities and have been incorporated by reference into the Upper Carroll DEIS from the TLMP RSDEIS (1996a):

- Provide for the protection and maintenance of whale habitats.
- Ensure that Forest Service permitted or approved activities are conducted in a manner consistent with the Marine Mammal Protection Act, the Endangered Species Act, and National Marine Fisheries Service regulations for approaching whales, dolphins, and porpoise.

**Marine Mammals**

Forest-wide standards and guidelines direct the Forest Service to prevent and/or reduce potential harassment of sea lions and other marine mammals due to activities carried out by or under the jurisdiction of the Forest Service. These have been incorporated by reference into the Upper Carroll FEIS from the TLMP RSDEIS (1996a). These Forest-wide standards and guidelines to provide for protection and maintenance of harbor seal, Steller sea lion, and sea otter habitats are as follows:

1. Ensure that Forest Service permitted or approved activities are conducted in a manner consistent with the Marine Mammal Protection Act and the Endangered Species Act.

2. Locate facilities and concentrated human activities requiring Forest Service approval as far from known marine mammal haulouts, rookeries and known concentration areas as practicable. The following distances are provided as general guidelines for maintaining habitats and reducing human disturbance:

   - Facilities, camps, LTFs, campgrounds and other developments should be located one mile from known haulouts and farther if the development is large.

- Individuals associated with Forest Service permitted or approved activities will not intentionally approach within 100 yards, or otherwise intentionally disturb or displace any hauled-out marine mammal.

### Waterfowl

The standards and guidelines for waterfowl from the TLMP RSDEIS (1996a) are incorporated by reference into the Upper Carroll EIS. Significant waterfowl areas include Carroll Inlet Estuary and Neets Bay. These habitats will be maintained through the protection of the 1000-foot estuary buffer. Activities are located as far from these areas as feasible. Disturbance to waterfowl will be minimized by the mitigation for protecting trumpeter swans (see above).

### Heron and Raptor Nest Protection

- Any active heron rookeries or raptor nests will be protected with a 600-foot windfirm buffer of old-growth habitat. Disturbance will be minimized during the active nesting season (generally March 1 to July 31) on a case by case basis.

- The nests will be monitored annually for two years after discovery of the active nest. If the nest remains inactive for two consecutive years, protection measures for the site will be removed.

### Alexander Archipelago Wolf

- A 600-foot windfirm buffer will be maintained around active wolf dens. Road construction within the buffer will be discouraged and alternate routes explored.

- The den will be monitored for at least two consecutive years and if the den becomes inactive, then buffer restrictions can be removed.

### Mountain Goat

- Aircraft flights, including helicopter yarding of timber, will seek to avoid mountain goat kidding areas from May 15 through June 15. Flights should maintain a 1,500-foot vertical or horizontal distance from traditional summer and kidding areas and animals.

- Restrict blasting within one mile of known mountain goat kidding areas from May 15 through June 15.

### Subsistence

Because most subsistence use involves harvesting fish and game, mitigation measures that protect or enhance fish and game resources will also protect and enhance subsistence activities. By placing units and roads away from beach and estuary fringe habitats, and away from salmon bearing streams, mitigation measures were built into each of the alternatives considered in the FEIS. Road management objectives (closures) were also heavily influenced by the desire of subsistence hunters to limit access.

### Scenic Quality

Effects of timber harvest on views from anchorages and known recreational day use areas have been reduced by leaving buffers of timber along the beaches and inland lakes. The adopted visual quality objectives for this plan emphasize the protection of the visual resource as viewed from saltwater, particularly in Carroll Inlet. Protecting these viewsheds will reduce the direct effects on visual quality. Stream riparian buffers will protect fisheries habitat and sport anglers use of Class I and II streams in the Project Area.

### Cultural Resources
Potential effects on cultural resources have been minimized by excluding project activities from most high probability areas (exceptions are LTFs, camps, a small number of units, and access roads to these facilities). The high probability areas were all surveyed in 1994 and 1995, except for exact road locations which cannot be precisely determined until after unit and road layout occurs. Types of mitigation measures include avoidance, protective enclosures, monitoring of harvest activities, restrictions on size or road location, and recovery and documentation of materials.

### Sensitive Plants
Choris Bog Orchid (Platanthera chorisana) is a designated sensitive species. Six populations of this species were discovered in muskeg openings during botanical surveys of the Project Area conducted in 1995. Populations were found within the vicinity of FEIS Units 20 and 59 (ROD Units C13 and C19) and adjacent to a small pond in the Carroll Creek drainage. The primary risk of perturbation to these populations will be through road construction activities. Road locations have been adjusted to avoid direct impacts to known locations of Choris Bog Orchid.

### Fisheries
Design stream crossings to provide fish passage for anadromous and resident fishes. This applies to proposed new road construction or major road reconstruction crossing Class I and II streams. (See ROD Appendices 2 and 3, Unit Design and Road Cards.)

Time road construction activities within all Class I and some Class II streamcourses to protect spawning adult fish and their eggs and fry from disturbance. This means instream road construction activities must be conducted during time periods that would not cause reductions in egg or fry survival or disturb spawning adults. Generally road construction activities adjacent to streams will be restricted to the time period May 15 to August 15.

