use of FNIC resources by personnel at schools receiving USDA funds for Child Nutrition Programs. To collect this information, FNIC proposes to provide attendees of selected educated related conferences with a password to access a one-time, voluntary, electronic FNIC Resources usage survey. The information collected in this survey will assist FNIC staff in improving the resources provided to meet the needs of the targeted audience. The authority to collect this information is CFR, Title 7, Volume 1, Part 2, Subpart K, Sec. 2.65 (92).

*Need and Use of the Information:* FNIC will collect information to evaluate current FNIC resources and assist in planning and managing future projects. Failure to collect this information would inhibit FNIC's ability to ensure the resources FNIC provides are in accord with resources desired by targeted patron groups, such as personnel in schools participating in Child Nutrition Programs.

*Description of Respondents:* Not-for-profit institutions.

*Number of Respondents:* 200.

*Frequency of Responses:* Reporting: On occasion.

*Total Burden Hours:* 50.

**Animal and Plant Health Inspection Service**

*Title:* CWD in Cervids; Payment of Indemnity.

*OMB Control Number:* 0579–0189.

*Summary of Collection:* Federal regulations contained in 9 CFR Subchapter B govern cooperative programs to control and eradicate communicable diseases of livestock from the United States. In accordance with 21 U.S.C. 111–113, 114, 115, 117, 120, 123, and 134a, the Secretary of Agriculture has the authority to promulgate regulations and take measures to prevent the introduction into the United States and the interstate dissemination within the United States of communicable diseases of livestock and poultry, and to pay claims growing out of the destruction of animals. Disease prevention is the most effective method for maintaining a health animal population and enhancing our ability to complete in exporting animals and animal products. Veterinary Services, a unit within USDA's Animal and Plant Health Inspection Service (APHIS), is charged with carrying out this disease prevention mission. Chronic wasting disease (CWD) is a transmissible spongiform encephalopathy (TSE) of elk and deer typified by chronic weight loss leading to death. The presence of chronic wasting disease in cervids causes significant economic and market losses to U.S. producers. APHIS will collect information using VS Form 1–23 Appraisal & Indemnity Claim Form.

*Need and Use of the Information:* APHIS will collect the owner's name and address, the number of animals for which the owner is seeking payment, and the appraised value of each animal. The owner must also certify as to whether the animals are subject to a mortgage. If there is a mortgage, the form must be signed by the owner and each person holding a mortgage. Failure to collect this information would make it impossible for APHIS to launch its program to accelerate the eradication of chronic wasting disease from the United States.

*Description of Respondents:* Farms; Business or other for-profit.

*Number of Respondents:* 10.

*Frequency of Responses:* Reporting: On occasion.

*Total Burden Hours:* 10.

**Sondra A. Blakey,**
*Departmental Information Collection Clearance Officer.*
[FR Doc. 02–19945 Filed 8–6–02; 8:45 am]
**BILLING CODE 3410–01–M**

**DEPARTMENT OF AGRICULTURE**

**Forest Service**

**Alpine County, CA, Resource Advisory Committee**

**AGENCY:** Forest Service, USDA.
**ACTION:** Notice of meeting.

**SUMMARY:** The Alpine County Resource Advisory Committee (RAC) will meet on August 26, 2002, in Markleeville, California. The purpose of the meeting is to discuss issues relating to implementing the *Secure Rural Schools and Community Self-Determination Act of 2000* (Payments to States) and the expenditure of Title II funds benefiting National Forest System lands on the Humboldt-Toiyabe, and Stanislaus National Forests in Alpine County.

**DATES:** The meeting will be held August, 2002 at 6 p.m.

**ADDRESSES:** The meeting will be held at the Turtle Rock County Park, Markleeville, CA.

**FOR FURTHER INFORMATION CONTACT:** Laura Williams, Committee Coordinator, USDA, Humboldt-Toiyabe National Forest, 1536 S Carson St., Carson City, NV, 89701, (775) 884–8150, e-mail: *ljwilliams@fs.fed.us.*

**SUPPLEMENTARY INFORMATION:** Agenda items to be covered include: (1) Old business; (2) Project criteria discussion; (3) Camping in Alpine County; (4) Project proposals; (5) New business & Public comment.

The meeting is open to the public. Public input opportunity will be provided and individuals will have the opportunity to address the Committee at that time.

