**FILED**

MAR 2 3 2004

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By                                    Deputy

Thomas S. Waldo
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801-1145
Phone: (907) 586-2751
Fax: (907) 463-5891

Nathaniel S. W. Lawrence
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
Phone: (360) 570-9309
Fax: (360) 570-9310

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, SOUTHEAST ALASKA CONSERVATION COUNCIL, SIERRA CLUB, THE WILDERNESS SOCIETY, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>    Plaintiffs,<br><br>        v.<br><br>UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; MARK REY, in his official capacity as Under Secretary of Agriculture; DENNIS E. BSCHOR, in his official capacity as Alaska Regional Forester; and FORREST COLE, in his official capacity as Forest Supervisor for the Tongass National Forest.<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No. **J 04 - 010  CV** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
### (5 U.S.C. § 702; 16 U.S.C. § 1604; 16 U.S.C. § 539d; 42 U.S.C. § 4332)

**INTRODUCTION**

1.   This action challenges the 1997 Tongass Land Management Plan Revision ("Tongass Plan"), including its Record of Decision and the Environmental Impact Statement (EIS) accompanying it.  This action also challenges a 2003 Record of Decision to proceed with the currently roadless portions of the Woodpecker timber sale, which implements the Tongass Plan.

2.   The Tongass Plan allocates about 3.6 million acres of the Tongass to land use designations that allow logging and roadbuilding, of which about 2.5 million acres are currently undeveloped and roadless.  The Woodpecker timber sale authorizes clearcut logging and roadbuilding in a roadless area of the Tongass.  Like other Tongass timber sales, the Woodpecker sale also approves logging of trees that are, on average, more valuable economically and for wildlife than the average timber available for logging in the Tongass Plan. This practice is unsustainable.

3.   Tongass roadless areas and the high-value stands of old growth forest authorized for logging in the Woodpecker project are important for wildlife, biological diversity, recreation and other natural resource uses.  The Tongass Plan and the Woodpecker timber sale do not adequately protect these resources, and the defendants have failed adequately to consider and disclose the adverse impacts of the plan and the timber sale.

4.   The plaintiffs are organizations whose members use the roadless areas of the Tongass, including the Woodpecker timber sale area, for recreation, subsistence and sport hunting and fishing, camping, photography, wildlife viewing, and other activities that depend on the natural old-growth forest values.  These organizations seek declaratory and injunctive relief preventing the Forest Service from proceeding with actions that cause harm to the environment, and thereby to their members, pending compliance with the law.

**JURISDICTION, RIGHT OF ACTION, AND VENUE**

5.   This court has jurisdiction pursuant to 28 U.S.C. § 1331 and may issue a declaratory

judgment and further relief pursuant to 28 U.S.C. §§ 2201-02.  Judicial review is available under

the Administrative Procedure Act.  5 U.S.C. §§ 701-06.

6.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and the Department of

the Interior and Related Agencies Appropriations Act, 2004, Pub. L. No. 108-108, § 338 (2003).

**PLAINTIFFS**

7.   The Natural Resources Defense Council (NRDC) is a non-profit organization

dedicated to protection of the earth's environment.  NRDC has over 1,500 members in the State

of Alaska and more than 550,000 members in all.  NRDC's involvement in conservation of the

Tongass National Forest dates back almost to the organization's inception.

8.   Southeast Alaska Conservation Council (SEACC) is a nonprofit organization of 18

volunteer conservation groups in fourteen communities across the Southeast Alaska panhandle,

from Yakutat to Ketchikan, and over 2000 individual members, the majority of whom live in

Alaska.  SEACC advocates the conservation and wise long-term management of the scenic,

wilderness, fish, wildlife, recreation, subsistence and other natural resources and values of southeast

Alaska and the Tongass National Forest in particular.

9.   The Sierra Club is a national grassroots conservation organization.  The Sierra Club's

members are 700,000 Americans, including about 1,850 Alaska residents, who are inspired by

nature.  They explore, enjoy, and protect the wild places of the earth including the Tongass

National Forest.  They practice and promote the responsible use of the earth's ecosystems and

**Exhibit 21, page 3 of 27**

resources. For over a hundred years they have sought to educate and enlist humanity to protect and restore the quality of the natural and human environment. In Southeast Alaska the Sierra Club is represented by the Juneau Group of the Sierra Club. Sierra Club members reside in nearly every community of Southeast Alaska, from Yakutat to Ketchikan, and derive benefits and enjoyment from the natural environment and unlogged areas of the Tongass National Forest.

