

United States
Department of
Agriculture

Forest Service

Tongass
National
Forest
R10-MB-570

January 2006



# Kuiu Timber Sale Area

# Draft Environmental Impact Statement



**Exhibit 38, page 1 of 8**

# 2 Alternatives

## 2.2 Alternatives Considered In Detail

The No-Action Alternative (Alternative ), Proposed Action (Alternative 4) and three other action alternatives were considered in detail. Figures 2-1 through 2-5 display the five alternatives. Tables 2-1 and 2-2 compare the proposed activities and effects of the alternatives.

### 2.2.1 Alternative 1 (Figure 2-1)

This alternative proposes no timber harvest, road construction, changes to the road management objectives, or other activities within the Kuiu Timber Sale Area at this time. It represents the existing condition of the Kuiu Timber Sale Area. It does not preclude future timber harvest or other activities from this area.

### 2.2.2 Alternative 2 (Figure 2-2)

This alternative was developed to minimize impacts to wildlife and watersheds, and have no impact to roadless areas. The proposed timber harvest would result in the production of approximately 14.6 million board feet (mmbf) of timber from approximately 491 acres. Only ground-based logging systems would be used. The amount of trees remaining in a unit after harvest would vary from zero to fifty percent of the stand's pre-harvest basal area.

Where high wildlife values are identified, approximately 50 percent of the stand basal area would be retained to provide cover and structure for wildlife habitat. Harvest units in the Recreational River LUD would retain 50 percent of the stand basal area to retain scenic values. Logs would be transported to existing log transfer facilities (LTFs) in either Saginaw Bay or Rowan Bay. The Saginaw Bay LFT would require some reconstruction before use.

Approximately 2.9 miles of temporary road construction would be necessary for timber harvest. No new long-term use classified roads would be constructed. Temporary road construction would not cross any Class I or II fish streams in this alternative. The reconstruction of closed roads would require the installation of three crossing structures on Class I streams, and three crossing structures on Class II streams. Temporary road construction and closed road reconstruction would require placement of one crossing structure on a Class III stream, and five crossing structures on Class IV streams. These culverts or bridges would be removed upon completion of harvest activities.

After timber harvest is complete, 8.2 miles of currently open roads that would be used to access timber for this project would be closed to motorized traffic and placed in storage with stream crossing structures removed (Roads 6413, 46096, and 46021). Additionally, approximately 4.5 miles of roads currently in storage (Roads 6417, 46091, 46094, and 6443) would be opened and reconstructed to access timber. After harvest, these roads would be returned to storage

condition with all stream crossing structures removed and closed to motorized traffic.

### 2.2.3 Alternative 3 (Figure 2-3)

This alternative was developed by modifying Alternatives 2 and 4 to reduce impacts to resources such as wildlife, hydrology, and fisheries while providing a larger economic return. The proposed timber harvest would result in the production of approximately 23.6 million board feet (mmbf) of timber from approximately 794 acres. Only ground-based logging systems would be used. The amount of trees remaining in a unit after harvest would vary from zero to fifty percent of the stand's pre-harvest basal area.

Where high wildlife values were identified, approximately 50 percent of the stand basal area would be retained to provide structure for wildlife habitat. Logs would be transported to existing log transfer facilities (LTFs) in either Saginaw Bay or Rowan Bay. The Saginaw Bay LTF would require some reconstruction before use.

Approximately 7.5 miles of temporary road construction would be necessary for timber harvest. No new classified roads would be constructed. One bridge would be placed across a Class II fish stream on a temporary road to reduce impacts to fish. The bridge would be removed after timber harvest activities are completed. The reconstruction of closed roads would require the installation of two crossing structures on Class I streams and three crossing structures on Class II streams. Temporary road construction and closed road reconstruction would require placement of eight crossing structures on Class III streams, and 19 crossing structures on Class IV streams. All culverts or bridges would be removed upon completion of harvest activities.

After timber harvest is complete, 8.4 miles of currently open roads that would be used to access timber for this project would be closed to motorized traffic and placed in storage with all stream crossing structures removed (Roads 6413, 46096, and 4618). Additionally, 3.2 miles of roads currently in storage that would be opened and reconstructed to access timber would be closed to motorized traffic and returned to storage condition with all stream crossing structures removed (Roads 6417, 46091, and 46094).

### 2.2.4 Alternative 4 Proposed Action (Figure 2-4)

The Proposed Action for the Kuiu Timber Sale would result in the production of approximately 42.6 million board feet (mmbf) of timber from approximately 1,425 acres. A mix of ground-based and helicopter logging systems would be used. Helicopter logging would be used to access units on steeper ground. Using helicopters reduces the need for road construction and allows a more selective harvest on steeper slopes. The amount of trees remaining in a unit after harvest would vary from zero to fifty percent of the stand's pre-harvest basal area.

