Steve Silver
Amy Gurton Mead
Robertson, Monagle & Eastaugh
801 W. 10th Street, Suite 300
Juneau, Alaska 99801
(907) 586-3340 (telephone)
(907) 586-6818 (facsimile)

ssilver628@aol.com
agmead@romea.com


Attorneys for
Alaska Forest Association,
Intervenor Defendant

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ORGANIZED VILLAGE OF KAKE et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES FOREST SERVICE, et al., <br><br> Defendants. | Case No. J04-029 CV (JKS) |

## OPPOSITION TO PLAINTIFFS' MOTION FOR EQUITABLE RELIEF

# TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    THE RELIEF REQUESTED BY THE PLAINTIFFS IS
          INEQUITABLE "DEMAND". . . . . . . . . . . . . . . 3

    II.   ANY REMEDY IMPOSED BY THE COURT MUST TAKE INTO
          ACCOUNT CONGRESS' INTENT THAT MARKET DEMAND
          BE MET . . . . . . . . . . . . . . . . . . . . . .8

          A.    Allowing Logging to Remain at
               "Current Levels" Will Irreparably
               Harm the Timber Industry . . . . . . . . . 9

               i.   Historic levels are not viable . . . . .10

               ii.  If economic timber is made available,
                    it will be utilized. . . . . . . . . .14

               iii. The impact of the Japanese market. . . .16

    III. THE FOREST SERVICE MUST CONSIDER MARKET DEMAND IN
          ORDER TO COMPLY WITH FEDERAL LAW . . . . . . . .18

    IV.   RECENT DEMAND STUDY SUPPORTS AFA'S ASSERTIONS. . .20

    V.    PLAINTIFFS' ACTIONS BELIE THEIR ASSERTION THAT DEMAND
          IS ONLY 50 MMBF. . . . . . . . . . . . . . . . .22

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . 24

**TABLE OF AUTHORITIES**

Alaska National Interest Lands Conservation Act
      (16 USC § 3101, *et seq.*) . . . . . . . . 1, 13, 19, 20

*Hoonah Indian Ass'n v. Morrison*
      170 F.3d 1223, 1225 (9th Cir. 1999). . . . . . . . .19

National Forest Management Act
      (16 USC § 1600, *et seq.*). . . . . . . . . . . 1, 8, 13

Natural Resources Defense Council v. U.S. Forest Service,
      421 F.3d 797, 801 (9th Cir. 2005) . . . . . . . . 8, 9

*Ohio Forestry Assoc., Inc., v. Sierra Club*,
      523 U.S. 726 (1998). . . . . . . . . . . . . . . . 3

*Sierra Club v. Peterson*, 185 F.3d 349, 370 (5th Cir. 1999). . . .8

Tongass Timber Reform Act
      (16 U.S.C. § 539d). . . . . . . . 1, 9, 13, 18, 19, 20

INTRODUCTION

Claiming that "All logging in the Tongass will create irreparable harm",[1] Plaintiffs seek to enjoin a number of existing and future timber sales on Kuiu Island and in roadless areas of the Tongass.[2]

The Plaintiffs' proposal is anything but equitable. It poses a serious and tangible threat to AFA's, its members' and their employees' legally cognizable interests, and ignores Congress' unequivocal policy decision to direct, support and fund a timber harvest program in the Tongass National Forest.[3]

---

[1] Motion for Equitable Relief Pending revision of the Tongass Land Management Plan (hereinafter "Brief") at p. 6.
[2] The Plaintiffs' proposal would add a great deal of acreage to the existing 5.4 million acres of permanent wilderness designated by Congress pursuant to ANILCA(P.L. 96-487,section 703), and the more than 1.0 million acres in protected wilderness and other areas pursuant to TTRA(P.L 101-626, 16 USC 539d et. seq, secs. 201 and 202). Once again, Plaintiffs are attempting to make themselves "timber czar" designating more and more land to be off-limits to timber harvest, despite the unambiguous declaration by Congress and the Forest Service that those areas not so designated be available for timber harvest, subject to applicable law and regulation.
[3] *See* National Forest Management Act (16 USC § 1600, *et seq*.), Alaska National Interest Lands Conservation Act (16 USC § 3101, *et seq*.), Tongass Timber Reform Act (16 U.S.C. § 539d), and annual Department of Interior and Related Agencies Appropriation Bills over at least 20 years (*see* Public Law No: 109-54, sec. 416, Public Law 108-447 sec. 317, Public Law 108-447, sec. 318, Public Law No 109-108, sec. 318, Public Law No: 108-7 sec. 318, Public Law No: 107-63, sec. 323. 318 Public Law No: 107-63, Public Law No: 106-291, sec. 328. Public Law 105-83, sec. 347)).

