

## United States Department of the Interior

### FISH AND WILDLIFE SERVICE
Southeast Alaska Ecological Services
3000 Vintage Blvd., Suite 201
Juneau, Alaska 99801-7100

IN REPLY REFER TO:

November 19, 1996

Beth Pendleton
Co-Leader of TLMP Team
USDA Forest Service
9465 Old Dairy Road
Juneau, AK 99801

Dear Ms. Pendleton:

As stated in previous letters to the Forest Service, including the August 22, 1996, comments to the Draft Revised TLMP, the Service considers the 1995, Anadromous Fish Habitat Assessment (AFHA); the Interagency Viable Populations (VPOP) Committee's May, 1993, report, _A Proposed Strategy for Maintaining Well-distributed, Viable Populations of Wildlife Associated With Old-growth Forests in Southeast Alaska_ (Strategy); the 1994, USFS, Pacific Northwest Research Station (PNW) document, _Review of Wildlife Management and Conservation Biology on the Tongass National Forest: A Synthesis with Recommendations_ (Peer Review); the VPOP Committee's 1994, _Response to the Peer Review of: A Proposed Strategy for Maintaining Well-Distributed, Viable Populations of Wildlife Associated with Old-Growth Forests in Southeast Alaska_ (Response); the Alexander Archipelago Wolf; Queen Charlotte Goshawk; and Marbled Murrelet Conservation Assessments to represent the best scientifically defensible fish and wildlife management and planning tools available at this time. The Service continues to recommend that concepts presented in these documents be fully incorporated into the selected alternative. The Service also recommends that responsive vehicles for adaptive management schemes for incorporation of new information be included in the Standards and Guidelines.

The following is the Service's position on the principle outstanding issues raised as a result of our review of information recently provided by the Forest Service concerning TLMP Team modifications of the April, 1996, preferred alternative.

### Issue: Old-growth Reserve Strategy

In response to the Peer Reviewers' recommendations, the VPOP Committee recommended logging and road building be restricted to areas other than the three largest old-growth forest patches within each ecological province. Using the Forest Service "1996 TLMP RSDEIS Dev/Non-Dev LUDs and Big 3 OG" map, it appears that the current proposed old-growth strategy does not prohibit logging and roading in these areas. The following three provinces are examples in which the three largest old-growth patches are not protected from

1

further fragmentation. In Province 3 on east Chichagof Island, the old-growth patch in VCUs 194, 195, and 196 is not fully protected. Only about half of the patch in VCU 210 and 211 is protected. A portion of the patch in VCUs 235 and 236 is not protected in VCU 236. In Province 11 on Kuiu Island, the block south of Saginaw Bay (VCU's 399, 400, 402, and 421) will not be protected. The block north of Rowan Bay (VCU 400, 401, and 402) is not fully protected. None of the three largest patches are fully protected in Province 9 (Sumdum, Windham Bay, Port Houghton).

These largest blocks should be completely protected as reserves to prevent further fragmentation and maintain future management options as recommended by the Committee. Additional reserves will be required to meet the VPOP Committee distance criteria. Incorporating other non-developmental LUDs other than the old-growth LUDs into the old-growth habitat strategy is acceptable, when these areas contain suitable old-growth habitat blocks. However, the distance between actual suitable contiguous habitat blocks within these LUDs should comply with the VPOP committee criteria (not the distance between non-development LUD boundary lines) when significant portions of non-development LUDs are unforested or contain low amounts of high quality forest habitat. For example, the distance between the large blocks of old-growth habitat in the west Chichagof Province and old-growth habitat in adjoining non-development LUDs is greater than the distance between the non-development LUD boundaries in the area. All the reserves should meet the VPOP reserve composition, but the 1993 VPOP reserve sizes should be considered a minimum as the Peer Reviewers recommended larger reserves. The Service recommends including the other large old-growth blocks in each province (as designated on the Forest Service "1996 TLMP RSDEIS Big 5 OG Block" map) as components of the reserve system for the forest. In other words, use the best contiguous blocks of habitat available as the basis for the reserve system.

