

# Record of Decision
# Tongass National Forest
# Land and Resource Management
# Plan Revision
# Alaska



## May 1997

The United States Department of Agriculture (USDA) prohibits discrimination in its programs on the basis of race, color, national origin, sex, religion, age, disability, political beliefs, and marital or familial status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means of communication program information (braille, large print, audiotape, etc.) should contact the USDA Office of Communications at (202) 720-2791.

To file a complaint, write the Secretary of Agriculture, U.S. Department of Agriculture, Washington, DC 20250, or call 1-800-245-6340 (voice) or (202) 720-1127 (TDD). USDA is an equal employment opportunity employer.

## IV. Rationale For Decision

My decision to select Alternative 11 was reached after a comprehensive review of the relevant environmental, economic, and social consequences of the Final EIS alternatives and is based on a number of factors. The discussion below of why I selected Alternative 11 from among the ten alternatives analyzed in the Final EIS highlights several factors that were of primary importance to my decision. Next, the discussion of public issues and comments further explains why I believe Alternative 11 best responds to multiple needs, including ensuring a healthy forest habitat and providing a sustainable supply of goods and services including timber. My consideration of national policy issues, as explained, further shaped my decision. Forest Plan compliance with applicable laws, regulations, and executive orders, which is discussed in a separate section of this ROD, also was a key factor.

### A. Comparison of Alternatives

The maintenance of habitats needed to ensure the long-term viability of all Tongass wildlife and fish species and to sustain commercial, sport and subsistence use, is a key factor in my decision. In terms of fish, I find that all alternatives maintain riparian habitats and water quality in the short-term to at least the minimums required by law. For long-term viability, however, especially of individual fish stocks or entities, the alternatives have varying degrees of risk. I want to ensure the long-term productivity of Southeast Alaska's exceptional fish resource, to the extent that resource may be affected by management of the Tongass National Forest. Based on the analysis in the Final EIS (Chapter 3, "Fish"), and the results of the two Fish/Riparian panels, Alternatives 2, 6, 7, 9, and 10 generally involve higher risk and do not offer me this assurance. Of the remaining four alternatives (other than Alternative 1), Alternative 11 consistently rated lowest, or as low, in the level of risk to fish. I also favor the use of one forest-wide option, which for Alternative 11 is option 2A as described in the Final EIS (Chapter 3, "Fish"), for riparian protection, and the incorporation of watershed analysis as a part of this option.

Long-term viability for wildlife species has been extensively studied and analyzed, and is discussed in detail in the Final EIS (pages 3-380 to 3-429) and Appendix N to the Final EIS. Based on this analysis, the alternatives fall into roughly three groups (excluding Alternative 1, which has essentially no additional risk): Alternatives 2, 7, and 9 having relatively high risk of not maintaining habitat sufficient for viability of all species, Alternatives 3, 6, and 10 having an intermediate level of risk, and Alternatives 4, 5, and 11 having a lower risk for various species of concern. I want a Forest Plan that, in conjunction with all the other multiple-use goals and objectives, has a relatively low level of risk—or conversely, gives me the relatively high assurance that the habitat needed for long-term viability of all wildlife species would be maintained and commercial, sport and subsistence use sustained.

Alternatives 4, 5, and 11 are comparable in this regard, although Alternatives 5 and 11 tends to have a somewhat lower risk than Alternative 4 for most species. Each alternative uses a different approach to maintaining viability, with Alternatives 4 and 5 relying more on extended timber harvest rotations and VCU harvest thresholds, with Alternative 5 adding a limited reserve system, and Alternative 11 relying more on a forest-wide system of old-growth habitat reserves, and somewhat greater protection for riparian areas and the beach fringe. In this context, I favor Alternative 11 because, among many reasons, its reserve strategy enables the setting aside of unfragmented old-growth habitat blocks of varying sizes forest-wide, focusing on areas of key importance to wildlife and areas of concern to the public and other agencies; and, within those areas available for timber harvesting, Alternative 11 offers more flexibility for timber harvesting and adaptive management approaches. Additional standards and guidelines added to Alternative 11, which respond to concerns raised in connection with certain wildlife species, provide further assurance that Alternative 11 will adequately maintain wildlife habitat.

