**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY;
FRIENDS OF THE SANTA CLARA
RIVER,

        *Plaintiffs-Appellants,*

      v.

UNITED STATES FISH & WILDLIFE
SERVICE,

        *Defendant-Appellee,*

CEMEX INC., a Louisiana
Corporation qualified to do
business in California f/k/a
Southdown Inc. d/b/a Transit
Mixed Concrete (TMC),

        *Defendant-Intervenor-Appellee.*

No. 04-55084

D.C. No.
CV-02-00412-RMT

OPINION

Appeal from the United States District Court
for the Central District of California
Robert M. Takasugi, District Judge, Presiding

Argued and Submitted
October 19, 2005—Pasadena, California

Filed June 5, 2006

Before: Cynthia Holcomb Hall, Diarmuid F. O'Scannlain,
and Richard A. Paez, Circuit Judges.

Opinion by Judge O'Scannlain

6127

**COUNSEL**

John Buse, Environmental Defense Center, Ventura, California, argued the cause for the petitioners; Brent Plater, Center for Biological Diversity, Oakland, California, and Karen M. Kraus, Environmental Defense Center, Santa Barbara, California, were on the briefs.

Andrew Mergen, United States Department of Justice, Washington, D.C., argued the cause for respondent United States Fish & Wildlife Service; Assistant Attorney General Thomas L. Sansonetti, James C. Kilbourne, and Paul S. Weiland, United States Department of Justice, Washington, D.C., were on the brief.

Michael Hassen, Jeffer, Mangels, Butler & Marmaro, LLP, San Francisco, California, argued the cause for respondent CEMEX, Inc.; Kerry Shapiro and Scott N. Castro, Jeffer, Mangels, Butler & Marmaro, LLP, San Francisco, California, were on the brief.

Robert J. Uram, Ella Foley-Gannon, and Aaron J. Foxworthy, Sheppard, Mullin, Richter & Hampton LLP, San Francisco, California, filed a brief for amicus curiae Building Industry Legal Defense Foundation and California Building Industry Association.

---

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the Endangered Species Act requires the United States Fish and Wildlife Service to complete formal designation of critical habitat for an endangered fish species listed over thirty-five years ago.

I

A

The United States Fish and Wildlife Service ("Service") listed the unarmored threespine stickleback ("stickleback"), a small, scaleless freshwater fish, as an endangered species in 1970 under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1599. The stickleback is found chiefly in parts of Santa Barbara, Los Angeles, and San Diego counties in southern California. The stickleback prefers to make its nest where there is ample vegetation and a gentle flow of water, avoiding areas with either too much or no water flow. In fact, the rate of water flow is a key factor in preferred stickleback habitat.

In 1980, the Service proposed a rule designating three stream zones of the Santa Clara River watershed as critical habitat for the stickleback but never completed the designation.

In 1990, the Bureau of Land Management ("BLM") awarded CEMEX, Inc.,[1] a contract to mine fifty-six million tons of sand and gravel from a location in Los Angeles County's Soledad Canyon. Although the mining would not take place within the stickleback's habitat, the project involves pumping water from the Santa Clara River and could cause portions of the river to run dry periodically. Parts of the Santa Clara River commonly dry out during the summer season, trapping stickleback in isolated pools, which eventually dry completely. Uncontrolled pumping during particularly dry periods could exacerbate the problem, significantly impacting the stickleback. Because of the project's potential impact, the BLM initiated formal consultation with the Service under the ESA, submitting its final biological assessment for the project in June 1996.

The Service reviewed the project's likely impact on the stickleback and CEMEX's proposals to mitigate those impacts. Ultimately, the Service issued its January 1998 biological opinion, which concluded that the project was "not likely to jeopardize the continued existence of the stickleback." The biological opinion included an incidental take statement ("ITS") "which if followed, [would] exempt[ ] the [Service and CEMEX] from the prohibition on takings[2] found in Section 9 of the ESA." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 790 (9th Cir. 2005) (citing 16 U.S.C. § 1536(b)(4) and *Aluminum Co. of America v. Adm'r,*

---

[1]We refer to CEMEX and its predecessor-in-interest, Transit Mixed Concrete, collectively as "CEMEX."

[2]The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

*Bonneville Power Admin.*, 175 F.3d 1156, 1159 (9th Cir. 1999)). The Service was unable to predict how many stickleback might be taken by the project, particularly in light of the difficulty in isolating the cause of any particular stickleback's death.

