Thomas S. Waldo
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: twaldo@earthjustice.org

Nathaniel S.W. Lawrence
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
Ph: 360-534-9900
Fax: 360-534-9909
Email: nlawrence@nrdc.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ORGANIZED VILLAGE OF KAKE, SOUTHEAST ALASKA CONSERVATION COUNCIL, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, THE WILDERNESS SOCIETY, and CENTER FOR BIOLOGICAL DIVERSITY, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; MARK REY, in his official capacity as Under Secretary of Agriculture; DENNIS E. BSCHOR, in his official capacity as Alaska Regional Forester; and FORREST COLE, in his official capacity as Forest Supervisor for the Tongass National Forest, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. J04-0029 CV (JKS) |

**PLAINTIFFS' REPLY BRIEF (COUNTS V AND IX)**

_____
Organized Village of Kake, et al. v.
United States Forest Service, et al.,
J04-0029 CV (JKS)

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT......................................................................................................................3

I.    THE FAILURE TO UPDATE THE DEMAND PROJECTIONS OR TO
      DISCLOSE THE STRUCTURAL CHANGES IN THE MARKETS FOR
      TONGASS TIMBER VIOLATED NEPA. ..........................................................3

      A.    The Japanese market for Tongass wood products has nearly disappeared due
            to structural changes in the global marketplace.............................................4

      B.    The Forest Service has recognized the critical importance of the Japanese
            market share, yet failed to follow its own procedures to revise the market
            demand projections accordingly or to disclose the changes in the Threemile
            EIS. ...............................................................................................................6

      C.    Domestic markets have not replaced the Japanese markets. .....................10

      D.    Supply constraints do not explain the dramatic decline in logging on the
            Tongass. ......................................................................................................14

II.   THE FAILURE TO CONSIDER THE DECLINE IN MARKET DEMAND
      RENDERS ARBITRARY THE "NECESSARY" FINDING UNDER ANILCA
      SECTION 810....................................................................................................19

      A.    Both parts of the "necessary" finding are invalid.....................................19

      B.    Federal Defendants' other assertions about subsistence are irrelevant and/or
            demonstrably wrong. ..................................................................................22

III.  THE COURT SHOULD VACATE THE THREEMILE RECORD OF
      DECISION.........................................................................................................24

CONCLUSION.................................................................................................................25

Organized Village of Kake, et al. v.
United States Forest Service, et al.,
J04-0029 CV (JKS)

Plaintiffs Organized Village of Kake, et al., submit this reply in support of their opening brief on the merits of Counts V and IX, entitled Plaintiffs' Opening Brief ("Plf. Br.") (filed Nov. 23, 2005) (Docket No. 48). This brief responds to the Opposition Brief of Federal Defendants ("Fed. Opp.") (filed Jan. 20, 2006) (Docket No. 50) and to the brief of Alaska Forest Association (AFA), entitled Defendant-Intereveor's [sic] Opposition Brief ("AFA Opp.") (filed July 30, 2007) (Docket No. 115).[1]

<u>INTRODUCTION</u>

Neither the Forest Service nor AFA is able to refute the central contention of this case: that former Japanese customers have almost completely stopped purchasing Tongass wood products, undermining a central assumption of the 1997 Brooks and Haynes demand projections on which the Threemile timber sale project is based.[2] Nor can they demonstrate that the

---

[1] The AFA brief is the substitute for a previous brief stricken due to improper reliance on an affidavit that was not part of the administrative record. *See* Order from Chambers (filed July 3, 2007) (Docket No. 114). Unfortunately, AFA continues to rely primarily on non-record documents. Out of the eight exhibits attached to AFA's substitute brief, five are not in the administrative record. *See* AFA Exhs. 2, 3, 4, 5, & 8. All five of these exhibits include documents dated in 2007 that could not possibly have had a bearing on the Forest Service's 2004 decision to approve the Threemile timber sale. AFA has failed to disclose that these documents are not part of the administrative record and has not carried its burden of showing that the Court should consider them. *See Sierra Club v. Dombeck*, 161 F. Supp. 2d 1052, 1063 (D. Ariz. 2001); *see also Animal Def. Council v. Hodel*, 840 F.2d 1432, 1438 (9th Cir. 1988) (refusing to allow supplementation where the proponent "has not demonstrated that it falls within any of the exceptions"), *modified on other grounds*, 867 F.2d 1244 (9th Cir. 1989). Rather than delaying this case further through another motion to strike, Plaintiffs submit that the Court should not consider these documents or the arguments in AFA's briefs relying on them. Because that is most of AFA's brief, this reply focuses primarily on the arguments of Federal Defendants.

[2] Throughout this brief, Plaintiffs refer to the loss of Japanese markets and corresponding decline in market demand as a current condition. At issue in this case is the validity of the Threemile decision, which was initially signed on April 23, 2004, *see* Plf. Exh. 21 at 25, and affirmed on administrative appeal on October 7, 2004. *See* Fed. Exh. 4 at 1. Thus, what is actually at issue

(footnote continued…)

Organized Village of Kake, et al. v.        1
United States Forest Service, et al.,
J04-0029 CV (JKS)

domestic market—or any other market—has been able to replace this lost demand.  Instead of responding to this claim, both sets of defendants mischaracterize Plaintiffs' claim as equating actual logging levels with market demand, *see*, *e.g.*, Fed. Opp. at 1; AFA Opp. at 6, and then spend most of their briefs offering alternative explanations for the sharply reduced logging levels.

By misstating Plaintiffs' claim, these arguments miss the point.  Plaintiffs have never argued that the actual logging levels are the equivalent of market demand (though they certainly do provide some evidence of reduced demand).  Rather, Plaintiffs base their claim on the fact that a key assumption of the 1997 Brooks and Haynes projections—the dominance of Japan as a market for Tongass timber—has changed completely, requiring a recalculation of market demand according to the Forest Service's own rules.  Plaintiffs pointed out that the Forest Service itself in numerous other documents has described a substantial decline in market demand since 1997.  *See* Plf. Br. at 16-20.  By relying on the outdated Brooks and Haynes projections, with no recalculation of demand as required by agency criteria and no disclosure of the important structural changes in the timber markets subsequent to those projections, the Threemile Environmental Impact Statement (EIS) is highly misleading in violation of the National Environmental Policy Act (NEPA).  This failure also renders arbitrary the agency's finding that the significant restriction to subsistence uses caused by the Threemile project is "necessary" under section 810 of the Alaska National Interest Lands Conservation Act (ANILCA).

