IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ORGANIZED VILLAGE OF KAKE, SOUTHEAST ALASKA CONSERVATION COUNCIL, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, THE WILDERNESS SOCIETY, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>    Plaintiffs,<br><br>vs.<br><br>UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; MARK REY, in his official capacity as Alaska Regional Forester; and FORREST COLE, in his official capacity as Forest Supervisor for the Tongass National Forest,<br><br>    Defendants. | Case No. 1:04-cv-00029 (JKS)<br><br><br>O R D E R |

**INTRODUCTION**

  This is an environmental case in which the Organized Village of Kake and several environmental groups (collectively "Plaintiffs") seek injunctive and declaratory relief requiring the United States Forest Service ("Forest Service") to prepare a supplemental Environmental Impact Statement before authorizing the "Threemile Timber Harvest" on Kuiu Island within the Tongass National Forest. The Forest Service prepared a final Environmental Impact Statement ("FEIS") for the timber harvest and published its Record of Decision ("ROD") in April 2004. Plaintiffs contend that the FEIS and ROD were inadequate because they relied on 1997 market demand projections which Plaintiffs allege were outdated and inaccurate. Plaintiffs further contend that the Forest

Service's subsistence evaluation and finding under Sec. 810 of the Alaska National Interest Lands Conservation Act ("ANILCA") was arbitrary and capricious because the finding was made in reliance on the aforementioned market demand report and the invalidated 1997 Tongass National Forest Land and Resource Management Plan ("TLMP").

Currently before the Court is the Plaintiffs' Opening Brief on the merits of Counts V and IX in this action. Docket Nos. 48 (Brief); 50 (Govt. opp'n); 115 (AFA opp'n); 117 (Reply). Oral argument has been requested by Defendants.[1] Docket No. 119. As all the facts are contained within the administrative record, this Court will treat Plaintiffs' motion at Docket No. 48 as a motion for summary judgment.

## BACKGROUND

The Threemile Timber Harvest at issue in this case proposes to log approximately 665 acres of Kuiu Island, 621 acres of which are located within inventoried roadless areas. Docket No. 48, Ex. 21 at 6 (ROD at 4). Kuiu Island is part of Southeast Alaska's Alexander Archipelago located roughly 20 miles south of Kake within the Tongass National Forest. Docket No. 48, Ex. 20 at 5 (FEIS at 1-3). The harvest will provide approximately 19.5 million board feet ("mmbf") of sawlog and utility volume, and result in the construction of 8.4 miles of new roads and a land-to-barge type log transfer facility. Docket No. 48, Ex. 21 at 6 (ROD at 4).

In April of 2004, the Forest Service published the FEIS and ROD for the Threemile Timber Harvest. Docket No. 48, Exs. 20, 21 (FEIS and ROD respectively). The ROD made it clear that the decision to authorize the project was based at least in part on the Forest Service's need to meet market demand for timber from the Tongass National Forest. As noted in the ROD, the Tongass Timber Reform Act ("TTRA") requires the Forest Service to "provide a supply of timber from the Tongass National Forest which (1) meets the annual market demand for timber from such forest and (2) meets the market demand from such forest for each planning cycle." 16 U.S.C. § 539d(a);

---

[1] The Court has considered this request. After a review of the record, it appears that the parties have sufficiently briefed the issues to the extent that oral argument will not be helpful. See D. Ak. LR 7.2(a)(3); *United States v. Cheely*, 814 F. Supp. 1430, 1436 n.4 (D. Alaska 1992), *aff'd*, 36 F.3d 1439 (9th Cir. 1994).

ORDER

Docket No. 48, Ex. 21 at 19 (ROD at 17). Given this requirement, the Forest Service needed to "seek to provide a timber supply sufficient to meet the annual market demand for the Tongass National Forest and the demand for the planning cycle." Docket No. 48, Exs. 20 at 4 (FEIS at 1-2); 21 at 4 (ROD at 2). The Forest Service explained that the alternative selected for the Threemile Timber Harvest was a necessary part of the overall plan to satisfy the mandate under the TTRA. Docket No. 48, Ex. 21 at 19 (ROD at 17).