Split yard or fully suspend logs on all identified streamcourses that require additional protection to maintain streambank stability and prevent stream sedimentation.

### Soils
Reduce the potential for landslides by providing for full bench road construction and end haul of waste in areas with very high potential for mass movement, as well as in other areas as determined by geotechnical engineers.

Another means of reducing the landslide potential is to maintain partial log suspension on all slopes with high mass movement potential. Ground disturbance should not exceed 10 percent.

### Log Transfer Facilities
For National Forest permitted LTFs, the grade of the working surface shall be constructed to back drain water away from the working face toward filter strips or collection/settling basins. Clean up of bark and debris will occur on a frequent basis in accordance with the necessary EPA permits.

### Regeneration
It is desirable to maintain the cedar component in stands where it naturally occurs. Because cedar tends to regenerate poorly following clearcut harvest in some stands, it is desirable to not harvest the mature cedar but to retain that vegetative structure for biodiversity and to establish cedar regeneration. Silvicultural methods such as seed tree or shelterwood harvest are appropriate to meet specific resource objectives. Areas identified to be best suited for cedar regeneration include units within the cedar or mixed conifer plant association that are proposed for helicopter yarding and have either elevations over 1,200 feet (on north and east aspects) or over 1,500 feet (on south and west aspects). Specific units or parts of units

identified as meeting this criteria include approximately 15 acres in FEIS Units 35, 38, and 74 (ROD Units C07 and C28).

Problems establishing adequate natural regeneration because of aspect or indigenous plant association may be mitigated by supplemental hand planting. Hand planting will be done on approximately 198 acres or as necessary within units identified in FEIS Appendix I to insure regeneration within five years after timber harvest as required under NFMA.

**Caves/Karst**
There are no known occurrences of carbonate rock (Berg 1988) and associated cave resources within the Project Area. Field reconnaissance also failed to identify any occurrences in this area.

The potential for identifying significant cave resources within the Project Area during implementation is extremely low. However, if cave resources are identified that may be affected by the proposed activities, the cave/karst mitigation measures in effect at that time will be applied.

# Monitoring and Enforcement

A monitoring program is the process by which the Forest Service can evaluate whether or not the resource management objectives of the FEIS have been implemented as specified and whether or not the steps identified for mitigating the environmental effects were effective. Three levels of monitoring are recognized. The first level or implementation monitoring is generally feasible at the project level. The second level or effectiveness monitoring is generally conducted on an Area-wide basis, however some project specific effectiveness monitoring is occasionally conducted to address specific needs (see FEIS Chapter 2 - Monitoring). The third level, validation monitoring, is conducted at the Regional or forest-wide level.

One major objective of this strategy is to do initial implementation and effectiveness monitoring of Forest Service BMPs. The Tongass National Forest is currently developing a BMP monitoring strategy and action plan to achieve this objective. BMP monitoring in the Upper Carroll Project Area will follow the general guidelines outlined in this action plan. BMPs to be monitored at a specific site are determined through a review of unit/road cards, fish habitat reports, and other appropriate documentation.

Applicable monitoring requirements are specified at the end of Chapter 2 of the FEIS. For each monitoring item, an objective, desired result, method of measurement, and evaluation (or threshold and corrective action) are identified, along with identification of the responsible staff. Monitoring activities may reveal results that deviate from planned effects, in which case corrective actions are prescribed.

The Ketchikan Area Forest Supervisor is responsible for ensuring that project implementation, mitigation, monitoring, and enforcement is accomplished as specified.

# Findings Required By Law

**National Forest Management Act**

The National Forest Management Act (NFMA) requires specific determinations in this Record of Decision including consistency with existing Forest Plans and Regional Guides. It also requires a determination of clearcutting as the optimal method of harvesting and specific authorization of clearcuts over 100 acres in size.

### Tongass Land Management Plan and Alaska Regional Guide

This decision is consistent with the Alaska Regional Guide and the Tongass Land Management Plan (1979a). I have reviewed the management direction, standards and guidelines, and the schedule of activities for the VCUs included in the Selected Alternative, and find the Selected Alternative to be consistent with these elements. The areas of undisturbed old-growth wildlife habitat maintained in this alternative exceed the standards for retention established in the TLMP.

Although not required, the activities authorized in this decision are consistent to the extent practicable with the proposed standards and guidelines and management prescriptions of the TLMP RSDEIS (1996a) Preferred Alternative.

### Clearcutting as the Optimal Method of Harvesting

The Alaska Regional Guide established silvicultural and management standards for the western hemlock-Sitka spruce forest type (Alaska Regional Guide, page 3-18). Even-aged management in the form of clearcutting is, according to the Regional Guide, to be used where (1) the management objective is to meet timber production objectives established in the Forest Plan, (2) where there is a risk of dwarf mistletoe infestation, and (3) where risk of windthrow is determined to be high. Harvest units in the Selected Alternative are within LUD IV lands and have a moderate to high risk of windthrow. Most units in the Selected Alternative are prescribed for clearcut harvest. Clearcutting of these harvest units will meet the objective of maintaining fast-growing, mistletoe-free stands of mixed species and is the optimum method of harvesting, considering the following factors referenced in the Alaska Regional Guide:

1. The thin bark and shallow roots of hemlock and spruce make them particularly susceptible to logging injury, which leads to decay. Losses from decay fungi are high, especially in the old-growth forests of Alaska. Conversion from old- to young- growth by clearcutting has the greatest potential for reducing decay.