Dated: July 29, 2002.
**Gary Schiff,**
*Carson District Ranger.*
[FR Doc. 02–19873 Filed 8–6–02; 8:45 am]
**BILLING CODE 3410–11–M**

**DEPARTMENT OF AGRICULTURE**

**Forest Service**

**Notice of Resource Advisory Committee Meeting**

**AGENCY:** Southwest Idaho Resource Advisory Committee, Boise, ID, USDA, Forest Service.
**ACTION:** Notice of meeting.

**SUMMARY:** Pursuant to the authorities in the Federal Advisory Committee Act (Public Law 92–463) and under the Source Rural Schools and Community Self-Determination Act of 2000 (Public Law 106–393) the Boise and Payette National Forests' Southwest Idaho Resource Advisory Committee will meet Wednesday, August 21, 2002 in Cascade, Idaho for a business meeting. The meeting is open to the public.

**SUPPLEMENTARY INFORMATION:** The business meeting on August 21, begins at 10:30 AM, at the American Legion Hall, Cascade, Idaho. Agenda topics will include review and approval of projects proposals, a forum with County Commissioners, development of project solicitation strategies for FY'03, and an open public forum.

**FOR FURTHER INFORMATION CONTACT:** Randy Swick, Designated Federal Officer, at (435) 865–3701.

Dated: July 31, 2002.
**Mark J. Madrid,**
*Forest Supervisor, Payette National Forest.*
[FR Doc. 02–19899 Filed 8–6–02; 8:45 am]
**BILLING CODE 3410–11–M**

**DEPARTMENT OF AGRICULTURE**

**Forest Service**

**Extension of Certain Alaska Timber Sale Contracts; Finding of Substantial Public Interest**

**AGENCY:** Forest Service, USDA.
**ACTION:** Notice

**SUMMARY:** There is substantial overriding public interest in extending

**51166** Federal Register / Vol. 67, No. 152 / Wednesday, August 7, 2002 / Notices

National Forest System timber sale contracts in Alaska for 3 years, subject to a maximum total contract length of 10 years. The extension applies to timber sale contracts awarded after January 1, 1997, which purchasers are diligently performing (not in default). To receive the extension, purchasers must request the extension in writing to the Contracting Officer and agree to release the Forest Service from damages for the replacement cost of timber if the contract is canceled in the future.

Contract extensions in Southeast Alaska will serve the public interest by advancing the Department's goal of economic stability through employment in Southeast Alaska in the wake of the closing of the region's two pulp mills. The intended effect is to minimize contract defaults, mill closures, and company bankruptcies.

**DATES:** The determination was made on July 30, 2002.

**FOR FURTHER INFORMATION CONTACT:** Rex Baumback, Forest and Rangelands Staff (202) 205-0855.

**SUPPLEMENTARY INFORMATION:** The Forest Service sells timber from National Forest System lands to individuals or companies. Each sale is formalized by execution of a contract between the purchaser and the Forest Service. The contract sets forth the explicit terms and provisions of the sale, including such matters as the estimated volume of timber to be removed, the period for removal, price to be paid to the Government, road construction and logging requirements, and environmental protection measures to be taken. The average contract period is approximately 2 years, although a few contracts have terms of 5 or more years.

The National Forest Management Act of 1976 (16 U.S.C. 472a(c)) provides that the Secretary of Agriculture shall not extend any timber sale contract period with an original term of 2 years or more, unless the purchaser has diligently performed in accordance with an approved plan of operations or the "substantial overriding public interest" justifies the extension. The authority to make this determination has been delegated to the Chief at 7 CFR 2.60.

The closure of the pulp mills operated by the Alaska Pulp Corporation (APC) and Ketchikan Pulp Company (KPC) in 1993 and 1997, respectively, has had a significant effect on the overall regional economy in Southeast Alaska. Wood consumption by these pulp mills and their associate sawmills accounted for about half of Alaska National Forest timber harvest since 1980. Employment in the wood products sector has declined significantly since the peak of 1990, decreasing by 2,500 jobs, or 72 percent, between 1990 and 2000. While this total includes the entire pulp mill labor force, which accounted for nearly 900 jobs in 1990, a larger absolute loss occurred in the logging sector with a loss of 1,433 jobs. A total of 993 people were employed in the wood products sector in 2000. Employment decreases tend to lag behind decreases in production. consequently, current wood products employment is projected to fall even lower since harvest has not rebounded. The unemployment rate in Alaska is 5 percent to 11 percent higher than the national average of 6 percent. Government indices indicate that the Western softwood lumber market has declined approximately 25 percent since mid-1999. Harvest from Tongass National Forest timber sales has steadily declined from 338 million board feet in 1990 to 147 million board feet in 2000. Although 2001 harvest level was only 48 million board feet, the lowest since industrial wood production started in the early 1950's this level was influenced not only by poor markets but also by court ordered injunctions that halted harvest for a portion of the year.