10.     The Wilderness Society, founded in 1935, is a national non-profit membership organization devoted to preserving wilderness and wildlife, protecting America's prime forests, parks, rivers, deserts, and shorelines, and fostering an American land ethic. It has approximately 225,000 members nationwide, approximately 700 of whom live in Alaska.

11.     The Center for Biological Diversity (the Center) is a non-profit organization based in Tucson, Arizona with a regional office in Sitka, Alaska. The Center works to protect wild places and their inhabitants. The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked. It has been actively involved in protecting Alaska's wildlife since the early 1990's. With regard to the Tongass National Forest, the Center has filed petitions to protect the Queen Charlotte goshawk and the Alexander Archipelago wolf under the Endangered Species Act. The Center is still involved in active litigation over the fate of the goshawk, and carefully follows the fate of many other species that depend upon Tongass wildlands. The Center has 7,500 members including some members who live in Southeast Alaska.

12.     The plaintiffs participate actively in the administrative processes established for management of the Tongass. Various of the plaintiff groups have submitted comments on proposed actions and draft EISs for the Tongass Plan and for the Woodpecker timber sale. Various of these groups have also filed appeals (including interventions and interested party

**Exhibit 21, page 4 of 27**

comments) of the Tongass Plan and of the 2003 Record of Decision for the Woodpecker timber sale.  The plaintiffs have exhausted administrative remedies for each of the decisions challenged in this complaint.

13.    Members of plaintiff organizations reside near, visit, or otherwise use and enjoy the Tongass National Forest, including the Woodpecker project area.  In particular, members of plaintiff organizations use these areas for recreation, subsistence and sport hunting and fishing, wildlife viewing, photography and education, and aesthetic and spiritual enjoyment.  The plaintiffs and their members derive scientific, recreational, aesthetic, and conservation benefits and enjoyment from these areas.  The logging authorized in the Woodpecker timber sale will directly and irreparably injure these interests.

14.    The plaintiff organizations monitor the use of forest ecosystems and compliance with the laws respecting these ecosystems, educate their members and the public concerning management of these ecosystems, and advocate policies and practices that conserve the natural value of these ecosystems.  It is impossible to achieve these organizational purposes fully without adequate information and public participation in the processes required by law.  The interests and organizational purposes of the plaintiffs are directly and irreparably injured by defendants' violations of the laws as described in this complaint.

## DEFENDANTS

15.    The full name of Defendant United States Forest Service is United States Department of Agriculture, Forest Service.  It is an agency of the Department of Agriculture entrusted with the administration of the national forests, including the Tongass.

**Exhibit 21, page 5 of 27**

16.     Defendant United States Department of Agriculture is the department of the executive branch responsible for overseeing the activities of the Forest Service.

17.     Mark Rey is sued in his official capacity as the Under Secretary, Natural Resources and Environment, United States Department of Agriculture

18.     Defendant Dennis E. Bschor is sued in his official capacity as US Forest Service Region 10 Regional Forester.

19.     Defendant Forrest Cole is sued in his official capacity as the Forest Supervisor for the Tongass National Forest.

## FACTS

Planning Process

20.     The Tongass National Forest in Southeast Alaska is this country's largest National Forest.  The Tongass contains the largest remaining expanse of unaltered coastal temperate rainforest ecosystem in the world.

21.     The National Forest Management Act (NFMA) requires the Forest Service to prepare and revise land and resource management plans for national forests.  16 U.S.C. § 1604. After a lengthy planning process, the Alaska Regional Forester signed a Record of Decision (ROD) for the Tongass Land Management Plan Revision in May 1997.  At that time, the Forest Service published the revised Land and Resource Management Plan for the Tongass National Forest, its associated Final Environmental Impact Statement (FEIS), and a Record of Decision selecting the management alternative to be implemented.

**Exhibit 21, page 6 of 27**

22.    The 1997 Tongass Plan established a maximum allowable sale quantity (ASQ) of 2.67 billion board-feet per decade, which is equivalent to an annual average of 267 million board-feet (mmbf) per year.

23.    Numerous groups and individuals filed administrative appeals of the Regional Forester's May 1997 decision.

24.    In April 1999, Under Secretary James Lyons resolved all administrative appeals and issued a final Record of Decision for implementation of the Tongass Land Management Plan.  The final Record of Decision modified the May 1997 Record of Decision by reducing the ASQ to 1.87 billion board-feet per decade, which is equivalent to an annual average of 187 million board-feet per year.  The final Record of Decision also identified 18 areas of special interest, mostly in roadless areas.  The 1997 Tongass Plan had assigned these areas to land use designations that allowed logging.  The final Record of Decision changed them to new designations that generally prohibit timber sales.  The final Record of Decision also adopted new standards and guidelines to provide additional protection for wildlife.