**Exhibit 38, page 3 of 8**

# 2 Alternatives

Where helicopter logging is necessary to access the standing timber, trees less than 16 inches diameter at breast height (DBH) and western hemlock greater than 36 inches DBH would be left standing to improve economics. Where high wildlife values were identified, approximately 50 percent of the stand basal area would be retained to provide cover and structure for wildlife habitat. Harvested units in the Recreational River LUD would retain 50 percent of the stand basal area. Logs would be transported to existing log transfer facilities in either Saginaw Bay or Rowan Bay. The Saginaw Bay LTF would require some reconstruction before use.

Approximately 19 miles of temporary road construction would be necessary for timber harvest. No new classified roads would be constructed. Temporary road construction would require the installation of two crossing structures across Class II fish streams. The reconstruction of closed roads would require the installation of three crossing structures on Class I streams, and three crossing structures on Class II streams. Temporary road construction and closed road reconstruction would require placement of 14 crossing structures on Class III streams, and 19 crossing structures on Class IV streams. All culverts or bridges would be removed upon completion of harvest activities.

After timber harvest is complete, 11 miles of roads that are currently open and that would be used to access timber for this project would be closed to motorized traffic and placed in storage with all stream crossing structures removed (Roads 6413, 46096, 46021, 6418, and a portion of 6427). Additionally, 6.1 miles of roads currently in storage that would be opened and reconstructed to access timber would be closed to motorized traffic and returned to storage condition with all stream crossing structures removed (Roads 6417, 46091, 6422, 6443, and a portion of 6427).

### 2.2.5 Alternative 5 (Figure 2-5)

This alternative proposes only even-aged management with clearcut harvesting of timber to increase the economic return. The proposed timber harvest would result in the production of approximately 36.3 million board feet (mmbf) of timber from approximately 1,231 acres. Only ground-based logging systems would be used. Logs would be transported to existing log transfer facilities in either Saginaw Bay or Rowan Bay. The Saginaw Bay LTF would require some reconstruction before use.

Approximately 17.1 miles of temporary road construction would be necessary for timber harvest. No new classified roads would be constructed. Temporary road construction would require the installation of two crossing structures across Class II fish streams. The reconstruction of closed roads would require the installation of three crossing structures on Class I streams, and three crossing structures on

# 2 Alternatives

## 2.6 Identification of the Preferred Alternative

At this point in the analysis, Alternative 4 has been identified as the Preferred Alternative. The recommendations were based on the environmental analysis and public and agency comments received to this date. The Responsible Official may select this alternative, another alternative, or a modification of one of the alternatives. The Responsible Official may also select another old-growth habitat reserve (OGR) option from the small OGR options discussed in Issue 2: Wildlife Habitat and Subsistence in Chapter 3.

## 2.7 Alternatives Considered but Eliminated From Detailed Study

Several alternatives were considered during the planning process, but not all have been included in the EIS for detailed study. The alternative dropped from detailed analysis is described briefly below, along with the reasons for not considering it further.

Some units within the unit pool were also eliminated from further consideration due to environmental concerns.

### 2.7.1 Helicopter-logging only

The possibility of developing a helicopter logging only alternative, which would eliminate the need for additional road construction, was considered at the request of U.S. Fish and Wildlife Service and other commenters. Because helicopter logging is the most expensive yarding method, using this as the only method would not allow the cost of helicopter logging to be offset by more cost-effective conventional ground-based systems, making this alternative financially inefficient. Using the NEAT economic model and given present market conditions, the economics of helicopter logging could not be made positive, even with increased timber volumes.

### 2.7.2 Units Dropped from the Unit Pool

Several units were dropped from consideration within any alternative. They are listed in Table 2-3 along with the rationale for elimination.

# Why is Timber from the Tongass National Forest Being Offered for Sale?

**National Legislation**

On a national level, the legislative record is clear about the role of the timber program in the multiple-use mandate of the national forests. One of the original objectives for creation of national forests was to provide natural resources, including timber, for the American public. The Organic Act of 1897 (partially repealed in 1976) directed the agency to manage the forests in order to "improve and protect the forest ... [and] for the purpose of securing favorable conditions of water flows, and to _furnish a continuous supply of timber_ for the use and necessities of the citizens of the United States" (emphasis added). The Multiple-Use Sustained Yield Act of 1960 directs the Forest Service to administer federal lands for "outdoor recreation, range, timber, watershed, and wildlife and fish purposes."

The National Forest Management Act (NFMA) of 1976 states that "the Secretary of Agriculture...[may sell, at not less than appraised value, trees, portions of trees, or forest products located on National Forest System Lands]." Although the heart of the Act is the land management planning process for national forests, the Act also sets policy direction for timber management and public participation in Forest Service decision-making. Under NFMA, the Forest Service was directed to "limit the sale of timber from each national forest to a quantity equal to or less than a quantity which can be removed from such forest annually in perpetuity on a sustained-yield basis."

The NFMA directs the Forest Service to complete land management plans for all units of the National Forest System. Forest Plans are developed by an interdisciplinary team to provide for the coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness. Forest plans designate areas of national forest where different management activities and uses are considered appropriate including those areas suitable for timber harvest.