1

The Plaintiffs profess their proposed "resolution"
protects their interests "without causing unnecessary risk
to the active sawmills in Southeast Alaska or the
communities in which they operate."[4]  The Plaintiffs could
not be more wrong.  Their solution would place the timber
operators in dire straits.  For example, there simply is no
substitute timber for the major sales planned for Fiscal
Years 2006 and 2007[5].  If these sales are enjoined, the loss
of some 173.5 mmbf would have devastating effects on AFA
and its members.

Additionally, as Plaintiffs fail to provide any
information as to which areas would be closed to timber
harvest by their proposed order there is no way to properly
evaluate the total impact of the Plaintiffs' proposal.
Plaintiffs define the "roadless area" to be any unroaded
area greater than 5000 acres not within 1200 feet of an
existing road, but provide no maps, legal descriptions or
summary of how much acreage this would encompass of the
17.6 million acre forest.[6]  Regardless, in most instances,

---

[4] Brief, p. 3.

[5] These planned sales include Kuiu Roaded(34mmbf, FY 2006),
Scratchings (26 mmbf, FY 2007) Synchro(40mmbf, FY 2007),
Straight Creek (18mmbf, FY 2007), Emerald Bay (16 mmbf FY
2006), (Dutchman 30 mmbf) and  North (6.0 mmbf, FY 2006)
and  Dolomi (3.5mmbf, FY 2007). *See* Exh. 1.

[6] See Plaintiffs' [Proposed] Order Granting Equitable Relief
at p. 2. Although the Forest Service has stated its belief

the removal of the "roadless" sections from individual
sales would devastate the economics of the sale.[7]

The AFA joins the Federal Defendants with respect to
the legal standard to be imposed, and concurs that *Ohio
Forestry Assoc., Inc., v. Sierra Club*,[8] limits the scope of
remedies available.  Under this precedent, the Plaintiffs
cannot properly demand an injunction on any sales not
specifically before the Court.  The mere filing of a motion
does not provide the necessary jurisdiction.

The purpose of this brief is to explain to the Court
how the Plaintiffs' proposal would work a direct hardship
on the AFA and its members, threatening the very existence
of the remaining timber industry despite Plaintiffs'
assurances to the contrary.  This brief will also show that
the Plaintiffs do not really believe their statement that
timber demand has been reduced to a pre-World War II level
of 50 mmbf, as their actions to intimidate potential owners
from reopening the veneer mill at Ketchikan demonstrate.

ARGUMENT

I.    THE RELIEF REQUESTED BY THE PLAINTIFFS IS INEQUITABLE

The Plaintiffs claim that their proposed solution is

---

as to which areas are considered "roadless", there is no
certainty that the Forest Service's designations will match
the Plaintiffs.  Exh. 1.
[7] Declaration of Owen Graham, ¶ 9.
[8] 523 U.S. 726 (1998).

3

justified by the fact that it "enable[s] the logging companies to continue operations at the levels that have prevailed consistently on the Tongass for the last five years . . ."[9]  The premise that continuing operations at current levels avoids any harm to the logging community is faulty.  The timber sale program is already seriously constrained, with the existing mills and supporting companies struggling to stay in business.[10]

The Forest Service and timber industry have long acknowledged that in order to sustain the industry and meet market demand, there needs to be a three-year supply pipeline of timber volume under contract.[11]  This amount is necessary to assure operators that the raw material they need to operate efficiently will be available when needed, and to permit the companies to plan and prepare for timber harvest and manufacturing of products. That need is not

---

[9] Brief, p. 3.

[10]  See e.g. Declaration of Jackie DuRette. DuRette Construction was the winning bidder on both the Skipping Cow and Upper Carroll sales. If those sales are enjoined, the company will go under. 15 family jobs (each providing about $50,000 per year) and two subcontractor contracts will be lost and DuRette Construction, after 25 years of struggling to survive in Southeast Alaska, will face certain forced liquidation, leaving the DuRettes in financial ruin.