The Service concurs with the Peer Reviewers and VPOP Committee Response that logging or road building be restricted to areas outside reserves except where specific essential circumstances may warrant. New roads should not be constructed in reserves. Existing roads not in use for current operating uses or intercommunity transportation should be effectively removed or closed.

Known stands of rare volume classes 6 and 7 below 800 feet should be maintained as old-growth reserves or corridors as recommended in the VPOP Response.

Issue: Connectivity and Small Habitat Conservation areas (Old-growth Habitat Reserves)

As recommended by VPOP, the main function of small habitat conservation areas (old-growth reserves) is as temporary habitat for wildlife dispersing between large and medium HCAs. The composition of small HCAs, as described by VPOP, include: Small HCAs should be greater than or equal to 1600 acres, and contain at least 800 acres of old-growth (8 MMBF/acre). Lands not suitable for timber harvest, buffers, and other removed lands should be utilized to the extent practicable.

2

Current old-growth reserve criteria differ fundamentally from the VPOP recommendations. Altering the minimum size of reserves to a percentage area per VCU is without biological justification. Current criteria for omitting a small reserve within a given VCU also differ substantially from VPOP recommendations. The current criteria do not appear congruent with the function of small reserves to provide temporary habitat for wildlife dispersing between larger reserves, as they allow small reserves to be established which do not have the ability to support resident or dispersing wildlife.

The connectivity provided by small HCAs is dependent upon their placement and composition. To determine how well currently designated small HCAs provide for connectivity between old-growth reserve areas, 30 VCUs within four sale areas ranging across the forest were examined. Their size, connectivity and composition were examined. Due to the limitations of the data provided (e.g., Forest-wide old-growth distribution and acreage spreadsheets of combined non-development areas) the acreage of each HCA, or the amount of old-growth within each could not be determined with precision. However, the following general trends were observed:

1) VCUs which according to VPOP recommendations should contain small HCAs did not, especially in the Eight Fathom sale area.

2) Some HCAs were less than the minimum 1600 acre size, some were much larger than this or were contiguous with HCAs in other VCUs to provide a large old-growth reserve (e.g., Honker Divide).

3) Some HCAs appeared to include existing blocks of productive old-growth, although others were designed around planned harvest sale units.

4) Provision of connectivity was extremely variable. Many small HCAs were isolated due to water, elevation, existing clearcuts (especially along beach corridors and riparian zones), and abutment to extensively logged private lands. Some were fragmented by existing clearcuts and existing or planned roads. Many were linked to other old-growth reserves solely through riparian zones or beach fringe. While this is a recommendation of the VPOP Committee, and makes intuitive sense, it is critical to note that where these habitat types provide sole connections across otherwise unsuitable landscapes, they need to be adequate in both width and composition. The VPOP response recommends connecting large HCAs with corridors that are 1600 feet in width, and medium HCAs with corridors of at least 1000 feet. These corridors should be located at elevations of less than 800 feet, be unlogged, and be composed of vegetation similar to that within the HCAs to enhance survival of dispersing animals. Breaks in these corridors should be less than 65 feet wide. The VPOP response further recommends that beach corridors serving as travel corridors linking HCAs be 3300 feet wide and subject to only selective harvest.

5) Where small HCAs adjoined non-development LUDs, these connections were often of limited use to wildlife due to elevational barriers.

3

5) As one example of a missed opportunity to provide connectivity, within the Control Lake sale area on Prince of Wales Island a large old-growth reserve has been established within Honker Divide. Yet this reserve is disconnected from the Karta Wilderness Area to the south despite the opportunity to provide for this connection by establishing a small reserve in the Rio Roberts watershed. This connection would provide for continuity of a large reserve system and protect an important existing watershed study area. This is but one example where increased planning for connectivity could improve the current reserve strategy.

It appears that the mapped reserves we examined do not meet the small reserve criteria.