Maintaining options for a variety of social and economic uses of the Tongass—from continuing a timber harvest program that provides a sustainable supply of timber and other timber products to providing for subsistence opportunities and unspoiled settings for recreation and tourism—was another key factor in my decision. It is partly a matter of finding a balance, within a multiple-use context, of the many public uses and demands on forest resources, and partly not foreclosing options for the future that changes in public

Record of Decision

needs, economic conditions, or new technologies may bring.  Alternatives 4 and 5 (in addition to Alternative 1) do not have a timber program that would be adaptable to changing demands or new technologies and would be more likely to adversely affect communities whose primary employment comes from timber harvesting.  Alternatives 4 and 5 also generally offer fewer opportunities for the more developed types of recreation uses and access.  Alternatives 7 and 9 have timber program potentials in excess of what would be needed to respond to changes within the timber industry and would not maintain an acceptable level of scenic quality or undeveloped recreation opportunities.  Alternatives 7, 9, and 2 do have a higher PNV than the selected alternative.  PNV is but one measure of economic efficiency based on a calculation of assigned dollar value to resource outputs less associated costs.  While Alternative 11 has a somewhat lower PNV, given the failure of PNV to consider qualitative factors critical to accurately predicting net public benefits, and the superior ability of Alternative 11 to balance many competing values and uses of the Tongass National Forest, I find that Alternative 11 currently provides the best strategy for maximizing net public benefits.

Alternatives 1, 3, 6, 10, and 11 are better than alternatives 2, 4, 5, 7, and 9 in maintaining scenic quality and undisturbed settings, factors important to the continued expansion of the recreation and tourism industries, and to most Southeast Alaska communities.  Based on the previous discussion of fish and wildlife viability, Alternatives 3, 6, 10, and 11 all provide a reasonable assurance of maintaining subsistence resources and opportunities.  In both cases, Alternative 11 rates relatively higher than the others.  In addition, all five alternatives, 2, 3, 6, 10, and 11, have a timber program potential (Allowable Sale Quantity) that allows flexibility to respond to changing needs within the timber industry, as reflected in the most recent demand study (see Final EIS, Appendix M), and are responsive to communities dependent upon timber harvesting.  All five alternatives also recognize areas of high mineral potential within the Tongass.

Finally, several alternatives respond well to the need to recognize and protect areas across the Tongass with special or unique resources or features.  Among these are the karst and caves resource, rivers eligible for inclusion in the National Wild and Scenic Rivers System, and areas suitable for designation as Special Interest Areas or Research Natural Areas.  Alternatives 7 and 9 fall far short in this regard, and Alternative 2 lacks adequate protection of karst areas and associated caves.  Alternatives 3, 4, 5, 6, 10, and 11 apply the Karst and Caves standards and guidelines, and designate all recommended Special Interest Areas.  Of these, Alternatives 3, 4, 5, 6, and 10 recommend 25 rivers for Wild, Scenic or Recreational designation, and Alternative 11 recommends 32 rivers.  Alternative 11's additional rivers give it a slight edge.  Alternatives 1, 2, 3, 4, 5, 6, 7, 10, and 11 designate four additional Research Natural Areas, while Alternative 9 designates no additional ones.

Alternative 1, the "environmentally preferable" alternative, would result in the least adverse effects to the physical and biological environment.  Essentially, with no scheduled timber program and no new road construction, it has no additional adverse effects of these types.  Accordingly, in comparison with other alternatives, it tends always to rate highest when levels of resource protection are a consideration.  Conversely, when timber-related employment and community dependence on such employment, infrastructure development and new road access, or rural development in a multiple-use context, are considerations, Alternative 1 generally ranks lowest.  I conclude that it does not provide an acceptable balance between environmental protection and resource use.