The Service's biological opinion requires CEMEX to take specific "reasonable and prudent measures" in order to minimize incidental take of stickleback. The measures include continuous monitoring of water levels in the Santa Clara River and the cessation of pumping from the river "if the habitat requirements of the . . . stickleback are not being met." The BLM's formal consultation process with the Service ended with the issuance of the biological opinion.[3]

B

The Center for Biological Diversity ("CBD"), an organization dedicated to the protection and restoration of natural ecosystems and imperiled species, filed suit in 2002, claiming that the Service violated the ESA by failing to complete the designation of critical habitat for the stickleback. CBD subsequently amended its complaint to claim that the Service violated the ESA and its own regulations by issuing the ITS to CEMEX. Following such amendment, the district court granted CEMEX's motion to intervene as a defendant based on its interest in the mining project.

On September 11, 2002, the Service published its finding that critical habitat should not be designated for the stickleback. Designation of Critical Habitat for the Unarmored Threespine Stickleback, 67 Fed. Reg. 58,580, 58,581 (Sept. 17, 2002) ("Critical Habitat Finding" or "Finding"). Coinci-

---

[3]In August 2001, the BLM reinitiated formal consultation with the Service because of the presence of other endangered species, including the arroyo toad, in the project area. The resulting consultation did not alter the Service's conclusion regarding project impact on the stickleback.

dentally, CBD moved for summary judgment on the same day. After the Service also moved for summary judgment, CBD amended its complaint a second time, challenging the Finding as arbitrary and capricious.

Following cross-motions for summary judgment in December 2002 and January 2003, the district court granted summary judgment to the Service and CEMEX. The court declared CBD's original claim moot. The court rejected CBD's other claims, concluding that the decision not to designate critical habitat was within the Service's discretion and that the Service did not violate the ESA by issuing an ITS to CEMEX. The district court also granted motions to strike several CBD exhibits that were not part of the administrative record.

CBD timely appealed.[4]

## II

CBD challenges the Service's Finding on three grounds. First, CBD argues that the Service exceeded its statutory authority because the ESA requires designations of critical habitat to be made "to the maximum extent prudent and deter-

---

[4]We review the grant of summary judgment *de novo*, *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir. 2003), and apply the same standards as the district court. *Brower v. Evans*, 257 F.3d 1058, 1065 (9th Cir. 2001). When reviewing administrative decisions involving the ESA, we are guided by section 706 of the Administrative Procedure Act ("APA"). *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1235-36 (9th Cir. 2001). Under the APA, agency actions and findings shall be set aside only when they are found to be "arbitrary, capricious, an abuse of discretion," "in excess of statutory . . . authority," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)-(D). This is a narrow scope of review, which does not allow us to "substitute [our] judgment for that of the agency." *Ariz. Cattle*, 276 F.3d at 1236. We must uphold the agency's decision if the agency considered the relevant factors and made no clear error of judgment. *Id.*

minable." Second, CBD claims that the Finding was arbitrary and capricious because the Service did not articulate a rational connection between the facts and its decision. Third, CBD insists that the Finding is invalid because the Service did not provide a notice and comment period. We consider each argument in turn.

### A

To begin, CBD claims—based on its interpretation of the ESA—that the Service has a mandatory duty to complete the proposed designation of critical habitat for the stickleback.

**[1]** The ESA subsection governing designations of critical habitat states:

> The [Service],[5] by regulation promulgated in accordance with subsection (b) of this section and to the maximum extent prudent and determinable—
>
> > (A)   shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and
> >
> > (B)   may, from time-to-time thereafter as appropriate, revise such designation.

16 U.S.C. § 1533(a)(3)(A). Under this provision, designations of critical habitat must be made at the time a species is listed

---

[5]The Secretary of the Interior ("Secretary") has responsibility for implementing the provisions of the ESA for the majority of land animals and freshwater fish species. The Secretary has delegated these duties under the ESA to the Service. *See* 16 U.S.C. §§ 1532(15), 1533(a)(1)-(3); 50 C.F.R. § 402.01(b) (2005). Where the ESA uses "Secretary," we substitute "Service" to reflect this delegation.