_____

(…footnote continued)
in this case is the state of the market as reflected in the record for the agency's 2004 decisions. However, markets have not substantially changed since that time.  For stylistic simplicity Plaintiffs often refer to these issues in the present tense.

_____

Organized Village of Kake, et al. v.          2
United States Forest Service, et al.,
J04-0029 CV (JKS)

<u>ARGUMENT</u>

I.    THE FAILURE TO UPDATE THE DEMAND PROJECTIONS OR TO DISCLOSE
      THE STRUCTURAL CHANGES IN THE MARKETS FOR TONGASS TIMBER
      VIOLATED NEPA.

The Threemile EIS violates NEPA because it fails to disclose that the Japanese market

for Tongass timber products has largely disappeared and not been replaced.  This is a critical

omission that makes the entire EIS highly misleading.  The entire project is based on the premise

that demand for wood products exists at the levels projected by Brooks and Haynes in 1997, but

those projections explicitly assumed that Japan would continue to be the dominant market for

Tongass wood products.  The Forest Service itself adopted a methodology recognizing the

central importance of this assumption and requiring revision of the projections when the less

profitable domestic share of the market for Tongass lumber exceeded 35 percent of the total.  At

least two years before the Threemile decision, the Forest Service recognized that the domestic

market had grown to 72 percent of Tongass wood product sales, vastly exceeding the threshold

the agency itself had identified as critical, yet took no steps to revise the projections or even to

disclose this fundamental, structural change in markets for Tongass timber.  Had the agency

correctly described market conditions in the Threemile EIS, it would have been more difficult or

impossible to justify the project and the harm it causes to roadless areas and traditional

subsistence uses.[3]

Defendants do not dispute that an EIS may not rely on misleading information.  *See* Plf.

Br. at 12 (citing cases).  Relying on a Fifth Circuit case, Federal Defendants attempt to

---

[3] Contrary to the assertion of Federal Defendants, this claim is not the same as the one the Court
decided in *NRDC I*.  *See* Fed. Opp. at 11.  The decision to authorize the Threemile project was
later than the decisions at issue in that case and was based on more recent data reinforcing the
structural changes in timber markets and loss of market demand.

Organized Village of Kake, et al. v.                    3
United States Forest Service, et al.,
J04-0029 CV (JKS)

marginalize the importance of economic analysis in an EIS, *see* Fed. Opp. at 10 (citing *S. La. Envt'l Council v. Sand*, 629 F.2d 1005, 1014 (5th Cir. 1980)), but this is not the law in the Ninth Circuit. This Circuit recognizes that "[i]naccurate economic information may defeat the purpose of an EIS by 'impairing the agency's consideration of the adverse environmental effects' and by 'skewing the public's evaluation' of the proposed agency action." *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 811 (9th Cir. 2005) (striking down EIS based on error in calculating market demand for timber, quoting *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 446-48 (4th Cir. 1996)). That is true here.

Nor do Defendants dispute the fact that the Threemile EIS relied critically on the 1997 Brooks and Haynes projections as justification for the timber sale project, both directly for long-term demand projections and indirectly as an important component of the Morse procedures for calculating the volume of timber to be offered each year. *See* Plf. Br. at 14-16.

A.    The Japanese market for Tongass wood products has nearly disappeared due to structural changes in the global marketplace.

Defendants barely address the central component of Plaintiffs' claim: that the Japanese market for Tongass timber products nearly disappeared subsequent to the 1997 Brooks and Haynes projections, and well before the Threemile decision. The record is replete with references to this structural change from the Forest Service's own expert analyses, EISs, and public announcements. In fact, the additional documents attached to Federal Defendants' brief further confirm this fact. *See*, *e.g.*, Fed. Exh. 6 at 2 (2003 Wilderness FSEIS) ("Japan, traditionally the major destination market for Southeast Alaskan lumber, accounted for just 24 percent of demand in 2000, with the bulk of sales (62 percent) going to the continental U.S."); *id.* at 5 ("Japan has traditionally been the major destination market for Southeast Alaskan lumber

Organized Village of Kake, et al. v.                    4
United States Forest Service, et al.,
J04-0029 CV (JKS)

and other processed wood products.  In recent years, however, this situation has changed

dramatically."); Fed. Exh. 7 at 3 (2003 706(a) report) ("As for destination markets for Southeast

Alaskan wood products, shipments to foreign markets increased over 2002 levels, but were still

less than half of the 2001 levels, and were one-tenth of 1999 levels."); *id.* at 4 ("Demand for

Southeast Alaska wood products in historic export markets, particularly Asia, continues to be

low."); *id.* at 14 ("On the demand side, shrinking markets in Japan and competition from

producers in other regions mean that traditional sources of profit have largely evaporated."); *see

also* Plf. Exh. 5 at 1 (USFS op-ed) ("Extremely soft Asian markets are the principal reason for

this lack of interest in our timber offerings."); Plf. Exh. 14 at 1 (USFS briefing paper) ("The

Pacific Rim market for timber products has considerably changed due to new suppliers and

modifications to Japanese building codes.  The Alaska industry struggles to replace the

demand."); Plf. Exh. 19 at 3 (2001-02 draft 706(a) report) ("As for destination markets for

Southeast Alaskan wood products, shipments to foreign markets continued to decline and prices

remained at historically low levels."); *id.* at 11 ("Declines in both Japanese import volumes and

market prices for Southeast Alaskan logs and lumber are a clear indication of lagging demand for

these products in that market.").

> These and other Forest Service documents in the record also show that this loss of the

Japanese market is not merely a temporary blip, but a structural change that is likely to endure

for the foreseeable future.  *See*, *e.g.*, Plf. Exh. 7 at 2 (Morse report) ("the timber industry in

Southeast Alaska is in the midst of a complete structural change"); Plf. Exh. 19 at 11 (2001-02

draft 706(a) report) (citing "structural changes in the Japanese wood products market"); Fed.

Exh. 6 at 5 (2003 Wilderness FSEIS) (citing "the structural changes that have occurred in the

Japanese wood products and construction sectors"); Plf. Exh. 18 (USFS press release) ("it is

---

Organized Village of Kake, et al. v.                    5
United States Forest Service, et al.,
J04-0029 CV (JKS)

highly unlikely that markets will improve enough for [current timber sale contracts] to become economical during the life of the timber sale contract," according to Tongass Forest Supervisor Forrest Cole); *see also* Plf. Exh. 14 at 1 (USFS briefing paper) (loss of Pacific Rim markets attributed to "new suppliers and modifications to Japanese building codes").