In coming to this conclusion, the Forest Service first developed expectations about future timber markets and the resultant demand for Tongass timber. Docket No. 48, Ex. 20 at 14 (FEIS at 3-21), and 33 (FEIS app. A at A-6). The annual market demand is calculated using a planning document, "Responding to the Market Demand for Tongass Timber," which was developed by Forest Service Regional Economist Kathleen Morse and published in 2000. Docket No. 48, Ex. 20 at 33 (FEIS app. A at A-6). The Morse procedure estimates annual market demand based on a host of variables including: installed and operable mill capacity; industry rate of capacity utilization; percent usable wood in average timber sale; share of industry raw material provided by the Tongass; annual consumption of Tongass timber; standard deviation of lead time; desired probability of meeting consumption level; timber inventory requirements; current timber inventory; projected harvest; and inventory shortfalls. *See* Docket No. 48, Ex. 7 at 32-35 (Morse Report at 28-31). Some of these variables, such as the harvest projections for the coming year, are taken directly from long-term demand projections developed by research economists at the Pacific Northwest Research Station ("PNW") and set forth in a report titled "Timber Products Output and Timber Harvests in Alaska: projections for 1997-2010." *Id*. at 12, 32. The so-called 1997 Brooks and Haynes report endeavored to estimate demand for Tongass timber through 2010 while acknowledging that future demand was highly uncertain because of changes in Alaska's forest industry. *Id*. at 12-13.

Based on the Morse procedure, which incorporated variables supplied by the 1997 Brooks and Haynes report, the Forest Service estimated the annual market demand for 2004 as 162 mmbf. Docket 48, Ex. 20 at 14 (FEIS at 3-21). In turn, the Forest Service approved the Threemile Timber Sale to supply 19.5 mmbf toward the annual demand of 162 mmbf. *See* Docket No. 48, Ex. 21 at 7 (ROD at 5).

ORDER

Pursuant to ANILCA, the Forest Service also considered the direct, indirect, and cumulative impacts of the Threemile Timber Harvest on subsistence uses and needs. Docket No. 48, Ex. 21 at 18-21 (ROD at 16-19); 16 U.S.C. § 3120. The Forest Service determined there was a significant possibility of a significant restriction on subsistence uses of deer. Docket No. 48, Ex. 21 at 18 (ROD at 16). However, the Forest Service concluded that the alternative selected for the Threemile Timber Harvest was necessary, involved the minimal amount of public lands required, and incorporated reasonable steps to minimize the adverse impacts on subsistence. *Id*. at 18-21.

After exhausting administrative remedies in November of 2004, Plaintiffs filed a complaint challenging the Threemile Timber Harvest, the overarching 1997 Tongass Land and Resource Management Plan (" TLMP"), and the Forest Service's decision to exempt the Tongass from the Roadless Area Conservation Rule. Docket 1 at 2. Plaintiffs amended their Complaint in June of 2005, eliminating the counts regarding the Roadless Area Conservation Rule. Docket No. 36. The counts regarding the 1997 Tongass TLMP were stayed and eventually dismissed in May of 2007 pursuant to a settlement agreement following the decision in *Natural Res. Def. Council v. United States Forest Serv.*, 421 F.3d 797 (9th Cir. 2005) (*hereinafter* "*NRDC I*"). Docket No. 108. The stay and subsequent dismissal have narrowed this case to the controversy over the Threemile Timber Harvest as alleged in Counts V and IX of Plaintiffs' Opening Brief. Docket No. 48.

## STANDARD OF REVIEW

This action seeks review of the Forest Service's compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq*., and the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3101 *et seq*. Judicial review of an agency's compliance with either NEPA or ANILCA is governed by the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. *See Ocean Advocates v. United States Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2005); *Kunaknana v. Clark*, 742 F.2d 1145, 1151 (9th Cir. 1984).

Pursuant to the APA, agency decisions may be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *United States v. Bean*, 537 U.S. 71, 77 (2002); *High Sierra, Hikers Ass'n v. Blackwell*, 390 F.3d 630, 638 (9th Cir.