2. Hemlock dwarf mistletoe, *Arcenthobium tsugense*, a common disease of western hemlock, can best be controlled by clearcutting. Elimination of residual overstory trees infected with dwarf mistletoe prevents infestation of western hemlock in the new stand.

3. Exposure to the sun raises soil temperature, which speeds decomposition, thereby improving the productivity of most sites.

4. Clearcutting favors regeneration of Sitka spruce by destroying advance hemlock regeneration and by creating more favorable conditions for post-logging reproduction of spruce.

5. Risk of blowdown in residual stands is eliminated. The chance of blowdown along cutting boundaries is increased but can be reduced through proper design of cutting units.

6. Natural seed fall is generally adequate for regeneration and most young stands are dense.

7. Logging costs are lower than with other systems.

On June 4, 1992, F. Dale Robertson, former Chief of the Forest Service, issued a letter to Regional Foresters and Station Directors on the subject of Ecosystem Management of the National Forests and Grasslands. As part of this letter, an attachment was included regarding clearcutting on National Forest System lands and the use of other silvicultural systems. Specific items are listed which describe circumstances where clearcutting is appropriate. Within the FEIS for Upper Carroll, a discussion of alternatives considered is displayed. Where clearcutting is specified as the preferred regeneration harvest, documentation is provided for the reasons clearcutting is appropriate, and reference is made to the appropriate items in the Chief Robertson's letter which apply. Considering these factors, clearcutting, as applied in the Selected Alternative is appropriate and consistent with the criteria in the letter.

### Clearcuts Over 100 Acres in Size
There is one unit which exceeds 100 acres. In addition, ROD Unit C05 (20 acres) will result in a created opening of approximately 135 acres in combination with previous harvest units. FEIS Appendix B includes a table that displays units or combinations of units and lists the reasons for exceeding 100 acres. Units over 100 acres were displayed for public review and comment for more than 45 days after release of the DEIS. This 45-day public comment period met the requirements of the Alaska Regional Guide for approval of units over 100 acres. These units are authorized for harvest as designed based on public review and the statements of reasons listed for the units greater than 100 acres in Appendix B of the FEIS.

## Tongass Timber Reform Act

Harvest units were designed and will be located to maintain a minimum 100-foot buffer zone for all Class I streams and Class II streams which flow directly into Class I streams as required in Section 103 of the TTRA. As discussed previously in the Mitigation section of this ROD, the actual widths of these buffer strips will often be greater than the 100-foot minimum. The design and implementation direction for the Selected Alternative incorporate BMPs for protection of all stream classes.

### Proportionality—Original Method
Section 301(c)(2) of the TTRA modified the KPC Long-term Timber Sale Contract to require proportional harvest of timber Volume Classes 6 and 7. Analysis of the proportion of Volume Classes 6 and 7 planned for harvest was performed for the Upper Carroll Project. It was determined that upon completion of the Selected Alternative's harvest, proportionality consistent with the requirements of the TTRA for Management Areas K32 and K35 will result.

Using the Timber Type Map (TIMTYP) Proportionality Analysis Method outlined in FSH 2409.18-93-3 (1993), the proportion of Volume Classes 6 and 7 were calculated for Management Areas K32 and K35. The change in proportionality from the base percentage of 1990, resulting from harvest activity since 1990, and the change from the 1990 base resulting from the subtraction of the proposed harvest acres for each alternative are displayed in Table ROD-12. The base proportions presented here are different from that presented in the Forest Service Handbook. This difference is due to the use of project-specific information, updated GIS coverages for the Project Area, and an analysis based on polygon coverages rather than point grid coverages. As such, it represents an incremental improvement to the proportion presented in the Forest Service Handbook. Selection of FEIS Alternative 1 (No Action) would maintain the existing proportion identified as of December 31, 1994, for Management Areas K32 and K35.

The Selected Alternative in Management Areas K32 and K35 will continue to meet the proportionality base proportions of 8.82 and 5.39 percent using Proportionality Analysis Method FSH 2409.18-93-3 (1993). For Management Area K32, the Selected Alternative exceeds the base proportion by a difference of +0.02 percent. For Management Area K35, the Selected Alternative exceeds the base proportion by a difference of +0.16 percent.

In the following table, alternatives are within the required proportion if the "change from base" value is positive. If the "change from base" value is negative, the alternative is considered out of proportion.