Rules at 36 CFR 223.52 permit contract extensions when Forest Service officials determine that adverse wood product market conditions have resulted in a drastic decline in wood product prices. Under market-related contract addition procedures, the Forest Service refers to the Western softwood lumber price index (PCU2421#4) to measure severe market declines in Western softwoods. The index has reflected the market decrease. Timber sale purchasers in Alaska, who have so requested, have received up to the maximum of 3 years of additional contract time authorized by 36 CFR 223.52. However, the market has not recovered, and companies in Alaska are still facing contract default, mill closure, and bankruptcy.

It has been determined that additional contract time will assist these purchasers by giving them more time in which the market may improve or in which they can mix their high-priced sales with lower priced sales. If bankruptcies, mill closures, and defaulted contracts are avoided, the United States and Southeast Alaska will benefit from more stable employment and market opportunities and increased competition for National Forest System timber sales. This action is consistent with Congress' direction to the Secretary in the Tongass Timber Reform Act of 1990 (16 U.S.C. 539d (note)) to provide for the multiple use and sustained yield of forest resources and to seek to provide a supply of timber from the Tongass National Forest which meets the annual market demand for timber from the Forest. This goal was also embodied in the February 21, 1997, settlement agreement reached between the Forest Service and the Ketchikan Pulp Company.

Accordingly, based on a study of alternatives and current rules at 36 CFR 223.115, it has been determined that there is substantial overriding public interest in extending sales in Alaska for up to 3 years, but not to exceed a total contract length of 10 years. To receive the extension, purchasers must request the extension in writing to the Contracting Officer and agree to release the Forest Service from damages for the replacement cost of timber if the contract is canceled in the future. The text of the finding is set out at the end of this notice.

Dated: July 30, 2002.

**Sally D. Collins,**
*Associate Chief.*

**Determination of Substantial Overriding Public Interest for Extending Certain Timber Sale Contracts in Alaska**

The Tongass Timber Reform Act (16 U.S.C. 539d (note)) directs the Secretary to provide for the multiple use and sustained yield of forest resources and to seek to provide a supply of timber from the Tongass National Forest which meets the annual market demand for timber from the Forest. Consistent with this direction the Forest Service seeks to maintain an economically viable timber sale program, which includes keeping volume under contract for future harvesting.

Periodically, lumber markets may experience severe declines in prices. Based on Bureau of Labor Statistics producer price indices, the lumber market for Western softwoods peaked in July 1999. Since then, price indices have declined approximately 25 to 30 percent. With the closings in 1993 and 1997 of the pulp mills operated by the Alaska Pulp Corporation and the Ketchikan Pulp Company, the economy of Southeast Alaska changed significantly. At the time of the mill closures, the Department committed itself to aiding the timber-dependent communities in Southeast Alaska by advancing the goal of economic stability through employment in the region. Currently, the unemployment rate in Alaska is 5 percent to 11 percent higher than the national average of 6 percent.

While most Forest Service timber sale contracts in Alaska contain provisions to extend termination dates during severely declining markets, many contracts have been extended for the

maximum amount of time permissable under 36 CFR 223.52. Nevertheless, the market has not improved significantly, and many companies in Alaska are still facing contract default, mill closure, and bankruptcy. A contract extension would assist these purchases by giving additional time in which the market may improve or in which they could mix their high-priced sales with lower-priced sales.

Having numerous, economically viable timber sale purchasers both maintains market opportunities and increases competition for National Forest System timber sales. These factors result in higher prices paid for such timber. Therefore, the Government benefits if defaulted timber sale contracts, mill closures, and bankruptcies can be avoided by granting contract extensions. In addition, the Government would avoid the difficult and expensive process of collecting default damages.

Therefore, pursuant to 16 U.S.C. 472a, 36 CFR 223.115, and the authority delegated to the Chief at 7 CFR 2.60 and from the Chief to the Associate Chief in Forest Service Manual Chapter 1230, I have determined that there is substantial overriding public interest in extending for 3 years National Forest System timber sales contracts in Alaska, subject to a maximum total contract length of 10 years. To receive the extension purchasers must make written request to the Contracting Officer and agree to release the Forest Service from damages for the replacement cost of timber if the contract is canceled in the future.

Dated: July 30, 2002.