25.    On March 31, 2001, the court vacated the 1999 Record of Decision in *Alaska Forest Association, et al., v. United States Department of Agriculture, et al.*, No. J99-0013 CV (JKS) (D. Alaska).  The court also enjoined the Forest Service from implementing the 1999 Record of Decision and ordered the Forest Service to prepare a supplemental EIS addressing the changes from the 1997 Tongass Plan.  However, the Forest Service never prepared a supplemental EIS to address those proposed changes.  Instead, the agency has chosen to implement the 1997 Tongass Plan without the changes adopted by Under Secretary Lyons.

26.    The Forest Service has implemented the Tongass Plan with numerous decisions to authorize new timber sales.  These decisions include (date of signing of Record of Decision

**Exhibit 21, page 7 of 27**

follows):  Woodpecker (September 12, 2003); Madan (July 31, 2003); Finger Mountain (June 20, 2003); Cholmondeley (April 23, 2003); Sea Level (May 3, 1999); Canal Hoya (April 1, 1999); Crane and Rowan Mountain (June 30, 1998); and Chasina (April 27, 1998).  The Forest Service prepared a site-specific EIS for each of these decisions.

27.    The timber sale offerings approved under these EISs have caused and are projected to cause adverse impacts to wildlife and other resources including visual quality, roadless recreation, and subsistence and sport hunting.

Planning for Viable Populations of Wildlife

28.    As part of formulating wildlife protections for possible use in the Tongass Plan, the Forest Service, responding to congressional direction, assembled a group of prominent scientists to provide peer review for protective strategies it was considering.  The primary wildlife conservation strategy considered by the Forest Service at the time, like that eventually adopted as a part of the Tongass Plan, was a system of reserves protecting a limited amount of old growth habitat throughout the Forest.  This peer review group identified important considerations for wildlife not proposed by the Forest Service, including the protection of large unroaded, unlogged blocks of habitat, and the conservation of "high volume" forest stands.  The peer review group ultimately concluded that the Forest Service's conservation strategy was not adequate to protect old growth dependent wildlife.

29.    High volume stands, characterized in part by the presence of large trees and having special significance as wildlife habitat, are a relatively scarce resource in Southeast Alaska.  They have been disproportionately targeted for logging by the Forest Service and on

lands adjacent to the Tongass by others, in an unsustainable and harmful practice known as "highgrading."

30.    Concerns over highgrading led Congress in 1990 to adopt protections for high volume stands.

31.    Scientific panels convened by the Forest Service evaluated the alternatives presented in the 1996 Revised Supplemental Draft EIS (RSDEIS) for the Tongass Plan for their effects on individual wildlife species and groups of related species. Several of these panels rated alternatives similar to the one ultimately adopted as having a relatively low likelihood of maintaining viable populations of the species well-distributed throughout the Tongass.

32.    A majority of members of the scientific peer review group described in paragraph 29 above submitted a joint statement on the RSDEIS emphasizing the importance of preserving the Tongass' remaining large blocks of old growth, including undeveloped watersheds, from logging and of avoiding logging of high volume stands. These scientists specifically identified the RSDEIS strategies as inadequate to ensure the continued viability of wildlife well-distributed in the Tongass.

33.    Public comments on the RSDEIS also requested that the Forest Service develop one or more alternatives that actively provided timber for industrial use but scheduled logging only outside of the remaining blocks of undeveloped old growth watersheds.

34.    The Forest Service convened scientific panels to evaluate the alternatives in the Tongass Plan's FEIS for their impacts on wildlife viability. Once again, several of these panels rated the preferred and similar alternatives as having a relatively low likelihood of maintaining viable populations of the species well-distributed throughout the Tongass.

**Exhibit 21, page 9 of 27**

35.     The Forest Service made some adjustments to the FEIS's preferred alternative prior to adopting it as the Tongass Plan in the 1997 Record of Decision.  These adjustments did not, however, remedy the central defects identified by scientists and the public in the preferred alternative.

36.     The former scientific peer review members described in paragraph 29 above analyzed the Tongass Plan as adopted in 1997 and prepared a joint statement concluding that the plan would not ensure the continued viability of Tongass wildlife species, that continued logging and roading of existing large blocks of old growth, including undeveloped watersheds, was inconsistent with maintaining wildlife viability, and that high volume stands had to be maintained for wildlife.  This statement was submitted to the Forest Service during the administrative appeal process for the Tongass Plan.