**Alaska-Specific Legislation**

Timber from the Tongass National Forest is being offered for sale as part of the multiple-use mission of the Forest Service identified in the public laws guiding the agency. In addition, Alaska-specific legislation and the Tongass Forest Plan direct the Forest Service to seek to provide timber to meet market demand, subject to the budget appropriations process.

Legislation unique to Alaska directs the Forest Service to maintain a commercial timber program. The Alaska National Interest Lands Conservation Act (ANILCA) and the Tongass Timber Reform Act (TTRA) provide direction on the issue of Tongass timber supply. Section 101 of TTRA amended the ANILCA timber supply mandate and fixed

budget appropriations and replaced them with the following text in Section 705 (a):

> Sec. 705. (a) Subject to appropriations, other applicable law, and the requirements of the National Forest Management Act of 1976 (P.L. 94-588); except as provided in subsection (d) of this section, the Secretary shall, to the extent consistent with providing for the multiple use and sustained yield of all renewable forest resources, seek to provide a supply of timber from the Tongass National Forest which (1) meets the annual market demand for timber from such forest and (2) meets the annual market demand from such forest for each planning cycle."

**Tongass National Forest Land and Resource Management Plan (Forest Plan, as amended)**

The Record of Decision for the Tongass Land and Resource Management Plan Revision (Forest Plan) was signed by the Alaska Regional Forester in 1997. The Forest Plan incorporated new resource information and scientific studies and reflected an extensive public involvement process.

There was direction to supplement the 1997 Final EIS to evaluate and consider roadless areas within the Tongass for recommendation as potential wilderness areas as part of the March 2001 US District Court decision on litigation on the 1997 Forest Plan. The Record of Decision for the Supplemental Environmental Impact Statement was signed in February 2003. The No-action Alternative was selected; no additional lands were recommended for Wilderness designation and no changes were made to the land use designations (LUDs) from the 1997 Record of Decision. The 1997 Forest Plan defines appropriate activities within each LUD. Approximately 74 percent of the Tongass is allocated to LUDs where commercial timber harvest is not allowed.

Amendments have been made to the 1997 Forest Plan, primarily to modify small old-growth habitat reserves to meet Forest Plan criteria. These amendments have been accomplished with environmental analysis and are documented in decision documents. Due to those modifications, land use designations (LUDs) in certain areas have changed from development LUDs that allow timber harvest to Old-growth Habitat LUD or changed from the Old-growth Habitat LUD to development LUDs. Since the plan was signed in 1997, these amendments have affected approximately two percent of the acres designated as suitable commercial timber by re-designating them as Old-growth Habitat LUD where timber harvest is not allowed.

The effects to resources in the Final EIS for the 1997 Forest Plan were analyzed as if the full timber harvest allowed under each alternative would occur over the next decade and into the future. In that way the Forest Plan analysis displayed the maximum environmental effects that could be reasonably foreseen. Since substantially less timber volume and acres have been harvested in the first eight years of Forest Plan implementation than was analyzed, the effects on resources are expected to be less than

**Exhibit 38, page 7 of 8**

projected in the 1997 Final EIS. The environmental effects analysis in the Forest Plan estimated 267 MMBF and 10,200 acres would be harvested per year. Forest Plan monitoring indicates that average annual harvest has been less than that amount (Table A-1).

Table A-1
Projected and Actual Tongass Harvest (MMBF)

| Fiscal Year | Projected Harvest [1] | | | Actual Harvest |
|---|---|---|---|---|
| | Low | Medium | High | |
| 1998 | 77.3 | 86.0 | 112.2 | 119.8 |
| 1999 | 86.4 | 99.3 | 127.9 | 145.8 |
| 2000 | 95.5 | 115.9 | 142.7 | 146.8 |
| 2001 | 104.6 | 129.0 | 157.7 | 47.8[2] |
| 2002 | 113.7 | 134.9 | 173.1 | 33.8 |
| 2003 | 122.8 | 140.8 | 188.9 | 50.8 |
| 2004 | 131.9 | 146.5 | 205.0 | 46.0 |
| 2005 | 131.9 | 152.2 | 221.4 | 49.6 |
| 2006 | 131.9 | 157.8 | 238.2 | |
| 2007 | 132.0 | 163.4 | 255.3 | |
| Average | 112.8 | 132.6 | 182.2 | |

[1] From Morse (April 2000) and Brooks and Haynes 1997.

[2] Truncated logging season due to litigation.

On August 5, 2005, the Ninth Circuit Court of Appeals ruled that a misinterpretation of the Brooks and Haynes 1997 draft timber demand projections rendered the 1997 Record of Decision for the Tongass Land Management Plan Revision arbitrary and capricious. The court of appeals remanded the matter for further proceedings consistent with the court's opinion (*Natural Resources Defense Council v. U.S. Forest Service*). The process of remedying the defects identified by the court of appeals will be time-consuming. Delaying the completion of this and other site-specific projects should be avoided because it would result in substantially undermining the Forest Service's ability to respond to timber demand.