[11] See Exhibit 2, June 24, 2003 letter from Alaska Regional Forester Dennis Bschor to Governor Frank Murkowski, p. 2 stating that "The Tongass overall goal is to have three years of economical timber supply under contract."

being met.

The installed capacity of the remaining mills,
including those currently idle, is approximately 370
million board feet per year (this number does not include
mills that can process utility grade logs, which comprises
about 15% of the timber in southeast Alaska)[12]; thus a
three-year supply would mean well over a billion board feet
of timber. Currently, the volume of federal timber
available and under contract is about 92 million board
feet.[13] The few mills that are struggling to stay open have
an installed capacity of about 200 million board feet, but
even those few mills have only enough timber under contract
for six months of normal operation.[14]

Even this meager supply would be seriously jeopardized
if the Court were to adopt the Plaintiffs' suggested
remedy.  The Plaintiffs blithely assert that other,
adequate timber can be immediately (and magically) produced

---

[12] Graham Dec., ¶ 3.
[13] Graham Dec., ¶ 3.
[14] *See* Graham Dec. at ¶ 3. In addition to the federal
timber, there is about 22 million board feet of State
timber under contract. In total from all sources, the
Viking mill has about 58 mmbf of timber under contract,
which represents only about 73% of its annual capacity. The
Wrangell sawmill has about 9 mmbf under contract which
represents only about 14% of their annual capacity, none of
this from federal timber, and the Ketchikan sawmill has
about 24 mmbf under contract which represents only about
70% of its annual capacity.  See Graham Declaration at ¶ 4.

5

to compensate for the timber under preparation which the
Plaintiffs wish to enjoin.  The Plaintiffs are wrong;
replacement timber does not exist.  The long, three year
process of timber preparation (with the three year estimate
not even taking into account the litigation delays caused
by lawsuits regularly brought by the Plaintiffs) cannot
abide such an irreparable interruption as demanded by the
Plaintiffs.[15]

The depressed state of current timber operations are a
direct result of a shortage in economic, federal Tongass
timber supply.  As of June, 24, 2003, half of the volume
that was currently under contract was recognized as being
"associated with projects having poor economics due to
changed market and processing conditions."[16]  Conditions
have not improved.  Although the Plaintiffs their proposed
relief strikes a "reasonable balance by allowing logging to
continue at prevailing levels"[17], the reality is that
continuing even at the "prevailing levels" would be a death
knell to the timber industry in Southeast Alaska.

It takes at least 360 mmbf to sustain a fully
integrated, competitive timber industry in Southeast

---

[15] Graham Dec. at ¶ 2.
[16] Exh 2, p. 1.
[17] Brief at p. 4.

Alaska.[18]  Despite Congress's admonition to do so, this need

has not been met for many years.  The industry has been

operating at "starvation" levels for at least the last five

years.

> - Pacific Log and Lumber (Ketchikan sawmill)
>   narrowly avoided a permanent closure and is
>   still at risk of a closure later this year
>   if additional timber is not made available.[19]
>
> - Alcan is looking at being forced to close
>   its Evergreen Timber subsidiary operations
>   permanently this year because of the ongoing
>   lack of volume available to harvest.[20]
>
> - Silver Bay Logging is operating in Wrangell
>   solely on non-federal timber because there
>   is no economic federal timber available in
>   proximity to its sawmill. The non-federal
>   timber will be depleted within a year.[21]

If Plaintiffs' proposed remedy is adopted, these and other

timber companies will not be able to continue operating.

Additionally, Plaintiffs' assertion that the timber

industry is adequately protected with solely that timber

available in the roaded areas is simply wrong.[22]  The

Plaintiffs are ignoring that the amount of timber which can

be harvested in any particular area is subject to statutory

---

[18] Graham Dec. at ¶ 3.
[19] *See* Declaration of Steve Seley, ¶ 8. *See also*, Exh. 17.
[20] *See* Declaration of Brian Brown, ¶ 9.
[21] *See* Graham Dec. at ¶ 4.
[22] Brief at p. 23 ("Logistically, the Forest Service is capable of making sufficient timber sale offerings in the short term from other, already-roaded areas, without further logging on Kuiu Island.")

and regulatory constraints. For example, with respect to
the North Thorne, Scratchings, and Traitors Cove projects,
an economic sale can only be accomplished with 5 – 22% of
total volume.[23] There simply is not enough legally
available, economic timber in the already-roaded areas to
sustain even the current state of the timber industry.