In summary, connectivity is not being provided adequately by the current alternative, and opportunities exist to improve the function of the reserve strategy through consideration of this critical function.

We recommend re-examining the criteria and placement of small reserves, preferably by an interagency IDT familiar with the areas to be mapped. While the current small reserve strategy probably results in equal or greater acreage being reserved, the placement and function of these parcels are critical to the success of any habitat strategy intended to provide for long-term biodiversity.

Issue: Matrix Management

The matrix is the body of the Tongass between the old-growth reserves including those areas that will be actively managed for timber production. The current preferred alternative results in the additional harvest of 502,000 acres of old-growth by 2095. When added to acres already harvested (-387,000 acres of national forest lands and 5-600,000 acres of private or state owned lands), well over a million acres of old-growth forest will be converted to younger seral stages. This harvested acreage exceeds the total size of many national forests in other parts of the United States, and is not an inconsequential action. The time needed to restore old-growth characteristics to logged lands has been estimated at 250-300 years, a long-term commitment. These factors require a careful long-term approach to avoid adverse consequences that will not be corrected for generations to come.

VPOP recommends that in order to maintain minimum viable populations of all forest wildlife species well distributed across the landscape, that:

> logging be concentrated on lower volume stands to restore the relative abundance of low, medium and high quality productive old-growth (low-grading), and

> no logging occur in a 3300' buffer along all saltwater shorelines.

Although the Forest Service states they are exceeding the intent of VPOP recommendations, neither of these recommendations are fully met.

The Service firmly believes that all productive old-growth is not of equal

4

value to wildlife. Factors that result in lower timber values or operability, such as low density forest or steep slopes, often also correspond to lower wildlife values. Not all acres within the matrix will be harvested and these residual stands will provide some benefit for wildlife. However, it is likely that these remnants will be of lower value than contiguous blocks of better quality forest. Although the harvest of adjacent units may be separated by decades, which in human terms seems to be a long time, such harvest will result in a continuous blanket of young (<100 years old) seral stage forest of minimal value for many wildlife species.

An array of approaches has been discussed to minimize the long-term adverse consequences of old-growth conversion to younger forest conditions. These include, but are not limited to, use of alternative silviculture to reduce habitat quality losses created by clearcuts, and lengthening rotations so managed stands can acquire and offer old-growth characteristics for a portion of the rotation. The Service recommends aggressive implementation of silvicultural methods that result in the retention of old-growth characteristics in accordance with existing Forest Service national policy.

Riparian

In general, the Service agrees that the incorporation of Riparian Option 2 with Forest-wide and specific process group Standards and Guides and Watershed Analysis will maintain the biological productivity of the Forest's fishery resources and prevent management resulting in the loss of fish stocks. However, several Service recommendations remain unaddressed:

1) AFHA recommends no timber harvest in floodplains of glacial outwash, alluvial fan, and floodplain process groups prior to watershed analysis. Current Standards and Guides for these channel types prohibit commercial timber harvest within 100 feet of the stream, but allow unprogrammed timber harvest within the remainder of the riparian management area. This prescription could be strengthened by requiring Watershed Analysis prior to allowing unprogrammed harvest within the floodplain outside of the 100 foot minimum buffer.

2) Class IV streams are defined under Fish Standards and Guides, and their management is discussed under Riparian Standards and Guides where it is stated that they will be managed as part of the hillslope, but clear language in the Soils and Waters standards and guides needs to specifically describe how Class IV streams will be treated.

3) The plan needs to note the FHAT caveat on the limitations of the Tongass Fish Habitat Objectives ("[these data] should be considered a starting point for developing quantifiable indices to assess and monitor aquatic habitat condition...") and identify strengthening these as a research/information need in Appendix B, Information Needs.