Given the many social and economic trade-offs inherent in national forest management, I find that Alternative 11 best balances the many interrelated environmental, social and economic issues that arise when managing for multiple uses.  The following discussion of responses to public and other reviewers' comments further explains the rationale underlying my decision.

# Record of Decision

300-year rotation). In these units, timber harvest treatments over two-acres in size must meet certain minimum criteria designated to maintain forest stand structure characteristics beneficial to goshawks.

A more detailed explanation of goshawk protection and management provisions can be found in Appendix N of the Final EIS.

*Alexander Archipelago Wolf.* The interagency wolf conservation assessment was developed in cooperation with the U.S. Fish and Wildlife Service and the Alaska Department of Fish and Game (ADF&G) to synthesize the best available information to address wolf conservation. Using the major findings contained within the assessment, the Forest Plan provides a high likelihood of sustaining viable wolf populations in Southeast Alaska (see Appendix N, and pages 3-399 to 3-406 of the Final EIS). The wolf assessment identified three principal management considerations to address both near-term and long-term wolf viability concerns.

1. Deer are the principal prey of wolves; consequently maintaining a long-term deer herd capable of sustaining a viable wolf population is a habitat management concern. The wolf assessment indicated that a deer population of approximately 13 deer per square mile would reduce risks to long-term wolf viability. This density of deer is likely to support wolves and also sustain the current harvest of deer by humans.

2. Large roadless and unfragmented reserves are considered necessary in biogeographic provinces where intensive timber harvesting has occurred or is planned, to reduce the long-term risk to wolf viability. The wolf assessment describes a reserve system of approximately 50,000 acres (the approximate core activity area of one wolf pack) for every 192,000 acres of landscape where wolves occur.

3. The third concern related to wolf viability is the potentially unsustainable human-induced mortality in some areas, both legal and illegal. The wolf assessment identified open road access as a contributing factor to excessive mortality, and found that reported wolf mortality increases substantially when open-road density exceeds 0.7 miles of road per square mile. The Forest Plan requires participation in cooperative interagency monitoring and analysis to 1) identify areas where wolf mortality is excessive; 2) determine if the mortality is unsustainable; and 3) identify the probable causes of the excessive mortality. Access management may be implemented where analysis indicates road access is contributing to unsustainable wolf mortality rates.

Appendix N of the Final EIS contains a thorough explanation of how these three components affect wolf viability and how the Plan will ensure adequate protection.

Recent court action requires the U.S. Fish and Wildlife Service to reconsider its decision not to list the Queen Charlotte goshawk and the Alexander Archipelago wolf pursuant to the Endangered Species Act. Consistent with the principles of adaptive management, the Forest Service will further examine our old-growth habitat strategy relative to conservation measures examined in the interagency conservation assessments prepared over the last 18 months as part of the forest planning process. The Forest Service will work closely with the U.S. Fish and Wildlife Service and State agencies to determine whether any subsequent changes to overall Plan direction will be needed to provide for the conservation of these two subspecies in Southeast Alaska. Such changes, if needed, will be made to the Plan in compliance with applicable laws. Given the habitat strategy in the revised Forest Plan and these commitments, we do not believe that listing of either species is warranted.

Selected Management Indicator Species

*Brown Bear.* Concerns have been raised about road access as a potential contributing factor to brown bear mortality. These concerns, and the Forest Service treatment of them, are similar to those discussed above regarding wolves. If interagency monitoring efforts suggest that excessive bear mortality occurs as a consequence of road access, then road access management will be implemented and hunting regulations will also be examined, in cooperation with other agencies. In addition, the Plan includes a standard and

Record of Decision

## VII. Implementation

### A. Plan Effective Date

The approved Tongass National Forest Land and Resource Management Plan is effective 30 days from the date of the Notice of Availability in the *Federal Register* for the Final EIS.