CENTER FOR BIOLOGICAL DIVERSITY v. USFWS      6137

as endangered, but this requirement was added to the ESA in 1982. Indeed, the 1982 amendments to the ESA specified that

> [a]ny regulation proposed after, or pending on, the date of the enactment of this Act to designate critical habitat for a species that was determined before such date of enactment to be endangered or threatened *shall be subject to the procedures . . . for regulations proposing revisions to critical habitat instead of those for regulations proposing the designation of critical habitat.*

ESA Amendments of 1982, Pub. L. No. 97-304, § 2(b)(2), 96 Stat. 1411 (1982) (emphasis added).

**[2]** Pursuant to the 1982 Amendments, critical habitat designations for the stickleback—listed as an endangered species in 1970[6] —are governed by the procedures for critical habitat revisions. While the Service "shall" designate critical habitat, it "may" revise critical habitat designations "from time-to-time . . . as appropriate." 16 U.S.C. § 1533(a)(3)(A). When "may" and "shall" are both used in a statute, "the normal inference is that each is being used in its ordinary sense—the one being permissive, the other mandatory." *Haynes v. United States*, 891 F.2d 235, 239-40 (9th Cir. 1989). It follows that critical habitat designations are mandatory, but revisions are discretionary.

CBD concedes as much but argues that once a proposal is made the Service has a mandatory duty to complete the designation "to the maximum extent prudent and determinable." Put another way, CBD contends that once the Service proposes a designation of critical habitat, that designation must be completed unless *not* prudent or determinable. The Service

---

[6]The Service listed the stickleback as an endangered species in 1970, under the precursor to the ESA. 35 Fed. Reg. 16,047, 16,048 (Oct. 13, 1970).

published a proposed rule for designation of critical habitat for the stickleback in 1980. Proposed Designation of Critical Habitat for the Endangered Unarmored Threespine Stickleback ("Proposed Critical Habitat Designation"), 45 Fed. Reg. 76,012 (Nov. 17, 1980). Under CBD's theory, the Service has a mandatory duty to complete this proposed designation.[7] We are not persuaded.

The 1982 Amendments state that *pending proposals* for designation of critical habitat are governed by the statutory provision on critical habitat revisions. ESA Amendments of 1982 § 2(b)(2). As such, the Service has discretion in choosing a course of action with respect to such proposals, just as it does in deciding whether or not to propose a designation.

We cannot accept the contention that "to the maximum extent prudent and determinable" should be read as the controlling language of § 1533(a)(3)(A) and that it mandates completion of the 1982 critical habitat proposal. Such contention fails to account for Congress's use of "shall" for designations and "may" for revisions. If CBD's interpretation is accepted, the statute's use of the discretionary "may" for revisions is rendered superfluous because the Service would be required to complete proposals pending at the time of the 1982 Amendments "to the maximum extent prudent and determinable." If this were truly Congress's intent, it would not have explicitly stated that pending proposals would be controlled by the provision on critical habitat revisions. Significantly, CBD does not explain why, under its logic, all critical habitat revisions would not be mandatory "to the

---

[7]The Service has by regulation defined "not determinable" as when "[i]nformation sufficient to perform required analyses of the impacts of the designation is lacking, or [t]he biological needs of the species are not sufficiently well known to permit identification of an area as critical habitat." 50 C.F.R. § 424.12 (a)(2). By comparison, a designation is "not prudent" if it would be detrimental to the species. 50 C.F.R. § 424.12(a)(1). In the present case, the Service made no express findings that designation was either "not determinable" or "not prudent."

maximum extent prudent and determinable," rendering meaningless the statute's separate treatment of revisions and designations. We decline to interpret the statute in this manner, and thus, we reject CBD's proposed interpretation.[8] *See Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991).

We also reject the argument that a mandatory duty to complete the critical habitat designation arose when the Service failed to make a final determination on the proposal by October 13, 1983—a year after enactment of the 1982 Amendments. We previously held that the ESA's time requirements are meant to spur agency action rather than to prohibit it once the specified time lapses. *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1400 (9th Cir. 1995). Agency delay alone does not transform a discretionary duty into a mandatory duty, especially where Congress provided a specific remedy for such a violation—a citizen suit to compel a decision. *See id.*

**[3]** For these reasons, we conclude that the *proposed* designation of critical habitat for an endangered species listed prior to the 1982 Amendments does not create a mandatory duty to make the "designation."

B

CBD next argues that the Service's Finding was arbitrary and capricious.