This functionally permanent loss of the Japanese market has a huge impact on the viability of Tongass timber sales, because the large majority of Tongass wood products are now going to domestic markets that do not offer the premium prices formerly available in Japan. *See* Fed. Exh. 7 at 11 (2003 706(a) report) (domestic market "does not offer the same premiums for logs and cants as did the Japanese"); Plf. Exh. 19 at 11-12 (2001-02 draft 706(a) report) (same); *see also* Plf. Exh. 12 at 4 (2003 Wilderness FSEIS) ("The U.S. market places less of a premium on particular species and grades, and, as a result, generally offers lower prices for Tongass products").

    B.    <u>The Forest Service has recognized the critical importance of the Japanese market share, yet failed to follow its own procedures to revise the market demand projections accordingly or to disclose the changes in the Threemile EIS.</u>

The Morse methodology on which Defendants rely so heavily actually makes even more evident why the EIS's treatment of market demand violated NEPA. The Forest Service adopted this methodology through public notice-and-comment rulemaking procedures in the Federal Register[4] to help the agency determine the volume of timber to be offered annually. It

---

[4] *See* Plf. Exh. 7 at 46 (acknowledging publication in Federal Register and responding to public comments); 65 Fed. Reg. 18,962 (April 10, 2000) (adopting Morse methodology) (attached as Plf. Exh. 34); 63 Fed. Reg. 65,573 (Nov. 27, 1998) (proposing and soliciting public comments on Morse methodology) (attached as Plf. Exh. 33). The Court is required to take judicial notice of Federal Register publications. *See* 44 U.S.C. § 1507; *United States v. Int'l Union of Operating*
(footnote continued…)

Organized Village of Kake, et al. v.       6
United States Forest Service, et al.,
J04-0029 CV (JKS)

recognized the central importance of the relative Japanese and domestic shares of the market and incorporated a requirement to monitor this variable and revise demand projections when it crosses a specific numeric threshold.  The agency's failure to follow its own requirement, or even to disclose the change in the EIS, renders the EIS highly misleading in violation of NEPA.

The methodology requires:  "If it can be documented that sales to domestic markets account for more than 35 percent of lumber production in Southeast Alaska, revise the ten-year harvest forecast."  Plf. Exh. 7 at 38.  Brooks and Haynes assumed that only 25 percent of Tongass lumber production would go to the lower-priced domestic markets, but that share had nearly tripled—to 72 percent—by 2000.  *See* Plf. Exh. 12 at 6.  This 72 percent share is more than double the 35 percent threshold established in the Morse methodology, triggering the requirement to "revise the ten-year forecast."  Plf. Exh. 7 at 38.  The Forest Service was aware of this fact by May 2002, and probably much earlier.  *See* Plf. Exh. 35 at 1, 3 (Wilderness DSEIS published May 2002).  Yet, in the Threemile FEIS published April 2004, the Forest Service still had not complied with the requirement to revise the projections, and failed even to disclose that these structural changes in the markets had occurred.  In their opening brief, Plaintiffs pointed out that the Forest Service had failed to comply with this requirement of the Morse methodology, *see* Plf. Br. at 18, and Defendants failed completely to respond.  It is highly misleading, and therefore in violation of NEPA, for the Threemile EIS to rely on the Morse methodology to establish the need for the project, without following the requirements of the methodology or even disclosing the relevant facts.

---

(…footnote continued)
*Eng'rs, Local 701*, 638 F.2d 1161, 1167 n.9 (9th Cir. 1979); *U.S. Steel Corp. v. U.S. EPA*, 595 F.2d 207, 212 n.11 (5th Cir.); *modified on other grounds*, 598 F.2d 915 (5th Cir. 1979).

---

Organized Village of Kake, et al. v.                7
United States Forest Service, et al.,
J04-0029 CV (JKS)

Having adopted this requirement publicly through formal rulemaking procedures, the agency is not free to disregard it without explanation.[5]  Under basic principles of administrative law, "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute."  *Bush-Quayle '92 Primary Comm. v. FEC*, 104 F.3d 448, 453 (D.C. Cir. 1997) (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)), *cited in S.E. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 653 (9th Cir. 2007).  This is particularly true under NEPA, which has as its very purpose to foster informed decision-making and informed public participation.  *See* Plf. Br. at 11-12.

Federal Defendants make much of the fact that the Morse methodology is "self-correcting," by reducing offering levels when logging levels fall.  *See* Fed. Opp. at 2, 5. According to its own terms, this is true only if the agency complies with the methodology, which it did not do here.  In the section of her report describing the "self-correcting" nature of the methodology, Morse explained the importance of complying with the monitoring requirements:

> Finally, the procedures include a detailed monitoring section that lists the information needed to validate assumptions about the relationships among markets, mill capacity, and operating rates each year.  As industry structure, markets, and timber consumption rates change, the procedures will be updated with this new information.  The procedures are designed so that, over time, erroneous projections will be systematically accounted for and corrected.

---

[5] Plaintiffs do not contend that the Morse methodology is a substantive rule binding on the agency.  *See* Plf. Exh. 7 at 46 (Forest Service describing Morse methodology as an interpretive rule and/or rule of agency practice rather than a substantive rule).  They argue only that, having carefully adopted the methodology through public notice-and-comment procedures published in the Federal Register, the agency must provide a reasoned explanation for any decision to depart from it.

Organized Village of Kake, et al. v.                    8
United States Forest Service, et al.,
J04-0029 CV (JKS)

Plf. Exh. 7 at 45.  The requirement to revise the ten-year forecast if domestic sales exceed

35 percent of production is included within the "Monitoring" section described by Morse in this

paragraph.  *See id.* at 36, 38.  The Morse report repeatedly emphasizes the importance of

complying with these monitoring requirements.  *See id.* at 2 (report includes "a commitment to

monitor key parameters of the emerging timber market and to incorporate this information in

timber sale planning" and "establish[es] a framework for systemically collecting, evaluating, and

incorporating the information needed to refine this approach"); *id.* at 5 ("The procedures

described here require systematic monitoring of key economic indicators and regional stumpage

market conditions. … Thus, the approach described here embodies the essence of adaptive

management:  a continual cycle of hypothesis – feedback – adjustment."); *id.* at 13 ("Significant

changes in Alaska's manufacturing capacity, product mix, or competitive position, may warrant

revision and reconsideration of the long-range harvest projections in the context of overall

management goals.").  Because the Forest Service failed to follow an important requirement, the

"self-correcting" nature of the methodology could not function as designed.  The EIS's reliance

on the misapplied methodology, with no disclosure or explanation, is highly misleading.