ORDER

2004); *Public Util. Dist. No. 1 v. Fed. Emergency Mgmt. Agency*, 371 F.3d 701, 706 (9th Cir. 2004). The arbitrary and capricious standard is appropriate for resolutions of factual disputes implicating substantial agency expertise. *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376 (1989); *Safari Aviation Inc. v. Garvey*, 300 F.3d 1144, 1150 (9th Cir. 2002), *cert. denied*, 538 U.S. 946 (2003); *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000). Review under the standard is narrow and the reviewing court may not substitute its judgment for that of the agency. *See United States Postal Serv. v. Gregory*, 534 U.S. 1, 6-7 (2001). The agency, however, must articulate a rational connection between the facts found and the conclusions made. *See Envtl. Def. Ctr., Inc. v. Envtl. Prot. Agency*, 344 F.3d 832, 858 n.36 (9th Cir. 2003), *cert. denied*, 541 U.S. 1085 (2004); *Midwater Trawlers Co-op v. Dep't of Commerce*, 282 F.3d 710, 716 (9th Cir. 2002).

The case law developing these standards with regard to NEPA is rather robust. Factual disputes implicating substantial agency expertise are reviewed under the arbitrary and capricious standard while legal issues are reviewed under the reasonableness standard. *See Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 964 (9th Cir. 2002). In reviewing the adequacy of an agency's EIS, courts in this circuit apply a "rule of reason" standard, asking "'whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *See Natural Resources Defense Council v. United States Forest* Serv., 421 F.3d 797, 810 n.27 (9th Cir. 2005) (*quoting Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001)). *Center for Biological Diversity v. United States Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003).

## DISCUSSION

Plaintiffs first argue that the Forest Service violated NEPA by relying on the 1997 Brooks and Haynes projections in its 2004 evaluation of the Threemile Timber Harvest. Docket No. 48 at 11. They contend that the Brooks and Haynes projections were outdated and inaccurate, and that the use of the inflated projections caused the FEIS to present to the public a false impression that the timber sale was necessary to meet the requirements of the TTRA. *Id*. Plaintiffs next argue that the

ORDER

Forest Service acted arbitrarily in finding that the restriction of subsistence uses caused by the timber sale was necessary in accordance with ANILCA. *Id*. at 20.

**I - Threemile Timber Harvest FEIS**

NEPA requires federal agencies to "'carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action.'" *NRDC I*, 421 F.3d at 810-11 (*quoting Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005)). This entails taking a "hard look" at the environmental consequences of the proposed action. *Id*. at 811. In order to weigh the environmental considerations, the government must prepare an EIS in which the environmental effects of the proposed action are analyzed by the agency and disclosed to the public. *See* 42 U.S.C. § 4332(2)(C); *NRDC I*, 421 F.3d at 811. The agency need not choose the most environmentally sound alternative; NEPA merely requires that the agency decision be "fully informed and well considered." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).

"Where the information in the initial EIS was so incomplete or misleading that the decisionmaker and the public could not make an informed comparison of the alternatives, revision of an EIS may be necessary to provide a reasonable, good faith, and objective presentation of the subjects required by NEPA." *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1439 (9th Cir. 1988). The Ninth Circuit has recognized that "inaccurate economic information may defeat the purpose of an EIS by impairing the agency's consideration of the adverse environmental effects and by skewing the public's evaluation of the proposed agency action." *NRDC I*, 421 F.3d at 812 (*quoting Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 446-48 (4th Cir. 1996)) (internal quotation marks omitted). The Ninth Circuit has specifically addressed the importance of accurate market demand information to a proper analysis of proposed timber sales in the Tongass National Forest:

> Had the decision makers and public known of the accurate demand forecast for Tongass timber, and the concomitant lower employment and earnings potential, the Forest Service may have selected an alternative with less adverse environmental impact, in less environmentally sensitive areas. Presenting accurate market demand information [is] necessary to ensure a well-informed and reasoned decision, both of which are procedural requirements under NEPA.

ORDER

*Id*. Thus, if it can be shown that the Forest Service presented misleading market demand information, which was significant to its evaluation of the alternatives for the proposed Threemile Timber Sale, this Court must find the FEIS and ROD in this case inadequate. *See Id*. at 813.

Plaintiffs argue that the FEIS presented inaccurate and misleading information because the annual market demand estimate for 2004 was based on the inaccurate and outdated projections of the 1997 Brooks and Haynes report. Docket No. 48 at 11. To make their argument that the 2004 market demand estimate was inflated and misleading, Plaintiffs contend that: (1) the annual market demand estimate was explicitly reliant on the 1997 projections; and (2) the 1997 projects were outdated and inaccurate because of significant changes in the market for Tongass timber. Docket No. 48 at 14-20.