**Table ROD-12**
**Proportion of Volume Classes 6 and 7 Proposed for Harvest by Management Area as Described by Proportionality Analysis Method FSH 2409.18-93-3**

|  | Total Timber Base (acres) | Class 6 & 7 (acres) | Proportionality (percent) | Difference (percent)1/ |
|---|---|---|---|---|
| **Management Area K32** | | | | |
| TTRA Baseline (on November 28, 1990) | 83,049 | 7,328 | 8.82 | |
| Post TTRA Harvest | 76,084 | 6,812 | 8.95 | +0.13 |
| Selected Alternative | 75,060 | 6,637 | 8.84 | +0.02 |
| **Management Area K35** | | | | |
| TTRA Baseline (on November 28, 1990) | 47,314 | 2,552 | 5.39 | |
| Post TTRA Harvest | 46,058 | 2,552 | 5.54 | +0.15 |
| Selected Alternative | 46,008 | 2,552 | 5.55 | +0.16 |

SOURCE: Nightingale, Marks, 1996

1/ A positive difference indicates that the percent of Volume Classes 6 and 7 remaining in the Management Area is higher than the TTRA baseline. A negative difference indicates a lower percentage than the TTRA baseline.

**Proportionality**

**Litigation Settlement**
An updated approach to determining proportionality is currently being negotiated by the Forest Service. Until a final agreement is reached, and updated FSH guidelines are established, the Upper Carroll FEIS proportionality analysis will follow the procedures originally established in the FSH as well as the Transition Method shown in Table ROD-13 that was developed by Wilson in 1994. Settlement agreement and revised FSH may require further assessment of the Upper Carroll proportionality analysis for the preferred alternative.

**Transition Proportionality Analysis Method**
The Transition Proportionality Analysis Method developed by Wilson and Golnick in 1994 is also used to measure the proportionality within Management Areas K32 and K35. This method was developed in response to a lawsuit against the Forest Service challenging the use of TIMTYP and acres rather than volume to calculate the proportionality of harvest. The Interim Method uses the methodology of adjusting the total acres of each volume class to correct for indicated inaccuracies in the TIMTYP mapping of volume classes present at the local level. This adjustment is based on previously collected field data for each Administrative Area. The acres in each volume class are then multiplied by the average volume per acre for each volume class (also based on Administrative Area field data) to calculate the total volume present in each volume class. The volume of Volume Classes 6 and 7 is then divided by the total volume present in Volume Classes 4 through 7 to determine the proportion of high volume with the management area.

This approach differs from the acreage-based approach in two ways. First, this approach uses volume instead of acres to determine the proportion. Second, the process includes an adjustment to account for incorrectly mapped stands in all volume classes. Because this

approach is based on volume, and volume per acre varies between volume classes, harvest of Volume Class 7 acres will have a greater effect on proportionality than harvest of Volume Class 6 acres. Similarly, harvest of Volume Class 5 will be more effective in meeting the proportionality requirement, acre per acre, than the harvest of Volume Class 4.

Table ROD-13 displays the proportionality for the selected alternative using the transition method developed by Wilson and Golnick.

Table ROD-13
**Proportion of Volume Classes 6 and 7 Proposed for Harvest by Management Area as Described by Transition Proportionality Analysis Method**

|  | Total Timber Base (MBF Vol)1/ | Class 6 & 7 (MBF Vol) | Proportionality (percent) | Difference (percent)2/ |
|---|---|---|---|---|
| **Management Area K32** | | | | |
| TTRA Baseline (on November 28, 1990) | 2,120,769 | 789,617 | 37.2 | |
| Post TTRA Harvest | 1,943,069 | 732,155 | 37.7 | +0.4 |
| Selected Alternative | 1,915,206 | 724,584 | 37.8 | +0.6 |
| **Management Area K35** | | | | |
| TTRA Baseline (on November 28, 1990) | 1,126,040 | 243,088 | 21.6 | |
| Post TTRA Harvest | 1,098,803 | 243,088 | 22.1 | +0.5 |
| Selected Alternative | 1,097,799 | 242,921 | 22.1 | +0.5 |

SOURCE: Nightingale, Marks, 1996

1/ Total Timber Base volumes derived from TIMTYP Data Layer using Transition Method of adjustment.
2/ A positive difference indicates that the percent of Volume Classes 6 and 7 remaining in the Management Area is higher than the TTRA baseline. A negative difference indicates a lower percentage than the TTRA baseline.

**Endangered Species Act**

Actions authorized in the Selected Alternative are not anticipated to have a direct, indirect, or cumulative affect on any threatened, endangered or sensitive species in the Upper Carroll Project Area. A complete biological assessment is included in Appendix D of the FEIS. I have determined that this action will not have any adverse impacts on any threatened or endangered species.

**Bald Eagle Protection Act**

Management activities within 330 feet of an eagle nest site are restricted by a Interagency Agreement between the Forest Service and the U. S. Fish and Wildlife Service to facilitate compliance with the Bald Eagle Protection Act. The Selected Alternative includes no road construction within 330 feet of a known bald eagle nest.