**Sally D. Collins,**
*Associate Chief.*

[FR Doc. 02–19869 Filed 8–6–02; 8:45 am]
**BILLING CODE 3410–11–M**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–570–853]**

**Bulk Aspirin from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Changed Circumstances Review**

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce is currently conducting an administrative review of the antidumping duty order on bulk aspirin from the People's Republic of China. The period of review is July 6, 2000, through June 30, 2001. This review covers imports of subject merchandise from two producer/exporters.

We preliminarily find that sales have not been made below normal value. If these preliminary results are adopted in our final results of review, we will instruct the Customs Service not to assess antidumping duties.

In addition, in response to a request from Jilin Pharmaceutical Import and Export Corporation, Jilin Pharmaceutical (U.S.A.) Inc., and Jilin Pharmaceutical Company Ltd., the Department of Commerce published a notice of initiation of changed circumstances review on June 7, 2002 (67 FR 39344). We preliminary find that Jilin Henghe Pharmaceutical is the successor-in-interest of Jilin Pharmaceutical Company Ltd. and Jilin Pharmaceutical Import and Export Corporation.

We invite interested parties to comment on these preliminary results. We will issue the final results no later than 120 days from the date of publication of this notice.

**EFFECTIVE DATE:** August 7, 2002.

**FOR FURTHER INFORMATION CONTACT:** Blanche Ziv or Cole Kyle, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue, N.W., Washington, D.C. 20230; telephone: (202) 482–4207, or (202) 482–1503, respectively.

**SUPPLEMENTARY INFORMATION:**

**The Applicable Statute and Regulations**

Unless otherwise indicated, all citations to the Tariff Act of 1930, as amended ("the Act"), are references to the provisions effective January 1, 1995, the effective date of the amendments made to the Act by the Uruguay Round Agreements Act ("URAA"). In addition, unless otherwise indicated, all citations to the Department of Commerce ("Department") regulations are to 19 CFR Part 351 (April 2001).

**Background**

On July 11, 2000, the Department published an antidumping order on bulk aspirin from the People's Republic of China ("PRC"). *See Notice of Antidumping Duty Order: Bulk Aspirin from the People's Republic of China*, 65 FR 42673 (July 11, 2000). On July 2, 2001, the Department published in the **Federal Register** an *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 66 FR 34910 (July 2, 2001).

On July 27 and 31, 2001, in accordance with 19 CFR 351.213(b), two manufacturers/exporters of the subject merchandise, Shandong Xinhua Pharmaceutical Co., Ltd. ("Shandong"), and Jilin Pharmaceutical Import and Export Company, Jilin Pharmaceutical (U.S.A.) Inc., and Jilin Pharmaceutical Limited Company (collectively, "Jilin Pharmaceutical"), respectively, requested that the Department conduct an administrative review of this order. In addition, Jilin Pharmaceutical requested that, contemporaneous with the ongoing administrative review of the order, the Department review the company's name change and determine that Jilin Henghe Pharmaceutical ("Jilin Henghe") is the successor-in-interest of Jilin Pharmaceutical.

On August 20, 2001, we published a notice of initiation of the administrative review. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocations in Part*, 66 FR 43570 (August 20, 2001). The period of this review ("POR") is July 6, 2000, through June 30, 2001.

We issued questionnaires to Jilin Pharmaceutical and Shandong on October 29, 2001. We received responses to the questionnaires from Shandong and Jilin Pharmaceutical on December 5 and 27, 2001, respectively.

On December 21, 2001, the Department invited interested parties to comment on surrogate country selection and to provide publicly available information for valuing the factors of production. We received responses from Rhodia, Inc., ("the petitioner") and Jilin Pharmaceutical on January 22, 2002. Shandong provided surrogate value information to the Department on July 8, 2002.

On March 29, 2002, the Department found that it was not practicable to complete the review in the time allotted and published an extension of time limit for the completion of the preliminary results of this review to no later than July 31, 2002, in accordance with section 751(a)(3)(A) of the Act. *See Bulk Aspirin from the People's Republic of China; Extension of Time Limit for the Preliminary Results of the Antidumping Duty Administrative Review*, 67 FR 15177 (March 29, 2002).

We issued supplemental questionnaires to Jilin Pharmaceutical and Shandong on April 22 and 24, 2002, respectively. We received responses to the supplemental questionnaires from Jilin Pharmaceutical and Shandong on May 24 and 29, 2002, respectively.

On, June 3, 2002, we initiated a changed circumstances review to be conducted contemporaneously with the ongoing administrative review of the order. *See Bulk Aspirin From the People's Republic of China; Initiation of*