37.     The Tongass Plan FEIS did not include information then available to the Forest Service about the significance and scarcity of high volume class forest stands in Southeast Alaska, the reduction in their numbers throughout the region by logging, and the likely impact of the FEIS alternatives on such stands and their associated values.

38.     The Tongass Plan FEIS analyzed the impacts of the various alternatives on forest "volume strata."  In so doing, the FEIS did not include information then available to the Forest Service about the original proportion of high strata stands in the region and their disproportionate loss to logging over time.

39.     The Tongass Plan FEIS analyzed the impacts of alternatives on volume strata on the assumption that each stratum would be logged in proportion to its occurrence on the Tongass.

40.     The Tongass Plan does not prohibit highgrading, or disproportionate logging, of volume strata or volume classes.  For the first decade of the Tongass Plan, the Forest Service

planned to log a disproportionate amount of high volume timber.  For example, the Canal Hoya draft and final EISs state that "there is a disproportionate amount of harvesting planned within high-volume low-elevation stands – areas that also provide critical wildlife habitat and are the most valuable to several species of concern…."

41.    After the Tongass Plan was made final, the Forest Service through a separate process decided to protect all large, undeveloped portions of the Tongass, known as Inventoried Roadless Areas, from further logging, excepting projects already in the planning process or previously approved.

42.    Notwithstanding the decision described in paragraph 42 above, the Forest Service is planning to implement the Tongass Plan by logging in many of the Tongass' Inventoried Roadless Areas.

43.    Since the Tongass Plan was adopted, the Forest Service has continued to highgrade Tongass timber.

44.    The EISs for timber projects implementing the Tongass Plan do not contain information or analyses that adequately reveal the past history, significance, and impacts of highgrading.

45.    Recently the Forest Service has begun to offer timber sales that highgrade the Tongass' high value cedar stands.

46.    The EISs for timber projects that highgrade cedar do not reveal significant information available to the Forest Service about the possible consequences of this practice.

**Exhibit 21, page 11 of 27**

Tongass Plan Market Demand Analysis

47.    In making his decision adopting the 1997 Tongass Plan, the Alaska Regional

Forester used a draft report projecting market demand prepared by Pacific Northwest Station

economists Brooks and Haynes ("Timber Products Output and Timber Harvests in Alaska:

Projections for 1997-2010" (Brooks and Haynes,  May 15, 1997)).  This draft report projected a

market demand ranging from a low scenario in which harvest levels were between 65-72

mmbf/year to a high scenario in which harvest levels were between 136-206 mmbf/year over the

thirteen-year period.

48.    The 1997 Record of Decision states that the demand projections contained in that

draft are "for sawlogs suitable for producing lumber in Southeast Alaska mills."

49.    This statement is incorrect.  In fact, the projections encompass both sawlogs and

utility logs.

50.    This error led to an assumption in the Tongass Plan decision that an annual

logging level of between 130 mmbf and 296 mmbf would be needed to satisfy the projections in

the May 15 Brooks and Haynes draft.

51.    In adopting a plan, the Regional Forester was, among other things, seeking to

provide sufficient timber to meet market demand for the planning cycle, under 16 U.S.C. § 539d.

52.    The erroneous interpretation of the May 15 Brooks and Haynes draft caused the

Regional Forester to seek to provide a supply of timber that was significantly higher than the

actual Brooks and Haynes projections.

53.    In so doing, the Forest Service allocated significantly more land for timber

production than was necessary to meet the Brooks and Haynes projected market demand.

**Exhibit 21, page 12 of 27**

Logging and road construction on these lands causes harm to wildlife, recreation and other multiple use objectives.

Actual Market Demand

54.     Beginning in the 1950s, the United States annually sold large volumes of timber to the Ketchikan Pulp Company (KPC) and Alaska Pulp Company (APC), and their predecessors, pursuant to 50-year contracts intended to facilitate construction and operation of two large pulp mills.

55.     APC ceased operation of its Sitka pulp mill in 1993, and the Forest Service terminated its long-term contract in 1994.  APC removed 94 mmbf of Tongass timber in FY 1994 and 15 mmbf in FY 1995.  It has logged no timber from the Tongass since.

56.     KPC ceased operation of its Ketchikan pulp mill in 1997.  To resolve legal claims, the United States, KPC, and Louisiana-Pacific Corporation entered a Settlement Agreement in 1997.  The agreement canceled the contract.  The United States agreed to pay KPC approximately $135 million and to make 300 mmbf of Tongass timber available to KPC for cutting in 1997, 1998, and 1999.  KPC dropped its claims and agreed to cut this timber and keep its sawmills operating.  In 1999, the agreement was extended to grant one more year to cut the remaining timber, to provide start-up timber for a proposed new veneer mill.