II.   ANY REMEDY IMPOSED BY THE COURT MUST TAKE INTO
      ACCOUNT CONGRESS' INTENT THAT MARKET DEMAND BE MET

      The Ninth Circuit recognized that the National Forest
Management Act[24] (NFMA) requires the Forest Service to
"balance competing demands on national forests, including
timber harvesting, recreational use, and environmental
preservation."[25]  Members of the AFA have a protected
interest pursuant to NFMA, which "is a substantive statute
imposing requirements on the Forest Service…."[26]  Pursuant
to NFMA and land planning requirements for the national
forests (including the Tongass), the Forest Service must
provide for multiple use and sustained yield of forest
resources, including timber uses.[27]  The scope of the Forest
Service's obligation is further buttressed and defined by

---

[23] Exh. 3.
[24] 16 USC §§ 1600-1614.
[25] 421 F.3d 797, 801 (9th Cir. 2005).
[26] *Sierra Club v. Peterson*, 185 F.3d 349, 370 (5th Cir. 1999).
[27] *See* 16 U.S.C. § 1604(e).

the Tongass Timber Reform Act (TTRA)[28], which requires the
Forest Service to consider "market demand" for timber.[29]
(Timber supply must "mee[t] the annual market demand for
timber from such forest and (2) mee[t] the market demand
from such forest for each planning cycle." 16 U.S.C.
539d(a)). Thus, in assessing what the appropriate remedy in
this case might be, the Court must consider the effect on
the timber sale program, timber supply availability, and
harms to AFA, its members, and the timber-dependent
communities.

    A.   Allowing Logging to Remain at "Current Levels"
           Will Irreparably Harm the Timber Industry

    The Court must engage in a balance of harms analysis
in considering whether, or to what extent, the Court should
impose a permanent injunction in this case. The end result
to any remedy fashioned by the Court should not be the
death of the timber industry. The Plaintiffs argue that
their solution is appropriate because logging levels will
remain the same, and they reason that allowing logging
levels to remain the same will result in "market demand"
being met.[30] The plaintiffs rely on the following to
support their argument:

---

[28] 16 U.S.C. § 539d(a); *see also*, 421 F.3d at 801.
[29] 421 F.3d 797, fn. 7 (9th Cir. 2005).
[30] Brief at pp. 15; 21.

- Current cutting levels are approximately the same as those that prevailed before the 50 year pulp mill contracts began, with logging levels on the Tongass remaining "remarkably stable" since the last of the logging under the pulp mill contracts;[31] and

- their belief that even if more timber were made available, it would likely either not be bid upon or would remain uncut.[32]

- their assessment of prevailing market conditions over the last five years, which they think "reflect structural changes in the market," caused, for the most part, by Japan changing "its practices and suppliers" and the Tongass sawmills being unable to find "replacement markets" for the markets lost in Japan. [33]

The Plaintiffs' belief that their proposed remedy is "reasonable" and "appropriate" is based upon faulty premises.

    i.   Historic levels are not viable

Plaintiffs' basic argument is that the demand for Tongass timber has returned to an historic level that prevailed before World War II, approximately 50 mmbf.[34] This premise is completely incorrect. The fact that harvesting levels have approximated 50 mmbf per year in the last few years does not mean that demand is the same as it was pre-World War II.

---

[31] Brief, p. 21.
[32] Brief at p. 23.
[33] Brief at p. 24
[34] Brief, p. 21.

Plaintiffs "rationale" that the demise of the two major Southeast pulp mills has drastically reduced demand to pre-World War II levels is simply incorrect. While the closing of the two pulp mills did indeed change the structure of the industry, those closings did not significantly affect demand. The major sawmills that existed in the 1990s are still mostly in place, thus their demand is undiminished. The Ketchikan sawmill has been replaced with a veneer plant that has roughly the same capacity and the Viking sawmill has added a small log side to its facility; both of which offset the dismantling of the sawmills at Ketchikan and Haines.

As explained above, it is not that demand does not exist – indeed, the currently operating mills have a combined installed capacity of at least 370 mmbf. Current cutting levels have not been low because demand is not there, current levels have been low because economic timber has not been made available in sufficient amounts.

> - Kirk Dahlstrom, Secretary of the Klawock mill, states that he could operate, produce and sell 60 mmbf of timber, utilizing 2 full time shifts if only this timber were available. Instead, he has been operating at only a fraction of capacity. Dahlstrom futher states that his markets are strong and located in Alaska, the lower 48 and overseas.[35]

---

[35] Declaration of Kirk Dahlstrom, ¶¶ 3 and 4.