Issue: Goshawk Management

The following comments are based on the information and suggestions contained in the Northern Goshawk in Southeast Alaska Conservation Assessment. (Page numbers refer to the draft goshawk assessment)

The goshawk assessment does not provide specific management recommendations. The risk assessment done so far only considers one aspect of a management strategy (300-year rotation). The Service repeated this risk analysis using data provided by the TLMP team, and found the following:

Management units managed under rotations shorter than 300 years (Based on 0.33% annual removal from all POG in the unit since 1954 as basis for 300-year rotation).

| Management Unit (n) | Units with >13.7% harvest of POG* in 1995 | Units with >47.0% harvest of POG in 2095 |
|---|---|---|
| VCU (932) | 136 (15%) | 85 (9%) |
| Mgmt. Area (149) | 24 (16%) | 8 (5%) |
| Province (21) | 1 (5%) | 0 |

* POG = Productive old-growth

This analysis suggests that currently 15% of the Tongass is not consistent with one facet of goshawk habitat use patterns. Furthermore, this inconsistency is concentrated in particular Management Areas, not dispersed across the forest, decreasing suitability over substantial contiguous sections of the forest. Under the new plan, an improvement is noted, but 100 years into the future, the inconsistency remains.

The goshawk assessment suggests the application of a reserve strategy where high past timber harvest has occurred or is planned. Areas of concern highlighted in the goshawk assessment (Figure 8) include: Chichagof, Baranof, Kruzof, Kuiu, Kupreanof, Mitkof, Zarembo, Revillagigedo, Prince of Wales and associated islands, and several locations on the Alaska mainland. The Service concurs with this strategy.

The Service agrees that beach and riparian buffers may provide substantial additions of goshawk habitat for those individuals in proximity to those areas. However, goshawks in interior portions of the landscape do not benefit from these allocations. Nor do goshawks benefit where these buffers have already been substantially altered by past management. Goshawk nest buffers of 100 acres specified in the Standards and Guides have minimal benefit for goshawks. These nest buffers may result in the retention of individual nest trees, but do little to protect foraging areas which may be the critical limiting resource in southeastern Alaska.

The Service recommends that the FS :

Conduct a risk analysis that incorporates additional information

6

indicated by the assessment. Specifically, describe the change in the availability of productive old-growth thought to be of value to goshawks based on elevation, slope, and quality (i.e., what proportion of the available is high or very high). Determine if the amount of remaining POG is consistent with values observed for goshawk use areas. Incorporate a risk factor for harvest on private lands within the Province.

Manage the Forest so harvest levels are consistent with a 300-year rotation scheme (p. 93) at the VCU level (p. 98), particularly for habitats preferred by goshawks (higher volume stands on gentle slopes at low elevations).

Issue: Alexander Archipelago Wolf Management

The following comments are based on the information and suggestions contained in the Alexander Archipelago Wolf Conservation Assessment and information regarding the current preferred alternative to the extent it was available at the time of this analysis.

Road Construction and Access Management
- Limit new road construction
- Where road densities exceed 0.4 kilometers per square kilometer on islands with significant human population (e.g., POW, Mitkof and Revilla), effectively close road systems to achieve road densities of less than 0.4 kilometers per square kilometer.
- Close all roads within established no timber harvest LUDs, except essential roads connecting communities or facilities.
- Review and identify human access/ wolf mortality issues that may exist on islands with low human populations in cooperation with the Service and ADF&G.

Habitat Management
- Maintain a minimum average deer density of at least 13 deer per square mile in wildlife analysis areas that currently support this density. Where current deer densities are lower than 13 deer per square mile, maintain at least current deer densities.
- Establish at least one large unfragmented, unroaded reserve (capable of supporting at least 18 deer per square mile) in each Biogeographic Province within ADF&G Game Management Units 2 and 3.
    - Based on information available to the Service, Provinces 11 and 18 meet or exceed Wolf Assessment suggested large reserve size (acres). Provinces 10, 13, 14 and 17 do not meet this criterion. This analysis is based on preliminary information. We suggest further discussion of this matter to verify data and application of wolf assessment strategy.
    - Some reserves, such as the Central POW large reserve, contain roads and previously logged areas that lower habitat quality. Diminished quality should be compensated by increased size.
    - Intuitive screening of the recently provided Deer Capability Densities (deer model results) suggests that predicted deer densities are not realistic. The model does not predict deer

7

densities - it predicts deer habitat capability. The model also does not address stochastic events, such as abnormally high snow fall, which is reasonably likely to occur, and will adversely affect deer populations.