### B. Transition to the Revised Plan

The revised Plan does not provide final authorization for any activity, including timber sales, nor does it compel that any contracts or permits be advertised or awarded. Rather, like the 1979 TLMP (as amended in 1985-86 and 1991), it provides a programmatic framework within which project-level decisions, including timber sales, are considered. Projects must undergo appropriate site-specific analysis, and comply with applicable requirements for public participation, environmental analysis and disclosure, and the administrative appeal procedure before final authorization and implementation.

Timber Sales

The relationship of four categories of timber sale projects to the revised Plan is described below. In summary, the completed projects in category 1 will not be affected by the revised Plan. The projects in categories 2 and 3, which were initiated under the management direction of the 1979 TLMP, as amended, and which will all be completed within the next few years, may be affected to varying degrees by the revised Plan. Many of these projects have already been developed to achieve consistency with recently proposed versions of the revised Plan. All the new timber sale projects in Category 4 that will be initiated during the 10- to 15-year life of the revised Plan will be consistent with the Plan.

1. *Completed timber sale projects for which NEPA decision documents were signed and whose timber volumes have all been sold to independent operators or released to long-term contract holders before the effective date of this Plan.* The decision documents for these projects do not need to be modified because of the revised plan.

2. *Timber sale projects for which NEPA decision documents were signed before the effective date of this Plan, but whose timber volumes will not have been sold (wholly or in part) before the effective date of this Plan.* The decision documents for these projects do not need to be modified because of the revised plan, except as noted below. Timber sale projects in this category include, among others, the Northwest Baranof, Eight Fathom, Southeast Chichagof, APC Final Supplement to the EIS's for the 1981-86 and 1986-90 Operating Periods, Kelp Bay, Ushk Bay, Upper Carrol, South Lindenberg, Lab Bay, and Cloudy timber sale projects. I have reviewed these projects and determined that they are consistent with the goals, objectives, and projected environmental effects of the revised Plan, and that, with the exception of the Eight Fathom and South Lindenberg projects, it is not necessary to modify them further in proceeding with their implementation. To achieve greater consistency with the revised Plan, I have directed the Forest Supervisors to modify the Eight Fathom timber sale project to avoid compromising an Old-growth Habitat LUD in the Plan, and the South Lindenberg project to better achieve the Plan's riparian standards and guidelines.

    The remaining unsold parts of the timber sale projects in this category which have not already been reviewed with the U.S. Fish and Wildlife Service will continue to be reviewed prior to actual sale. Any outstanding fish and wildlife concerns identified in such reviews will be alleviated or mitigated where feasible and necessary through site-specific adjustments.

    Also, some new standards and guidelines for wildlife, which address landscape connectivity, endemic terrestrial mammals, northern goshawk, and American marten, were added to the Plan through the process described in Appendix N of the FEIS. My intent in adding these new standards and guidelines is to avoid some possible long-term cumulative effects without disrupting timber sale

## IX. Contact Persons

If you would like more information on the Forest Plan or the Final Environmental Impact Statement, please contact any of the following officials:

Gary Morrison, Forest Supervisor
Tongass National Forest, Chatham Area
204 Siginaka Way
Sitka, AK 99835
907-747-6671

Abigail Kimbell, Forest Supervisor
Tongass National Forest, Stikine Area
P.O. Box 309
Petersburg, AK 99833
907-772-3841

Bradley Powell, Forest Supervisor
Tongass National Forest, Ketchikan Area
Federal Building
Ketchikan, AK 99901
907-225-3101

Beth Pendleton, Team Leader
Forest Plan Revision Team
8465 Old Dairy Road
Juneau, AK 99801
907-586-8700

Signature

_/s/ Phil Janik_    May 23, 1997
**Phil Janik**    Date
**Regional Forester**