---

[8]Neither do we accept CBD's argument that a failure to designate critical habitat will render the ESA's consultation requirement unenforceable. This argument ignores 16 U.S.C. § 1536(a)(2), which requires consultation to ensure that agency actions are "not likely to jeopardize the continued existence of any endangered species." In fact, the BLM and CEMEX initiated consultation on the Soledad Canyon project under that subsection. The mining project is downstream of the formerly proposed critical habitat and thus will not affect it.

1

**[4]** Before reaching the argument's merits, we must first address CEMEX's claim that CBD lacks standing under the APA to challenge the Finding because designation of critical habitat for the stickleback is discretionary. The review provisions of the APA do not apply when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). We must therefore decide whether the Service had a mandatory duty to issue its Finding.

**[5]** Once a critical habitat revision proposal is published, the Service has one year in which to publish one of four actions in the Federal Register. 16 U.S.C. § 1533(b)(6)(A)(i). The Service "shall publish":

> (I) a final regulation to implement the revision,

> (II) a finding that the revision should not be made,

> (III) notice that the one-year period is being extended, or

> (IV) notice that the proposed revision is being withdrawn together with the finding on which the withdrawal is based.

*Id.* Although the Service has some discretion in selecting one of these options, it *must* choose one of the four.

**[6]** Discretion means choice on whether or not to act, not required choice among several options. Because the Service had a mandatory duty to select one of the four actions in the statute based on its proposed designation of critical habitat for the stickleback, the action is not one "committed to agency discretion by law." The APA's review provision therefore applies, and CBD indeed has standing under the statute to challenge the Service's Finding as arbitrary and capricious.

2

[7] An agency decision is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (internal quotation marks omitted); *see also Rybacheck v. EPA*, 904 F.2d 1276, 1284 (9th Cir. 1990) ("Our function is to determine whether the Agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made." (internal quotation marks omitted)). CBD argues that the Service failed to articulate a rational connection between the fact that "critical habitat is a high priority" for the stickleback and its Finding that the proposed designation should not be made. *See Rybacheck*, 904 F.2d at 1284.

We evaluate the Service's Finding based on its stated rationale. *See Ariz. Cattle*, 273 F.3d at 1236 ("The basis for the decision . . . must come from the agency."). In its Finding, the Service examined the four available options and determined that it could not justify taking three of the four actions. Critical Habitat Finding, 67 Fed. Reg. at 58,581.

First, the Service stated that it could not justify publishing a final regulation designating the area as critical habitat under 16 U.S.C. § 1533 (b)(6)(A)(i)(I) because the 1980 proposal no longer satisfied the ESA's requirement that such designations "be made on the basis of the best scientific data available" after considering the economic impact of the designation. *Id.* (citing 16 U.S.C. § 1533(b)(2)). The existence of considerable new information would have required the Service to reassess the proposed designation because both the scientific evidence and the economic impact analysis were seriously outdated. *Id.*

Second, the Service stated that it could not defer its decision under subsection (i)(III) to redo the economic analysis and update its scientific information. Doing so would have forced the Service to divert resources from its mandatory duties under the ESA, including a backlog of nondiscretionary designations of critical habitat for approximately 475 species—many mandated by court order and court-approved settlement agreements. *Id.* These mandatory designations were, by definition, a higher priority than the discretionary designation of critical habitat for the stickleback.[9] *Id.*

Third, the Service similarly stated that it could not justify withdrawing the proposed designation because a notice of withdrawal must be accompanied by a finding that "there is not sufficient evidence to justify the action proposed." *See* 16 U.S.C. § 1533(b)(6)(A)(i)(IV), (B)(ii). Such a finding could not be made based on stale information, but gathering the required information would have compromised the Service's ability to address its backlog of mandatory duties. Critical Habitat Finding, 67 Fed. Reg. at 58,581.