Despite the overwhelming documentation in the record of the nearly complete loss of

Japan as a market for Tongass wood products, and of the enormous effect this structural change

has on market demand for those products, the Threemile EIS ignores the issue completely.  This

is true even though the EIS states that its purpose is to meet the market demand for timber,

relying expressly on the Brooks and Haynes projections and the Morse methodology.  *See* Plf.

Br. at 14-16.  To cite these authorities as establishing the need for the project without disclosing

the abundant evidence in the record undercutting this conclusion renders the EIS extremely

misleading, in violation of NEPA.

Organized Village of Kake, et al. v.
United States Forest Service, et al.,
J04-0029 CV (JKS)

9

C.    <u>Domestic markets have not replaced the Japanese markets</u>.

For the most part, Defendants simply ignore the loss of the Japanese market in their briefs.  Federal Defendants address it only in the last half of a paragraph at the top of page 17 of their brief.[6]  Citing two documents, they assert that "Alaska has developed new markets in the Lower 48 due to the relatively robust U.S. housing construction market" and that "Tongass producers have found unique market niches in the domestic market for specialty products…."  Fed. Opp. at 17.  The unstated implication is that the domestic market has filled the void left by the loss of the Japanese market.  There are two problems with this argument.

First, it is not supported by the record citations, or by anything else in the record.  The first document cited to support the assertion is page 3-253 of the 2003 Wilderness FSEIS, Fed. Exh. 6 at 5.  The complete paragraph to which Defendants apparently refer provides as follows:

> There are a number of reasons for this shift [from Japanese exports] including Japan's lagging economic performance, the relatively robust U.S. housing construction market, and the structural changes that have occurred in the Japanese wood products and construction sectors.  Solid-wood products from the west coast of North America, traditional mainstays of the wood housing construction materials market in Japan, have increasingly given way to composite and engineered wood products—products that are not currently produced in Southeast Alaska.  New competitors have also entered the Japanese market, most notably the Europeans, who have dramatically increased their market share over the last decade.  In the past Japan provided a lucrative market for Tongass National Forest products, especially those at the higher end of the quality spectrum.  The U.S. market places less of a premium on particular species and

---

[6] Defendants correctly point out that Brooks and Haynes assumed that low-grade wood may be left as logging residue and that the decline in North America's overall share of the Japanese market was not great enough to trigger a revision of the market demand projections under the Morse methodology.  *See* Fed. Opp. at 16-17.  While neither of these factors, by themselves, would trigger a requirement to revise the Brooks and Haynes forecasts, they do provide further evidence of weakness in the markets.  In contrast, the loss of Japan as a market specifically for Tongass wood products substantially deviates from a key Brooks and Haynes assumption and, by itself, triggered the Morse requirement to revise the demand forecasts.

---

Organized Village of Kake, et al. v.                    10
United States Forest Service, et al.,
J04-0029 CV (JKS)

grades, and, as a result, generally offers lower prices for Tongass products.  Prices
for all of the species harvested on the Tongass have declined considerably  over
the last five years (USDA Forest Service, 2002a).

Fed. Exh. 6 at 5.  This paragraph is about the substantial loss of the Japanese market and the

lower prices available in the U.S.  The reference to "the *relatively* robust U.S. housing market,"

in context, clearly means that it is robust relative to the Japanese market.  Nothing in this

paragraph states or implies that domestic markets have replaced the former markets in Japan.

Indeed, the paragraphs immediately following the quoted discussion suggest just the opposite.

The next paragraph begins, "These changes in demand and prices have had significant effects on

the Southeast Alaskan wood products industry and the profitability of the remaining facilities."

*Id.*  After discussing the low utilization rates of the existing mills and various bankruptcies and

mill closures, it concludes, "While it is possible that uncertainty regarding the stability of future

supplies of Federal timber in the region may have helped discourage investment, a number of

other changes, primarily market-related, have also had significant effects on the region's timber

industry."  *Id.* at 7.  In short, this record document does not support Defendants' argument at all,

and in fact significantly undercuts it.

    The only other document cited by Federal Defendants apparently to imply that domestic

markets have replaced Japanese markets is the 2003 Timber Supply and Demand Report,

prepared under section 706(a) of ANILCA.  *See* Fed. Opp. at 17 (citing Fed. Exh. 7 at 3 & 12).

That document does not help them any more than the Wilderness FSEIS.  The complete

discussion to which they apparently refer on page 3 provides:

>    This shift [from Japanese to domestic markets] entails a loss of export premiums
> previously associated with the Japanese market, but there are also *potential*
> market *opportunities* as local producers gain more experience with U.S. markets,
> and U.S. consumers learn more about the Southeast Alaska's wood products.
> Local producers are *exploring* product differentiation and niche marketing
> *opportunities*.

Organized Village of Kake, et al. v.                11
United States Forest Service, et al.,
J04-0029 CV (JKS)

Fed. Exh. 7 at 3 (emphasis added).  Similarly, the discussion of this topic at the other page cited

by Federal Defendants provides:

> Southeast Alaska generally has old, low-tech, low-productivity equipment.
> Alaska is not particularly well positioned to compete in the world marketplace for
> commodity goods.  Viable *options* are niche products and import substitution (i.e.,
> making products in Alaska for local consumption and substituting them for
> products currently imported). … Niche products are an *option* for Alaska wood
> products producers.  Niche products unique to Alaska *could* include yellow cedar
> structural elements, hemlock and spruce millwork and structural elements,
> musical instruments components, and alder, cottonwood, and birch furniture and
> interior woodwork.  The U.S. Forest Service Alaska Wood Utilization Research
> and Development Center was established in 1999, in part to *explore* such
> *possibilities*. …
>
>   Crone (2004) states that wood product manufacturers remaining in
> Southeast Alaska have survived by finding niche markets for at least *some* of their
> products. …

*Id.* at 12 (emphasis added).  This discussion proceeds to the following conclusion two pages

later:  "On the demand side, shrinking markets in Japan and competition from producers in other

regions mean that traditional sources of profit have largely evaporated.  At the same time,

though, new market *opportunities* are currently being *explored*."  *Id.* at 14 (emphasis added).

     In short, the only record documents on which Federal Defendants rely actually undercut

the agency's position and support Plaintiffs' position.  They state that the Japanese market,

formerly important as a source of profit for Tongass timber products, has largely disappeared and

not been replaced, and that Alaska is not well-positioned to compete in the global marketplace

for commodity products.  They state that local producers are "exploring" "potential"

"opportunities" or "options" for niche products, but with only limited success by surviving

manufacturers for "some" products to date.  Nothing in the record supports the assertion in the

government's brief that domestic markets have replaced Japanese markets or that it is

unnecessary to comply with the requirement of the Morse methodology to revise the demand

Organized Village of Kake, et al. v.                    12
United States Forest Service, et al.,
J04-0029 CV (JKS)

forecasts to reflect the dramatic shift in markets. In fact, they show just the opposite: that the loss of the Japanese markets has had an enormous impact on demand and prices for Tongass wood products.