    A.    **Relationship Between the FEIS and the 1997 Projections**

As noted *supra*, the FEIS reported the annual timber offering required to meet market demand for fiscal year 2004 as 162 mmbf. Docket No. 48, Ex. 20 at 14 (FEIS at 3-21). This was derived from the procedure developed by Forest Service Economist Kathleen Morse. *Id*. The Morse procedure in turn relied on the 1997 Brooks and Haynes report to provide harvest projections. Docket No. 48, Ex. 7 at 32 (Morse Report at 28). Specifically, the harvest projections from the 1997 Brooks and Haynes report appear to fix the range of expected timber purchases.[2] *Id*. at 32-33. The Forest Service notes that the Morse procedure is self-correcting in the sense that a low harvest in one year should lower the projected offering the following year. Docket No. 50 at 5. Although the Court can see how a low harvest from the previous year might cause an inventory surplus rather than shortfall, the harvest projection supplied by the 1997 Brooks and Haynes report would simply become the top bound of the range of expected timber purchases rather than the

---

    [2]    Under the Morse procedure, the range of expected timber purchases is defined as the interval between the projected harvest ("$h$") and the projected harvest ("$h$") plus the inventory shortfall ("$i - i_c$"): $[h]...[(i - i_c) + h]$. Docket No. 48, Ex. 7 at 33 (Morse Report at 29). Consequently, the projected harvest figure taken from the 1997 Brooks and Haynes report will always define either the bottom or top bound of the range of expected timber purchases. When the inventory shortfall is positive, the projected harvest will equal the bottom bound, and when there is an inventory surplus making the shortfall negative, the projected harvest will equal the top bound of the range.

ORDER

bottom bound. *See* note 2 *supra*. Given Morse's recommendation that it is better to over-supply than under-supply the market, and that it would be reasonable to set annual offerings at the upper bound of the range to achieve this, the Court is convinced that the annual timber sale will always be at least equal to, if not greater than the projected harvest figures supplied by the 1997 Brooks and Haynes report. The Court thus agrees with Plaintiffs that the market demand information presented to the public and relied upon by the Forest Service was fundamentally tied to the 1997 Brooks and Haynes projections.

        **B.**      **Whether the 1997 Projections Made the FEIS Misleading**

Plaintiffs argue that the FEIS was misleading because the 1997 Brooks and Haynes market demand projections were outdated and inaccurate when the Forest Service relied upon them to compute the annual timber sale for 2004. Docket No. 48 at 16. To support this claim, Plaintiffs point to the discrepancy between actual harvest levels and the 1997 projections, and to changes in the timber market which they argue undermine the basic assumptions on which the 1997 projections were based. *Id*.

In their opening brief, Plaintiffs pointed to the discrepancy between actual harvest levels and the 1997 projections as evidence of shortcomings of the demand projections. *Id*. The Forest Service responded persuasively that the actual harvest levels cannot be a measure of true market demand when the timber supply from the Tongass has been restrained by litigation. Docket No. 50 at 12-15. Plaintiffs rightly counter that the supply problems pointed to by the Forest Service cannot be held up as the sole factor leading to lower actual harvests. Docket No. 117 at 14-19. The Court agrees with both these points; while the supply problems probably do not fully explain the decline in actual harvests, their existence still prevents the decline in actual harvest from being reliable evidence of a concomitant decline in market demand.

Plaintiffs next outline changes to structural assumptions made by the 1997 Brooks and Haynes projections which they argue undermine the accuracy of the projections. Docket No. 48 at 17-20. Specifically, they point to a decline in North America's share of the Japanese softwoods market, an increase in the percentage of Alaskan timber being sold to domestic markets, and the failure of the Alaskan timber industry to find a market for low-grade timber. *Id*.

ORDER

First, Plaintiffs argue that the 1997 projections assumed that new markets would be found for low-grade timber following the closing of the Alaska pulp mills. Docket No. 48 at 18. This market failed to materialize, and the Forest Service began allowing purchasers the option to leave the low-grade materials behind. Docket No. 48, Ex. 12 at 4 (Wilderness SEIS at 3-253). However, Plaintiffs' argument misstates the assumption. The 1997 Brooks and Haynes projections "assumed that alternative markets, either export or domestic, [could] be developed for chips, low-grade saw logs, and utility grade logs," and that "in the absence of markets, low-grade saw logs and utility logs may be left as logging residues." Docket No. 48, Ex. 4 at 8 (Brooks and Haynes Report at 4). Thus, the 1997 projections assumed that the timber industry would find a use for the low-grade timber, or be allowed to leave it as residue and avoid the cost of processing the unmarketable pieces. Therefore, the assumption about low-grade timber was still valid in 2004.