| | |
|---|---|
| **Clean Water Act** | The design of harvest units and roads for the Selected Alternative were guided by standards, guidelines, and direction contained in the current TLMP, the TLMP RSDEIS (1996a), Alaska Regional Guide, and applicable Forest Service manuals and handbooks. The ROD Appendices 2 and 3, Unit Design and Road Cards, contain specific details on practices prescribed to prevent or reduce non-point sediment sources. Reasonable implementation with site-specific application and monitoring of approved BMPs is expected to comply with applicable State Water Quality Standards Regulations. These regulations provide for variances from anti-degradation requirements and water quality criteria. The harvest and road-building operators will be responsible for compliance, including obtaining any variance required by the State, and will be monitored for compliance by the Forest Service. The Forest Service expects Upper Carroll Project Area activities will fully qualify for any variance required by the State, according to the criteria in 18 AAC 70.015. |
| | A monitoring plan to detect and evaluate possible effects of bark accumulations, oil sheens, and surface runoff will be implemented as a part of permitting processes for log transfer facilities (BMP 14.4, FSH 2509.22). |
| **National Historic Preservation Act** | Cultural resource surveys of various intensities have been conducted in the Project Area. The State Historical Preservation Officer has been consulted, and the provisions of 36 CFR part 800 are being complied with. Forest Service timber sale contracts contain enforceable measures for protecting any undiscovered cultural resource that might be encountered during sale operations. No ground-disturbing activities associated with this action will occur before a cultural resource clearance for a specific area has been given. I have determined, consistent with the Forest Service direction on cultural resources, that there will be no significant effects on cultural resources. We have completed the Section 106 review for all timber harvest related activities displayed in the Final Environmental Impact Statement. This includes roads, units, and LTFs in all alternatives. |
| **Federal Cave Resource Protection Act of 1988** | The actions in the Selected Alternative will not have a direct, indirect, or cumulative effect on any significant cave in the Upper Carroll Project Area. No cave resources have been documented in the Project Area and no caves were discovered during field work done for this analysis (FEIS, Chapter 3). |
| **ANILCA Section 810** | **Subsistence Evaluation and Findings**<br>A subsistence evaluation was conducted for the five alternatives considered in detail for the proposed action in accordance with ANILCA Section 810. Open houses followed by ANILCA Section 810 hearings were held in Ketchikan and Saxman. The results from the subsistence hearings were incorporated into the development of the Selected Alternative. |
| | The evaluation of comments from the public, subsistence hearing testimony, and additional analysis indicates that the potential foreseeable effects from the action alternatives in the Upper Carroll Project Area do not indicate a significant possibility of a significant restriction of subsistence uses for bear, furbearers, marine mammals, waterfowl, salmon, other finfish, shellfish, and other foods such as berries and roots. |
| | The analysis does conclude that there is a significant possibility of a significant restriction on subsistence use of Sitka black-tailed deer in the Project Area for the community of Ketchikan and Saxman. Implementation of the Selected Alternative by itself does not present a significant possibility of a significant restriction to subsistence use of deer. The effects of the Selected Alternative on the subsistence use of deer are minimal, with a reduction in deer habitat capability within the Project Area of less than 5 percent. However, there is a significant possibility of a significant restriction when the Selected Alternative together with other past, present, and future actions are considered in a cumulative manner. This restriction exists regardless of which alternative is implemented, including the FEIS No Action Alternative. This restriction would be a result of (1) a decrease in habitat capability that could decrease the abundance or distribution of deer, (2) high deer mortality during severe winters that occur periodically, (3) average yearly deer harvest levels exceeding what appears to be |

sustainable harvest levels, and (4) anticipated human population growth with its associated increase in subsistence hunter demand when compared to the habitat capability to produce deer.

### Subsistence Determinations

Section 810 of ANILCA requires that when a use, occupancy, or disposition of public lands would significantly restrict subsistence uses, determinations must be made that (1) the significant restriction of subsistence uses is necessary, consistent with sound management of public lands, (2) the proposed activity involves the minimum amount of public lands necessary, and (3) reasonable steps will be taken to minimize adverse impacts on subsistence uses and subsistence resources resulting from the action.

### Necessary, Consistent with Sound Management of Public Land

The Selected Alternative has been examined to determined whether the associated potential restriction to subsistence use is necessary, consistent with the sound management of public lands. Standards used for the review included: (1) the Multiple Use Sustained Yield Act of 1960; (2) the National forest Management Act (NFMA) of 1976 and its implementing regulations; (3) the Alaska National Interest Lands Conservation Act (ANILCA) of 1980; (4) the Alaska Regional Guide (1983); (5) the Tongass Land Management Plan of 1979 (as amended) and the draft revision; (6) the Tongass Timber Reform Act (TTRA) of 1990; (7) the Alaska State Forest Practices Act; (8) the Alaska coastal Zone Management Program; (9) Subsistence Management and Use Handbook (1985); and (10) Subsistence Evaluation and Finding (FSH 2609.25).

ANILCA placed an emphasis on the maintenance of subsistence resources and life-styles. However, the Act also provided for adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people, and recognized public lands necessary and appropriate for more intensive uses. The Act also required the forest Service to make available for harvest 4.5 billion board feet of timber per decade from the Tongass National Forest. The TTRA removed the 4.5 billion board foot requirement from ANILCA, but directed the Forest Service to seek to meet market demand for timber to the extent consistent with providing for the multiple use and sustained yield of all renewable forest resources, and subject to applicable law.