57.     In attempting to meet market demand for Tongass timber, the Forest Service forecasts demand using estimates contained in the final 1997 Brooks and Haynes report, published shortly after the 1997 Tongass Plan.  The report is entitled "Timber Products Output and Timber Harvest in Alaska: Projections for FY97-10" (Brooks and Haynes; PNW-GTR-409, September, 1997).

**Exhibit 21, page 13 of 27**

58.    The 1997 demand projections are an integral component of the formula developed in the 2000 report entitled "Responding to the Demand for Tongass Timber:  Using Adaptive Management to Implement Sec. 101 of the 1990 Tongass Timber Reform Act."  This formula is used annually by the Forest Service in determining the volume of timber to offer each year.

59.    The Forest Service relies explicitly on the 1997 Brooks and Haynes projections in describing the demand for Tongass timber in the Final EIS for the Woodpecker timber sale.  In the FEIS, the Forest Service also used the 1997 demand projections to set its goals for the volumes of timber under analysis (Pool 1), available for sale (Pool 2), and under contract (Pool 3).  The "anticipated harvest" discussed in Appendix A of the Final EIS is the harvest projected by the 1997 Brooks and Haynes report.

60.    The historical data on which the 1997 demand predictions are based include volume cut pursuant to the two long-term pulp mill contracts.

61.    From the start of the long-term contracts until and including FY 2000, the long-term contracts, including the KPC settlement and extension, accounted for the large majority of the timber cut in the Tongass.

62.    The timber logged from the Tongass between 1997 and 2000 included significant volume provided by the KPC Settlement Agreement and the one-year extension thereof.  In FY 1997, KPC removed approximately 69 mmbf.  In FY 1998, KPC removed approximately 80 mmbf.  In FY 1999, approximately 87 mmbf was removed under the Settlement Agreement.  In FY 2000, approximately 80 mmbf was removed under the Settlement Agreement as extended.  No Tongass timber has been cut pursuant to KPC's 50-year contract, the Settlement Agreement, or extension since FY 2000.

**Exhibit 21, page 14 of 27**

63.    Annual timber volume cut on the Tongass since the end of the long-term contracts and KPC settlement, as extended, has been significantly lower than the 1997 demand predictions. From FY 1996 to FY 2000, as KPC was finishing out its contract, the logging volume on the Tongass averaged approximately 130 mmbf per fiscal year.  In FY 2001 and FY 2002 the volume logged on the Tongass was approximately 48 mmbf and 34 mmbf respectively.  The volume logged in FY 2003 was approximately 51 mmbf.  The FY 2003 total included approximately 16 mmbf cleared for the Southeast electrical intertie on behalf of Ketchikan Public Utilities.

64.    The 1997 demand predictions are predicated in part on the assumption that a market would develop for low-grade saw logs, utility logs, and manufacturing residue to fill the niche left by the closure of the pulp mills.  Such a market has not arisen.

65.    The Forest Service has recognized that there were already significant differences between the assumptions underlying Brooks and Haynes' 1997 projections and actual conditions in 2000.

66.    Brooks and Haynes estimated that North America's share of Japanese softwood lumber imports would range from 70 to 76 percent, depending on their scenario.  North America accounted for just 61 percent of Japanese softwood lumber imports in 1999.

67.    The dollar value of Tongass timber exports to Japan has declined by more than half over the last five years.

68.    There is no current market for chipped Tongass logs.

69.    The loss of the market for wood chips has important implications for the economic viability of timber sales on the Tongass.  The lack of a market for chips also has

resulted in an increase in applications to export low grade round Sitka spruce and hemlock logs cut from the Tongass.

70.    The veneer plant constructed by Gateway Forest Products in Ketchikan operated for approximately 9-10 months before ceasing production in December 2001, notwithstanding significant public assistance in financing the mill and providing startup timber for it.

71.    The changes in demand and prices have had significant effects on the Southeast Alaska timber industry and the profitability of the remaining facilities.

72.    Since the end of the KPC settlement agreement, as extended, two major Southeast Alaska wood products companies – Gateway Forest Products, Inc. and Silver Bay Logging, Inc. – have filed for bankruptcy protection.

73.    Gateway Forest Products has ceased operation and the majority of its assets have been liquidated.

74.    Prices for all species of trees logged on the Tongass have declined considerably over the last five years.

75.    From FY 1998 to FY 2002, the Forest Service made about 263 timber sale offerings on the Tongass.

76.    Of the sale offerings in this time period, about 75 received no bids.  About 139 received only one bid.  About 49 received multiple bids.