- Steve Seley of Pacific Log and Lumber has installed one of the most sophisticated timber operations in the Pacific Northwest. This facility, manufactured and imported from Switzerland, allows Pacific Log and Lumber to produce specialized timber for high value end users. Mr. Seley states that he could meet his entire capacity of mill production at 2 shifts with 32 mmbf. PLL currently has only 23 mmbf under contract, which includes timber from the Upper-Carroll-II and Licking Creek sales.[36]

- The Wrangell sawmill has been in, and is now out of, bankruptcy. It is now operating only on state-owned timber because the ability to rely on federal timber has been so unpredictable, and because Silver Bay cannot affordably harvest the only federal timber which is currently available close to the mill, as it requires a helicopter to log. Silver Bay no longer owns a helicopter and does not want to risk another bankruptcy by logging timber sales that require only high-cost helicopter yarding. That does not mean the mill does not need federal, Tongass timber.[37]  The State timber has only provided a limited, one-shift stopgap supply which will run out soon.[38]

- The Ketchikan veneer mill is owned by the Ketchikan Gateway Borough, which purchased it from Gateway Forest Products to keep the facility from being sold out of state. The Borough is in negotiations with a potential operator. The issue for the sale is not demand; it is supply.[39]

---

[36] Declaration of Steve Seley, ¶¶ 3, 5, and 7.
[37] See Declaration of Walt Schrader at ¶ 2 - 3.  Mr. Schrader's company, Forrest Products, hopes to purchase the Wrangell mill, but needs to prove to his financial backers/banks that he has a reliable source of economic timber available in at least the amount of 50 mmbf for each of the next five years. Schrader states he cannot accomplish the sale without federal timber.
[38] Graham Dec., ¶ 4.
[39] Graham Dec. at ¶ 10.

- Alcan Forest Products states that its ability to harvest and sell timber is restricted only by its inability to find affordable timber which it can purchase for local or export markets. Alcan operates on a different business model than some of the other companies as it does not own a production facility. Nevertheless, some of its customers have a demand for timber like low-grade sawlogs and utility logs that the local sawmills cannot profitably process and which the Forest Service under federal law can and will allow to be exported under limited circumstances (primarily "blow down" timber such as that in the Coyak sale at Yakutat.) Alcan states that if the timber were available, it could envision a market of at least 360 mmbf.[40]

Considering these five operations alone, it is apparent that annual market demand is much higher than that conceded by the Plaintiffs (and could be higher still. The opportunity for more industry exists, if only there were a sufficient federal timber supply.[41]) AFA grants that the Court is not in a position to determine the annual market demand. Doing so is the obligation of the U.S Forest Service pursuant to NFMA, TTRA, and ANILCA.[42] The AFA is making this information available to the Court to

---

[40] Brown Declaration, ¶ 2.
[41] For example, a currently closed veneer facility, located in Ketchikan, stands ready.
[42] The Forest Service is much more likely to understate demand, making it easier to meet its statutory obligations. The Forest Service has been criticized by some for its low estimates of demand. (need cite) If the agency constrains its timber sale program to at or below its own demand estimate, since the agency has monopoly power over supply, the harvest level will always match the estimate. (See Exh. 4, at p. 5 of the report.)

illustrate the fact that Tongass demand has not lessened simply because the pulp mills are gone.[43]

The Plaintiffs' assertion that timber demand has gone "back to the future" and is no more than the 50 mmbf level of pre-World War II is fundamentally wrong and misguided.

> ii.  If economic timber is made available, it will be utilized.

Plaintiffs argue that even if more timber were offered, it would likely either not be bid upon, or would remain uncut.  What the Plaintiffs are refusing to acknowledge is that not all timber sales are economic. Sales cannot be assessed as if each were an identical loaf of bread.  Each sale presents unique factors which contribute to its economic viability, for example:

- road construction requirements, including both the miles of road needed and the varying difficulty and cost per mile of constructing those roads;

- harvesting requirements including yarding system needs like a slackline yarder or mobile yarder or helicopter yarder;

---

[43] The Court should also consider the much smaller population and economic status of Southeast Alaska and the nation before World War II. Then, the population of Southeast Alaska was only 28 thousand.(Exh. 5) The current population in Southeast Alaska is approximately 73,000 (http://www.tongass-seis.net/media/tong_triv.html) This change obviously affected demand and harvest levels.