### Issue: Standards and Guidelines

The majority of objectives in the forest-wide standards and guidelines (S/Gs) are not in concert with the purpose and definitions as stated in 36 CFR Part 219. The regulations state that the plan must contain goals, measurable objectives, quantitative standards and guidelines, and monitoring and evaluation requirements. Objectives should respond to goals, and each goal should have concise, measurable objective(s). Specificity is an important component of a structured planning approach. The objectives for the majority of forest-wide standards and guidelines are neither concise nor time-specific. The Service has made this same comment on previous drafts of the S/Gs and in the August 22, 1996, letter to the Forest Service.

Monitoring and evaluation are also identified as criteria for decision in the consistency check table. The monitoring and evaluation requirement will not provide a basis for determinating accomplishment of objectives until the objectives are changed from the general to the specific in compliance with regulatory requirements.

Monitoring and evaluation are integral components of the planning process. To complete an effective planning cycle requires that funding must be provide for these purposes. This is the mechanism that will determine how well the objectives in the standards and guidelines are being met. Funding for these activities must be a required part of Forest Service operations. The Service recommends that at the beginning of project implementation funding be in place to conduct monitoring and evaluation.

### The Future of Interagency Cooperation in the Management of the Tongass National Forest

The Tongass National Forest covers a vast geographical area, and provides fish, wildlife aesthetic and other resources of enormous economic, recreational, commercial, scientific and ecological value. It supports the world's greatest remaining wild anadromous salmon population. Although managed by the Forest Service, the exercise of public trust responsibilities associated with the Tongass devolves to numerous Federal and State agencies. As trustees, our duty is to enhance the value of the trust for the benefit of the American people, not merely to administer its gradual diminution.

The concept of interagency partnership is explicitly provided for in a variety of Federal conservation laws, particularly in the Endangered Species Act. In December, 1994, the Service, Forest Service and Alaska Department of Fish and Game entered into a Memorandum of Understanding that explicitly established a cooperative program to promote the conservation of species tending toward listing under Federal or State ESA. The Service has sought MOU implementation

8

by serving as a member of the TLMP IDT. It has further contributed through the NEPA process, and by support of interagency studies associated with petitioned or species at risk.

It is the intent of the Service to continue in this vein, and, to the extent permitted by staffing, funding, and prioritizing of on-going work, enhance its involvement with the Forest Service on Tongass operational and planning activities. Furthermore, it is the intent of the Service, utilizing the budget process, to expand its capabilities in this arena.

Throughout the planning process now nearing closure, Regional Forester Phil Janik has steadfastly maintained that Tongass management must be science based. The Service's involvement, thus grounded, has sought to assure the fulfillment of this goal. The question before us is: Where do we go from here? The Service believes that the cooperative working relationship exhibited over the last two years is but a flawed, pale shadow of that which will evolve as we enter the 21st century. What we need now is a scientific reality check: To evaluate where we have been, where we are, and direct our progress. To that end, the Service recommends a reconvening of the VPOP Committee or similar group to guide our future cooperative efforts: To determine those areas of conservation concern needing further investigation, refinement or possible alteration; to assure, to the extent possible, that the environmental problems and associated socioeconomic tragedies experienced elsewhere are never visited on the people of Southeast Alaska.

To achieve this goal has been the intent of the spectrum of Service input to the TLMP process over the last several years. This letter is intended to clarify and supplement previously provided information. It is not to be construed as a comprehensive review of outstanding issues.

Sincerely,

Nevin D. Holmberg
Field Supervisor

9.