Having rejected the other three possible actions, the Service concluded that "the proposed designation of critical habitat for the . . . stickleback should not be made." *Id.* at 58,582. It did so after reviewing the existing protections for the stickleback that would be unaffected by the decision. *Id.*

Nevertheless, CBD claims that the Critical Habitat Finding frustrates the policy mandate of the ESA. However, the Service stated that the Finding would not "alter the protection [the stickleback] and its habitat will continue to receive under

---

[9]CBD does not dispute the Service's backlog of mandatory critical habitat designations, asserting instead that the ESA allows the Service to leave the designation in place while it updates the necessary data. However, the ESA authorizes only one six month extension to the mandatory duty to act within one year. 16 U.S.C. § 1533(b)(6)(B). Significantly, CBD does not claim that the Service could both eliminate its significant backlog and gather information on the stickleback in six months.

the [ESA]." *Id.* at 58,582. Indeed, the Finding has no effect on an agency's duty to consult with the Service to ensure that its actions are "not likely to jeopardize the continued existence" of the stickleback. 16 U.S.C. § 1536(a)(2). Nor does it eliminate the ESA's prohibition on take[10] of stickleback. 16 U.S.C. § 1538(a)(1) ("it is unlawful for any person . . . to [ ] take any [endangered] species"). In any event, in order to accept CBD's contention, we would be forced to question Congress's decision to allow the Service discretion regarding designation of critical habitat for species listed as endangered prior to 1982. This, we cannot do. Therefore, we must conclude that the Service's Finding is not at cross-purposes with the ESA's protection of the stickleback as an endangered species.

CBD next argues that the Service may refuse to designate critical habitat only if "the benefits of such exclusion outweigh the benefits of specifying such area." 16 U.S.C. § 1533(b)(2)). But subsection 1533(b)(2) only establishes a "basis for determinations," requiring the Service to base designations of critical habitat on the best scientific evidence available and after consideration of any resulting economic impact. Further, it establishes a standard for excluding areas from mandatory designation only when the benefits of exclusion outweigh the benefits of inclusion. *Id.* Because we have already determined that designation of critical habitat for the stickleback is discretionary, § 1533(b)(2) simply does not apply in this case.[11]

---

[10]As previously noted, 'take' means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

[11]CBD's reliance on *Natural Resources Defense Council v. United States Department of the Interior*, 113 F.3d 1121 (9th Cir. 1997), is unpersuasive. There, the designation of critical habitat was mandatory under § 1533(a)(3)(A), subject to the balancing of benefits in § 1533(b)(2). *Id.* at 1127. We held that the Service had failed to weigh properly the benefit to the species and thus could not exclude the area in question from mandatory critical habitat designation. *Id.* at 1124. The same rationale does not apply here where the designation of critical habitat for the stickleback was *not* mandatory.

**[8]** Based on our review, it is clear that the Service "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *See Rybacheck,* 904 F.2d at 1284. The Service's Finding was not arbitrary or capricious.

3

Finally, CBD argues that we should set aside the Finding because the Service did not provide an adequate opportunity for public comment. Under the APA, agency actions must be set aside if taken "without observance of procedure required by law."[12] 5 U.S.C. § 706(2)(A).

**[9]** With respect to critical habitat revisions, the ESA specifically requires notice and comment in only two circumstances: (1) when the one-year period for taking action is being extended and (2) when a proposed revision is being withdrawn. § 1533(b)(6)(A)(i)(III), (IV). The statute does not expressly require notice for the remaining two available actions in § 1533(b)(6)(A)(i), including a finding that a revision should not be made. Indeed, § 1533(b)(6)(A)(i)(II) directs the Service to issue a "final regulation" to implement a finding that a revision or, as here, a designation, will not be made. We therefore infer that Congress did not intend to require notice when the Service takes one of these two actions.[13]

---

[12]The ESA states that "[e]xcept as provided in paragraphs (5) and (6) of this subsection," the APA shall apply to "any regulation promulgated to carry out the purposes of this chapter." 16 U.S.C. § 1533(b)(4). Paragraph (6) describes the Service's mandatory duty to act on proposed critical habitat revisions. Thus, the APA's notice requirements are not applicable to the Service's Critical Habitat Finding.

[13]*Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995), does not support CBD's argument. That case concerned publication requirements for proposed rule-making, *id.* at 1401-02, but a formal finding that a discretionary proposal to designate critical habitat should not be made final is simply not a proposed rule. The ESA contains specific notice and comment requirements for proposed rules, 16 U.S.C. § 1533(b)(5), but it does not require notice when the Service finds that a critical habitat designation under § 1533(b)(6)(A)(i)(II) should not be made.

*See Boudette v. Barnette*, 923 F.2d 754, 756-57 (9th Cir. 1991) (noting that the *expressio unius est exclusio alterius* canon "creates a presumption that when a statute designates certain . . . manners of operation, all omissions should be understood as exclusions").