The second flaw with the Federal Defendants' assertion that domestic markets have replaced Japanese markets is that, even if it were possible to construct an argument that this were true, it would not excuse the Forest Service from its NEPA obligation to disclose the existence of substantial evidence to the contrary. The record is overflowing with data and analysis demonstrating that the Japanese market has largely disappeared, that it has not been replaced, and that this structural change has had an enormous impact on market demand for Tongass wood products and on the timber industry. *See supra* pp. 4-6, 10-12. NEPA requires agencies to disclose uncertainties in their data and responsible opposing viewpoints. *See*, *e.g.*, *The Lands Council v. Powell*, 395 F.3d 1019, 1031-32 (9th Cir. 2005) (holding EIS inadequate where Forest Service failed to disclose shortcomings in watershed model); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167-69 (9th Cir. 2003) (holding EIS inadequate where Forest Service failed to disclose responsible opposing viewpoints of agency experts on goshawk habitat); *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 703-05 (9th Cir. 1993) (holding EIS inadequate where Forest Service failed to disclose uncertainties regarding spotted owl impacts, including credible opposing view of report prepared for U.S. Fish & Wildlife Service). In *Seattle Audubon Society*, for example, where there was a credible scientific report calling the agency's strategy into question, the court noted, "Even if the Forest Service concludes that it need not undertake further scientific study regarding owl viability and the impact of further habitat loss, the Service must explain in the EIS why such an undertaking is not necessary or feasible." 998 F.2d at 704. The same reasoning applies here. Even if the Forest Service believes that domestic

Organized Village of Kake, et al. v.                    13
United States Forest Service, et al.,
J04-0029 CV (JKS)

markets have replaced the Japanese markets, there is so much evidence to the contrary in the record that the Forest Service is required to disclose the competing evidence and explain its position in the EIS.

      D.      <u>Supply constraints do not explain the dramatic decline in logging on the Tongass.</u>

Both the Forest Service and AFA devote much of the briefing to arguments that supply constraints caused by litigation and administrative actions, rather than a decline in market demand, caused the enormous drop in logging levels subsequent to 2000. There are several problems with this argument.

First, as Defendants themselves point out, logging levels themselves are not the issue in this case. There is no dispute that logging levels plummeted as soon as the last of the long-term contract timber was logged, *see* Plf. Br. at 6-7, and it is certainly possible that this decline may have had multiple causes. The issue in this case is whether the Forest Service could permissibly refuse to disclose in its EIS the loss of the Japanese markets subsequent to the Brooks and Haynes projections, or the impact of that loss on market demand.

Second, expert Forest Service analysis in the record makes clear that supply constraints do not explain the decline in the timber industry, but that the industry faces a problem of greatly diminished demand. Two years in a row, in the agency's annual report to Congress on timber supply and demand, the Forest Service wrote, "Both supply and demand present challenges for the region's timber sector as it is currently configured." Plf. Exh. 19 at 6; Fed. Exh. 7 at 6. Citing the fact that many Tongass timber sales were going unsold and that volumes under contract remained stable, the agency concluded that "a simple lack of volume supplied by the [Tongass National Forest] is not the reason for recent harvest declines." Plf. Exh. 19 at 10-11; *see also* Fed. Exh. 7 at 10-11. The agency drew the same conclusion in the 2003 Wilderness

Organized Village of Kake, et al. v.      14
United States Forest Service, et al.,
J04-0029 CV (JKS)

FSEIS, explaining, "While it is possible that uncertainty regarding the stability of future supplies of Federal timber in the region may have helped discourage investment, a number of other changes, primarily market-related, have also had significant effects on the region's timber industry." Fed. Exh. 6 at 7. There is no analysis in the record supporting a conclusion that supply constraints alone, or even primarily, caused the sharp drop in logging volumes.

This only stands to reason. If it were true that demand remained high while restrictions in timber supply prevented the industry from meeting this demand, then prices should rise in the face of competitive bidding for the restricted supply and existing volumes under contract should be rapidly depleted. Instead, prices *fell*,[7] competitive bidding on timber sales virtually ceased,[8] volume under contract remained relatively stable,[9] and a substantial volume of uncut timber already under contract was first extended and then canceled due to the lower prices available for

---

[7] *See*, *e.g.*, Fed. Exh. 7 at 11 ("When seen in contrast to the high prices common in the 1990s, current prices indicate a significant softening of demand for Southeast Alaskan and other Pacific Northwest wood products, particularly at the upper end of the market"); Plf. Exh. 19 at 11 (same); Extension of Certain Alaska Timber Sale Contracts, 67 Fed. Reg. 51,165, 51,166 (Aug. 7, 2002) (citing long-term price declines as basis for extending timber sale contracts beyond normal terms) (attached as Plf. Exh. 36). The Court is required to take judicial notice of Federal Register publications. *See supra* note 4.

[8] *See*, *e.g.*, First Am. Compl. ¶¶ 77-82 (filed June 24, 2005) (Docket No. 36); Fed. Def.'s Answer to First Am. Compl. ¶¶ 77-82 (filed June 30, 2005) (Docket No. 37) (admitting that the large majority of timber sale offerings in 1998-2003 received only one bid or no bids at all); Fed. Exh. 7 at 10 ("a significant proportion of the timber the Forest Service has offered from the Tongass National Forest in the past several years has gone unsold").

[9] *See*, *e.g.*, Fed. Exh. 7 at 10 (citing "[r]elatively stable volumes under contract"); Plf. Exh. 19 at 10-11 (same). The Federal Defendants cite raw numbers from the same report for the assertion that the volumes under contract were volatile, *see* Fed. Opp. at 17, but this contradicts the assessment of the experts who wrote the report and found them relatively stable. *See* Fed. Exh. 7 at 10. In fact, the report specifically cautioned that the volume ratios cited in the government's brief "are potentially misleading." *Id.* at 9.

---

Organized Village of Kake, et al. v.                  15
United States Forest Service, et al.,
J04-0029 CV (JKS)

wood products.[10]  These undisputed facts are entirely inconsistent with the theory that a

constraint in timber supply was a major factor causing the decline of logging levels on the

Tongass.