Second, the 1997 projections assumed that North America would continue to supply 70 percent to 76 percent of Japanese softwood imports. Docket No. 48, Ex. 4 at 9 (Brooks and Haynes at 5). Plaintiffs point to the Forest Service's 2003 supplemental EIS on Roadless Area Evaluation for Wilderness Recommendation ("Wilderness SEIS") which acknowledged that North America's share of the Japanese market for softwoods had declined to 61 percent in 1999. Docket No. 48, Ex. 12 at 5-6 (Wilderness SEIS at 3-287-88). The Forest Service acknowledges the decline in market share, but argues that a 9 percent decline "does not represent a structural shift in the market" requiring recalculation of the long-term demand projections. Docket No. 50 at 16. The Forest Service points out that Regional Economist Morse noted this assumption and recommended revising the 1997 projections only if the market share varied significantly by 25 percent in either direction. *See* Docket No. 48, Ex. 7 at 39 (Morse Report at 35). Although North America's share of the Japanese market was clearly shrinking, the Forest Service cannot be seen as arbitrary for relying on the professional economic advice of Morse that the demand model was not particularly sensitive to this variable.

Finally, the 1997 projections assumed that the Japanese market would continue to be the primary destination for Alaskan timber. Docket No. 48, Ex. 4 at 8 (Brooks and Haynes Report at 4). The projections also assumed that the market for Alaskan timber was in transition and that the

ORDER

domestic market would grow in importance, eventually accounting for 15 to 35 percent of Southeast timber production. *Id*. In her recommendations for monitoring and validating the procedure for calculating annual demand, Economist Kathleen Morse recommended that the Forest Service continue to monitor this percentage and to revise the long-term demand estimate "if it can be documented that sales to domestic markets account for more than 35 percent of lumber production." Docket No. 48, Ex. 7 at 38 (Morse Report at 34). Logically, once the domestic market had grown past this point, one would have to question whether the projections based chiefly on demand derived from the Japanese market were still valid. The Forest Service began noticing the shift in the structure of the market:

> Declines in both Japanese import volumes and market prices for Southeast Alaskan logs and lumber are a clear indication of lagging demand for these products in that market.... One result of declining exports to Japan is that Southeast Alaskan producers have come to rely on the domestic market in the lower 48 states to a much greater extent than in the past....

Docket No. 48, Ex. 19 at 11-12. By 2003 at the latest, The Forest Service was aware that the percentage of production from Southeast Alaska going to domestic markets had increased to 72 percent, well above the 35 percent assumption made by Brooks and Haynes. Docket No. 48, Ex. 12 at 6 (Wilderness SEIS at 3-288).

     The Forest Service in effect argues that demand is demand, and that the increase in sales to domestic markets had simply replaced the lost demand from the Japanese market. Docket No. 50 at 17. First, Plaintiffs correctly point out that the record does not support the supposition that domestic demand *had replaced* the lost Japanese demand. *See* Docket No. 117 at 10-14. While the Forest Service was hopeful the Alaskan timber industry could replace lost volume by exploiting domestic markets, this was still speculative. *Id*. While the shift in percentage indicates the domestic market had become more important in defining demand for Alaskan timber, the percentages do not imply that aggregate demand remained the same. Second, The Forest Service's argument runs contrary to the advice and recommendation of its own economist Kathleen Morse. *See* Docket No. 48, Ex. 7 at 38 (Morse Report at 34). At the end of her report, Morse responded to several key issues identified in public comments to her procedure. Docket No. 48, Ex. 7 at 44-47, (Morse Report at 40- 43). In discussing concern over the potential for the procedure to overestimate demand because of its

ORDER

reliance on historical demand data, Morse explained that although there was no way to conclusively determine how historical data would fare in predicting the future, her procedure protected against bad historical data:

> [T]he procedures include a detailed monitoring section that lists the information needed to validate assumptions about the relationships among markets, mill capacity, and operating rates each year. As industry structure, markets, and timber consumption rates change, the procedures will be updated with this new information. The procedures are designed so that, over time, erroneous projections will be systematically accounted for and corrected.