The Selected Alternative is necessary as a component of the timber management program designed to meet KPC Long-term Sale Contract requirements, implement the Forest Plan, and meet TTRA direction. KPC Long-term Sale Contract offerings made from the project will contribute to meeting KPC contract obligations. There is currently a generally strong market demand for timber, a limited timber supply from other sources, and an under-utilized mill capacity in the region. The Selected Alternative provides the most volume to contribute to the Forest Service's actions to seek and meet market demand while providing for other resources and uses. Current timber market analysis indicates that the timber demand exceeds the timber supply. The timber volume provided by the Selected Alternative will best help to bridge that gap. This volume serves as a component of the ten year timber sale schedule which attempts to provide timber to industry in an even timber sale flow over the planning cycle. The timber volume is also a substantial component of the timber sale program to be offered in the next five years on the Ketchikan Area to meet annual market demand. Timber volume from other areas of the Tongass National Forest is not available to replace this volume in a reasonable time frame.

Of the action alternatives, the Selected Alternative best meets the objectives of the KPC Contract, Forest Plan, and TTRA for timber harvests while also providing protection measures for forest resources. It is consistent with the Forest Plan, laws, regulations, policies, public needs, and the capabilities of the land.

Based on a review of the subsistence hearing testimony and the analysis conducted in the FEIS, it is apparent that all of the action alternatives involve some potential impact to

subsistence deer use in the future There is no alternative that would meet KPC Contract, TLMP, and TTRA objectives and yet avoid a significant possibility of a subsistence restriction somewhere in the Tongass National Forest. Therefore, based on the analysis of the information presented in the FEIS and this ROD, it is my determination that the Selected Alternative is necessary, consistent with sound management of public lands and strikes the best balance between meeting the needs of the public and protecting forest resources.

**Amount of Land Necessary to Accomplish the Purpose of the Proposed Action**
The amount of public land involved to implement the Selected Alternative is (considering sound multiple-use management of public lands) the minimum necessary. The Upper Carroll Project Area was selected to become part of the timber sale schedule because it is designated as a multiple use area that permits timber harvest in the Forest Plan. The TLMP assigned a land use designation (LUD) of IV to approximately 100 percent of the Upper Carroll Project Area. This designation provides for intensive resource use and development with an emphasis on commodity resources such as timber. In addition, the TLMP schedules timber sale preparation for both Management Areas in the Project Area. The Upper Carroll Project Area is located partially within the KPC Primary Sale Area; the remainder is located within the Contract Contingency Area.

The Project Area is located in an area that has been harvested twice. This includes harvest from 1954 in VCU 744 and more recent harvest in VCU 746 (Shelter Cove). The Selected Alternative has two proposed sale areas which will utilize existing LTF sites (one requires reconstruction). The Selected Alternative also provides a sound location and design for all harvest units and roads. The minimum amount of land and roading was used to resolve resource concerns while meeting the purpose and need for the project in a practical and efficient manner. The Selected Alternative harvests less than 5 percent of the inventoried old-growth forest within the Project Area and less than 14 percent of the commercial forest land. Resources were protected to the maximum extent practicable.

Choosing an alternative other than the Selected Alternative (including the No Action Alternative) or locating the harvest in another location on the Ketchikan Area would not avoid or substantially lessen the risk to subsistence use in the future. The total deer habitat capability within the Project Area, projected into the future, is only expected to be reduced by less than 5 percent by harvest from the Selected Alternative when compared to the No Action Alternative. The risk to subsistence use in the future is primarily a result of (1) a decrease in habitat capability that could decrease the abundance or distribution of deer, (2) average yearly deer harvest levels exceeding what appears to be sustainable harvest levels, and (3) anticipated human population growth with its associated increase in subsistence hunter demand when compared to the habitat capability to produce deer. These effects are independent of the Upper Carroll Project.

The entire Tongass National Forest is used by one or more rural communities for subsistence purposes for deer hunting (TRUCS, Forest Service 1990b). The areas of most subsistence use are the areas adjacent to existing road systems, beaches, and the areas in close proximity to the communities. Much effort was taken to protect the highest value subsistence areas. For example, beach fringe is one of the most highly used subsistence areas and there is no timber harvest planned in the beach fringe by the Selected Alternative.

Management activities can not completely avoid these subsistence areas due to their location and broad extent across the Forest. Areas other than subsistence use areas that could be harvested may be limited by other resource concerns such as soil and water protection, high-value wildlife habitat, economics, scenic quality, or unit and road design. The impact of viable timber harvest projects always includes the alteration of old-growth habitat which reduces habitat capability for old-growth dependent species.

It is not possible to lessen harvest in one area and concentrate it in another without impacting one or more rural communities important subsistence use areas. In addition, harvestable

populations of game species could not be maintained in a natural distribution across the Forest if harvest was concentrated in specific areas. A well-distributed population of species is also required by the Forest Service regulations implementing the NFMA.

Therefore; it is my determination that the Selected Alternative involves the minimum amount of public land necessary and strikes the best balance between meeting the needs of the public and protecting the forest resources.

### Reasonable Steps to Minimize Adverse Impacts Upon Subsistence Uses and Resources

Considerable steps were taken to minimize the impacts to subsistence use and resources. The Selected Alternative reflects special efforts by the forest Service to minimize the effects on resources used for subsistence by those rural communities that would be most likely to receive the highest priority in the event of an ANILCA section 804 "Tier II" restriction. Considerable effort was taken during the Upper Carroll analysis to protect the highest value subsistence areas for deer. Most areas of high value and historic beach fringe or stream buffers which are the areas of traditional use. The affect of the Selected Alternative on subsistence use of deer by the communities of Ketchikan and Saxman is minimal. The Selected Alternative projects a reduction in deer habitat capability in the future of less than one percent for both full WAAs (406 and 510) and less than five percent within the Project Area.