77.     From September 19, 2002 to September 19, 2003 the Forest Service made about 48 timber sale offerings on the Tongass.

78.    Of the sale offerings in this time period, about 28 received one bid.  About 15 received no bids.  About five received multiple bids.  Three of the sales were offered twice during this time period.

**Exhibit 21, page 16 of 27**

79.    In FY03, the Forest Service made about 44 timber sale offerings on the Tongass.

80.    Of the sale offerings in FY03, about 25 received one bid.  About 14 received no bids.  About five received multiple bids.  Three of the sales were offered twice during this time period.

81.    In 2003, Gateway Forest Products and the Forest Service entered into an agreement canceling the nine timber sales it had under contract with a total volume of approximately 108 mmbf.

82.    The Brooks and Haynes demand projections have not been updated since 1997.

83.    In January 2004, the Forest Service announced that 20 timber sales under contract at the time would be available for cancellation by mutual agreement with the purchasers.  All of these sales were originally awarded between October 1, 1995 and January 1, 2002.  They contained about 138 mmbf of remaining volume.  The Forest Service stated that all 20 sales were "uneconomical" under current timber markets.  The Forest Service further stated that it was highly unlikely that markets would improve enough for these sales to become economical during the life of the timber sale contract.

Timber Sale Losses

84.    Each year, the Forest Service spends tens of millions of dollars administering the Tongass timber sale program.

85.    The Forest Service keeps detailed records of the money it shows as spent each year on the timber sale program.  Some of that information is made available to the public as part of the annual monitoring reports.

86.    The Forest Service reported that in FY 1999 it spent $19,842,546 on "timber management," $7,685,131 on "timber road construction," more than $5 million on "general administration," and more than $3 million on "ecosystem planning, inventorying, and monitoring."

87.    The Forest Service reported that in FY 2000 it spent $14,524,473 on "timber management," more than $3 million each on "road construction" and "road maintenance, nearly $4 million on "general administration," and more than $1 million on "ecosystem planning, inventorying, and monitoring."

88.    The Forest Service reported that in FY 2001 it spent $21,192,221 on "timber management," more than $13 million on "roads" and more than $2 million on "ecosystem planning, inventorying, and monitoring."

89.    The Forest Service reported that in FY 2002 it spent $17,9234,470 on "timber management," more than $15 million on "roads" and more than $3 million on "ecosystem planning, inventorying, and monitoring."

90.    In FY 1999, income to the Forest Service for timber sold from the Tongass totaled approximately $5,456,000.  In FY 2000, income from timber sold from the Tongass totaled approximately $5,582,000.  That number declined to approximately $1,855,000 in FY 2001 and approximately $1,242,000 in FY 2002.  In FY 2003, income to the Forest Service for timber sold from the Tongass totaled approximately $1,464,000.

91.    These costs, and the associated losses, were not discussed during the NEPA process for the Woodpecker timber sale.

92.    Instead, the discussion of "public investment" in the Woodpecker FEIS simply cites outdated and incomplete "budget allocation costs and management expenses" as estimates

of the costs incurred by the Forest Service.  The budget estimates do not reflect accurately the costs borne by the Forest Service in administering the Woodpecker timber sale.

93.    The Forest Service itself has recognized in its annual monitoring reports that these numbers are inaccurate and should be revised.

94.    Moreover, the Woodpecker FEIS does not present the costs borne by the Forest Service in a way that allows the public or the decisionmaker to understand the total expense that would be borne by the Forest Service for each alternative.  Nor does it show those costs in conjunction with the predicted revenues.  That failure prevents the public and the decisionmaker from determining that the alternatives will result in significant losses for the Forest Service and taxpayers.

95.    Accordingly, the evaluation of the "public investment" necessary to administer the Woodpecker sale is incomplete and misleading, and does not accurately reflect the actual costs incurred by the Forest Service.


COUNT I

Failure to Ensure Wildlife Viability

(National Forest Management Act)

96.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-95.

97.    The National Forest Management Act (NFMA) requires the Forest Service to adopt regulations for national forest planning.  16 U.S.C. § 1604.

98.    In formulating and adopting the Tongass Plan, the Forest Service was required by its NFMA regulations in effect at the time, 36 C.F.R. § 219.19 (2000), to manage fish and

**Exhibit 21, page 19 of 27**

wildlife habitat "to maintain viable populations of existing native and desired non-native vertebrate species" found on the Tongass.

99.    In formulating, adopting, and implementing the Tongass Plan, the Forest Service was required by its NFMA regulations in effect at the time, 36 C.F.R. § 219.27 (2000), to "[p]rovide for adequate fish and wildlife habitat to maintain viable populations of existing native vertebrate species."