- log hauling considerations like length of haul, the steepness of the adverse and favorable (downhill and uphill) haul routes;

- log barging or log rafting considerations;

- timing constraints on the road construction, cutting and yarding activities, which limit the amount of harvesting that can be accomplished each year. This in turn causes delays in recouping bond, mobilization, and road investments, further affecting sale economics; and

- the fact that each timber sale also has its own unique mix of tree species and log grades, in addition to considering the proximity of the sale to their mill, each mill must consider the type of timber the sale is comprised of. A timber sale with a lot of small hemlock, for example, might be more attractive to a veneer plant or a sawmill that has a small-log line as part of its manufacturing equipment.[44]

Sawmill operators must consider all of these variables in deciding whether to bid. Choosing not to bid on a particular timber sale does not mean the operator doesn't need timber, it simply means that the particular sale did not come close enough to meeting that operator's specific needs. Of the timber sales offered in recent years, many have failed to be economic and of those seemingly economic sales which were bid upon, litigation frequently ensued.

As additional support for their argument, Plaintiffs cite to the fact that between FY98 and FY03, 307 sales were offered with 29% of them receiving no bids, and of those

---

[44] Graham Dec. at ¶ 11.

which were bid on, many were never cut.[45]  The fact is that
many uneconomic sales were offered by the FS between FY98
and FY03.  Simply because uneconomic sales were not bid on
does not mean the demand was not there. A different
scenario emerges if one looks at a time period when more
lucrative sales were offered.  For example, from the period
between FY00 and FY05, 482 mmbf offered, 432 mmbf sold and
376 mmbf was harvested.[46] Therefore, the mills purchased 90%
of the offered volume and logged 87% of what was sold.
Significantly, as of FY00, both the Ketchikan and Sitka
pulp mills had been closed for years.[47]  Thus, despite the
Plaintiffs' assertion otherwise, demand for economic timber
unquestionably existed notwithstanding the status of the
pulp mills.

    iii. The impact of the Japanese market.

  Plaintiffs argue that because Tongass sawmills have
not been able to find a replacement for the now "soft"
Japanese market, market demand is lower than it has been in
the past.[48]  The impact on current market demand from the

---

[45] Brief at p. 23.
[46] Graham Dec. at ¶ 6.
[47] Alaska Pulp Corporation closed its Sitka mill closed in
September of 1993, and Ketchikan Pulp Corporation closed
its mill in March of 1997, but continued harvesting timber
for the sawmills and the prospective veneer plant until
2000.
[48] Brief, p. 24.

16

Asian market is much lower than the Plaintiffs assume. In reality, Southeast sawmills have sent most of their hemlock lumber to the Pacific Northwest since the early 1990's. The primary hemlock product from Tongass mills the last ten years or so has been "shop lumber." That market is still very lucrative. The average price for shop lumber during the period from 2001-2005 was an average of $684. The price is currently $737. As far as the Japanese market, high-grade spruce is still custom cut for Japan and still commands a very high price.[49]

In order for the timber industry to remain competitive in the world market, its mills need to be designed for the purpose of producing specific products. Each log from each tree and each stand of timber has different characteristics. Not every log is suitable for the manufacturing of every product. For instance, vertical-grain shop lumber can be sawn only from the larger, higher quality hemlock logs. Stud lumber can be sawn from smaller, low-grade logs but since Southeast hemlock is very dense and frequently causes nails to bend, the Southeast mills choose to not produce much stud lumber. Instead, the industry is focused on other products like veneer that can be peeled from small rough logs. Much of the veneer that

---

[49] Graham Dec. at ¶ 7.

can be peeled from Alaska hemlock has sufficient density to meet the stringent Laminated Veneer Lumber (LVL) requirements. The markets for LVL are strong and growing. There are many kinds of mills that can manufacture products from Alaska's timber. Each of these mills has its own economics and log supply requirements.[50]

III. THE FOREST SERVICE MUST CONSIDER MARKET DEMAND IN ORDER TO COMPLY WITH FEDERAL LAW

The Plaintiffs argue that a permanent injunction of all current and future sales in the Roadless areas and Kuiu Island is

> in the public interest, because it will help ensure compliance with the law in a manner that protects the public's interest in the most sensitive areas of the Tongass while also enabling a continuing supply of timber at prevailing levels.[51]

Fixing current supply at "prevailing levels" does not enable the Forest Service to meet its obligation to consider market demand, which is a statutory obligation designed by Congress to protect the timber industry and communities (see 16 U.S.C. § 539d(a)). A look at the history of Congressional timber policy illustrates that Congress believes in fostering a timber program and that

---

[50] Graham Dec. at ¶ 8; see also e.g., Schrader Declaration at ¶ 4.
[51] Brief at p. 26.