**[10]** We are satisfied that Congress did not intend to impose a notice requirement on agency actions taken under 16 U.S.C. § 1533(b)(6)(A)(i)(I)-(II). We therefore decline to set aside the Critical Habitat Finding on such ground.

C

Based on the plain language of the ESA and its amendments, we are convinced that Congress conferred discretion on the U.S. Fish and Wildlife Service to choose whether to designate critical habitat for endangered species listed before 1982, including the stickleback. Although the Service was required to act on the proposed designation, we are satisfied that the Service's Finding was a proper exercise of its discretion. In any event, neither the APA nor the ESA require a notice and comment period that would force us to set the Finding aside. The district court therefore acted properly in granting defendants' motions for summary judgment.

III

We next consider CBD's challenge to the incidental take statement ("ITS") contained in the biological opinion that the Service issued to CEMEX for the Soledad Canyon project. CBD claims that the Service must ensure that agency action will not violate any federal or state law before it issues an ITS. Before reaching the merits, we address CEMEX's renewed claim that CBD lacks standing and the Service's contention that CBD's claim is not ripe.

### A

**[11]** CBD does not ground its right to bring this claim on the ESA private action provisions.[14] Instead it relies on the APA, which provides a right to judicial review of all "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. This right applies universally except where a statute specifically precludes judicial review or "agency action is committed to agency discretion by law." § 701(a). The ESA does not expressly preclude review, and CBD alleges that the Service has a mandatory duty to ensure that agency actions comply with all applicable laws before issuing an ITS. We are satisfied that CBD has standing to bring its claim under the APA.

### B

**[12]** The Service contends that CBD's claim is not ripe for review because CEMEX has not completed all of the permit requirements for the proposed project. To resolve a ripeness claim, "we must consider (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio*

---

[14]CEMEX argues that CBD does not have standing to bring its claim under 16 U.S.C. § 1540(g)(1)(C), which permits any person to file suit against the Service "where there is alleged a failure . . . to perform any act or duty under section 1533 of this title which is not discretionary." Were the ESA's citizen suit provisions the only source of CBD's standing, CEMEX would be correct. CBD cannot bring a claim under such provision because its claim is based not on § 1533, but on the Service's duties under § 1536. Neither could CBD base standing on 16 U.S.C. § 1540(g)(1)(A), which authorizes citizen suits "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . , who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." This provision cannot be used to seek judicial review of the Service's implementation of the ESA. *Bennett v. Spear*, 520 U.S. 154, 173-74 (1997).

*Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998); *Citizens for Better Forestry*, 341 F.3d at 976-77 (quoting *Ohio Forestry*). We analyze the present case with these three considerations in mind.

**[13]** First, the Service's issuance of an ITS will cause "hardship" to CBD because it creates a legal right; the ITS directly authorizes the incidental taking of stickleback. *See Ohio Forestry*, 523 U.S. at 733. The Service's action "is a definitive statement of [the] agency's position," "has a direct and immediate effect on the complaining parties," and "has the status of law." *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 780 (9th Cir. 2000).

**[14]** Second, immediate judicial review of CBD's claim will not interfere with further administrative action. *See Ohio Forestry*, 523 U.S. at 735. The Service's policy on the Soledad Canyon project is fixed and will not be reconsidered because the consultation process is complete once the biological opinion is issued.[15]

**[15]** Third and finally, further factual development will not assist us in resolving the legal question at issue. *See id.* at 737. The voluminous administrative record in the case covers virtually every conceivable angle of the project, and we may safely base our decision on it.

We cannot agree with the Service's contention that we should follow the Third Circuit's direction in *New Hanover Township v. United States Corps of Engineers*, 992 F.2d 470 (3d Cir. 1993). *New Hanover* held a controversy unripe because future permitting was required, stressing pragmatic considerations where an order to begin the permitting process

---

[15]The Service will have some involvement in monitoring the project, and formal consultation will be reinitiated once stickleback are actually taken. The Service will not, however, have any further input into the project *before* it begins.

under the Clean Water Act would be pointless if a required state permit were denied. *Id.* at 472-73. Significantly, the Clean Water Act specifically contemplates dual permit requirements at the state and federal levels. *See id.* at 472.