 Moreover, most of the circumstances cited by Defendants as evidence of supply

constraints are not supported by the record and do not withstand analysis.  For example, they cite

the Roadless Area Conservation Rule, adopted by the Forest Service in January 2001.  The main

flaw in this argument is that the rule was in effect in the Tongass for only about seven months,

from December 12, 2002, until July 14, 2003.[11]  Federal Defendants assert that the Forest

Service "set aside a number of projects in the NEPA process" because of this rule, Fed. Opp.

at 13, but there is no evidence to support this assertion.  The only authority cited for it contains

no such statement.  *See* Fed. Exh. 1 at 23, *cited in* Fed. Opp. at 13.  Even if a project had been set

aside for as long as the seven months the rule was in effect, there is no evidence that this delay

caused any constraint in the timber supply.

 The same is true of the allegation as to *NRDC I*.  That case was filed on December 9,

2003, during the federal fiscal year 2004.  *See* Plaintiffs' Notice of Related Cases at 1 (filed Nov.

---

[10] *See* Plf. Exh. 36 at 2-3 (extending terms for Tongass timber sale contracts due to poor markets); Plf. Exh. 18 (offering timber sale cancellations due to poor markets); Plf. Exh. 23 (list of canceled sales).

[11] The newly-inaugurated Bush Administration initially postponed the effective date of the rule until May 12, 2001.  *See Kootenai Tribe of Id. v. Veneman*, 313 F.3d 1094, 1106 (9th Cir. 2002).  Before it could take effect, however, a federal district court in Idaho enjoined its application.  *See id.* at 1107.  The Ninth Circuit reversed this injunction on December 12, 2002, allowing the rule to go into effect for the first time.  *See id.* at 1126.  However, on July 14, 2003, a district court in Wyoming enjoined the rule again.  *See Wyoming v. USDA*, 414 F.3d 1207, 1211 (10th Cir. 2005).  In December 2003, the Bush Administration adopted a temporary exemption to the rule for the Tongass, which remains in effect today.  *See* 68 Fed. Reg. 75,136 (Dec. 30, 2003); *see also* Fed. Exh. 1 at 23.

Organized Village of Kake, et al. v.   16
United States Forest Service, et al.,
J04-0029 CV (JKS)

12, 2004) (Docket No. 2) (citing *Natural Res. Def. Council v. U.S. Forest Serv.*, No. J03-029 CV (JKS) (filed Dec. 9, 2003)).  That litigation could not have had any impact on the supply or demand considerations relevant to the Threemile decision.  The Threemile Record of Decision (ROD) was signed in April 2004, about halfway through FY 2004 and before the start of the 2004 logging season.  *See* Plf. Exh. 21 at 25.  Thus, the very latest data regarding supply, demand, and logging levels available in the record at the time of this decision was for FY 2003, before *NRDC I* was filed.  Moreover, the first injunction in that case was not entered until October 18, 2004, six months after the Threemile ROD was signed.  As documented throughout this brief and Plaintiffs' Opening Brief, the loss of the Japanese market and resulting decline in market demand was well established by FY 2003, before *NRDC I* was filed.  To the extent that case had any impact on timber supply, it could not have been relevant to the facts in this record.[12]

The only evidence that litigation or administrative actions had any effect on timber supply relevant to this case relates to the injunction in *Sierra Club v. Rey*.  The 2003 supply and demand report states that the injunction in that case had some unspecified impacts on timber supply in 2002 and 2003.  *See* Fed. Exh. 7 at 8.  However, the same report concludes two pages later that "a simple lack of volume supplied by the Tongass National Forest is not the sole reason

---

[12] Federal Defendants also cite Fed. Exh. 5 for the proposition that the alleged supply constraints forced the agency to reoffer repeatedly sales that no one wanted to buy.  *See* Fed. Opp. at 14. However, Fed. Exh. 5 is a 2006 document that is not in the administrative record and could not have been relevant to the agency's 2004 decision at issue in this case.  It appears intended to demonstrate facts about recent timber sale offerings that are not relevant to this case.  Federal Defendants have failed to disclose that this document is not in the record, nor have they carried their burden of demonstrating why the Court should consider it.  There being no apparent reason why this document should be considered, the Court should disregard it.  *See supra* note 1.

Organized Village of Kake, et al. v.          17
United States Forest Service, et al.,
J04-0029 CV (JKS)

for recent harvest declines." *Id.* at 10.  Thus, the record does not support the contention that litigation was a major factor causing reduced logging levels.

Defendants make much of the fact that demand forecasts are necessarily subject to uncertainty and that timber markets are volatile.  *See* Fed. Opp. at 3, 12, 17.  However, it is undisputed that the agency relied on these demand forecasts to justify its decision in this case. *See* Plf. Br. at 14-16.  The mere fact that future market conditions are necessarily uncertain does not excuse the Forest Service from disclosing known structural changes in markets that, according to the agency's own experts, have a dramatic impact on market demand and require revision of the demand forecasts on which the agency relied.

In a similar vein, Federal Defendants assert that it is better to offer too much timber than too little.  *See* Fed. Opp. at 2, 5.  This assertion misstates both the record and the agency's legal obligations, and it ignores NEPA's duty of disclosure.  It misstates the record, because the assessment on which this statement is based is more limited than Defendants' broad assertion.  It states, "*In terms of short-term economic consequences*, over-supplying the market is less damaging than under-supplying it."  Plf. Exh. 7 at 33 (emphasis added), *cited in* Fed. Opp. at 5. Thus, the statement addresses only the narrow purpose of short-term economic consequences.

The agency is required by law to take a broader view, taking into account not only the short-term economic consequences of its actions, but also the impacts to other uses of the forest in both the short and long term.  The market demand provision of the Tongass Timber Reform Act (TTRA) "envisions not an inflexible harvest level, but a balancing of the market, the law, and other uses, including preservation."  *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 731 (9th Cir. 1995).  When the Forest Service offers too much timber for sale, places important for other uses, including Threemile Arm, are put unnecessarily at risk.

---

Organized Village of Kake, et al. v.                 18
United States Forest Service, et al.,
J04-0029 CV (JKS)

The demand could be met without entering roadless areas or areas important for subsistence and other uses. Thus, the statement that too much timber is better than too little misstates the agency's legal obligation to balance other uses of the forest.

Most importantly, if the agency's intent was to disregard the substantial evidence of market decline and the corresponding requirements of the Morse methodology, and, instead, to err on the side of over-supplying the market, the Threemile EIS is highly misleading. It states that the purpose of the project is to meet the market demand as determined by Brooks and Haynes and by the Morse methodology, not to over-supply the market. *See* Plf. Br. at 14-16.