*Id*. at 45. Although these monitoring procedures are in no sense mandatory, the Forest Service has completely failed to offer any sort of rationale for why it failed to follow its own guidance and update the demand projections when it was well aware of the dramatic shift in the structure of the market for Alaskan timber products.

The Court therefore finds that the annual market demand for 2004, based on the 1997 Brooks and Haynes projections was outdated, inaccurate and misleading. The Forest Service's failure to update its demand projections subverted NEPA's purpose of providing decision makers and the public with an accurate assessment of the information relevant to evaluate the Threemile Timber Harvest. Had the Forest Service provided accurate harvest demand figures for its analysis, it may have selected an alternative with less adverse environmental impact, in less environmentally sensitive areas.

**II - Subsistence and Land Use Decision**

Section 810 of ANILCA, 16 U.S.C. § 3120, requires federal agencies, before allowing use, occupancy or disposition of public lands, to evaluate the effect of such use, occupancy or disposition on subsistence uses and needs. 16 U.S.C. § 3120(a). If the agency determines the proposed action will significantly restrict subsistence uses, the agency must give notice of the proposed action and hold a hearing in the vicinity of the area involved. *Id*. Before allowing the use, occupancy, or disposition, the agency must also make a determination that:

> (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.

ORDER

*Id*.  Finally, if the agency is required to prepare an EIS under NEPA, the evaluation and findings are required to be incorporated into the NEPA process.  16 U.S.C. § 3120(b).

In *Hoonah Indian Ass'n v. Morrison*, 170 F.3d 1223 (9th Cir. 1999), the Ninth Circuit interpreted the meaning of the "necessity" finding.  The court admonished that the word "necessary" does not stand outside of a context, subject to definition only by a dictionary.  *Hoonah*, 170 F.3d at 1227.  Rather, the subsistence provision of the statute says "necessary, consistent with sound management principles for the utilization of public lands."  *Id*. (*quoting* 16 U.S.C. § 3120(a)(3)(A)).  A significant restriction of subsistence uses might not be necessary to achieve compliance with law, yet necessary to conform to sound management principles for such "utilization."  *Id*.  If so, the statutory language would make it necessary.

In *Hoonah*, the court upheld the agency's finding that a timber sale was "necessary, consistent with sound principles for the management of the public lands" because "a substantial component of the economy of Southeast Alaska is dependent on a viable timber industry," and "there is a clear need" for the sale in order to "come closer to the objective of providing a three-year supply of timber to the existing dependent industry."  *Id*.  The court rejected the argument that an activity is not necessary unless it is required by law.  *Id*.

In this case, Plaintiffs argue that the Forest Service's finding that the Threemile Timber Sale was necessary is arbitrary and capricious because both the TLMP and the market demand calculation on which the finding was based were arbitrary.  Docket No. 48 at 21-22.  The Forest Service argues that its finding was not arbitrary because it was based on the existence of a market demand for timber.  Docket No. 50 at 19-20.

As the 1997 TLMP was held arbitrary by the Ninth Circuit in *NRDC I*, and this Court has already found the market demand calculation used in the FEIS arbitrary, the foundation for the Forest Service's subsistence finding has washed away.  Consequently, the Court agrees with Plaintiffs that the subsistence analysis and finding must be redone along with the FEIS and ROD.

/////

/////

/////

ORDER

**IT IS THEREFORE ORDERED**

The Motion at **Docket No. 48**, treated as a motion for summary judgment, is **GRANTED**. The Motion for oral argument at **Docket No. 119** is **DENIED**.  The Forest Service violated NEPA by presenting misleading and inaccurate information in its FEIS and ROD for the Threemile Timber Harvest.  By failing to update its long-term demand projections even after it was aware of the tremendous structural shift in the Alaskan timber industry, the Forest Service failed to follow its own expert advice and thereby acted arbitrarily.  The Forest Service's subsistence determination under ANILCA was also arbitrary because it too ultimately relied upon the inaccurate and misleading market demand figures for its justification.  The 2004 FEIS and ROD for the Threemile Timber Harvest are vacated.  The Forest Service is hereby enjoined from offering the Threemile Timber Harvest for sale until it has updated its long-term market demand projections and complied with its NEPA and ANILCA duties based on the updated projections.

The Clerk shall enter judgment accordingly.

Dated this 26th day of September 2007.

/s/ James K. Singleton, Jr.
**JAMES K. SINGLETON, JR.**
United States District Judge

ORDER