Another significant subsistence resource in the Project Area is salmon. Fish habitat is protected in the Selected Alternative through the application of the BMPs and stream buffers. In addition to protecting fish habitat these buffers also protect estuarine and riparian habitat important to other species such as plants, deer, bear, and furbearers.

The Selected Alternative reflects a reasonable balance between projected need for Tongass timber from the Project Area to help meet KPC Contract, TLMP, ANILCA, and TTRA timber related employment objectives, and continued protection of subsistence uses and resources. Impacts on subsistence have been minimized through the development of the individual harvest units and road corridors, and through the formulation of the alternatives.

The FEIS and this ROD describe the mitigation measures that will be implemented as a part of the Selected Alternative. Most of the mitigation measures are designed to maintain fish and wildlife habitat productivity at the highest level possible, while still maintaining a supply of timber.

A significant possibility of a significant restriction on the subsistence use of Sitka black-tailed deer in the Project Area is expected when the Selected Alternative together with other past, present, and reasonably foreseeable actions are considered in a cumulative manner. This restriction would be a result of (1) a decrease in habitat capability that could decrease the abundance or distribution of deer, (2) high deer mortality during severe winters that occur periodically, (3) average yearly deer harvest levels exceeding what appears to be sustainable harvest levels, and (4) anticipated human population growth with its associated increase in subsistence hunter demand when compared to the habitat capability to produce deer.

It is my determination that reasonable measures to minimize impacts on subsistence have been adopted to the maximum extent practicable while still meeting the purpose and need for this project.

### Executive Orders

#### Executive Order 11988

Executive Order 11988 directs Federal agencies to take action to avoid, to the extent possible, the long- and short-term adverse impacts associated with the occupancy and modification of floodplains. The numerous streams in the Upper Carroll Project Area make it impossible to avoid all floodplains during timber harvest and road construction. The design of the proposed developments and the application of Best Management Practices combine to minimize adverse impacts on floodplains.

### Executive Order 11990
Executive Order 11990 requires Federal agencies to avoid, to the extent possible, the long- and short-term adverse impacts associated with the destruction or modification of wetlands. The Selected Alternative avoids most identified wetlands; however, many small wetlands or muskegs occur as inclusions within forested areas. These areas may be altered by timber harvest or road construction. Techniques and practices required by the Forest Service serve to maintain the wetland attributes including values and functions. It is estimated there will be only minimal loss of wetlands with any of the alternatives. Soil moisture regimes and vegetation on some wetlands may be altered in some cases; however, these altered acres would still be classified as wetlands and function as wetlands in the ecosystem.

### Executive Order 12898
Executive Order 12898 directs Federal agencies to identify human health and environmental effects of agency programs that disproportionately impact minority and low income populations. Sec. 4-4 of this executive order addresses subsistence consumption of fish and wildlife. Subsistence consumption patterns were analyzed and the effects of the project on subsistence uses were documented in the environmental assessment.

### Executive Order 12962
Executive Order 12962 requires Federal agencies to evaluate the effects of proposed activities on aquatic systems and recreational fisheries. The Selected Alternative attempts to minimize the effects upon aquatic systems through project design, watershed analysis, application of Forest Plan Standards and Guidelines, BMPs, and site specific mitigation measures. Recreational fishing opportunities will remain essentially the same because (1) aquatic habitats are protected to the extent practicable, and (2) the isolated road system, far from the nearest town, is unlikely to result in increased opportunities.

## Coastal Zone Management Act

The Coastal Zone Management Act of 1972 (CZMA), as amended, while specifically excluding Federal lands from the coastal zone, requires that a Federal agency's activities be consistent with the enforceable policies of a state's coastal management program to the maximum extent practicable when that agency's activities affect the coastal zone. Forest Service requirements for consistency are detailed in a Memorandum of Understanding between the State of Alaska and the Regional Forester, dated October 8, 1981. Standards against which the consistency evaluation take place are: Alaska Statute Title 46, Water, Air, Energy, and Environmental Conservation; Alaska Forest Practices Act of 1990; and the District Coastal Management Program.

The Alaska Coastal Management Plan incorporated the Alaska Forest Resources and Practices Act of 1979 (as revised) as the applied standards and guidelines for timber harvesting and processing. The Forest Service standards and guidelines, BMPs, and mitigation measures described in Appendix A of the FEIS are fully consistent with the State Standards.

Based on the analysis in the FEIS, review of the Alaska Forest Practices Act, and comments from the City of Ketchikan and State agencies on the DEIS, the action and activities are consistent to the maximum extent practicable with the enforceable policies of the Alaska Coastal Management Plan.

The standards and guidelines for timber management activities in the Upper Carroll Project Area meet or exceed those indicated in the Alaska Forest Practices Act and the Alaska Coastal Management Program (ACMP).