100.    For planning purposes, the Forest Service defined a "viable population" in 36 C.F.R. § 219.19 (2000) as "one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area."

101.    In adopting the Tongass Plan and deciding to implement it through the Woodpecker decision, the Forest Service failed to ensure the population viability of vertebrate species in violation of 36 C.F.R. §§ 219.19 & 219.27 (2000).

COUNT II

Miscalculation of Market Demand in the Tongass Plan

(National Forest Management Act, Tongass Timber Reform Act,

National Environmental Policy Act, Administrative Procedure Act)

102.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-95.

103.    The National Forest Management Act requires the Forest Service to prepare a land management plan for each national forest.  16 U.S.C. § 1604.

104.    The NFMA specifies that each management plan shall:

(1) provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960 (16 U.S.C. 528-531), and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness; and

(2) determine forest management systems, harvesting levels, and procedures in the light of all of the uses set forth in subsection (c)(1) of this section ….

16 U.S.C. § 1604(e).

105.    The Tongass Timber Reform Act exhorts the Forest Service to "seek" to provide enough timber to meet market demand, subject to all applicable laws and "to the extent consistent with providing for the multiple use and sustained yield of all renewable forest resources." 16 U.S.C. § 539d.

106.    The Record of Decision for the Tongass Plan is the formal decision document setting forth the Regional Forester's rationale for adopting the Plan.  40 C.F.R. § 1505.2.

107.    In explaining the basis for the Allowable Sale Quantity of timber that may be cut under the Tongass Plan, the Forest Service made an error in projecting market demand for timber.  The Record of Decision nearly doubles the actual projections.  The market demand projection influenced the amount of land to be made available for logging.  The result was a plan that allowed logging up to an average of 267 mmbf/year, while the demand projection for the highest market scenario was an average of 154 mmbf/year.  More likely medium and low market scenarios had lower demand projections.

108.    In making this error, the Forest Service allowed logging in areas that would cause unnecessary harm to other multiple use objectives, such as wildlife and recreation.

109.    The 1997 Tongass Plan FEIS makes the same error in reporting projected market demand and harvest levels.  The FEIS also uses the same error to predict employment and income levels under the various alternatives.  The result is that the FEIS presents false and

misleading data regarding the likely amount of logging and predicted economic benefits of the proposed action and alternatives.

110.    Under the Administrative Procedure Act, the Court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law …."  5 U.S.C. § 706(2)(A).

111.    In adopting the Tongass Plan based on a significant error projecting market demand, and in implementing the Plan in the Woodpecker timber sale project, the Forest Service acted arbitrarily and in violation of its obligations under the National Forest Management Act and the Tongass Timber Reform Act.

112.    The 1997 Tongass Plan FEIS violates NEPA by presenting false and misleading information about projected market demand, logging levels, and economic effects.


COUNT III

Inadequate Alternatives in Tongass Plan FEIS

(National Environmental Policy Act)

113.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-95.

114.    In formulating and implementing the Tongass Plan, the Forest Service was required by National Environmental Policy Act (NEPA) to provide "detailed statement[s] on … alternatives to [its] proposed action[s]," 42 U.S.C. § 4332(C)(iii), and to "study, develop, and describe appropriate alternatives to [its] recommended courses of action."  42 U.S.C. § 4332(E).

115.    White House Council on Environmental Quality ("CEQ") regulations, binding on and adopted by the Forest Service, implement NEPA in part by requiring that an EIS shall

"[r]igorously explore and objectively evaluate all reasonable alternatives" to the agency's proposal.  40 C.F.R. § 1502.14(a).

116.    Managing the Tongass by preventing logging in the existing large blocks of old growth, including undeveloped watersheds, is, and was in 1997, an appropriate and reasonable alternative for the Tongass Plan.  This fact is shown by recommendations from scientists and the public that the Forest Service adopt that approach, and by the fact that the agency itself did eventually adopt it for a time by deciding to protect remaining roadless areas on the Tongass.

117.    All of the alternatives in the 1997 FEIS, except Alternative 1, would allow logging at levels in excess of the medium scenario projected by Brooks and Haynes in their May 15, 1997 report.

118.    Managing the Tongass to allow a timber sale program that more closely approximated the actual and likely demand for timber as projected by Brooks and Haynes is, and was in 1997, an appropriate and reasonable alternative for the Tongass Plan.