18

adequate high value timber has been set aside for protection of old growth habitat.

Congress' directive, as illustrated by the Alaska National Interest Lands Conservation Act[52] (ANILCA), as amended by the Tongass Timber Reform Act (TTRA)[53], seeks to balance several interests, one of which is the interest in maintaining jobs in the timber industry in Southeastern Alaska and another is the Forest Service's obligation to seek to provide a supply of timber to meet the market demand for timber. As the Ninth Circuit stated in *Hoonah Indian Ass'n v. Morrison*, TTRA "commands the Secretary of Agriculture to sell enough wood from the Tongass National Forest, subject to certain limitations, to satisfy market demand ...."[54] Specifically TTRA § 101 states that, subject to other law, the Secretary

> shall seek to provide a supply of timber from the
> Tongass National Forest which (1) meets the
> annual market demand for timber from such forest
> and (2) meets the market demand from such forest
> for each planning cycle.

AFA's members are among the persons Congress intended to protect. The Plaintiffs' proposed remedy must be considered in the context of the impacts wrought upon the

---

[52] 16 U.S.C. 3101, *et seq.*
[53] 16 U.S.C. § 539d.
[54] 170 F.3d 1223, 1225 (9th Cir. 1999).

timber industry, employees and timber dependent communities which ANILCA and TTRA were enacted to protect.

IV.  RECENT DEMAND STUDY SUPPORTS AFA'S ASSERTIONS

    A recent USFS study on timber demand scenarios in the Tongass confirms the AFA's assertions in this brief and the declarations filed by the major timber producers still operating.  The report, *Timber Products Output and Timber Harvests in Alaska: Projections For 2005-25,* correctly describes the current and future timber market for Tongass timber that Plainfiffs are attempting to prevent by this motion.[55]

    Significantly, the report recognizes that the market for Tongass Timber products is strong, both in the lower 48 and in the Pacific Rim.  As to the lower 48, the report notes

> Until 1997, Japan was the major markets for
> Alaska forest products…Since 1997… a new type of
> owner is producing forest products in Alaska….the
> new owners have a history of selling products in
> the domestic market.[56]

And as to the Pacific Rim, the report states:

> There will likely be a **high and almost
> unprecedented demand for forest products in the
> Pacific Rim Market.** For the fist time in history,
> there is a question if the Pacific Rim price will

---

[55] Brackley, Allen M.; Rojas, Thomas D.; Haynes, Richard W., relevant pages attached as Exh. 6.  This report can also be found at http://www.fs.fed.us/pnw/pubs/brackley/index.shtml
[56] *Id.* at p. 18

be sufficient to compete with the domestic
markets. During the past several years, Alaska
producers have found ready markets for their
products in domestic (Alaska and lower 48)
markets."[57]

As further support for the authors' findings regarding
the Pacific Rim markets, the report cites to two articles,
one evaluating the Japanese market, and one the Chinese
market.  In both instances, the Brackley report noted that
"These studies found "numerous opportunities to market
forest products in Japan" and that "log, lumber, and wood-
based panel productions were forecast to increase 5, 10,
and 15 percent respectively in 5, 10, and 15 percent in
2006."[58]

The Brackley report findings are in almost total
agreement with the description of market demand contained
in AFA's declarations.  However, the table provided by the
report[59] indicates a trough of demand in the years 2007
under its 4 basic scenarios, limited, expanded, medium
integrated, and high integrated and for its limited and
expanded scenarios in 2008.  In all other years and
scenarios besides these two, the anticipated demand is well
above 50 mmbf.

---

[57] *Id.* at p. 21 (emphasis added).
[58] *Id.* at p. 20.
[59] The report describes four possible scenarios, displaying
a range of possible future demands.  *Id.* at p. 2.