Pragmatic concerns bear far less consideration in this case. If CBD prevails, the Service will be forced to withdraw its biological opinion until the mining project's compliance with all applicable state and federal laws is ensured. Unlike *New Hanover*, the very existence of additional legal requirements is at the heart of CBD's claim. CBD claims that no ITS should issue until the Service addresses those other legal requirements. Once CEMEX is in compliance with these laws, the Service could reissue the biological opinion containing the ITS. Additionally, the ESA and its regulations—unlike the Clean Water Act—do not explicitly involve compliance with other state and federal laws when issuing a biological opinion. For these reasons, we are not persuaded that *New Hanover* is applicable.[16]

[16] Instead, we are convinced that CBD's challenge is ripe for review, and we turn to the merits of the claim.

## C

CBD argues that no ITS can be issued unless the Service ensures compliance with all federal and state laws.[17] Although

---

[16]We also reject the Service's reliance on *Texas v. United States*, 523 U.S. 296 (1998), which involved an unripe controversy where application of a statute was not foreseeable or likely. *Id.* at 300. The present case is clearly distinguishable. We have a concrete application of the ESA, and we may properly view the statute in light of that application. *See id.* at 301.

[17]We review the district court's grant of summary judgment on the issue *de novo. Citizens for Better Forestry*, 341 F.3d at 969. Under the APA, we may set aside the Service's action only if it is "arbitrary, capricious, an abuse of discretion," "in excess of statutory . . . authority," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A),(C)-(D). In analyzing an agency's responsibilities under a statute, we ordinarily defer to the agency's interpretation. *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1578 (9th Cir. 1993).

the district court based summary judgment on preemption grounds, we may affirm "on any grounds supported by the record." *Mustang Mktg., Inc. v. Chevron Prods. Co.*, 406 F.3d 600, 606 (9th Cir. 2005).

[17] Under the ESA, the Service must issue an ITS to a federal agency as part of its biological opinion after confirming that the agency's actions, including any incidental takings, will not jeopardize the continued existence of an endangered species. 16 U.S.C. § 1536(b)(4). The recipient agency is immunized for incidental takings of endangered species as long as the agency complies with the "reasonable and prudent measures" specified by the Service for minimizing the action's impact on the endangered species. § 1536(b)(4)(i)-(ii).

Service regulations define "incidental take" as "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity." 50 C.F.R. § 402.02. "Otherwise lawful activities" are defined as "those actions that meet all State and Federal legal requirements except for the prohibition against taking." Interagency Cooperation—Endangered Species Act of 1973, as Amended; Final Rule, 51 Fed. Reg. 19926, 19936 (June 3, 1986). On the basis of these regulatory definitions, CBD argues that the Service cannot issue an ITS unless it first determines that an agency action will comply with all state and federal legal requirements. Specifically, CBD claims that the Service may not issue an ITS for the Soledad Canyon mining project because California law independently protects the stickleback, prohibiting *any* take of the species, incidental or not. Cal. Fish & Game Code § 5515 (West 2004) (known as the California Fully Protected Fish Statute). CBD insists that any take of stickleback will violate California law, and thus, the Soledad Canyon project cannot be considered an "otherwise lawful activity." CBD's lone citation to support this contention is to a case which does nothing more than repeat verbatim the regulatory definition of "incidental taking." *See Mt. Graham Red Squirrel*, 986 F.2d at 1580.

According to the ESA, once the Service is satisfied that an agency's action will not threaten an endangered species' continued existence, it *must* issue the ITS. 16 U.S.C. § 1536(b)(4) ("the [Service] shall provide . . . a written statement"). If the recipient agency complies with all the terms and conditions of the biological opinion, the ITS immunizes it from the prohibition against take of endangered species: "any taking that is in compliance with the terms and conditions specified in [this statement] shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2).

**[18]** The ESA says nothing about issuing a biological opinion or ITS only after ensuring a planned action's compliance with all state and federal laws. Indeed, an ITS does not immunize its holder for violations of any other law, be it state or federal. Congress knows how to require compliance with other laws, but it did not specifically do so here. *See Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 587 (1987) (detailing 43 U.S.C. § 1712(c)(8)'s requirement that the Secretary of the Interior "provide for compliance with applicable pollution control laws, including State, and Federal air, water, noise, or other pollution standards or implementation plans").

The Service interprets the regulatory language at issue to mean that "an ITS does not relieve the action agency or applicant of its responsibility to comply with all other . . . legal requirements." This is a reasonable interpretation, especially considering the specificity of other regulations that do require compliance with other laws. *See, e.g.*, 36 C.F.R. § 228.8(a) (1986) (requiring compliance with state air quality standards in national forests). Significantly, CBD cannot identify any instance in which the Service acted to ensure compliance with all other laws before issuing an ITS. We therefore cannot accept CBD's argument that the Service's interpretation is an expedient litigation position that is not entitled to deference.