II.  THE FAILURE TO CONSIDER THE DECLINE IN MARKET DEMAND RENDERS ARBITRARY THE "NECESSARY" FINDING UNDER ANILCA SECTION 810.

    A.  Both parts of the "necessary" finding are invalid.

There were two bases for the Forest Service's finding that the significant restriction to subsistence uses resulting from the Threemile project was "necessary" under ANILCA section 810: (1) implementing the forest plan, and (2) meeting "TTRA direction." Defendants cannot and do not dispute that the first of these reasons is invalid, since the plan has been held arbitrary. Instead, they assert that the finding can be upheld purely on the basis of the second prong, meeting "TTRA direction." *See* Fed. Opp. at 19. This argument fails.

First, the "TTRA direction" prong is also invalid, because, as discussed throughout this brief and Plaintiffs' Opening Brief, the agency failed to address the substantial changes to timber markets subsequent to the Brooks and Haynes projections on which the finding is based.

Moreover, even if the TTRA market demand assertions were sound, the "necessary" finding would be arbitrary because of the inadequacy of the forest plan. The plan is invalid because it designated too much land for logging based on a mistaken doubling of the market

Organized Village of Kake, et al. v.
United States Forest Service, et al.,
J04-0029 CV (JKS)

19

demand forecasts.  *See Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 806-10 (9th

Cir. 2005).  Had the Forest Service adopted a reasoned plan based on a sound assessment of

market demand, the agency would not have had to designate so much land for logging, and vital

places like Threemile Arm could (and, Plaintiffs believe, should) have been protected.  By

avoiding the places with the greatest subsistence values, such a plan might have greatly reduced

or eliminated any significant restrictions to subsistence uses.[13]  Thus, even if there were

sufficient market demand to justify a timber sale project the size of Threemile, satisfying the

"TTRA direction" prong of the finding, it is not possible to support a finding that a significant

restriction to subsistence uses is "necessary" in the absence of a sound forest plan.

Federal Defendants base their argument to the contrary entirely on *Roosevelt Campobello*

*International Park Commission v. U.S. EPA*, 684 F.2d 1041, 1046 (1st Cir. 1982), *see* Fed. Opp.

at 19, but this case does not help them.  Under the particular facts of that NEPA case, where

there were multiple purposes for an EIS, the continued validity of one of them was sufficient to

uphold the EIS.  *See id.*  It does not state a universal rule of law, and, for the reasons discussed

above, it does not apply to the facts of the present case.

Federal Defendants accuse Plaintiffs of misstating the basis for the "necessary" finding,

but it is Defendants who have misstated it.  The finding, as quoted by Federal Defendants

themselves, provides:

---

[13] The Forest Service points out that most of the Tongass is used for subsistence, and that it is not possible to move timber sales without affecting other communities.  *See* Fed. Opp. at 9 (quoting Plf. Exh. 21 at 19-20).  While it is true that most of the Tongass is used for subsistence, it is not used *evenly*.  Rather, subsistence use is concentrated within known community home ranges. *See* Plf. Exh. 37 at 2.  Thus, not all timber sales have the same impact on subsistence uses, and not all are found to cause significant restrictions.

---

Organized Village of Kake, et al. v.                20
United States Forest Service, et al.,
J04-0029 CV (JKS)

> As described in Appendix A of the FEIS, the Selected Alternative is necessary as a component of the timber management program designed to implement the Forest Plan and to meet TTRA direction. There is currently a market demand for timber, a limited timber supply from other sources, and an under-utilized mill capacity in the region. The volume from the Selected Alternative is a component of the 10-year timber sale schedule, which attempts to provide timber to industry in an even-flow over the planning cycle. The Selected Alternative can help meet the Forest Plan and TTRA objectives, while also providing reasonable protection measures for forest resources….

Plf. Exh. 21 at 19, *quoted in* Fed. Opp. at 20. Federal Defendants focus exclusively on the second sentence, arguing that the entire finding is based on the three factors in that sentence and not on Brooks and Haynes or on the Morse methodology. *See* Fed. Opp. at 20-21. This argument ignores the full context of the sentence and would lead to an illogical result.

The context of the sentence is that it is both preceded and followed by sentences describing a broader timber sale program designed to meet the goals of the forest plan and the TTRA, "[a]s described in Appendix A." Plf. Exh. 21 at 19. There is no dispute in this case that this timber sale program for the Tongass, as described in the Threemile EIS Appendix, was based on both Brooks and Haynes and the Morse methodology. *See* Plf. Br. at 14-16.

Moreover, the facts asserted in the second sentence, by themselves, could not possibly justify a finding that a significant restriction of subsistence uses is "necessary." The existence of some indeterminate level of market demand, the limited supply from other sources, and the under-utilized mill capacity in the region are simply facts of life in the Southeast Alaska timber industry. If those facts alone were sufficient to satisfy the requirements of the ANILCA finding, then the Forest Service could offer an unlimited number of timber sales from any place in the forest, regardless of actual demand and regardless of the severity of impacts to subsistence uses, and all the sales and their accompanying restrictions to subsistence would be "necessary." This would render the finding and the statute meaningless. The assertions in this sentence make sense

---

Organized Village of Kake, et al. v.
United States Forest Service, et al.,
J04-0029 CV (JKS)

21

only if they are bounded by an assessment of actual market demand and by the limits of a balanced, valid forest plan. In this case, however, for the reasons discussed above and in Plaintiffs' Opening Brief, both the assessment of market demand and the forest plan are fundamentally flawed.

      B.    <u>Federal Defendants' other assertions about subsistence are irrelevant and/or demonstrably wrong</u>.

In their exposition of background facts, Federal Defendants make a series of assertions about their ANILCA section 810 finding that are irrelevant and in some instances flatly wrong. None of these pronouncements addresses the fatal deficiency in the section 810 finding, *i.e.*, the disconnect between the agency's record and its conclusion that the conceded restriction of subsistence uses is "necessary" within the meaning of the statute. Because Federal Defendants' brief does not, for good reason, attempt to base a legal argument on these assertions, the Court can and should simply ignore them. However, to ensure they do not mislead the Court, Plaintiffs address them briefly here.

First, the agency wrongly asserts that there is "no possibility of a significant restriction on deer from *the project itself*." Fed. Opp. at 7 (emphasis in original). Federal Defendants cite no support for this assertion. The agency found that the cumulative impacts of past, present, and future planned logging will cause a significant restriction to subsistence uses in the area. The Forest Service did not make a finding to address the hypothetical impacts of the project isolated from the reality of the extensive past logging. No dispute exists that the proposed liquidation of additional prime habitat will further reduce deer population levels and therefore affect hunting effort. *See*, *e.g.*, Plf. Exh. 2 at 5. Because nothing in the record shows that this additive impact will not be significant, the claim that there is "no possibility" of such an outcome is baseless.