I have determined that the proposed activities are consistent with the Alaska Coastal Management Program to the maximum extent practicable. In accordance with the Memorandum of Understanding and Alaska Statutes, the Office of Governmental

**Federal and State Permits**

Coordination has done a consistency review of the Selected Alternative and concurred with this determination (State of Alaska, controlled correspondence, State I.D. No. AK 9605-04JJ).

Federal and State permits necessary to implement the authorized activities are listed at the end of Chapter 1 of the FEIS.

## Implementation Process

Implementation of this decision may occur no sooner than 30 days after the date of publication of the Notice of Availability of the FEIS in the *Federal Register*, or 50 days following publication of the legal notice of the decision in the *Ketchikan Daily News*, published in Ketchikan, Alaska, whichever is later.

This project will be implemented in accordance with Forest Service Manual and Handbook direction for Timber Sale Project Implementation in FSM 2431.3 and FSH 2409.24. This direction provides a bridge between project planning and implementation and will ensure execution of the actions, environmental standards, and mitigations approved by this decision, and compliance with the TTRA and other laws.

Implementation of all activities authorized by this Record of Decision will be monitored to ensure that they are carried out as planned and described in the FEIS and ROD Appendices 2 and 3, Unit Design and Road Cards, unless modified consistent with direction in the FSM 2432.3 and FSH 2409.18.

Unit Design and Road Cards are contained in ROD Appendices 2 and 3. These cards are an integral part of this decision because they document the specific resource concerns, management objectives, and mitigation measures to govern the layout of the harvest units and construction of roads. These cards will be used during the implementation process to assure that all aspects of the project are implemented within applicable standards and guidelines and that resource impacts will not be greater than those described in the FEIS. Similar cards will be used to document any changes to the planned layout, as the actual layout and harvest of the units occurs with project implementation. The implementation record for this project will display each harvest unit, transportation facility, and other project components as actually implemented; any proposed changes to the design, location, standards, and guidelines, or other mitigation measures for the project; and the decisions on the proposed changes.

## Process for Change During Implementation

Proposed changes to the authorized project actions will be subject to the requirements of the National Environmental Policy Act (NEPA), the National Forest Management Act of 1976 (NFMA), Section 810 of the Alaska National Interest Lands Conservation Act (ANILCA), the Tongass Timber Reform Act (TTRA), the Coastal Zone Management Act (CZMA), and other laws concerning such changes.

In determining whether and what kind of further NEPA action is required, the Forest Supervisor will consider the criteria for whether to supplement an existing Environmental Impact Statement (EIS) in 40 CFR 1502.9(c) and FSH 1909.15, sec. 18, and in particular, whether the proposed change is a substantial change to the intent of the Selected Alternative as planned and already approved, and whether the change is relevant to environmental concerns. Connected or interrelated proposed changes regarding particular areas or specific activities will be considered together in making this determination. Cumulative impacts will be considered.

**Exhibit 4, page 52 of 54**

The intent of field verification is to confirm inventory data and to determine the feasibility and general design and location of a unit or road, not to locate the final boundaries or road locations. Minor changes are expected during implementation to better meet on-site resource management and protection objectives. Minor adjustments to unit boundaries are also likely during final layout for the purpose of improving logging system efficiency. This will usually entail adjusting the boundary to coincide with logical logging setting boundaries. Many of these minor changes will not present sufficient potential impacts to require any specific documentation or action to comply with applicable laws. Some minor changes may still require appropriate analysis and documentation to comply with FSH 1909.15, sec. 18.

## Right To Appeal

This decision is subject to administrative appeal. Organizations or members of the general public may appeal this decision according to Title 36 Code of Federal Regulations (CFR) Part 215. The appeal must be filed within 45 days of the date that legal notification of this decision is published in the Ketchikan Daily News, the official newspaper of record. The Notice of Appeal must be filed in duplicate with:

> Phil Janik, Regional Forester
> Forest Service
> U.S. Department of Agriculture
> P.O. Box 21628
> Juneau, Alaska 99802-1628

It is the responsibility of those who appeal a decision to provide the Regional Forester sufficient narrative evidence and argument to show why the decision by the Forest Supervisor should be changed or reversed. At a minimum, the written notice of appeal must:

1. State that the document is a Notice of Appeal filed pursuant to 36 CFR part 215;
2. List the name, address, and, if possible, a telephone number of appellant;
3. Identify the decision document by title and subject, date of the decision, and name and title of the Responsible Official;
4. Identify the specific change(s) in the decision that the appellant seeks or portion of the decision to which the appellant objects;
5. State how the Responsible Official's decision fails to consider comments previously provided, either before or during the comment period specified in 36 CFR 215.6 and, if applicable, how the appellant believes the decision violates law, regulation, or policy.

The first timber offering is planned to be made available as part of the current timber supply in 1997.

## Contact Person

For additional information concerning the specific activities authorized with this decision contact the Ketchikan Area, Ketchikan Ranger District, Project Manager.

> Bill Nightingale
> Project Manager
> Ketchikan Area, Tongass National Forest
> Ketchikan Ranger District
> 3031 Tongass Avenue
> Ketchikan, Alaska  99901
>
> (907) 225-2148

*(signature)*
BRADLEY E. POWELL
Forest Supervisor, Ketchikan Area
Tongass National Forest

10-25-96
Date