119.    The Forest Service's failure in the Tongass Plan FEIS to study, develop, describe, rigorously explore, and/or evaluate the alternative of maintaining an active logging program restricted to trees outside of the existing large blocks of old growth, including undeveloped watersheds, violated 42 U.S.C. §§ 4332(C) and (E) and 40 C.F.R. § 1502.14(a).


COUNT IV

Failure to Disclose Highgrading

(National Environmental Policy Act)

120.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-95.

**Exhibit 21, page 23 of 27**

121.    In formulating, adopting, and implementing the Tongass Plan, the Forest Service was required by NEPA to identify "the environmental impact of [its] proposed action."  42 U.S.C. § 4332(C)(i).

122.    White House CEQ regulations, binding on and adopted by the Forest Service, implement NEPA in part by requiring that an EIS shall discuss "the environmental effects of alternatives," including "[d]irect effects and their significance" and those that "are caused by the action and … reasonably foreseeable."  40 C.F.R. §§ 1502.16 & 1508.8.

123.    The Forest Service violated 42 U.S.C. § 4332(C) and 40 C.F.R. §§ 1502.16 and 1508.8 by failing to include in the Woodpecker FEIS and in the Tongass Plan EIS information available to it about high volume stands, about the history and significance of past highgrading, about reasonably foreseeable future highgrading, and about the possible impacts and significance of highgrading by volume class, volume strata, and/or tree species.


COUNT V

Misleading Presentation of Market Demand

(National Environmental Policy Act)

124.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-95.

125.    NEPA requires federal agencies to prepare environmental impact statements on any proposal for "major Federal actions significantly affecting the quality of the human environment . . .."  42 U.S.C. § 4332(C).

126.    The presentation of incomplete or misleading information in an EIS violates NEPA.

**Exhibit 21, page 24 of 27**

127.    The information about market demand for timber contained in the Woodpecker FEIS is both incomplete and misleading.  In the FEIS, the Forest Service relied on outdated market demand projections to justify the projects.  The FEIS failed to present the public and decisionmaker with relevant, accurate information known to the Forest Service about market conditions.

128.    The false, incomplete and misleading information in the Woodpecker EIS violates NEPA.

COUNT VI

Public Investment Analysis

(National Environmental Policy Act)

129.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-95.

130.    An EIS must disclose to the public the costs the agency – and thereby the public – will bear in undertaking the proposed action.  42 U.S.C. § 4332.

131.    The "Public Investment" analysis contained in the Woodpecker FEIS is incomplete and misleading because it does not reflect current cost information collected annually by the Forest Service.  Actual costs are significantly higher than reported in the FEIS.  The agency and the public will bear significant losses on the project not disclosed in the FEIS.

132.    The presentation of the "Public Investment" estimates are misleading because they do not reasonably allow the public or decisionmaker to determine the total loss that the Forest Service expects to incur on the timber sale.

133.    The failures to present accurate information on public investment mislead and fail to inform the public and decisionmaker and thereby violate NEPA.

**Exhibit 21, page 25 of 27**

**PRAYER FOR RELIEF**

WHEREFORE, the plaintiffs respectfully request that the court:

1.  Enter a declaratory judgment that:

    a.  the Forest Service violated the requirement in its NFMA regulations to ensure minimum viable populations of wildlife well-distributed across the Forest;

    b.  the decision adopting the 1997 Tongass Plan was arbitrary, because it was based on a significant error in projecting market demand;

    c.  the FEIS for the Tongass Plan violates NEPA by disclosing erroneous information about projected market demand and resulting economic impacts;

    d.  the FEIS for the Tongass Plan violates NEPA by failing to consider reasonable alternatives to protect more large blocks of old growth, including undeveloped watersheds, and important high value stands;

    e.  the FEISs for the Woodpecker project and for the Tongass Plan fail adequately to disclose the practice of highgrading and its adverse impacts in violation of NEPA;

    f.  the FEIS for the Woodpecker project violates NEPA by presenting false, incomplete and misleading information about market demand for timber and resulting economic effects; and

    g. the FEIS for the Woodpecker project violates NEPA by presenting false, incomplete and misleading information about the costs to the public of the timber sales;

2.  Enter appropriate injunctive relief;

3.  Award plaintiffs the costs of this action, including reasonable attorneys' fees; and

4. Grant such other relief as this Court deems just and proper.

Respectfully submitted this 23rd day of March 2004,

Thomas S. Waldo (by Damien A. Shane
Bar No 040.3007)

Thomas S. Waldo
Eric P. Jorgensen
EARTHJUSTICE

Nathaniel S. W. Lawrence
NATURAL RESOURCES DEFENSE COUNCIL

Attorneys for Plaintiffs

Exhibit 21, page 27 of 27