21

Regardless of the scenario applied, the Brackley authors found that the range in annual demand for timber in Alaska National Forests is 48 to 370 mmbf of logs.[60]

AFA does not fully agree with the report as to the current level of demand, and restates its position that demand is already at the high level projected in the report. But despite this, surely the report stands for the proposition that demand for Tongass timber has not shrunk permanently to 50 mmbf as asserted by Plaintiffs. Since Brackley states that there will be a high and almost unprecedented demand for forest products in the Pacific Rim market, Plaintiffs assertion that the timber demand for Tongass timber has returned to pre-World War II levels and will permanently hover at 50 mmbf, the very lowest end of the Brackley demand limited scenario, is completely insupportable.

V.    PLAINTIFFS' ACTIONS BELIE THEIR ASSERTION THAT DEMAND IS ONLY 50 MMBF.

Despite claiming the contrary, it is difficult to accept that Plaintiffs truly believe that the Tongass timber demand is only 50 mmbf. The Plaintiffs' unprecedented actions to prevent the re-opening of the Ketchikan veneer plant imply otherwise. Since 2004, many

---

[60]    *Id.* at p. 2.

environmental groups, including NRDC and Sierra Club, have engaged in a major attempt to intimidate a potential owner from reopening the now shuttered veneer mill.

This barrage has included a telephone call and letter writing campaign in 2004 directed at one of the companies, Timber Products Company, a company which had initially shown interest in opening the mill.  A second company, Forest Products Company, was the victim of a similarly staged fax campaign.[61]

If the Plaintiffs were so confident that the timber demand for the Tongass was only 50 mmbf, then why have they expended so much effort in their campaign against two different companies in an effort to "convince" each not to purchase and reopen the veneer mill?  The more likely scenario is that, in fact, the Plaintiffs' and other allied environmental groups fully understand that the demand far exceeds the "back to the future starvation" supply that Plaintiffs demand in their motion.

The fact is that Plaintiffs fear the reopening of any operations such as the veneer plant.  Once that happens, their assertion that demand on the Tongass is only 50 mmbf will be exposed as the fallacy it is.  If Plaintiffs believe their own economic assertions, they would have no

---

[61] *See* Exhs. 7 - 12.

23

worries that the veneer mill would ever reopen.  But the reality is that the Plaintiffs are fighting the re-opening of the mill politically, while attempting to strangle supply with this motion.  The Brackley report positively states that demand for Tongass timber is as high at 370 mmbf based on adequate supply.  The AFA states the same in its declarations filed with this motion.  There is nothing to support Plaintiffs' claim that supply has permanently shrunk besides their own assertions.

CONCLUSION

The AFA and its members' interests are totally denigrated if the Plaintiffs' motion is granted.  As a matter of law, the Plaintiffs have failed to show likelihood of success on the merits, while the AFA has demonstrated that its interests would be substantially and permanently harmed by the Plaintiffs' proposed order.  As stated in prior pleadings, this is a matter of survival for the AFA and its members.

The Alaska timber industry cannot survive on the permanently restrictive number of 50 mmbf demanded by the Plaintiffs.  Although the Plaintiffs mask this in a disingenuous, historical argument that this would "return" the Forest to "historical" levels, nothing could be further from the truth.  In the 1940's Southeast Alaska's timber

24

industry was in a nascent, developing stage. Yet even then, in reality, its capacity and demand exceeded the Plaintiffs' asserted "historic" 50 mmbf level.[62] Now half a century later, and with the industry having grown in capacity of over 4 times pre-World War II levels, and with no alternative to obtain its timber, the AFA cannot and will not survive on a permanent, starvation supply as proposed in Plaintiffs' motion and order. Further, the Plaintiffs provide no explanation or road map as to how the Forest Service can or should replace the nearly 175 million board feet of timber which would be enjoined by Plaintiffs' proposed motion.

For the reasons cited herein, the Plaintiffs motion must be denied.

RESPECTFULLY SUBMITTED this 17th day of April, 2006.

s/Amy Gurton Mead
STEVE SILVER
AMY GURTON MEAD
Robertson, Monagle & Eastaugh
801 W 10th St., Ste. 300
Juneau, AK  99801
(907) 586-3340 (telephone)
(907) 586-6818 (facsimile)

ssilver628@aol.com
agmead@romea.com

Of Attorneys for Alaska Forest
Association, Intervenor Defendant

---

[62] Graham Dec. at ¶ 5.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day if April 2006, a copy
of the foregoing document was served electronically on the
following attorneys of record:

Bruce Landon
Thomas Waldo
Nathaniel Lawrence
Kevin Saxby


s/
Laurie Gyles-Chesnut