There is simply no evidence that the Service has ever interpreted its regulatory definitions to impose a sweeping duty to

require compliance with all other laws before issuing an ITS. CBD finds no support for its argument in the ESA, its legislative history, or the regulations governing the consultation process, and yet CBD's proffered interpretation would require the Service to ensure compliance with a farrago of zoning laws and permitting requirements that are completely unrelated to preservation and conservation efforts. Such a requirement would impose an enormous burden on the Service, which is already operating with a serious backlog of mandatory duties, resulting in a diversion of scarce resources away from conservation efforts.

[19] Based on this analysis, we defer to the agency interpretation of the regulations and conclude that the Service is not required to ensure compliance with federal and state law before issuing an ITS.[18]

IV

Finally, we address the district court's decision to strike fifteen exhibits offered by CBD because the documents were not part of the administrative record.[19]

[20] When reviewing an agency decision, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *see also Sw. Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) (citing *Camp*). Parties may not use "post-decision information as a

---

[18]Because we resolve the claim on this ground, we need not decide the meaning of "harm" under California's Fully Protected Fish Statute or address CEMEX's claim that the statute is preempted by federal mining laws.

[19]We review the district court's decision to exclude extra-record evidence for an abuse of discretion. *Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 997 (9th Cir. 1993).

new rationalization either for sustaining or attacking the Agency's decision." *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 811-12 (9th Cir. 1980).

We have recognized four exceptions to this rule, allowing extra-record materials

> (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision,
>
> (2) when the agency has relied on documents not in the record, [ ]
>
> (3) when supplementing the record is necessary to explain technical terms or complex subject matter, [or] . . .
>
> (4) when plaintiffs make a showing of agency bad faith.

*Sw. Center*, 100 F.3d at 1450 (internal quotation marks omitted). CBD has not alleged agency bad faith or that the Service relied on documents not in the record.[20]

CBD claims that the documents it offered were submitted for their persuasive force to explain the term 'take' under state law and to show that the Service failed to consider a relevant factor during its deliberations. We normally refuse to consider

---

[20]The Service issued its biological opinion on January 14, 1998. All of CBD's proffered documents postdate the agency decision and thus could not have been relied on by the agency. The documents offered by CBD include letters dated November 2000 and January 2002, an August 2001 conference outline, a 2003 declaration concerning an April 2002 seminar, ten California Endangered Species Act incidental take permits issued between July 1999 and September 2001, and one undated California ESA incidental take permit that, from internal references, must date from November 1998 or later.

evidence that was not before the agency because "it inevitably leads the reviewing court to substitute its judgment for that of the agency." *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980). When an agency's inquiry is inadequate, we generally "remand the matter to the agency for further consideration." *Id.*

**[21]** We rejected a similar attempt to introduce extra-record documents in *Southwest Center for Biological Diversity v. United States Forest Service,* 100 F.3d at 1450. There a party offered extra-record documents, including a letter dated a month after the agency decision was completed, arguing that they should be admitted to analyze "whether the Forest Service [had] considered all of the relevant factors" in its decision. *Id.* We held that the district court had not abused its discretion in striking the letter because post-decision information "may not be advanced as a new rationalization . . . for attacking an agency's decision." *Id.* at 1451-52.

**[22]** This is precisely the purpose for which CBD offered the stricken documents, and we agree with the district court that it is an impermissible use. Thus, the district court did not abuse its discretion in striking CBD's extra-record documents.[21]

V

In summary, it was not arbitrary and capricious for the Service to decide not to designate critical habitat for the stickleback. The Service was not required to ensure compliance with federal and state laws before issuing an ITS to CEMEX, and the district court did not abuse its discretion in striking extra-record exhibits offered to establish a new rationale for attack-

---

[21]We also grant CBD's motion to strike extra-record documents filed with the Court by CEMEX and the portions of its brief that refer to the documents. The documents are not part of the administrative record and do not come within one of our exceptions to the rule excluding such materials.

6154     CENTER FOR BIOLOGICAL DIVERSITY v. USFWS

ing the Service's decision. The district court's grant of summary judgment to the Service and CEMEX is

**AFFIRMED.**