Organized Village of Kake, et al. v.      22
United States Forest Service, et al.,
J04-0029 CV (JKS)

Jumping to the other extreme, Federal Defendants assert that even the "no action" alternative for the Threemile project—in other words, no logging—would significantly restrict subsistence uses. *See* Fed. Opp. at 7, 20. The basis for this statement is the view that cumulative impacts of all logging, past, present, and future, would still add up to a significant restriction even if Threemile is not now logged. *See* Plf. Exh. 21 at 19. Again, however, no dispute exists that the Threemile project itself will reduce prime deer habitat and thereby further restrict subsistence uses.

Federal Defendants further assert that the admitted restriction is principally attributable to human population growth projections that have not materialized. *See* Fed. Opp. at 7. This ignores the undeniable fact that a smaller number of deer in the woods requires greater hunter effort per deer taken, even given somewhat fewer than projected hunters. Thus, even if the human population does not grow at all, the reduction in deer habitat caused by logging will restrict subsistence uses by requiring hunters to spend more time finding fewer deer.

The government attempts to minimize the impact on Kake by asserting that few deer are taken on Kuiu Island. *See* Fed. Opp. at 7-8. Plaintiffs addressed this issue at length in their opening brief. *See* Plf. Br. at 3-5. The reason for this is that deer numbers declined sharply in the early 1970's due to abnormally deep snow and wolf predation. *See id.* at 4. The extensive logging that occurred in subsequent years destroyed an enormous amount of valuable deer habitat, greatly hindering the recovery of the deer populations. *See id.* at 4-5. This history, illustrating with the cultural importance of Kuiu Island to the residents of Kake, makes it all the more important to protect the habitat that remains. ANILCA protects the cultural aspects of subsistence living as much as the absolute numbers of animals, a fact the Forest Service almost completely ignores. *See Native Vill. of Quinhagak v. United States*, 35 F.3d 388, 394-95 & n.5

Organized Village of Kake, et al. v.                                23
United States Forest Service, et al.,
J04-0029 CV (JKS)

(9th Cir. 1994) (reversing denial of preliminary injunction where district court focused on whether people were starving rather than on the cultural aspects of subsistence living).

Federal Defendants also argue that the logging in the Threemile project is in the interior, while subsistence hunters normally hunt along the coast, implying that the Threemile logging will not hurt hunting. *See* Fed. Opp. at 8. This misrepresents both hunting patterns and the way deer use the habitat. First, while it is true that hunters normally gain access to an area by boat, they then "walk inland to hunt." *See* Plf. Exh. 20 at 25. Second, deer range widely, so that a reduced number of deer overall means fewer at the shore. *See* Plf. Exh. 2 at 5 ("Sitka black-tailed deer disperse through and use a variety of vegetation communities throughout the year….").

III.    THE COURT SHOULD VACATE THE THREEMILE RECORD OF DECISION.

At the time Plaintiffs filed their opening brief, the Threemile project was one of many at issue in the remand of *NRDC I*, and the parties accordingly agreed to defer the remedy phase of this lawsuit and address it in the context of the *NRDC I* remand. *See* Plf. Br. at 1, 26-27. Subsequently, the parties entered into a settlement agreement that precludes offering the Threemile sale until the Forest Service revises the forest plan. *See* Settlement Agreement ¶ 8 (filed May 23, 2007) (Docket No. 108). The agreement preserves Plaintiffs' right to pursue their site-specific challenges under Counts V and IX, at issue in this briefing. *See id.* ¶ 12.

In light of these facts, Plaintiffs submit that an appropriate remedy at this stage of the case would be to vacate the Threemile ROD and remand to the agency to act in compliance with NEPA and ANILCA, which is the normal remedy under the Administrative Procedure Act. *See*,

Organized Village of Kake, et al. v.                    24
United States Forest Service, et al.,
J04-0029 CV (JKS)

*e.g.*, *S.E. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654-55 (9th Cir. 2007).

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs request that the Court enter judgment for Plaintiffs declaring that the Threemile EIS violates NEPA, declaring that the "necessary" finding under ANILCA section 810 is arbitrary, vacating the Threemile ROD, and remanding to the agency to act in compliance with NEPA and ANILCA.

Respectfully submitted this 13th day of August, 2007,

<div style="margin-left:40%">

 /s/ Thomas S. Waldo

Thomas S. Waldo (ABA# 9007047)
Eric P. Jorgensen (ABA# 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: twaldo@earthjustice.org

Nathaniel S.W. Lawrence
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
Ph: 360-534-9900
Fax: 360-534-9909
Email: nlawrence@nrdc.org

*Attorneys for Plaintiffs*

</div>

Organized Village of Kake, et al. v.          25
United States Forest Service, et al.,
J04-0029 CV (JKS)

**CERTIFICATE OF SERVICE**

I, Thomas S. Waldo, certify that on August 13, 2007, a true and correct copy of PLAINTIFFS' REPLY BRIEF (COUNTS V AND IX), with accompanying documents, was served electronically on Bruce Landon, Steve Silver, and Amy Gurton Mead.


 /s/ Thomas S. Waldo
_____

Thomas S. Waldo

Organized Village of Kake, et al. v.
United States Forest Service, et al.,
J04-0029 CV (JKS)

## TABLE OF EXHIBITS

**Ex. No.**         **Description**

33          Notice of Availability and Request for Comments, Tongass National Forest Timber Demand Considerations, U.S. Forest Service, 63 Fed. Reg. 65573 (Nov. 27, 1998)

34          Notice of Availability, Tongass National Forest Timber Demand Considerations, U.S. Forest Service, 65 Fed. Reg. 18962-63 (Apr. 10, 2000)

35          Volume I: Draft Supplemental Environmental Impact Statement, Roadless Area Evaluation for Wilderness Recommendations, Tongass Land Management Plan Revision, U.S. Forest Service (May 2002) (excerpt)

36          Notice of Extension of Certain Alaska Timber Sale Contracts and Finding of Substantial Public Interest, U.S. Forest Service, Fed. Reg. 67 51165-67 (Aug. 7, 2002)

37          Final Environmental Impact Statement; Tongass Land Management Plan Revision, U.S. Forest Service (Jan. 1997) (excerpt)

_____
Organized Village of Kake, et al. v.
United States Forest Service, et al.,
J04-0029 CV (JKS)